**No. 25-6042**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

INNOVATIVE HEALTH, LLC,

*Plaintiff-Appellee*,

v.

BIOSENSE WEBSTER, INC.,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Central District of California, No. 8:19-cv-01984-JVS, Hon. James V. Selna

# APPELLANT'S OPENING BRIEF


M. Sean Royall
Jacob George Mathew
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

William F. Cavanaugh, Jr.
Isaac J. Weingram
PATTERSON BELKNAP
WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

Paul J. Watford
KING & SPALDING LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
(213) 443-4355
pwatford@kslaw.com

Ross E. Elfand
Casey Marie Berger
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
(212) 556-2100

*Counsel for Appellant*


February 17, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 6

STATEMENT OF THE ISSUES .......... 6

STATEMENT OF THE CASE .......... 7

I. Factual Background .......... 7

A. Cardiac Mapping Systems .......... 7

B. The Competitive Landscape for Cardiac Mapping Systems .......... 9

C. Price Competition for Cardiac Mapping Systems .......... 12

D. Reprocessed Catheters .......... 14

E. Implementation of Biosense's Clinical Support Policy .......... 15

1. Reprocessor free-riding .......... 15

2. Biosense's clinical support policy .......... 19

3. Hospitals' awareness of the policy .......... 22

II. Procedural History .......... 25

A. Innovative's Lawsuit .......... 25

B. The First Appeal .......... 26

C. *Daubert* Motion Following Remand .......... 27

D. Jury Trial .......... 28

E. Post-Trial Proceedings ........ 29

SUMMARY OF THE ARGUMENT ........ 30

STANDARD OF REVIEW ........ 33

ARGUMENT ........ 34

I. Innovative Failed to Prove Its Asserted Tying Market ........ 34

A. Innovative's Overly Narrow Tying Market Is at Odds With the Commercial Realities Shown at Trial ........ 35

B. Innovative Failed to Prove That Clinical Support Is a Distinct Product Separate From the Cardiac Mapping Systems ........ 38

C. Innovative's Evidence Failed to Overcome the Presumption Against Single-Brand Aftermarkets ........ 48

II. Innovative Failed to Prove That Biosense Has Market Power in the Asserted Tying Market ........ 58

A. Biosense Lacks the Power to Control Prices, Restrict Output, or Exclude Competition ........ 59

B. Biosense's Share of CARTO 3 Clinical Support Proves Nothing Regarding Market Power ........ 63

C. The Notable Absence of Facts Demonstrating Customer "Lock-In" Further Underscores Why Biosense Lacks Market Power ........ 66

D. Biosense's Catheter Pricing Likewise Provides No Credible Proof of Market Power ........ 66

III. Innovative's Failure to Disaggregate the Effects of Lawful Competition Invalidates the Jury's Damages Verdict ........ 69

A. Tying Liability Is Barred as a Matter of Law Where the Customer Knowingly Assents to the Challenged Terms and Conditions ........ 69

B. Many Hospitals Knew of the Clinical Support Policy Before Purchasing Their CARTO 3 Systems ........................ 73

C. Innovative's Damages Model Encompassed Lost Sales Attributable to Lawful Competition...................................... 76

CONCLUSION ........................................................................................ 78

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anti-Monopoly, Inc. v. Hasbro, Inc.*,
958 F. Supp. 895 (S.D.N.Y. 1997) .......... 60

*Apple Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) .......... 36, 48

*Avaya Inc. v. Telecom Labs, Inc.*,
838 F.3d 354 (3d Cir. 2016) .......... 73

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .......... 65

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) .......... 34, 58

*City of Vernon v. S. Cal. Edison Co.*,
955 F.2d 1361 (9th Cir. 1992) .......... 69, 70

*Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*,
262 F. Supp. 2d 50 (S.D.N.Y. 2003) .......... 55

*Coronavirus Rep. v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) .......... 35, 50, 58

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
150 F.4th 1056 (9th Cir. 2025) .......... 61

*County of Tuolumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001) .......... 58

*Dang v. S.F. Forty Niners*,
964 F. Supp. 2d 1097 (N.D. Cal. 2013) .......... 49

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .......... *passim*

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) .................................................. 56

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023)........................................................ *passim*

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.*,
786 F.2d 1342 (9th Cir. 1986) .............................................................. 70

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) .............................................................. 72

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ........................................................... 35, 42

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ........................................... 42, 43, 44, 70

*In re ATM Fee Antitrust Litig.*,
768 F. Supp. 2d 984 (N.D. Cal. 2009) .................................................. 48

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
2024 WL 4023561 (N.D. Cal. Aug. 26, 2024)....................................... 68

*Innovative Health, LLC v. Biosense Webster, Inc.* (*Innovative I*),
2024 WL 62948 (9th Cir. Jan. 5, 2024)......................................... *passim*

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) .................................................................................. 58

*Kaplan v. Burroughs Corp.*,
611 F.2d 286 (9th Cir. 1979) ........................................................... 34, 35

*Laidlaw Acquisition Corp. v. Mayflower Grp., Inc.*,
636 F. Supp. 1513 (S.D. Ind. 1986)....................................................... 48

*Lambrix v. Tesla, Inc.*,
737 F. Supp. 3d 822 (N.D. Cal. 2024) .................................................. 52

*Los Angeles Land Co. v. Brunswick Corp.*,
6 F.3d 1422 (9th Cir. 1993) ................................................................. 64

*M.A.P. Oil Co. v. Texaco Inc.*,
691 F.2d 1303 (9th Cir. 1982) .......................................................... 41, 42

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................. 65

*Newcal Indus., Inc. v. IKON Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) ............................................ 27, 35, 49, 72

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) ............................................................................ 38, 62

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) ................................................................. 44

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .................................................................. 71

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ........................................................... 59, 65

*Reese v. County of Sacramento*,
888 F.3d 1030 (9th Cir. 2018) .......................................................... 33, 48

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ........................................... 37, 48

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
532 F.3d 963 (9th Cir. 2008) ................................................................. 59

*Servicetrends, Inc. v. Siemens Med. Sys., Inc.*,
870 F. Supp. 1042 (N.D. Ga. 1994) ....................................................... 42

*Siva v. Am. Bd. of Radiology*,
418 F. Supp. 3d 264 (N.D. Ill. 2019) ..................................................... 46

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999) ........................................................... *passim*

*Suture Express, Inc. v. Owens & Minor Distrib., Inc.*,
851 F.3d 1029 (10th Cir. 2017) ........................................... 59, 60, 62, 64

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
959 F.2d 468 (3d Cir. 1992) .......... 37

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
184 F. Supp. 2d 947 (D. Ariz. 2001) .......... 50

*Wallace v. Int'l Bus. Machs. Corp.*,
467 F.3d 1104 (7th Cir. 2006) .......... 65

**Statutes**

15 U.S.C. § 1 .......... 25

15 U.S.C. § 2 .......... 25

28 U.S.C. § 1291 .......... 6

28 U.S.C. § 1331 .......... 6

28 U.S.C. § 1337(a) .......... 6

28 U.S.C. § 1367(a) .......... 6

Cal. Bus. & Prof. Code § 16720 .......... 25

**Rules**

Fed. R. App. P. 4(a)(1)(A) .......... 6

**Other Authorities**

Areeda, Phillip E. & Herbert Hovenkamp,
Antitrust Law: An Analysis of Antitrust Principles
and Their Application § 1740(c)(8) .......... 51, 53

Br. of Respondents,
*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) (No. 90-1029), 1991 WL 530838 .......... 51

## INTRODUCTION

Appellant Biosense Webster, Inc. was the first to develop and market a cardiac mapping system, a system that allows physicians to create a three-dimensional map of the heart and perform certain treatments to address heart arrhythmias. Biosense's mapping system, the CARTO, was originally introduced to the U.S. marketplace in the 1990s. Other major medical device manufacturers—including Abbott, Boston Scientific, and Medtronic—later introduced their own cardiac mapping systems. There is intense competition among these rival manufacturers for sales of such systems, primarily to hospitals. To promote sales and usage of their respective systems, each manufacturer provides hospitals with skilled personnel, at no charge, to assist physicians in creating readable maps using their systems.

All mapping system manufacturers also supply catheters for use with their systems. Sales of catheters generate 90% of the revenue for mapping system manufacturers, helping fund further innovation and the clinical support services they provide to hospitals without charge. Catheters are designed as single-use devices, but some can be refurbished for repeat usage. Third-party companies have built

independent businesses focused on selling these "reprocessed" catheters, competing against the system manufacturers' own catheters. Appellee Innovative Health, LLC is one such company. It sells reprocessed catheters but not cardiac mapping systems, and it does not provide clinical support services for mapping procedures.

In 2014, in response to growing use of third-party catheters in procedures performed with the CARTO 3 (the current version of Biosense's mapping system), Biosense began to enforce a policy under which it declined to provide clinical support to hospitals for mapping procedures in which another company's reprocessed catheters were to be used. This policy was made applicable to all customer accounts in April 2016.

Innovative took issue with Biosense's clinical support policy and sued on antitrust grounds. After an initial appeal following dismissal of Innovative's claims on summary judgment, *see Innovative Health, LLC v. Biosense Webster, Inc.* (*Innovative I*), 2024 WL 62948 (9th Cir. Jan. 5, 2024), the case was remanded for trial. At trial, the jury sided with Innovative and awarded $147 million in damages, before trebling. The

district court entered judgment and an injunction consistent with the jury's verdict.

Innovative's principal antitrust claim challenges Biosense's clinical support policy as unlawful "tying." Tying involves a refusal to sell one product—the "tying" product—absent the customer's agreement to purchase a separate "tied" product. Such practices can be unlawful where the seller possesses "appreciable economic power" (*i.e.*, "market power") over the *tying* product and uses that power to coerce customers into purchasing *tied* products they would prefer to purchase elsewhere. *Id.* at *1-2. Innovative claimed that Biosense used its supposed market power over clinical support services (the tying product) to coerce hospitals into purchasing Biosense's catheters (the tied products), which allegedly caused Innovative to lose sales and customers to pay "overcharges" for catheters.

Tying violations must involve two distinct product markets—the tying and tied markets. But the starting point is the tying market. Without first proving a well-defined tying market and then establishing that the defendant possesses market power in that market, a tying claim collapses. Here, Innovative failed as a matter of law to prove its

asserted tying market, and also failed to prove that Biosense possesses market power within that market.

Innovative defined the tying market as a market limited to *clinical support services* for mapping procedures performed only with Biosense's CARTO 3 system—a so-called "single-brand market." This market definition is fatally flawed for two reasons. First, clinical support services are not a distinct, standalone product. They are ancillary services that all manufacturers of cardiac mapping systems provide free of charge to their customers as an integral component of the firms' efforts to promote sales and usage of their systems.

Second, this is not one of the rare instances in which a market may permissibly be defined around a single brand's products. That approach can be justified where purchasers of costly durable equipment are effectively "locked-in" to continued use of one manufacturer's products. But this requires proof, among other things, that switching to an alternative supplier would be prohibitively costly, leaving customers vulnerable to abusive pricing for "aftermarket" goods or services. The trial record does not support this contention. To the contrary, hospitals desiring to switch can easily cover the costs of acquiring mapping

systems from alternative suppliers; indeed, most hospitals already have more than one manufacturer's mapping system installed and available for use, making switching across systems particularly easy.

Even within a market narrowly defined to encompass only clinical support services for CARTO 3 mapping procedures, Innovative failed to prove market power. Innovative placed heavy emphasis on Biosense's alleged high market share—that is, the share of CARTO 3 mapping procedures for which Biosense provides clinical support. However, a defendant's market share alone is insufficient to prove market power where, as here, the firm has no ability within that market to control prices, restrict output, or exclude competition. Nor are there other persuasive indicia of market power in the record of this case.

Innovative's failure to prove the asserted tying market and its failure to prove market power require reversal of the judgment. At a minimum, though, the jury's damages verdict must be vacated because Innovative presented legally invalid damages proof that aggregated the effects of lawful and unlawful conduct. Innovative claims lost sales to every hospital with a CARTO 3, regardless of when the hospital acquired its system. However, tying practices are not unlawful where

customers know of the alleged tying conditions before deciding to purchase the defendant's product. The trial record makes clear that many of the CARTO 3 purchasers included within Innovative's damages model were aware of Biosense's challenged clinical support policy before they made the purchase. That means they *chose* to accept Biosense's policy; they were not *forced* to do so. Innovative's failure to disaggregate the effects of this lawful conduct invalidates the jury's damages verdict.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 1367(a). The court entered final judgment on August 29, 2025. 1-ER-2-3. Biosense filed a timely notice of appeal on September 24, 2025. 12-ER-2387-2388; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether Biosense is entitled to judgment as a matter of law on the ground that Innovative failed to prove the existence of its asserted tying market, which was defined to include only clinical support services for CARTO 3 mapping procedures.

2. Whether Biosense is entitled to judgment as a matter of law on the additional ground that Innovative failed to prove Biosense possessed market power within the asserted tying market.

3. Whether, at a minimum, the jury's damages verdict must be vacated because Innovative's damages model failed to disaggregate the effects of hospitals' voluntary decisions to purchase CARTO 3 systems after learning of the policy Innovative challenges as unlawful tying.

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND

#### A. Cardiac Mapping Systems

Cardiac mapping systems are used for the diagnosis and treatment of arrhythmias caused by problems with the electrical signals that regulate heartbeats. Cardiac mapping systems identify the sources of arrhythmias by generating a three-dimensional map of the heart's electrical signals. 4-ER-357. A physician, known as an electrophysiologist or EP, can treat an arrhythmia by using the map to identify the cardiac tissue causing the arrhythmia. The physician can then destroy ("ablate") that tissue to restore a regular rhythm. Procedures using a cardiac mapping system are performed in an electrophysiology lab within a hospital. 4-ER-351, 356.

Cardiac mapping systems are a form of durable medical equipment consisting of a console that processes and displays information about the electrical signals in the heart, allowing creation of the map. 4-ER-371-372; 8-ER-1272-1273. Mapping consoles have a useful life of ten years or more. 6-ER-1021.

Mapping procedures require use of cardiac catheters that connect to the console and are inserted into a patient's veins, typically through an incision in the groin, and then snaked into the heart. 4-ER-356. Once in the heart, the catheter can be used to map the electrical signals, generate an ultrasound, or ablate the tissue causing an arrhythmia. Different types of catheters perform each of these different functions. 4-ER-360-362. The catheters at issue here are mapping and ultrasound catheters. These catheters were designed as single-use devices, but with clearance from the Food and Drug Administration ("FDA"), they can be refurbished for repeat use.

Mapping procedures require the assistance of a clinical technician skilled in operating the system, who helps create the map for viewing by the responsible physician. 6-ER-776-777; 7-ER-1132, 1207-1208.

These support services are provided by clinical account specialists (or "CAS"). 6-ER-776-777; 7-ER-1132, 1207-1208.

All cardiac mapping systems generate an electrical field and rely on changes to that field caused by the catheter to gauge the location of the catheter inside the heart. 8-ER-1276-1277. This is referred to as impedance. Some systems generate both an electrical field and a magnetic field. These systems use catheters with magnetic sensors near the tip that allow location detection based on changes to both the electrical and magnetic fields. 8-ER-1274-1275. Biosense was the industry leader in developing catheters with these dual capabilities. 7-ER-1124; 8-ER-1273-1274. Catheters with magnetic sensors are referred to as "sensor-enabled" catheters, and they provide more accurate location information than catheters that rely on impedance alone. 4-ER-378-379; 7-ER-1126-1127. The catheters at issue in this case are sensor-enabled catheters.

### B. The Competitive Landscape for Cardiac Mapping Systems

Biosense introduced the first generation of the CARTO mapping system in the 1990s. In 2009, Biosense introduced the mapping system at the center of this case, the CARTO 3. 8-ER-1271-1272. Biosense's

CARTO system was the first cardiac mapping system to use magnetic sensors to determine a catheter's precise location, combining the benefits of impedance and magnetic fields. 7-ER-1124; 8-ER-1273-1274. Biosense markets its mapping system based on the accuracy of this magnetic-sensor technology, guaranteeing that Biosense's system will display the location of a sensor-enabled catheter within 1 millimeter of its exact location. 8-ER-1446-1447. No other competitor makes such a claim. *Id.* To support this claim, Biosense undertakes a rigorous calibration process to ensure the accuracy of the magnetic sensors in its sensor-enabled catheters. 8-ER-1280-1285.

Although Biosense was an early innovator in the field, multiple medical device manufacturers have entered the market with cardiac mapping systems of their own, which they sell in direct competition with Biosense. 4-ER-432-433; 7-ER-1124; 6-ER-801-803. Abbott (formerly St. Jude Medical) sells the Ensite mapping system. Abbott differentiates itself by marketing Ensite as an open system that can use catheters manufactured by other companies. 6-ER-801. (By contrast, Biosense relies on a closed-system architecture that requires use of Biosense's catheters. 6-ER-801-802.) Boston Scientific markets a

cardiac mapping system originally called Rhythmia and now rebranded as the Opal. 4-ER-357-358; 7-ER-1124. Boston Scientific recently introduced catheters using a new technology that has increased usage of its system relative to the Abbott and Biosense systems. 8-ER-1448.

Beyond these long-time competitors, a number of other companies have recently entered the market or are developing new cardiac mapping systems. For example, last year Medtronic launched the Affera cardiac mapping system, and a company called Kardium was working towards regulatory approval for its cardiac mapping system at the time of trial. 7-ER-1064-1065.

The market for cardiac mapping systems is highly competitive. Manufacturers compete to place their systems in hospitals' electrophysiology labs and thereafter continue to promote usage of their systems. Hospitals often purchase and maintain more than one manufacturer's mapping system, providing physicians with a choice of which system to use for their procedures. 6-ER-802; 7-ER-1126; 10-ER-1869, 1870. Sixty-six percent of hospitals with electrophysiology labs have mapping systems from at least one of Biosense's competitors,

whereas only 34% have only CARTO 3 systems. 9-ER-1519-1520; 7-ER-1084-1085.

### C. Price Competition for Cardiac Mapping Systems

Each cardiac mapping system manufacturer sells a system console, supplies catheters for use with its system, and provides clinical support for procedures performed using its system.

***Consoles***. As noted, the mapping console is an item of durable equipment with a useful life of ten or more years. 6-ER-1021. The list price for a console can approach $250,000. 8-ER-1450. However, hospitals often acquire mapping consoles with little or no upfront capital outlay because manufacturers offer different ways to finance a purchase as well as the option to rent a console instead of buying it. 11-ER-2077; 4-ER-433; 10-ER-1871; 10-ER-1791; 10-ER-1894; 10-ER-1873, 1875-1876. As one witness testified, mapping consoles are sold with "a price of zero" approximately 25% of the time and there are multiple "ways to finance a system purchase." 9-ER-1527-1528.

***Clinical support***. All manufacturers provide hospitals with clinical support services for procedures performed using their mapping systems, at no additional charge. 6-ER-776-777, 838; 4-ER-359. It is

industry standard for manufacturers to provide these services for free as part of their system offering. 6-ER-988-989; 6-ER-811; 5-ER-684; 10-ER-1795; 9-ER-1506-1507. Hospitals in the past used their own staff to provide clinical support in approximately half of mapping procedures. 6-ER-963; 7-ER-1082; 7-ER-1193; 12-ER-2318. But over time, as cardiac mapping technology advanced, hospitals found it more efficient to rely on clinical account specialists from each manufacturer. 10-ER-1833; 6-ER-777-778, 791; 5-ER-735. Today, mapping system manufacturers provide clinical support for 95% (or more) of the procedures performed using their respective systems. 4-ER-359; 6-ER-776-777.

***Catheters***. All mapping system manufacturers also sell catheters for use with their systems. Although consoles have list prices approaching $250,000, catheter sales are the principal source of revenue for the manufacturers. 6-ER-987. Ninety percent of Biosense's revenue (and hospitals' costs) associated with the CARTO 3 system comes from catheter sales; only 10% comes from console sales. 9-ER-1516; 6-ER-987; 10-ER-1858. Revenue from catheter sales covers the

cost of providing free clinical support and finances further development and innovation. 9-ER-1516.

### D. Reprocessed Catheters

Although cardiac catheters are designed as single-use devices, the FDA has provided regulatory clearance for the reprocessing of certain catheters. Reprocessing involves collecting a used catheter, cleaning and sterilizing it, and refurbishing it for subsequent uses. 5-ER-724; 6-ER-780. Innovative is one of the companies that reprocesses used cardiac catheters. (Stryker is another.) Innovative was founded in 2015, but it did not receive FDA clearance to begin selling the reprocessed catheters at issue until March 2016. 12-ER-2374-2380.

In part because reprocessed catheters are not manufactured from scratch, suppliers of reprocessed catheters have somewhat lower costs than original equipment manufacturers such as Biosense. Innovative sells its reprocessed sensor-enabled catheters for roughly half the price charged for Biosense's new catheters. 4-ER-379; 6-ER-983. Some hospitals choose to buy reprocessed catheters to take advantage of this cost savings. 4-ER-379. But other hospitals choose to buy new catheters even when less-expensive reprocessed versions are available.

6-ER-806; 6-ER-894-895, 896. Those purchasing decisions are often driven by physician preferences, as some doctors do not find reprocessed catheters to be as accurate and reliable as new catheters. 6-ER-895-896; 10-ER-1831-1832; 7-ER-1139-1141, 1142-1144.

Biosense's affiliate, SterilMed, also sells reprocessed cardiac catheters. Unlike other reprocessors, SterilMed has access to Biosense's specifications for new catheters and the equipment that Biosense uses to ensure the accuracy and calibration of its sensor-enabled catheters. 8-ER-1284-1287. Thus, when SterilMed reprocesses Biosense's sensor-enabled catheters, SterilMed recalibrates the catheters to ensure that they are also accurate within 1 millimeter. 8-ER-1284-1287. SterilMed's reprocessed catheters are priced comparably to Innovative's reprocessed catheters. 9-ER-1537-1538; 11-ER-2083; 11-ER-2084.

### E. Implementation of Biosense's Clinical Support Policy

#### 1. Reprocessor free-riding

When Biosense released the CARTO 3 mapping system in 2009, hospitals used their own staff to provide clinical support for roughly half of the procedures. 6-ER-963; 7-ER-1082; 7-ER-1193; 12-ER-2318.

Biosense provided clinical account specialists at no charge for the other half. 7-ER-1082.

By 2015, as the number of mapping procedures had grown and the technology had become more complex, Biosense provided clinical support for 87% of procedures using the CARTO 3 system. 6-ER-963; 7-ER-1082. By 2018, that figure had increased to 95%. 12-ER-2366; 10-ER-2036; 7-ER-1083. One reason for the increase (and parallel increases in clinical support supplied by other mapping system manufacturers) was that hospitals increasingly found it inefficient to provide clinical support services themselves, particularly when their physicians were using multiple mapping systems from different manufacturers. 6-ER-778. Hospitals would have been required to employ and continuously train lab technicians to work on systems from Biosense, Abbott, and other competitors, and to keep up with software updates and improvements for each system. 6-ER-777-778. Most hospitals do not have the time or resources to train staff to provide clinical support. 7-ER-1195-1197; 4-ER-398-399; 7-ER-1133.

At trial, Innovative argued that Biosense contributed to the decline in hospital self-support by hiring clinical account specialists

away from hospitals, by refusing to train hospital staff or share training materials, and by enforcing non-compete agreements against former employees. 9-ER-1706-1707. But the decline in hospital self-support (and corresponding increase in manufacturer-supplied clinical support) was not unique to Biosense; it was an industry-wide trend. 4-ER-400; 7-ER-1191, 1192. Other mapping system manufacturers now also "provid[e] the mapper" free of charge in "[n]inety-five percent or more" of mapping procedures at hospitals. 4-ER-359; 6-ER-777.

The few hospitals that in the past did not rely on clinical support from the system manufacturer provided such support using their own staff. 5-ER-733. To this day, no independent third-party providers of clinical support services have entered the market. 7-ER-1169.

Although Biosense and its rivals provide clinical support at no charge, providing that support is a significant undertaking. Biosense initially attempted to meet this growing demand in part by hiring trained hospital staff. 4-ER-440-441. As the number of procedures grew, Biosense started hiring recent college graduates with, for example, degrees in biochemical engineering. 7-ER-1133, 1191-1192. New clinical account specialists go through six months of training

before they can cover a procedure on their own. 7-ER-1133, 1192. Biosense spends hundreds of millions of dollars per year in compensation alone for its clinical account specialists, who now number around 1,400. 8-ER-1493; 11-ER-2079. Biosense relies on revenue generated from the sale of its sensor-enabled catheters to cover this and other costs associated with clinical support. 9-ER-1516, 1595; 10-ER-1979.

Reprocessors like Innovative do not provide clinical support for mapping procedures in which their reprocessed catheters are being used. Instead, they expect the mapping system manufacturers to provide clinical support for those procedures, even though the system manufacturer receives none of the revenue from the catheter sales involved in those procedures. 4-ER-420-421, 503.

Innovative briefly considered providing clinical support for procedures using its reprocessed catheters. 10-ER-1978; 11-ER-2087; 10-ER-1922. Innovative had the financial resources to do so, and one of its employees, Aaron DeTate, is himself a clinical account specialist who could have trained additional personnel. 10-ER-1817; 4-ER-392-393. Innovative nonetheless declined to make that investment. 10-ER-1817.

Its CEO testified that, because reprocessors like Innovative "only reprocess[] about 25 percent of the catheters" while "[t]he rest of the catheters are the brand-new catheters" sold by system manufacturers, it was "not economically feasible" for reprocessors to provide clinical support for procedures using their catheters. 4-ER-489-490.

### 2. Biosense's clinical support policy

In part to address the problem of reprocessor free-riding, Biosense adopted its clinical support policy (sometimes referred to as the "case coverage policy"), which is the focus of Innovative's tying claim.

Dating back at least to 2011, Biosense maintained an internal policy not to provide clinical support for cardiac mapping procedures using reprocessed sensor-enabled catheters manufactured by third parties. Early on, the policy was inconsistently enforced. 8-ER-1313. But beginning in 2014, before Innovative was founded, Biosense announced that it would begin enforcing the policy more rigorously with customers. 8-ER-1331-1332.

This decision was triggered by a dispute that arose in April 2014 when a hospital in the Ascension group asked a physician and one of Biosense's clinical account specialists to perform a CARTO 3 mapping

procedure using a reprocessed catheter from Stryker. 10-ER-1984. They declined to do so, citing concerns about having never "created an image with one." *Id.* Ascension demanded assurances that Biosense personnel would provide clinical support for such procedures going forward. 10-ER-1982-1984.

After months of internal deliberations, Biosense decided that its clinical account specialists would not provide support for mapping procedures using third-party reprocessed catheters. 12-ER-2338-2340; 10-ER-1987, 1990. There were three reasons underlying the adoption of that policy.

First, Biosense relies on revenue from catheter sales to support the large investments it makes in directly employing and training the many clinical account specialists whose services are needed to perform cardiac mapping procedures. 12-ER-2338. As Biosense explained in an email to Ascension, "collecting the dollars for products we sell allows us to make these investments." *Id.* A reprocessor, by contrast, "sells you the reprocessed ultrasound catheters and collects the revenue but they are not investing in the clinical support that's required." *Id.*

Second, Biosense's clinical account specialists are required to "possess a competent base of knowledge" and a "thorough understanding of how each disposable product is designed to work with [Biosense's] capital equipment to ensure the best possible outcome for each procedure." 10-ER-1990. That is not merely a professional commitment. Hospitals themselves typically "require vendor representatives to provide documentation attesting to their competency with their company's products as part of the vendor credentialing process." *Id.* Biosense's clinical account specialists are trained on Biosense's own catheters, but not on catheters sold by third-party reprocessors. *Id.*

Finally, Biosense is not familiar with the details of how Stryker (and later Innovative) reprocesses Biosense's sensor-enabled catheters or the specifications for those reprocessed catheters. *Id.* That information is treated as confidential in Stryker's and Innovative's FDA submissions. 8-ER-1340. Accuracy is one of the primary differentiators Biosense relies upon to market its system. Biosense's guarantee that its system produces maps within 1 millimeter of accuracy is unique in the industry and relies on Biosense's rigorous calibration of the sensors

on its catheters. 8-ER-1446-1447. Biosense could not guarantee that level of accuracy with third-party reprocessed catheters. 8-ER-1340. (Innovative, for example, concedes that it does not recalibrate the Biosense sensor-enabled catheters it reprocesses. 5-ER-576.) Biosense could, however, offer customers reprocessed sensor-enabled catheters through SterilMed, which Biosense knew were tested against the same specifications used for its new catheters and thus did not present the same concerns. 8-ER-1284-1287.

#### 3. Hospitals' awareness of the policy

In October 2014, Biosense memorialized its clinical support policy in a letter to customers, notifying them that going forward its clinical account specialists "can only provide clinical support for cases that use catheters they have been trained to support." 12-ER-2386. By November 2014, Biosense had sent the letter explaining its policy to a number of major accounts including Ascension, a large healthcare system, and HealthTrust Partner Group, a large group purchasing organization ("GPO") representing thousands of medical facilities. 10-ER-1987; 12-ER-2384-2385; 8-ER-1345-1352. In February 2015, Biosense rolled out the position statement to "all other" accounts,

indicating to employees that the policy was to be implemented "[n]ow (as soon as possible)." 10-ER-2002, 2005.

Over the next year, Biosense continued increasing its compliance efforts, and in early 2016 it set a deadline of March 31 to ensure that all customers were notified of the policy. 12-ER-2381. By April 1, 2016, Biosense had fully implemented the clinical support policy. 8-ER-1358. Two of the hospital representatives who testified at trial acknowledged that they were aware of the policy by 2016. 5-ER-729, 744; 10-ER-1885-1886; 10-ER-2021.

Reprocessors like Stryker and Innovative also became aware of Biosense's efforts to enforce its clinical support policy. 4-ER-476, 520; 11-ER-2075. After Stryker became aware of the policy, it began distributing to its customers a rebuttal document that attempted to refute the points raised in Biosense's notification letter. 8-ER-1343. Innovative made a concerted effort to encourage hospitals to oppose Biosense's policy, arguing that hospitals should be able to benefit from buying lower-priced reprocessed catheters from Innovative (rather than from SterilMed) but continue to receive free clinical support from Biosense. 11-ER-2085-2087; 10-ER-1977-1978.

After Biosense announced its intent to enforce the clinical support policy, some hospitals switched to using open systems like Abbott's. 10-ER-1867; 10-ER-1775-1776; 6-ER-912-913; 12-ER-2308. Abbott and Boston Scientific did not adopt a policy similar to Biosense's. They continued to provide clinical support for procedures that used third-party reprocessed catheters, 6-ER-838; 9-ER-1507, which was consistent with their respective competitive strategies. Neither Abbott nor Boston Scientific had a reprocessing capability, as Biosense has through its affiliate, SterilMed. 9-ER-1507; 4-ER-435.

Despite adoption of Biosense's clinical support policy, numerous hospitals continued to use the CARTO 3 system and purchased new CARTO 3 consoles from Biosense. 11-ER-2038-2074. Hospitals that continued to use the CARTO 3 system did so because, even accounting for Biosense's closed-system strategy, physicians regard CARTO 3 as "the best thing for [their] patients." 10-ER-1885, 1887, 1891-1892; *see also* 10-ER-1775; 7-ER-1126-1127.

## II. PROCEDURAL HISTORY

### A. Innovative's Lawsuit

In October 2019, Innovative sued Biosense, alleging that the clinical support policy constituted an unlawful tying arrangement in violation of Section 1 of the Sherman Act and California's Cartwright Act. 15 U.S.C. § 1; Cal. Bus. & Prof. Code § 16720. Innovative also asserted claims for monopolization and attempted monopolization in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2. It based those claims on the same alleged tying arrangement underlying its Section 1 claim, as well as allegations that Biosense (1) collected used catheters to prevent Innovative from acquiring needed inputs, and (2) installed memory chips known as "EEPROMs" in certain catheters, which made reprocessing them more difficult.

In framing the relevant markets for its antitrust claims, Innovative sought to navigate around the competition that exists among rival firms in the primary market for cardiac mapping systems. Instead of predicating its claims on a market that included competitive equipment sales, Innovative alleged that certain sensor-enabled catheters used with the CARTO 3 system, as well as clinical support for

the CARTO 3 system, constituted single-brand "aftermarkets" unto themselves. (An aftermarket is a market where demand for the good or service in question is entirely dependent upon the prior purchase of a durable good in the primary market.)

Following the close of discovery, the district court granted Biosense's motion for summary judgment, holding that Innovative failed to establish any legally cognizable antitrust market. Dkt. 177 at 22.

### B. The First Appeal

On appeal, this Court reversed and remanded for trial. The Court held there were triable issues of fact regarding the extent to which customers who purchased a CARTO 3 system before April 1, 2016—the date on which Innovative conceded there was general awareness of the clinical support policy—were "locked-in" to the alleged aftermarkets. *Innovative I*, 2024 WL 62948, at *3. Despite reversing, this Court affirmed a core premise of the district court's summary judgment ruling, noting:

> The district court correctly concluded that customers who purchased the CARTO 3 after Biosense's tying policy formally took effect in April 2016 cannot serve as evidence of Biosense's market power. Sophisticated customers like

> hospitals assuredly were aware of the policy and yet chose to purchase the CARTO 3 anyway. Market power arising "solely from contractual rights that consumers knowingly and voluntarily gave to the defendant" does not offend the antitrust laws.

*Id.* at *2 (quoting *Newcal Indus., Inc. v. IKON Off. Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008)).

### C. *Daubert* Motion Following Remand

On remand, Biosense filed a *Daubert* motion seeking to exclude certain opinions of Innovative's expert, Dr. Eric Forister. Dkt. 318. Biosense argued that Dr. Forister's damages model was legally deficient because it did not differentiate between CARTO 3 customers who allegedly were "locked-in" to use of the CARTO 3 system when they first learned of Biosense's clinical support policy and customers who knew of the policy in advance but nonetheless "knowingly and voluntarily" proceeded to purchase a CARTO 3 system. *Id.* at 6-7, 12-17 (quoting *Innovative I*, 2024 WL 62948, at *2). Although Biosense contended that inclusion of the latter category of customers was legal error, the district court disagreed. It denied Biosense's *Daubert* motion, thus allowing Innovative to present a damages model predicated on the view that the challenged tying policy adversely and unlawfully "impact[ed] the

market as a whole," including customers "who purchased the CARTO 3 after the tying policy took effect" and who had "knowledge of the policy" before making their purchase decision. 1-ER-39 (internal quotation marks omitted).

### D. Jury Trial

The district court presided over an eight-day jury trial. At trial, Innovative argued that there were four relevant product markets pertinent to its antitrust claims, each limited to "products" used exclusively for CARTO 3 mapping procedures: (1) a market for sensor-enabled circular mapping catheters; (2) a market for sensor-enabled high-density mapping catheters; (3) a market for sensor-enabled ultrasound catheters; and (4) a market for CARTO 3 clinical support services. For purposes of its tying claim (the central claim in the case), Innovative argued that Biosense possessed and used market power in the last of these asserted markets—a single-brand tying market for CARTO 3 clinical support—to coerce customers into purchasing new Biosense catheters in lieu of reprocessed catheters. For purposes of its monopolization and attempted monopolization claims, Innovative argued that Biosense possessed or sought to acquire monopoly power in

the three single-brand aftermarkets for sensor-enabled catheters noted above.

Virtually all of the damages Innovative sought to recover were attributable to its tying claim. Its expert, Dr. Forister, calculated that Innovative suffered lost sales as a result of Biosense's clinical support policy, and that the profits from those lost sales between 2016-2025 totaled $139 million. 6-ER-999. Dr. Forister calculated that changes made to the EEPROM chip, which Innovative was ultimately able to engineer around, delayed FDA clearance for some of its catheters, resulting in additional lost profits of $8 million. 6-ER-999. Dr. Forister did not attempt to calculate a separate damages figure attributable to Biosense's collection of used catheters. 7-ER-1044. Thus, Dr. Forister proposed an overall damages figure of $147 million. 6-ER-1035-1036.

The jury returned a general verdict in Innovative's favor on each of its claims, awarding damages in the full amount Innovative requested: $147 million, before trebling. 1-ER-33.

### E. Post-Trial Proceedings

After the verdict, Biosense renewed its motion for judgment as a matter of law and Innovative filed motions for injunctive relief and

attorney's fees. Dkts. 535, 548, 551. The district court entered a permanent injunction against Biosense, denied Biosense's renewed motion for judgment as a matter of law, and granted in part Innovative's motion for attorney's fees. 1-ER-4-10; 1-ER-11-30. On August 29, 2025, the district court entered final judgment, from which Biosense has timely appealed. 1-ER-2-3; 12-ER-2387-2388.

## SUMMARY OF THE ARGUMENT

**I.** Innovative failed as a matter of law to prove its asserted tying market. A properly defined tying market must correspond to the commercial realities of the industry, but Innovative's proposed tying market does not for two independent reasons.

First, clinical support services are not a distinct, standalone product separate from the cardiac mapping systems themselves. The trial evidence established that all mapping system manufacturers provide clinical support to hospitals at no charge as an integral part of their system offerings. Witnesses on both sides confirmed that clinical support is part of a broader system offering, and there are no independent service providers that compete with the system

manufacturers to supply clinical support. These commercial realities preclude defining clinical support as a valid standalone market.

Second, Innovative's proof failed to overcome the well-established presumption against single-brand markets, which are rare and disfavored in antitrust law. Under *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), a single-brand aftermarket is valid only where customers face high switching costs that effectively lock them into purchasing the defendant's equipment. Innovative failed to prove such lock-in because the trial record established that hospitals can easily switch between competing mapping systems. More than half of hospitals that own a CARTO 3 system also own competing systems, and the cost of acquiring alternative equipment is far less than the alleged catheter "overcharges." If customers preferred not to pay Biosense's catheter prices, they would be free to shift to another mapping system. Unlike in *Kodak*, that choice is not precluded by prohibitive switching costs. As for Innovative's argument that physicians' "preferences" for the CARTO 3 system impose a barrier to switching, customers' subjective preference for a product is not a factor that can support a *Kodak* "lock-in" theory.

**II.** Innovative also failed as a matter of law to prove that Biosense possesses market power within the asserted tying market. Market power is the power to control prices, restrict output, or exclude competition. The trial record demonstrates that Biosense lacks any such power. Biosense cannot control prices for clinical support. It provides such services free of charge, as do all of its competitors, and there is nothing in the record to suggest that Biosense could raise prices to supra-competitive levels. Nor has Biosense restricted output; to the contrary, it has significantly expanded its provision of clinical support over the relevant period. And Biosense has not excluded competition for clinical support. While there are no independent service providers, this is not because Biosense has excluded them, but rather because the economics of this industry make it inefficient to offer such services on a standalone basis.

**III.** Even if the liability verdict were upheld, the damages verdict must be vacated because Innovative's damages model failed to disaggregate the effects of lawful conduct. Tying liability cannot be imposed where customers make purchases in a manner that signals their knowing assent to the challenged tying conditions. As this Court

held in the first appeal, hospital customers who purchased CARTO 3 systems with knowledge of Biosense's clinical support policy made a knowing and voluntary choice that does not offend the antitrust laws. The trial evidence established that many hospitals purchased their CARTO 3 systems after learning of the clinical support policy, but Innovative's damages model improperly included lost sales attributable to those purchases. Innovative's failure to exclude damages attributable to lawful conduct invalidates the jury's damages verdict.

## STANDARD OF REVIEW

This Court reviews de novo the denial of a renewed motion for judgment as a matter of law. *Reese v. County of Sacramento*, 888 F.3d 1030, 1036 (9th Cir. 2018). "A renewed motion for judgment as a matter of law is properly granted only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* (internal quotation marks omitted).

# ARGUMENT

## I. INNOVATIVE FAILED TO PROVE ITS ASSERTED TYING MARKET.

To prevail on its tying claim, Innovative had the burden to prove: "(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).

As with any relevant antitrust market, a properly defined tying product market must "correspond to the commercial realities of the industry." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979). Innovative's proposed tying market—which was limited to CARTO 3-only clinical support services—fails this fundamental test. It was an artifice used to distort commercial realities in an effort to falsely suggest that Biosense had the economic power to coerce customers into accepting unwanted tying conditions. The facts at trial did not support this overly narrow market definition, and this critical failure of proof alone requires reversal of the judgment. *See Coronavirus Rep. v. Apple,*

*Inc.*, 85 F.4th 948, 957 (9th Cir. 2023) ("Failing to define a relevant market alone is fatal to an antitrust claim.").

### A. Innovative's Overly Narrow Tying Market Is at Odds With the Commercial Realities Shown at Trial.

"A threshold step in any antitrust case is to accurately define the relevant market" or markets in question. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). In a tying case, it is essential to prove a valid tying product market because "a plaintiff must prove 'market power in the tying product' in order to establish" liability. *Newcal*, 513 F.3d at 1052. Without a properly defined tying market, "one cannot sensibly or seriously assess market power." *Coronavirus Rep.*, 85 F.4th at 957; *see also Qualcomm*, 969 F.3d at 992 (courts "cannot properly apply the rule of reason without an accurate definition of the relevant market"). If the proposed market definition is flawed, as often occurs when plaintiffs advance overly narrow markets in order to exaggerate a defendant's market presence, the entire antitrust analysis can be irreparably skewed from the outset. *Kaplan*, 611 F.2d at 292-95 (rejecting a "narrowly defined market" that did not "correspond to the commercial realities of the industry").

Biosense faces intense competition from a crowded field of rival cardiac mapping system manufacturers, each vying for the business of the same core hospital customers. 4-ER-432-433; 4-ER-357-358; 7-ER-1124; 6-ER-801-803. At trial, the intensity of that competition was borne out by proof of successful new entry into the cardiac mapping system space and by evidence showing that rival suppliers aggressively compete on pricing and through continued product innovation. 4-ER-357-358; 7-ER-1124; 8-ER-1448. Had Innovative defined "cardiac mapping systems" as the relevant tying market in this case, it could not have proved that Biosense possessed market power and its tying claim would have failed. Innovative instead focused on *clinical support services*, characterizing such services as a standalone product offering and arguing that a tying market could be defined around such services alone.

Innovative also asserted that this was one of the rare cases in which it was appropriate to follow the "disfavored" approach of defining the relevant market around a single brand. *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (noting that single-brand markets are "extremely rare"); *see also Reilly v. Apple Inc.*, 578 F. Supp.

3d 1098, 1107 (N.D. Cal. 2022) ("It is an understatement to say that single-brand markets are disfavored."). Innovative defined its proposed tying market as comprising clinical support *only* for CARTO 3 mapping procedures—a market with only one seller in which Biosense was, by default, a monopolist.

As shown below, Innovative's asserted tying market fails as a matter of law because (1) the clinical support that all mapping system manufacturers provide to hospitals free of charge is not a distinct product offering separate from the mapping systems themselves; and (2) Innovative's single-brand aftermarket limited to clinical support for the CARTO 3 system is an artificial framing that skewed market realities and failed to overcome the presumption against single-brand product markets. *See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 (3d Cir. 1992) (rejecting a single-brand tying market where "such a narrow definition ma[de] no sense in terms of real world economics" and a market "so defined" would make the defendant "the sole seller").

### B. Innovative Failed to Prove That Clinical Support Is a Distinct Product Separate From the Cardiac Mapping Systems.

In the first appeal, this Court held that a reasonable jury could find that clinical support and catheters are two distinct products. *Innovative I*, 2024 WL 62948, at *2 ("Innovative has produced sufficient evidence for a rational trier of fact to conclude that clinical support services and catheters are distinct products."). But the Court did not address whether clinical support is a standalone product on its own, separate from the cardiac mapping systems, which Innovative was also required to prove. The evidence Innovative introduced at trial was insufficient as a matter of law to sustain its burden.

**1.** As the Supreme Court has held, "courts should combine different products or services into a single market when that combination reflects commercial realities." *Ohio v. Am. Express Co.*, 585 U.S. 529, 544 (2018) (cleaned up). Here, the commercial reality is that all cardiac mapping system manufacturers provide clinical support to hospitals at no charge, and they must do so to remain competitive. 6-ER-988-989; 6-ER-801-803; 5-ER-684; 10-ER-1795; 9-ER-1506-1507. These services are part and parcel of the broader rivalry that exists

among these firms to promote sales of their mapping systems and to drive continued use of those systems once installed by hospitals.

Witnesses called by both sides at trial confirmed this market reality. Dr. Doshi admitted that clinical support "is part of a broader system offering." 6-ER-812. Dr. Osorio testified that he "view[s] the CAS provided by the industry as part of the overall system offering by the manufacturer." 7-ER-1133. Mr. Coldiron agreed that clinical support "is a service that's provided as part of the overall product offering." 10-ER-1795. And Ms. Tam testified that Biosense's clinical support services are part of "the whole mapping system." 4-ER-312.

The evidence at trial showed that Biosense annually invests substantial sums to hire, train, and compensate the clinical account specialists who supply these free services to hospitals. 8-ER-1493; 11-ER-2079; 7-ER-1191-1193. Biosense's competitors no doubt do the same. Clinical account specialists promote usage of their company's cardiac mapping system by improving ease of use of the system, building customer confidence in the system, and helping enhance procedural outcomes. That manufacturers go to such lengths to promote usage of their systems is hardly surprising, given that (1) most

hospitals have multiple systems from different manufacturers available for mapping procedures, giving physicians a choice regarding which manufacturer's equipment to use, 9-ER-1519-1520; 7-ER-1084-1085; and (2) repeat usage of their systems and associated catheter sales are key drivers of the manufacturers' revenues and profitability. 9-ER-1516; 6-ER-987.

As Innovative's witness Mr. Distel explained, manufacturers provide clinical account specialists for free "to sell more expensive products," and providing their services "helps you build your market share." 5-ER-683-684; *see also* 12-ER-2365 (Biosense new-hire slide deck: "Key Strategy: Invest in Clinical account specialists to grow procedure share").

It is thus both commercially sensible and competitively essential for mapping system manufacturers to provide clinical support to their hospital customers. They do so free of charge as part of an integrated product offering, following the industry standard that has developed over time. If any system manufacturer were to depart from this industry norm, it would fall out of step with its competition and could expect reductions in sales of new equipment and usage of installed

mapping systems, with a consequent reduction in profitable catheter sales.

**2.** It is not at all unusual for product sellers to offer free, or "included," services with their products as a means of promoting sales and product usage. Innovative's own expert at trial characterized clinical support as involving a sales and marketing function, testifying: "Well, it boils down to the fact that the CAS also act[] as salespeople. Biosense categorizes them as salespeople. They pay them as salespeople. And they measure that the CAS being in the same room dramatically increases sales." 9-ER-1592; *see also* 6-ER-1007.

In a case involving analogous facts (albeit in a different industry), this Court held that no rational jury could find two distinct products. In *M.A.P. Oil Co. v. Texaco Inc.*, 691 F.2d 1303 (9th Cir. 1982), this Court affirmed a directed verdict dismissing antitrust claims based on a finding that gasoline sold by Texaco, and related gasoline distribution services provided without charge to Texaco's retail dealers, were "a single product." *Id.* at 1307-08. The Court held that where a seller offers services to customers free of charge and "those services were essentially marketing techniques designed to either initially obtain or

subsequently retain a customer," the "economic reality" is that such services are integral to the sale of the product in question, *not* a separate and distinct product offering. *Id.*; *see also Servicetrends, Inc. v. Siemens Med. Sys., Inc.*, 870 F. Supp. 1042, 1061 (N.D. Ga. 1994) (rejecting claim that defendant unlawfully tied sale of its medical equipment to free one-year warranties that were "included in the price" of the equipment, concluding that they were a single unified product).

The same "economic reality" exists here, and it dictates the conclusion that Biosense's cardiac mapping system and the free clinical support it provides to hospitals are "a single product." *M.A.P. Oil*, 691 F.2d at 1307-08.

**3.** A relevant market is meant to capture "the field in which meaningful competition" among rival sellers exists. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997); *see Qualcomm*, 969 F.3d at 992 (emphasizing the importance of accurately defining the relevant market to isolate "the area of effective competition"). Aside from being an integral element of the broader competition for sales and usage of the associated mapping systems, there is no "meaningful competition" for clinical support services.

*Image Tech. Servs.*, 125 F.3d at 1202. Each mapping system manufacturer provides free clinical support only for mapping procedures using its own system consoles; the manufacturers do not provide clinical support for procedures performed using another manufacturer's console. 4-ER-359; 6-ER-776-777. Nor are there any independent service providers that provide clinical support in competition with the system manufacturers. 7-ER-1169.

The fact that there are no independent providers supplying clinical support is not surprising. These are complex services that require costly training and unique knowledge of each manufacturer's equipment. It would not be efficient, much less profitable, for a third party to attempt to provide clinical support services in competition with the mapping system manufacturers, particularly when these firms, per industry norm, are accustomed to furnishing such services at no cost. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 995 (9th Cir. 2023) (courts ask whether "it is efficient" to "disentangl[e]" two intertwined items or services and offer them as "separate products"). Even Innovative, despite having the technical and financial resources to offer clinical support, 4-ER-392-393, did not find it efficient to provide clinical

support as a standalone service. Innovative's CEO testified that it was "not economically feasible" for reprocessors to provide clinical support separately from the cardiac mapping systems. 4-ER-489-490.

In cases where courts have found services to be in a separate market, the fact that there were independent service providers was a key reason. For example, in *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997), the court noted that the "very existence" of independent service providers showed that "it would be efficient for a firm to provide" such services "separate[ly]," bolstering the conclusion that there was a "separate market." *Id.* at 816. The services in question here are provided only by the mapping system manufacturers themselves as an integral component of their overall product offering. There is no "meaningful competition" among firms providing clinical support services that would justify defining such services as a separate standalone market. *Image Tech. Servs.*, 125 F.3d at 1202.

That *all* mapping system manufacturers offer clinical support as an integral part of their system offerings confirms the absence of separate product markets. In *SMS Systems Maintenance Services, Inc.*

*v. Digital Equipment Corp.*, 188 F.3d 11 (1st Cir. 1999), the First Circuit dealt with an analogous question: whether mainframe computers and the "integrat[ed] three-year warranties" provided free of charge to purchasers of that equipment were one product or two. *Id.* at 13. The defendant there argued that such warranties were not separate products from the mainframe computers themselves, but rather "tools used by manufacturers to promote the attractiveness of their products and thus to gain a competitive edge." *Id.* at 15. In the court's view, the issue came down to whether "all or substantially all competing firms always or almost always (discounting occasional accommodations for customers with special needs)" provided their computers and warranties "together" versus separately. *Id.* Because the practice among computer manufacturers of "bundl[ing] warranties with their machines" was not "universal" (*i.e.*, some did, and some did not), the court rejected the defendant's "single product defense." *Id.*

In this industry, by contrast, mapping system manufacturers *do* follow a universal practice of combining clinical support together "with their machines" as a free ancillary service. That fact supports the conclusion that "the two attributes" should "be treated as components of

a single product." *Id.*; *see also Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 272-74 (N.D. Ill. 2019) (rejecting plaintiff's "attempt[] to isolate" as a separate product market a single component of a broader "method of doing business" where in reality the defendant "sells only one product" (internal quotation marks omitted)).

**4.** As noted above, in the first appeal Innovative prevailed on its contention that clinical support and catheters are plausibly distinct products. But at trial Innovative gave virtually no attention to the different (yet equally critical) issue of whether clinical support can properly be characterized as a distinct product on its own separate from the cardiac mapping systems. On this pivotal point, Innovative's expert did little more than point to the fact that "when the CARTO 3 was new, hospitals provided about half of their own mapping." 6-ER-947; *see also* 7-ER-1082; 7-ER-1193; 12-ER-2318. Innovative argued that this in itself proves there was "competition [from hospitals] for provision of clinical support," and it claimed there "still would be competition" had Biosense not taken actions "to block hospitals from mapping themselves." 9-ER-1577, 1578.

The evidence Innovative relied on is insufficient as a matter of law to support a finding that clinical support is a separate standalone product. As the cardiac mapping marketplace evolved, hospitals moved away from using their own staff to provide clinical support because it was inefficient for them to provide those services. 6-ER-777-778. Innovative's physician witness and multiple third-party witnesses testified that it was not feasible or cost-effective for hospitals to "invest the time and resources ... to provide mapping support" when they "can do the same job by getting support from the [manufacturer]" free of charge. 10-ER-1833. As mapping systems became more complicated, it became more difficult for hospitals to maintain mapping personnel with "adequate competencies." 6-ER-777-778. Hospitals found it "very efficient" to rely on manufacturer-provided clinical support to avoid the need "to train or hire" their own personnel. 7-ER-1133; 5-ER-735. While over a decade ago hospitals at times supplied their own clinical support, during the time period relevant to this lawsuit virtually all hospitals "did not" or "would not" do so. 6-ER-837.

As these facts show, hospitals no longer find it efficient to provide in-house clinical support for cardiac mapping procedures. Even in past

years when some hospitals provided clinical support using their own in-house personnel, this practice did not place those hospitals in "competition" with mapping system manufacturers. *See, e.g.*, *Laidlaw Acquisition Corp. v. Mayflower Grp., Inc.*, 636 F. Supp. 1513, 1519 (S.D. Ind. 1986) (a customer's decision to "supply [its own] needs by self help" should not be "considered 'competition'").

In sum, the trial record "permits only one reasonable conclusion," *Reese*, 888 F.3d at 1036: that clinical support services are not a separate standalone product permitting definition of a distinct relevant market. Such services are instead a facet of competition among rival system manufacturers focused on promoting sales and usage of their competing mapping systems.

### C. Innovative's Evidence Failed to Overcome the Presumption Against Single-Brand Aftermarkets.

As courts have long held, single-brand markets are almost never a valid approach to assessing competition. *Reilly*, 578 F. Supp. 3d at 1107; *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 997 (N.D. Cal. 2009); *Psystar*, 586 F. Supp. 2d at 1198 (decisions upholding such markets are "extremely rare"). "[S]ingle-brand markets typically do not constitute legally cognizable markets for the purposes of an antitrust

suit" because "[a] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product." *Dang v. S.F. Forty Niners*, 964 F. Supp. 2d 1097, 1105 (N.D. Cal. 2013) (internal quotation marks omitted).

In *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), the Supreme Court recognized that there are exceptional circumstances where defining a single-brand aftermarket is justified. Those circumstances arise when consumers purchase the defendant's durable goods in the primary market and become "locked-in" to purchasing the defendant's aftermarket goods due to a combination of factors, including high switching costs, high information costs, and "a defendant's ability to use not 'generally known' aftermarket restrictions to exploit unsophisticated consumers." *Epic Games*, 67 F.4th at 977. "Where a plaintiff asserts a *Kodak*-style single-brand aftermarket, it bears the burden of 'rebut[ting] the economic presumption that ... consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to enter a[] ... contract.'" *Id.* at 978 (alterations in original) (quoting *Newcal*, 513 F.3d at 1050). Thus, in cases like this one—where the primary market for

equipment sales is competitive—there is a presumption that the economic realities driving consumer purchasing decisions will *not* justify defining a single-brand aftermarket.

Innovative's proof at trial did not overcome this presumption. "To establish a single-brand aftermarket, a plaintiff must show," among other things, that "significant monetary or non-monetary switching costs exist." *Coronavirus Rep.*, 85 F.4th at 956 (cleaned up) (quoting *Epic Games*, 67 F.4th at 976-77). That critical criterion was not met here, which is cause in itself to reject Innovative's single-brand tying market. *See Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 955 (D. Ariz. 2001) ("in order to conclude that a *Kodak* lock-in market exists," the four prongs of *Kodak* must "*all* be satisfied," including a showing of "switching costs"), *aff'd*, 52 F. App'x 897 (9th Cir. 2002).

The Court's ruling in *Kodak* turned heavily on facts suggesting that the cost of purchasing new photocopier and micrographic equipment far exceeded the alleged "above-market premium" for aftermarket servicing of Kodak-brand copiers. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust

Principles and Their Application § 1740(c)(8). Those disproportionately high switching costs are what prevented customers from simply switching to a different equipment supplier to avoid "be[ing] forced by the defendant to accept an unwanted tied product." *Id.* The high cost of buying new equipment compared to the much smaller above-market premium consumers were charged for Kodak-supplied service (versus service provided by independent firms) was central to the Court's concerns about "lock-in." *Kodak*, 504 U.S. at 476 (noting that lock-in could be shown "if the switching costs were high *relative to* the increase in service prices" (emphasis added)).

In *Kodak*, those concerns were validated by record evidence showing that, with respect to one representative customer, the cost to replace its Kodak machines was "about $1.5 million," whereas the complained-of annual aftermarket overcharges for servicing were in the range of $100,000 (*i.e.*, referring to the difference between what Kodak charged for on-site service compared to comparable charges by an independent service provider). *See* Br. of Respondents at 11-12, 18, *Kodak*, 504 U.S. 451 (No. 90-1029), 1991 WL 530838. Thus, for customers that might seek to escape the effects of Kodak's tying

practices by switching to alternative equipment, the costs of making such a switch were prohibitive—that is, the investment in new equipment would involve a capital outlay many multiples higher than the cost of paying Kodak's higher aftermarket service prices. Post-*Kodak* authorities in which single-brand aftermarkets have been found viable involved similar cost disparities. *See, e.g.*, *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 845 (N.D. Cal. 2024) (finding that single-brand aftermarkets for Tesla compatible parts and repair services existed where the cost of a new vehicle, $40,000 to $110,000, far exceeded the alleged aftermarket overcharge).

Here, Innovative's antitrust theory is predicated on a claim that Biosense exploits customers through excessive aftermarket prices for catheters. Yet in this case there is no cost disparity to preclude rational customer switching behavior or to validate Innovative's claims of "lock-in," and hence no basis for defining "a *Kodak*-style single-brand aftermarket." *Epic Games*, 67 F.4th at 977-78. Unlike the scenario in *Kodak*, here the cost disparity runs in the opposite direction.

The evidence at trial showed that, over the lifespan of a CARTO 3 system, the cost savings that could be achieved by switching to a

competing system and buying Innovative's less-expensive reprocessed catheters would dwarf the upfront cost of acquiring the mapping consoles. Some Biosense customers spend millions of dollars "[y]early" on Biosense catheters above what the same customers would spend on reprocessed catheters. 5-ER-726. The capital outlay needed to acquire a cardiac mapping system, by comparison, is quite small, especially when taking into account the ready availability of discounts and incentives offered by manufacturers. 11-ER-2077; 4-ER-433; 10-ER-1871; 10-ER-1791; 10-ER-1894; 10-ER-1873, 1875-1876. The fact that Biosense customers pay far more for catheters than for consoles is reflected in Biosense's internal accounting records, which show that annual revenue generated by catheter sales exceeds the revenue generated by CARTO 3 console sales by a factor of nine to one. 6-ER-987; 10-ER-1858; 9-ER-1516.

If hospital customers believed they were being forced to purchase Biosense catheters at above-market prices, they would be free to switch to a different equipment supplier, and the costs of making such a switch would *not* "exceed[] the above-market premium for the aftermarket goods." Areeda & Hovenkamp, *supra*, § 1740(c)(8). Thus, the critical

economic conditions that impeded rational switching behavior in *Kodak*, in turn creating concerns about "lock-in" and justifying the unusual step of defining a single-brand aftermarket, simply do not exist here.

Moreover, if Biosense's customers believed they were being "forced" to purchase overpriced Biosense catheters, in most cases they would have no need to incur the "switching costs" associated with purchasing new equipment. As noted earlier, most hospitals already have cardiac mapping systems from other manufacturers installed and available for use. The evidence at trial showed that two-thirds of hospitals own a cardiac mapping system other than the CARTO 3, and more than half of hospitals that own a CARTO 3 also own a mapping system from a competing manufacturer. 9-ER-1519-1520. Every hospital witness who testified at trial confirmed that their hospitals had competing systems on site. 10-ER-1775-1776; 10-ER-1784; 10-ER-1826-1827; 10-ER-1869; 10-ER-1891-1892; 5-ER-739. The parties' physician and clinical account specialist witnesses testified to the same. 6-ER-802; 4-ER-321-322. The two physician witnesses, Dr. Doshi and Dr. Osorio, both testified that doctors are trained on multiple cardiac

mapping systems and that it is important for electrophysiologists to be familiar with multiple systems. 6-ER-802; 7-ER-1125-1126.

As this evidence shows, if hospitals want to save money on catheters by using Innovative's reprocessed devices, the savings they can achieve by switching from Biosense's new catheters vastly exceed the cost of purchasing a rival manufacturer's mapping console. And in most cases purchasing a new console from a rival manufacturer would not be necessary to facilitate switching to a different vendor's platform, given the availability of other vendors' equipment. *See Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 68 (S.D.N.Y. 2003) (fact that customers had already purchased alternatives to defendant's operating system software showed that "switching costs," even if "high and ... not incurred lightly," were "not prohibitive"). In light of these market realities, there was no factual basis in the trial record to support a finding that Biosense's customers were "locked-in" due to monetary switching costs. *See SMS Sys.*, 188 F.3d at 21 ("being part of an installed base and being locked-in are not synonymous"; "lock-in ... must be shown, not assumed").

With respect to non-monetary switching costs, Innovative argued that it is difficult to shift physicians away from the system on which they were trained and have the most experience. But the two physician witnesses who appeared at trial, Dr. Doshi and Dr. Osorio, both testified that doctors are trained on multiple cardiac mapping systems and that it is important for electrophysiologists to be familiar with multiple systems. 6-ER-802; 7-ER-1125-1126. Trial evidence showed that hospitals and physicians could switch to another system if they wish to do so. 10-ER-1775-1776; 10-ER-1891-1892; 5-ER-740; 9-ER-1519-1520; 4-ER-323. Some hospitals were unwilling to switch, not because of the alleged switching costs, but because physicians *preferred* the CARTO 3 system and believe it is "the best thing for [their] patients." 10-ER-1884, 1885, 1887, 1891-1892. Customer loyalty engendered by a superior product is not the type of non-monetary switching cost that can support *Kodak*-style "lock-in." *See SMS Sys.*, 188 F.3d at 23 (consumers' subjective preference for one manufacturer's product over others "does not translate into the kind of economic power that antitrust law aims to mitigate"); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 957-58 (N.D. Cal. 2021) (evidence failed to

demonstrate lock-in where low switching between systems could just as easily stem from customer "loyalty and product satisfaction" rather than switching costs), *aff'd in part, rev'd in part on other grounds*, 67 F.4th at 979-80.

The entire premise of *Kodak* was that customers *desired* to switch brands but, for economic reasons, were impeded from doing so. If Biosense's customers do not *desire to switch*, owing to a preference for the CARTO 3 system, that is their prerogative. Their uncoerced *choice* to remain loyal to Biosense cannot support the theory of antitrust liability Innovative built its case upon. As this Court stated in the first appeal, the informed purchasing decisions of sophisticated hospital customers "do[] not offend the antitrust laws." *Innovative I*, 2024 WL 62948, at *2.

In short, Innovative failed to present sufficient evidence at trial to overcome the presumption against single-brand aftermarkets. Thus, even if Innovative had proved that clinical support is a distinct, standalone product (and it did not), Innovative's attempt to establish a tying market limited to CARTO 3 clinical support is unsupported by the record evidence. That failure of proof is "fatal" to its tying claim under

both Section 1 of the Sherman Act and California's Cartwright Act. *Coronavirus Rep.*, 85 F.4th at 957; *see County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (analysis under the Cartwright Act "mirrors" analysis under the Sherman Act).[1]

## II. INNOVATIVE FAILED TO PROVE THAT BIOSENSE HAS MARKET POWER IN THE ASSERTED TYING MARKET.

"Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Cascade Health*, 515 F.3d at 912; *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984) (without meaningful market power, the defendant lacks the ability "to force a purchaser to do something that he would not do in a competitive market"). "Thus, in

[1] Innovative's failure to prove a valid tying market is also fatal to its monopolization and attempted monopolization claims under Section 2 of the Sherman Act. Innovative relied on Biosense's allegedly unlawful tying conduct to prove its Section 2 claims, 9-ER-1714-1715, and that conduct was the dominant focus of the trial. The jury returned a general verdict on the Section 2 claims, making it impossible to determine whether the jury would have reached the same verdict absent its reliance on the alleged tying conduct. Indeed, the district court denied Biosense's Rule 50(b) motion as to the Section 2 claims only by relying on the alleged tying conduct, explicitly questioning whether the jury's verdict could have been sustained based on the other forms of alleged anticompetitive conduct alone. 1-ER-22.

all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (internal quotation marks omitted). "If [a defendant] lacks market power in the [tying] market, there can be no cognizable tying claim." *Id.* at 972. Here, Innovative failed to prove that Biosense possesses market power in the asserted tying market, and this failure of proof is further grounds for reversal.

### A. Biosense Lacks the Power to Control Prices, Restrict Output, or Exclude Competition.

Market power is commonly defined as the power "to raise price and restrict output," or alternatively the power "to control prices or ... exclude competition." *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1039 (10th Cir. 2017); *see Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995). As with market definition, determinations about market power must be made with due attention to "the economic reality of the market at issue." *Kodak*, 504 U.S. at 467.

The overarching commercial reality in this industry is that Biosense and other mapping system manufacturers face intense inter-

brand competition. The presence of that competition dispels any notion that Biosense has market power relating to the sale of cardiac mapping systems, and the intensity of that competition has only grown over time as additional manufacturers have entered. *See Suture Express*, 851 F.3d at 1042-44 (evidence of "actual competition ... precludes a finding of market exclusion"). The success of multiple later-entering competitors demonstrates Biosense's lack of market power in the broader cardiac mapping system space. *See Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 904 (S.D.N.Y. 1997) ("[u]nrebutted evidence that actual competitors have entered the market is a strong indicator" of the absence of "market power"). At trial, Innovative did not dispute the existence of inter-brand competition among system manufacturers. 9-ER-1757 (referencing "competition between Biosense, Abbott, and Medtronic, and other companies," and acknowledging that customers "have a choice" among these alternatives).

As discussed above, Innovative chose to narrowly define its asserted tying market to encompass only clinical support services for CARTO 3 mapping procedures. Innovative argued that, in a market so narrowly drawn, Biosense is "dominant" by definition. 6-ER-964. But

when it comes to market power assessments, courts eschew such "formalistic" thinking, preferring to focus "on the 'particular facts disclosed by the record.'" *Kodak*, 504 U.S. at 466-67; *see CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1073 (9th Cir. 2025) (rejecting "overly formalistic" analysis in antitrust cases). An objective review of the record shows that, even in a single-brand aftermarket limited to clinical support for CARTO 3 procedures, no reasonable jury could conclude that Biosense has power over price or output or has done anything to exclude competition.

Like its competitors, Biosense provides clinical support services to its customers free of charge. Nothing in the record suggests that Biosense could dispense with *free* clinical support, let alone begin charging hospitals a monopoly price for such services. To the contrary, the undisputed evidence makes clear that competition among rival mapping system manufacturers would preclude Biosense from profitably raising prices for clinical support. 6-ER-988-989; 6-ER-811; 5-ER-684; 10-ER-1795; 9-ER-1506-1507; 9-ER-1592. Indeed, Innovative's own expert, Dr. Forister, testified that, because "it's industry standard to offer clinical support for free," it is to be expected

"as an economic matter" that Biosense will continue to follow that practice in line with its competition. 6-ER-988-989. Thus, even within Innovative's narrowly drawn tying market, Biosense has no power over price.

Nor is there evidence showing that Biosense restricted market output. The evidence shows just the opposite—that Biosense, over the relevant time period, significantly expanded the volume of CARTO 3 clinical support it provides. 11-ER-2078; 11-ER-2079. In fact, Biosense's increase in supply outstripped the market growth as a whole. 12-ER-2355; 8-ER-1443; 7-ER-1083-1084. As this Court has previously held, "growing and expanding during the pertinent time period" is "persuasive evidence of a lack of market power." *Suture Express*, 851 F.3d at 1041-42; *see also Am. Express*, 585 U.S. at 549 (finding no evidence of market power where "output of credit-card transactions grew dramatically" over the relevant period).

Finally, on the record introduced at trial, no reasonable jury could conclude that Biosense has excluded, or could exclude, competition for CARTO 3 clinical support. Innovative relied on evidence that Biosense hired clinical account specialists away from hospitals, refused to share

training materials, and enforced non-compete agreements against former employees. 9-ER-1706-1707. But that evidence does not explain why Biosense provides clinical support in 95% or more of the procedures using its system, which is true with respect to each of the competing manufacturers, as well. 4-ER-359; 6-ER-776-777. As discussed above, the commercial reality is that only the mapping system manufacturers themselves can efficiently provide these services for their own systems, which in part explains why no independent service providers have emerged. This is likely also true in part because competing against original equipment manufacturers that provide an ancillary service to their customers for free is not an attractive business proposition. Thus, Biosense has not "excluded" competitors; rather, the economics of this industry simply do not make competitive entry attractive.

### B. Biosense's Share of CARTO 3 Clinical Support Proves Nothing Regarding Market Power.

Unable to point to any evidence of power over pricing or output, Innovative relied heavily on Biosense's high market share, referring to the fact that Biosense provides clinical support for 95% or more of CARTO 3 mapping procedures (as do rival system manufacturers for procedures performed using their systems). 6-ER-964; 9-ER-1706-1707;

4-ER-359. There are various circumstances in which a firm may possess a large market share but still lack any meaningful power to control prices or exclude competition. *See Suture Express*, 851 F.3d at 1042 ("market share alone is insufficient to establish market power" where "other market realities" point to the opposite conclusion); *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) ("100% market share" was insufficient to prove monopoly power where defendant lacked "the power to control prices or exclude competition").

High market shares can be indicative, in some settings, of the defendant's dominance, pricing power, or past success in excluding competition, or of high barriers to entry that insulate the defendant from the constraints of competition. But here, none of those inferences can be drawn from the fact that hospitals, in almost all cases, rely upon the clinical support services that Biosense and other manufacturers provide free of charge. As the First Circuit stated in *SMS Systems*, that "a manufacturer has a high percentage of the market for servicing its own products does not mean that it can raise the price of services or parts with impunity in that market." 188 F.3d at 16.

"[C]utting prices in order to increase business often is the very essence of competition," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986), as is the provision of ancillary services to customers for free, which is equivalent to a price reduction. As the Supreme Court has observed, where a firm supplies a product for a price below the costs of providing it, this may draw customers "toward the product being sold at less than its cost" and thus add to the firm's share. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993). But market share gained through products given away for free, or sold at prices below cost, is not indicative of market power—not where, as here, market realities suggest that customers will continue to benefit from such attractive pricing practices in the future. *See Wallace v. Int'l Bus. Machs. Corp.*, 467 F.3d 1104, 1106-07 (7th Cir. 2006) (where "low prices" can be expected to "remain," "there is no antitrust problem"). Put simply, without the ability "to increase prices above competitive levels, and sustain them for an extended period," increased market share gained through below-cost pricing "do[es] not threaten consumer welfare." *Rebel Oil*, 51 F.3d at 1434.

### C. The Notable Absence of Facts Demonstrating Customer "Lock-In" Further Underscores Why Biosense Lacks Market Power.

Innovative argued to the jury that hospitals are "dependent on Biosense's mappers" and have no "other options," which it described as "the definition of being locked in." 9-ER-1690. But this ignores the evidence reviewed above showing that, by contrast to the facts of *Kodak*, hospitals do not face prohibitive switching costs that limit their ability to shift between cardiac mapping system suppliers. The absence of economic factors creating "lock-in" in this marketplace is an additional reason why, even within a narrowly defined CARTO 3-only clinical support market, Biosense cannot be found to possess market power.

### D. Biosense's Catheter Pricing Likewise Provides No Credible Proof of Market Power.

Finally, Innovative argued that Biosense's market power in the tying market for CARTO 3 clinical support can be inferred from evidence that Biosense charged supra-competitive prices for CARTO 3 *catheters*. The facts do not support this contention either.

No reasonable jury could conclude, based on the evidence introduced at trial, that Biosense charged supra-competitive prices for

its catheters. From 2013 to 2024, Biosense's sensor-enabled catheters were priced competitively with comparable catheters from rival manufacturers. 11-ER-2080; 11-ER-2081; 11-ER-2082. In the years following implementation of the clinical support policy, prices for Biosense's new catheters did not increase; they fell. 9-ER-1532-1533. And Biosense's affiliate SterilMed sells its reprocessed catheters to hospitals at prices that are lower than or comparable to Innovative's and Stryker's reprocessed catheters. 9-ER-1537-1538; *see also* 11-ER-2083; 11-ER-2084.

Attempting to work around these facts, Innovative argued that, absent the tie, the *average* of the combined prices of new and reprocessed catheters would have been lower. Dkt. 571 at 11-15; 6-ER-990, 1027; 9-ER-1713. But comparing the prices of new and reprocessed catheters is a meaningless, apples-to-oranges comparison. Reprocessed catheters are sold at a discount to new catheters across the board because, as Innovative has acknowledged, reprocessors have a "lower cost structure" than manufacturers of new catheters. Dkt. 571 at 14. When fundamentally different cost structures are present, "any analysis of the competitive price must account for those differences." *In*

*re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2024 WL 4023561, at *20 (N.D. Cal. Aug. 26, 2024) (quoting economic analysis of defendant's expert). Innovative's analysis failed to do so.

Analysis of price differentials between new and reprocessed catheters for rival mapping system manufacturers further undermined Innovative's theory. As noted above, unlike Biosense, Abbott and Boston Scientific provide clinical support when third-party reprocessed catheters are used. Yet Innovative offered no evidence that, for these systems, new catheters and third-party reprocessed catheters are closer in price than Biosense's new catheters and third-party reprocessed catheters. To the contrary, the evidence showed that Abbott's and Boston Scientific's new catheters are priced similarly to (and in fact higher than) comparable Biosense catheters. 7-ER-1079; 9-ER-1535-1537; 11-ER-2081; 11-ER-2082.

In short, the only valid apples-to-apples comparisons are between (1) prices of new catheters sold by Biosense and those sold by rival system manufacturers, and (2) prices of reprocessed catheters sold by SterilMed and those sold by other reprocessors. In both instances,

Biosense's prices for new and reprocessed catheters are comparable to competitors' prices.

## III. INNOVATIVE'S FAILURE TO DISAGGREGATE THE EFFECTS OF LAWFUL COMPETITION INVALIDATES THE JURY'S DAMAGES VERDICT.

A plaintiff in an antitrust case may not recover damages attributable to lawful competition. But Innovative's expert calculated damages without distinguishing between lost catheter sales attributable to the alleged unlawful tying arrangement and lost sales attributable to conduct that courts have explicitly held does not violate the antitrust laws. His failure to disaggregate damages attributable to lawful competition renders the jury's damages verdict invalid as a matter of law.

### A. Tying Liability Is Barred as a Matter of Law Where the Customer Knowingly Assents to the Challenged Terms and Conditions.

A plaintiff's damages model must "segregate the losses, if any, caused by acts which were not antitrust violations from those that were." *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992). A plaintiff's "utter failure to make any segregation between damages attributable to lawful competition and that attributable to the

unlawful scheme … requires reversal of the verdict and remand for a new trial on the amount of damages." *Id.* (quoting *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1986)); *see also Image Tech. Servs.*, 125 F.3d at 1224.

In this case, Innovative's tying claim relied on the theory of market power and "lock-in" upheld in *Kodak*. As discussed above, that theory applies when consumers who purchased the defendant's durable goods in the primary equipment market were unaware of the alleged tying policy and became "locked-in" to purchasing the defendant's aftermarket goods by virtue of significant switching costs. In that scenario, the inability to switch easily to a competing brand could permit the defendant to coerce consumers into purchasing the defendant's aftermarket goods when they may prefer to purchase those goods elsewhere.

The *Kodak* theory of liability does not apply, however, when consumers within a competitive market were aware of the challenged tying policy at the time of their purchase and nonetheless chose the defendant's brand over rival alternatives. The Third Circuit explained why that is so in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d

430 (3d Cir. 1997). There, Domino's franchisees alleged that the company had imposed an unlawful tying arrangement by requiring them to buy ingredients and supplies from Domino's as a condition of continuing to operate their franchises. *Id.* at 436. The franchisees attempted to rely on a *Kodak* lock-in theory, but the Third Circuit held that *Kodak* did not apply. The court noted that the franchisees were aware of the challenged tying policy before purchasing their franchises and thus could "assess the potential costs and economic risks at the time they signed the franchise agreement." *Id.* at 440. If they found the tying policy too burdensome, the franchisees "could have purchased a different form of restaurant, or made some alternative investment." *Id.* at 441. "Unlike the plaintiffs in *Kodak*," the franchisee plaintiffs in *Queen City Pizza* were required to purchase products from Domino's "not because of Domino's market power over a unique product," but because they chose to be "bound by [a] contract" mandating such purchases. *Id.*

This Court, in *Newcal*, adopted and expanded upon the Third Circuit's reasoning. There, the Court held that "the law prohibits an antitrust claimant from resting on market power that arises solely from

contractual rights that consumers knowingly and voluntarily gave to the defendant." *Newcal*, 513 F.3d at 1048 (emphasis omitted). The Court noted that a formal contract is not required to trigger this rule because "the law permits an inquiry into whether a consumer's selection of a particular brand in the competitive market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in an aftermarket." *Id.* at 1049. When "contractual obligations" of that sort limit a consumer to purchasing the defendant's aftermarket products, those sales do not fall within the *Kodak* framework at all. Instead, they are the result of knowing and voluntary consumer choices, which are "not a cognizable source of market power." *Id.* at 1047 (emphasis omitted) (citing *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997)).

In the first appeal, this Court explained how these principles apply in the factual circumstances at issue here. The Court noted that, after Biosense's clinical support policy was formally adopted in April 2016, "[s]ophisticated customers like hospitals assuredly were aware of the policy and yet chose to purchase the CARTO 3 anyway." *Innovative I*, 2024 WL 62948, at *2. Quoting *Newcal*, 513 F.3d at 1048,

the Court observed that "[m]arket power arising 'solely from contractual rights that consumers knowingly and voluntarily gave to the defendant' *does not offend the antitrust laws*." 2024 WL 62948, at *2 (emphasis added); *see also Avaya Inc. v. Telecom Labs, Inc.*, 838 F.3d 354, 405 (3d Cir. 2016) (holding, on analogous facts, that "no antitrust liability for a *Kodak*-style attempted monopolization claim could lie after May 2008 when customers were put on clear notice that purchasing an Avaya PBX precluded use of ISP maintenance").

Hospitals that purchased CARTO 3 systems *after* they learned of the policy made a knowing and voluntary choice to accept the terms of Biosense's closed system, under which they would be required to buy catheters from Biosense or SterilMed in order to receive free clinical support. Sales of catheters for use with those systems were not the product of coercion, as required to support a tying claim, but rather the natural consequence of an eyes-open choice to purchase Biosense's mapping system over alternative systems offered by competitors.

### B. Many Hospitals Knew of the Clinical Support Policy Before Purchasing Their CARTO 3 Systems.

The evidence at trial established that many hospitals purchased their CARTO 3 systems after learning of Biosense's clinical support

policy. As discussed above, the policy was fully implemented by April 1, 2016, the date by which Biosense sought to ensure that all existing customers were aware of the policy. But Biosense had already begun to notify hospitals of the policy before then, in some instances as early as 2014. And some of those hospitals thereafter purchased additional CARTO 3 systems—purchases that Innovative's expert improperly included within his damages model.

For example, Biosense informed Ascension, a healthcare system comprising dozens of hospitals, of the clinical support policy in 2014. 8-ER-1345, 1347; 10-ER-1987-1990. Thereafter, in February 2016, Ascension voluntarily entered into a new contract with Biosense, which included terms for purchasing additional CARTO 3 consoles. 8-ER-1346-1347; 11-ER-2088-2148. Similarly, in November 2014, Biosense informed HealthTrust Partner Group, a large group purchasing organization representing thousands of medical facilities, of the clinical support policy. 8-ER-1348-1349; 12-ER-2384-2386. Later, in August 2018, HealthTrust Partner Group entered into a new contract with Biosense, and some of its participating hospitals purchased new CARTO 3 consoles after entering into this contract. 8-ER-1350-1352; 11-ER-

2149-2150; 11-ER-2151-2306. And Portia Tranguch, the Director of Cardiac Services at Allegheny General Hospital, testified that "we've bought [CARTO 3] systems since we found out about [Biosense's] clinical coverage [policy]." 10-ER-1895.

Some hospitals, like those just discussed, already owned CARTO 3 systems at the time they learned of the clinical support policy, and they nonetheless decided to purchase additional CARTO 3 systems after that date. Lost catheter sales associated with the CARTO 3 systems those hospitals purchased after learning of the clinical support policy were unquestionably *not* the product of unlawful coercion. But that is also true of catheter sales associated with the CARTO 3 systems those hospitals owned before they learned of the policy. As evidenced by their decisions to purchase additional consoles after being informed of the policy's implementation, these hospitals would have chosen Biosense's closed system even if they had been aware of the policy at an earlier time. Thus, none of the lost catheter sales associated with CARTO 3 systems owned by these hospitals could properly be included in Innovative's damages model, regardless of when the system was purchased.

### C. Innovative's Damages Model Encompassed Lost Sales Attributable to Lawful Competition.

To assess damages on Innovative's tying claim, Dr. Forister used a benchmark analysis to calculate the lost profits on catheter sales Innovative allegedly would have made to hospitals but for the clinical support policy. 6-ER-1000-1005. For each of the catheters at issue here, Dr. Forister chose what he regarded as a comparable catheter not subject to the clinical support policy, and he determined Innovative's share of the overall market for sales of that benchmark catheter. He then assumed that, without the clinical support policy, Innovative would have captured the same share of the market for the catheters at issue. The model did not identify lost sales by individual hospital but instead computed lost sales for the market as a whole. Dr. Forister's damages calculations were therefore based on market-wide sales of each of the catheters at issue, without limiting the calculations to hospitals that purchased CARTO 3 systems *before* learning of the clinical support policy. 6-ER-1006 (describing items excluded from Innovative's damages model, without excluding profits attributable to lawful sales).

Dr. Forister's damages model was invalid under the legal principles discussed above. Biosense raised this issue before trial in its

*Daubert* motion, which sought to exclude Dr. Forister's legally defective damages opinions precisely because he failed to exclude damages attributable to lawful competition. Dkt. 318 at 12-17. The district court denied the motion on the ground that Innovative was entitled to recover damages for lost catheter sales to *all* hospitals, regardless of whether they purchased their CARTO 3 systems with knowledge of the clinical support policy. 1-ER-39. As *Queen City Pizza*, *Newcal*, and *Avaya* demonstrate, that ruling was erroneous as a matter of law, and it led to a damages verdict that is invalid as a matter of law. At a minimum, then, the damages verdict must be vacated and the case remanded for a new trial on damages.

## CONCLUSION

The judgment, along with the district court's orders entering a permanent injunction and awarding attorney's fees, should be reversed.

Respectfully submitted,

*/s/ Paul J. Watford*

Paul J. Watford
KING & SPALDING LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
(213) 443-4355
pwatford@kslaw.com

Ross E. Elfand
Casey Marie Berger
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
(212) 556-2100
relfand@kslaw.com
cberger@kslaw.com

M. Sean Royall
Jacob George Mathew
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600
sroyall@kslaw.com
jmathew@kslaw.com

William F. Cavanaugh, Jr.
Isaac J. Weingram
PATTERSON BELKNAP
WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
wfcavanaugh@pbwt.com
iweingram@pbwt.com

*Counsel for Appellant*

February 17, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-6042

I am the attorney or self-represented party.

**This brief contains** 13,998 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ____.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Paul J. Watford **Date** February 17, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 25-6042

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** /s/ Paul J. Watford **Date** Feb 17, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*