**No. 25-6042**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

INNOVATIVE HEALTH, LLC,

*Plaintiff-Appellee,*

v.

BIOSENSE WEBSTER, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Central District of California, No. 8:19-cv-01984-JVS, Hon. James V. Selna

## APPELLANT'S EXCERPTS OF RECORD
### Volume VI of XII: ER-753 – ER-1037

| | |
|---|---|
| M. Sean Royall | Paul J. Watford |
| Jacob George Mathew | KING & SPALDING LLP |
| KING & SPALDING LLP | 633 West Fifth Street |
| 2601 Olive Street, Suite 2300 | Suite 1600 |
| Dallas, TX 75201 | Los Angeles, CA 90071 |
| (214) 764-4600 | (213) 443-4355 |
| | pwatford@kslaw.com |
| William F. Cavanaugh, Jr. | |
| Isaac J. Weingram | Ross E. Elfand |
| PATTERSON BELKNAP | Casey Marie Berger |
| WEBB & TYLER LLP | KING & SPALDING LLP |
| 1133 Avenue of the Americas | 1290 Avenue of the Americas |
| New York, NY 10036 | 14th Floor |
| (212) 336-2000 | New York, NY 10104 |
| | (212) 556-2100 |

*Counsel for Appellant*

February 17, 2026

**ER-753**

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

| | | |
|---|---|---|
| INNOVATIVE HEALTH, LLC, | ) | CERTIFIED TRANSCRIPT |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | SACV-19-01984-JVS |
| BIOSENSE WEBSTER, INC., | ) | |
| Defendant. | ) | TRIAL DAY 4, VOL. I |
| ---------------------------- | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 9, 2025

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

2

APPEARANCES OF COUNSEL:

For the Plaintiff:

DEREK T. HO
ANDREW E. GOLDSMITH
MATTHEW D. READE
KELLEY C. SCHIFFMAN
RACHEL T. ANDERSON
ANNAMARIA M. MORALES-KIMBALL
SEAN P. QUIRK
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
(202) 367-7900

PANTEHA ABDOLLAHI
THEODORA ORINGHER, PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, CA  92626-7109
(714) 549-6200

JEFFREY L. BERHOLD
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia  30309
(404) 872-3800

MATTHEW I. SUMMERS
JOSHUA PAUL DAVIS
BERGER MONTAGUE, PC
505 Montgomery Street, Suite 625
San Francsico, CA  94111
(415) 906-1626

For the Defendant:

WILLIAM F. CAVANAUGH, JR.
ALEJANDRO H. CRUZ
ISAAC J. WEINGRAM
PATTERSON BELKNAP WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, NY  10036
(212) 336-2000

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-755

3

KARLA J. KRAFT
STRADLING YOCCA CARLSON & RAUTH, LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA   92660-6422
(949) 725-4000

MUHAMMAD USMAN FARIDI
NADAV BEN ZUR
LINKLATERS, LLP
1290 Avenue of the Americas
New York, NY   10104
(212) 903-9000


ALSO PRESENT:

AARON DETATE
Innovative Health Client Representative

KATHRYN MEISEL
Johnson & Johnson and Biosense Webster
Client Representative

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-756**

4

I-N-D-E-X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RAHUL DOSHI | 16 | 42 | 62 | 66 |
| TROY TUTTLE | 67 | 86 | 100 | |

| PLAINTIFF'S EXHIBITS: | | | MARKED | RECEIVED |
|---|---|---|---|---|
| Exhibits 224, 225, 228 | | | | 67 |

| DEFENSE WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (None) | | | | |

| DEFENSE EXHIBITS: | | | MARKED | RECEIVED |
|---|---|---|---|---|
| Exhibit 148 | | | | 92 |

| | PAGE |
|---|---|
| Videotaped Deposition Excerpts of PORTIA TRANGUCH played | 67 |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-757

5

SANTA ANA, CALIFORNIA; FRIDAY, MAY 9, 2025; 8:36 A.M.

(Jury not present)

THE CLERK:  Calling Item No. 1, SACV-19-01984-JVS, Innovative Health, LLC versus Biosense Webster, Inc.

Counsel, please state your appearances for the record.

MR. HO:  Good morning, Your Honor.  Derek Ho from Kellog Hansen for the plaintiff.

THE COURT:  Good morning.

MR. GOLDSMITH:  Andrew Goldsmith from Kellog Hansen for the plaintiff.  Good morning.

THE COURT:  Good morning.

MS. SCHIFFMAN:  Kelley Schiffman with Kellogg Hansen also for the plaintiff.  Good morning.

THE COURT:  Good morning.

MR. QUIRK:  Sean Quirk with Kellog Hansen for the plaintiff.  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BERHOLD:  John Berhold for the plaintiff.

THE COURT:  Good morning.

MS. ANDERSON:  Rachel Anderson for the plaintiff.

THE COURT:  Good morning.

MR. QUIRK:  Matthew Reade for the plaintiff.

THE COURT:  Good morning.

MR. SUMMERS:  Matt Summers for the plaintiff.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-758**

6

THE COURT:  Good morning.

MR. CAVANAUGH:  Good morning, Your Honor.  Bill Cavanaugh from Patterson Belknap on behalf of the defendant.

THE COURT:  Good morning.

MS. KRAFT:  Good morning, Your Honor.  Karla Kraft from Stradling on behalf of the defendant.

THE COURT:  Good morning.

MR. FARIDI:  Good morning, Your Honor.  Muhammad Faridi on behalf of the defendant.

THE COURT:  Good morning.

MR. CRUZ:  Good morning, Your Honor.  Alejandro Cruz on behalf of the defendant.

THE COURT:  Good morning.

MR. WEINGRAM:  Good morning, Your Honor.  Isaac Weingram from Patterson Belknap on behalf of Biosense.

THE COURT:  Good morning.

MR. KIRSHENBAUM:  Good morning, Your Honor.  Andrew Kirshenbaum on behalf of the defendant.

THE COURT:  Good morning.

MR. SEIB:  Karl Seib from Patterson Belknap on behalf of Biosense.

THE COURT:  Good morning.

Okay, thank you for the e-mail this morning. Let's take up the demonstratives.

MR. WEINGRAM:  Yes, Your Honor.  Isaac Weingram

7

from Patterson Belknap on behalf of Biosense.

Your Honor, I think we've narrowed it down to just a single demonstrative, the first one, which is Slide 8 about collections.

Your Honor, do you have a copy or would you like me to provide one?

THE COURT:  No.  You sent a copy with the e-mail.

MR. WEINGRAM:  I did indeed, okay.  My colleague sent one.  So, Your Honor, with respect to this demonstrative, I guess there are two issues.  One is related to the disclosure of the opinion expressed here, and the second is an issue about confusing of issues.

So the first is that we don't think that this demonstrative was actually properly disclosed in Dr. Forister's reports.  Secondly, and just as importantly, we think that the demonstrative itself will be misleading to the jury.  In particular, the collections here focus, as you'll note, on ACUNAV, which is not a catheter at issue here.  There is no damages claim with respect to ACUNAV. There is no claim that it's covered by the policy or the conduct at issue here.

So we think that the intention here is to mislead the jury into thinking that the collection practices related to ACUNAV can be applied to the other catheters at issue here.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-760**

8

THE COURT:  Why does the collection issue have to be limited to the catheters at issue here if that's the general practice of Biosense?

MR. WEINGRAM:  Because with respect to ACUNAV, Your Honor, they haven't defined the market.  So to that extent, there's no allegations to suggest that the collection practices would actually be anticompetitive.  They have no way to suggest that we have market power or a significant market share with respect to ACUNAV, so it just isn't relevant.

THE COURT:  But if the market is defined more broadly as catheters, why isn't it relevant?

MR. WEINGRAM:  With respect, Your Honor, that's not the market they have defined.  They've defined very specific markets in finding, for example, two navigational ultrasound catheters, which just includes the SOUNDSTAR catheter.  They've defined a market for high-density mapping catheters, which only is confined to the PENTARAY and the OCTARAY and Optrell.  And then they have defined a third market about circular mapping catheters that is just the LASSO.  In none of these markets is the ACUNAV.

THE COURT:  Okay, who is going to address this?

Ms. Schiffman.

MS. SCHIFFMAN:  Thank you, Your Honor.  Good morning.

9

THE COURT:  Good morning.

MS. SCHIFFMAN:  I'll start with that last point about the ACUNAV.  So you heard Mr. Distel testify yesterday regarding Sterilmed's collection practices as they relate to ultrasound catheters, and he mentioned both the ACUNAV and the SOUNDSTAR.

Their collection practices are uniform across the two.  They focus on collecting the ultrasound catheters.  That includes both the ACUNAV and the SOUNDSTAR.  The reason the ACUNAV is useful here is that, unlike the SOUNDSTAR, it's been less effected by the Case Coverage Policy.  So you can see the distinct effect of collections more clearly with the ACUNAV.  That's why we're using this in this instance.

In terms of disclosure, Dr. Forister disclosed this calculation in paragraph 87 of his initial 2021 report, and I can provide Your Honor with a copy or read that into the record if helpful.  Essentially the language is as follows:  "Biosense withheld a significant number of the catheters that it collected.  Between 2015 and 2020, Biosense collected more than double the number of ACUNAV that it sold."

THE COURT:  Slow down.  Slow down.

MS. SCHIFFMAN:  I'm sorry.  I'll repeat it. "Biosense withheld a significant number of the catheters that it collected.  Between 2015 and 2020, Biosense

10

collected more than double the number of ACUNAV that it sold."

That paragraph cites to the underlying data. And the work papers that were disclosed at the same time with the report include the calculations, the figures here. Biosense could have asked about the details of the calculation at either one of Dr. Forister's depositions, but they did not. So there is full disclosure here of everything on this slide.

THE COURT: Okay.

Do you want to respond?

MR. WEINGRAM: Yes, Your Honor.

THE COURT: It seems to me there was a disclosure.

MR. WEINGRAM: With respect, I don't think that the figures that are mentioned in this specific slide were actually disclosed, and I think actually the figures here are inconsistent with the language that Ms. Schiffman just read.

But beyond that, Your Honor, I think the broader issue and the more important one is that the ACUNAV is just simply not at issue. And I think Ms. Schiffman's statements just highlighted the issue that is presented here. They're suggesting now that the ACUNAV and SOUNDSTAR compete with one another, that they've defined a market that is just the SOUNDSTAR catheter. And they seek to leverage the fact that

11

there's ACUNAV collections which don't relate to any market, don't relate to any damages claim.  In fact, there are zero damages they claim with respect to the ACUNAV to now present this to the jury.

THE COURT:  I'm going to allow the slide.

You wanted to take up Exhibit 5046.  Do I have a copy of that?

MR. FARIDI:  May I approach, Your Honor?

THE COURT:  Please.

(Document handed to the Court)

MR. FARIDI:  These are the two exhibits, 5046 and 800, that came up during the cross-examination of Mr. Distel yesterday.  With respect to 800, Your Honor allowed us to put into evidence just the first page of the document, not the remaining pages.  And with respect to 5046, Your Honor allowed me to cross-examine Mr. Distel with the statements that he made in that document, but Your Honor did not allow us to put that document into evidence.

Both of these exhibits relate to communications that Innovative Health was having with its business partner, its distributor, Medline.  And this issue, Your Honor, is going to come up I think with respect -- in probably the examination of other witnesses.  I didn't want to take up the time yesterday before the jury to argue this issue in a more fulsome manner, so I just want to raise it now.

12

Both of these exhibits, Your Honor, should be allowed into evidence.  And similar exhibits to the extent they come up in other examinations should go into evidence for I think two reasons.

One is Medline is their distributor.  It's their agent.  So the exhibits come into evidence as statements made by the agent within the scope of the agency under Rule 801(d).  And the second thing, Your Honor, is they actually have a business record certification for Medline.  Their contention is that the e-mails that they were having with Medline, the ones that are referenced in their certification, are generated in the ordinary course of business at Medline.  So those records should come in as business records of Medline.

Now, those certifications that they got from their business partner, Medline, don't reference these two exhibits.  So there's a fundamental inconsistency in their position that the certification that they got from their business partner, the documents that they want to put into evidence, Medline documents, that those documents are generated in the ordinary course of business.  But the Medline communications that they were having that we want to put into evidence that reflect poorly on them, somehow those documents are not business records of Medline.

And that inconsistency, Your Honor, I think --

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-765**

13

THE COURT:  Well, who has the burden of establishing?

MR. FARIDI:  We do.

THE COURT:  Well, they came forward with a certificate.  I suppose you could have come forward with a certificate as well.

MR. FARIDI:  That is correct.

THE COURT:  Or deposed the custodian, whatever.

MR. FARIDI:  That is correct.  That's why I referenced the agency argument in the beginning because I think these statements are fairly attributed to them under Rule 801(d).

THE COURT:  Okay, who's going to address this?

Ms. Schiffman.

MS. SCHIFFMAN:  Thank you, Your Honor.  Very briefly on the agency point, the agency relationship does not exist here.  Innovative did not renew its contract with Medline.

THE COURT:  But did an agency relationship exist at the time these documents were generated?

MS. SCHIFFMAN:  I don't believe so either, Your Honor.  These are two companies that have a sales partnership, and that's it.

THE COURT:  So how would you characterize it?

MS. SCHIFFMAN:  They are two businesses that

14

interact and have a contractual relationship where Medline

sells -- or did sell Innovative's products just like a store

might sell a company's products.

THE COURT:  Okay.  Thank you.

MR. FARIDI:  Medline is their distributor.

Medline is selling their products to the hospital.  That's

uncontested.  If Your Honor will remember, there was this

one exhibit that we put up yesterday, the spreadsheet.  In

the spreadsheet, I talked about how some of these physicians

to whom Medline was selling IH's products did not like

reprocessed catheters.

That's a spreadsheet that captures Medline's sales

agents' activities that is coming from IH's files, and in

that very document, Mr. Distel is supervising the activities

of his agents at Medline.  He is giving them feedback as to

how you approach these hospitals with respect to --

THE COURT:  Is that feedback, is that coaching, or

direction?

MR. FARIDI:  I would say it's more like coaching.

THE COURT:  Well, is there a coaching exception?

MR. FARIDI:  There is no coaching exception except

when, Your Honor, is whether or not the statements are made

by an agent of the principal.  Any statement made by an

agent within the scope of the agency are admissible.  I

think -- I don't have the case numbers and the citations

15

here.  I think there was testimony that they are in fact IH's agents, and we can pull that up.  And if Your Honor wants to take this issue up during the lunch break or resolve it now, we can find that testimony.

THE COURT:  Well, for the time being, I'm not going to expand on yesterday's rulings.

MR. FARIDI:  Okay.  Thank you, your Honor.

THE COURT:  Okay.  Anything else?

MR. FARIDI:  Nothing from us, Your Honor.

MR. HO:  Nothing from the plaintiff, Your Honor.

THE COURT:  Okay.  Thank you.

(Recess)

(Jury not present)

THE COURT:  I'm afraid we're going to have to stop at 3:00 rather than 3:30 today.  The doctor's office wants me a little bit earlier, so just an hour for lunch today.

Anything before we bring the jury in?

MR. BERHOLD:  Do you want our witness to approach the stand before the jury --

THE COURT:  Yes, please -- no, call your witness in front of jury because the witness is just beginning.

MR. BERHOLD:  Okay.

(Jury present)

THE COURT:  Good morning, ladies and gentlemen.

Would you call your next witness, please.

16

MR. BERHOLD:  Thank you, Your Honor.

Innovative Health calls Rahul Doshi.

RAHUL DOSHI, PLAINTIFF'S WITNESS, SWORN

THE CLERK:  Could you please state your full name, spelling your last name for the record?

THE WITNESS:  It's Rahul Doshi, D-o-s-h-i.

THE COURT:  Mr. Berhold.

DIRECT EXAMINATION

BY MR. BERHOLD:

Q    Good morning, sir.

A    Good morning.

Q    Are you currently employed?

A    Yes, sir.

Q    Who is your employer?

A    HonorHealth.

Q    What is HonorHealth?

A    HonorHealth is a not-for-profit hospital network of now I believe nine hospitals in the Scottsdale and Northwest Phoenix market.

Q    Are you being paid for your time to appear here today?

A    I am not.

Q    Are you a practicing physician?

A    I am.

Q    Do you have a speciality?

A    Cardiac electrophysiology.

17

Q   What is electrophysiology in a nutshell?

A   So cardiac electrophysiology is the field that specializes in the treatment of cardiac arrhythmia disorders or electrical abnormalities of the heart.

Q   Do you have a title at HonorHealth?

A   I am the Chief of Cardiovascular Medicine, Network Director of Electrophysiology at HonorHealth, Chief of the Cardiac Arrhythmia Group, and Professor of Medicine at Arizona State University.

Q   How would you describe your position at HonorHealth?

A   I am over a large group of employed cardiovascular physicians, and more specifically, or more directly I should say, over a group of electrophysiologists, as well as having administrative responsibilities related to electrophysiology services for the hospital network.

Q   Are you involved in supervising the EPs at HonorHealth?

A   Yes.

Q   On the administrative side, are you involved in procurement?

A   I have involvement in procurement as part of essentially a committee that goes through decisions for the service line, including electrophysiology.  I'm not a sole decision-maker, of course, but, yes, I am involved in procurement.

Q   How would you describe a regular week in your practice?

18

A      I spend roughly two-thirds of my time practicing medicine, so I still see patients in the office.  I still do procedures for patients that include surgeries or also catheter-based interventions.  And then the remainder of my time is either academic pursuits, you know, teaching and writing and such, or administrative responsibilities related to the hospital network.

Q      Where are you physically during the work week?

A      In Scottsdale for the most part.

Q      Are you somewhere else as well?

A      I do spend part of my time -- I also live in Southern California here in Dana Point, so I do split my time back and forth.

Q      How often are you doing EP procedures?

A      Every week.  I'm typically in the EP laboratory where we do the majority of our procedures typically three days a week, sometimes four.

Q      How common is atrial fibrillation?

A      It is the most common arrhythmia in the world.  It is incredibly common.  It is estimated that literally two to three percent of the population over the age of 60 have atrial fibrillation, so this is an incredibly common disorder.

Q      Let's step back for a minute.

Can you tell me about your educational background?

19

A     Yes, sir.  I did my undergraduate degree at UCLA.  I did my medical school at Stanford.  I then did my initial medical training in internal medicine at Harbor-UCLA and then did my cardiology and electrophysiology training at Cedars-Sinai.

Q     Did you go into practice after your fellowship?

A     I did.

Q     Can you walk us through your time in practice by hospital to the present day?

A     Wow.  So I have been in practice for 25 years now.  So I finished training in 2000 formally with cardiac electrophysiology.  So roughly speaking, 2000 to 2005, I was in Las Vegas, Nevada, as part of a group, Cardiovascular Consultants of Nevada, which was a large private cardiology group.  And I also had a university affiliation with the University of Nevada as an assistant professor.  I was there for approximately five years.

I then left Las Vegas, and I actually came to Orange County.  I was with a group that was then Fullerton Cardiovascular Medical Group, primarily located at St. Jude Medical Center in Fullerton.  But I was practicing in several of the hospitals here in Orange County, including St. Jude Medical, Anaheim Memorial.  But then I also had a joint position as Chief of Electrophysiology at University of California-Irvine at the Medical Center here.  That

20

was -- I'm starting to now run out of time here.

Okay, so 2012, I believe, is when I left that position and then became Chief of Electrophysiology at the University of Southern California Keck School of Medicine in Downtown L.A. at the Medical Center there.  I was there until the end of 2019.

And then I started at HonorHealth in my current role -- well, started at HonorHealth in January 2020 as the Director for Electrophysiology, and it's only been this last six months that I'm now Chief of Cardiovascular Medicine.

Q     And did you teach while in practice at all of these places?

A     All of these places, yes.

Q     So six years at HonorHealth?

A     Going on six years, five and change.

Q     And do you still teach?

A     Yes, I do.

Q     And did you already say Arizona State -- or sorry, where do you teach?

A     So we have at HonorHealth, and have had, training programs.  We have residency programs and fellowship programs, and we certainly have cardiology and electrophysiology fellows.  So we have been doing that all along.  And I still have a university appointment at the University of Arizona College of Medicine in Phoenix.

21

HonorHealth now has become the primary clinical affiliate with a newly created medical school at ASU, Arizona State University.  So we will be having medical students as part of the new medical school through HonorHealth, but that hasn't started yet.

Q    Did I hear correctly that you've always been affiliated with an educational institution?

A    Yes, sir.

Q    Is that important to you?

A    Yes, absolutely.

Q    Why is that?

A    I've always been interested in academic medicine, and I've always enjoyed teaching and research, and it's just been a large part of my career.

Q    Let's talk about your EP program at HonorHealth.

How many doctors in your program?

A    We have a total of now nine electrophysiologists who are employed.  We have several other electrophysiologists that also provide services in the network.  So roughly speaking, about 12 electrophysiologists.

We have an EP fellowship program, which is one fellow a year for a two-year program.  So we have two electrophysiologists in training, if you will, at any given time.  So that would be the total EP manpower from a physician's side.  We also have of course other allied

22

professionals, nurse practitioners, who are part of our EP group as well that are also providers within our network.

Q    How many cardiac mapping machines at HonorHealth?

A    It's always a moving target, but roughly speaking, we have nine now.  We just added one, but that's throughout -- actually, no, I'm sorry, ten now.  So it would be ten now.

Q    In your time managing electrophysiology departments and teaching fellows, have you become familiar with physicians' preferences in cardiac mapping systems?

A    Yes, sir.

Q    In your experience, do some physicians have strong preferences for one cardiac mapping system over another?

A    Absolutely.

Q    And would you say some or most or all?  How would you describe it?

A    I would probably say the majority of our folks -- and that's been my experience in general -- have a preference. That does range from absolutely only will want to use a particular system because they just don't have the familiarity with another one, and that also ranges to maybe another quarter of folks who really don't have a strong preference either way.  So there is a continuum here for certain.

Q    You mentioned familiarity with the systems.

Can you talk a little bit more about the reasons

23

why a physician would prefer one mapping system over another?

A    Quite often it's just you can say historical.  People are trained on a particular system or another, and they have a greater degree of experience.  And you can imagine it becomes almost a self-fulfilling thing.  You are trained on a particular system or you have a particular preference in training, you start your practice, and you continue that, and you just gain more experience with that.  And that of course then further drives that preference and familiarity.

And, of course, it does vary.  Some physicians are very keen on trying to master many different platforms of technologies, and some are very focused on wanting to do what they feel most comfortable with.

Q    Do you have a sense of how many of the cases at HonorHealth are being done with the CARTO 3?

A    So the number always continues to change, and we actually just looked at our ablation volumes.  You know, we do several thousand catheter ablations every year at HonorHealth.  Roughly two-thirds of those procedures are done with CARTO.

Q    When physicians are doing EP procedures at HonorHealth, who operates the mapping machines while the doctor is forming the procedure?

A    There is a mapping specialist that is provided by the

24

companies who manufacture or make the mapping systems.

Q    And let's make sure I understand your testimony.

Will manufacturers provide that support for another manufacturer's machine?

A    No, they do not.

Q    Does any machine manufacturer not send representatives to operate their cardiac mapping machines during a procedure at HonorHealth?

A    No, they do not.

Q    Have you ever seen a case covered by someone other than the manufacturer's representative at any time during your career?

A    Yes, in part.  There have been several instances in my career where we've had lab personnel that had some degree of familiarity with the mapping systems and that they could do a straightforward case sometimes.  So it's variable.  Again, always with that added support if necessary.

But we've had -- for example, when I was at USC, we had some of our folks in the lab who were fairly comfortable with at least getting a case started and running most of it.  There were many times where there would be problems, and they would need to be troubleshooted, and then they would reach out to the company representative, but that was almost an exception.  Most places throughout my career, and certainly as time has gone by, it has become

25

increasingly so.  We just don't have that expertise in the laboratories.

Q     Why not?

A     I mean, there's a lot of reasons for that.  That's a very complicated question.  But basically, it relates to our difficulties in maintaining adequate competencies or having just availability of personnel.  Hospitals, and certainly cath labs, are no exception.

We are under a lot of pressure in terms of maintaining good personnel.  They have to stay busy, and thus they cover many different types of cases.  So having them focused on something that is very knowledge-based or expertise-driven, such as electrophysiology, is difficult, so they just don't have the experience.

On top of that, because there is so much demand for these folks, there is a great deal of turnover.  These people move from place to place, or they may move out of being at your hospital and working for industry instead, so there's a great deal of flux in these personnel.

And then on top of that, quite frankly, these systems are amazing, but they are incredibly complicated.  And they've become more complicated and more sophisticated as time has gone by, so it does require the type of training and expertise that, quite frankly, though, the companies do an amazing job at training their own folks to support.

26

Q    You mentioned that your own staff has to cover different types of cases.

Can you expand on that a little bit?  Were you referring specifically to EP cases?

A    Not at all.  In fact, just as an example -- and this varies of course across the country and certainly across facilities, but at HonorHealth, we have one hospital out of our five that do electrophysiology procedures that have some dedicated folks that focus on electrophysiology, not a hundred percent, but the majority of the cases that cover electrophysiology.

Now, within that, it's doing ablations, but it also could be doing putting in a pacemaker or putting in a defibrillator.  So there is a wide spectrum of cases even within electrophysiology that don't include mapping, so it's not like we have any of these folks sitting and doing one mapping case after another, after another.  That's only at one particular facility, and that's for a small subset of our personnel.

The rest of our facilities and the majority of our staff, even at our biggest center, actually go across laboratories and do different things.  So they might be doing electrophysiology one day.  They might be doing angioplasty the next day.  They might be doing a structural case like percutaneous valves or something the next day.  It

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-779

27

varies.  And it's just related to staff manpower and coverage of the lapse.

Q    And is any of your staff at HonorHealth currently trained to operate the mapping machines?

A    None.

Q    Have your hospitals been dependent on manufacturers to operate machines?

A    Yes.

Q    Has that dependence changed over the last five or six years at HonorHealth?

A    No.

Q    Could you do mapping procedures without that support from the manufacturers?

A    We could not.

Q    I want to change subjects.

What is reprocessing generally?

A    So reprocessing generally is taking something that you have used, such as a catheter or a sheath or a cable or what have you, and resterilizing it or sterilizing it -- no, resterilizing it, sorry -- so that you can reuse it for another patient.

Q    In your experience, do hospitals reprocess or reuse medical devices?

A    All the time.

Q    Do hospitals reprocess devices used during

28

cardiovascular surgery?

A    Yes, sir.

Q    What about open-heart surgery?

A    Yes.

Q    What about valve repair?

A    Yes.

Q    Does that include instruments like scissors?

A    Sure.

Q    What about devices used in mapping procedures?

A    Yes.

Q    Which devices?

A    We do reprocess or resterilize several different types of catheters.  We do also different types of long sheaths, which are basically long tubes that we use to insert catheters.  And we do it with many cables that these catheters are connected to.

Q    Does HonorHealth have a contract with anyone to reprocess catheters?

A    We currently have a contract with Innovative Health.

Q    Is that for EP catheters?

A    Yes.

Q    When did HonorHealth start its contract with Innovative Health?

A    I am actually not exactly sure.  It has not been a very long time.  I would say approximately a year and a half, but

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-781

29

I'm not a hundred percent sure when it started formally.

Q    Has anything prevented HonorHealth from taking full advantage of its reprocessing contract with Innovative Health?

A    Well, the one thing in particular has been related to being able to resterilize high-density mapping catheters from Biosense Webster because of a policy that they would not cover or support those cases if we did that.  And it's high-density mapping catheters and also a mapping-enabled sheath that is used for catheter manipulation.

Q    How has Biosense's policy affected your ability to make use of your reprocessing contract with Innovative?

A    Well, the concern is that we, obviously as mentioned, are dependent on Biosense to help us perform these procedures by providing somebody to do the mapping portion of the procedure or to run the mapping machine.  So if we don't have case coverage, we can't do the procedure.  It's really as simple as that.  So not being able to reprocess a particular type of catheter because then we're in fear of losing that coverage does affect our ability to reprocess catheters.

Q    When did you first hear about the Case Coverage Policy?

A    Sometime last fall I believe.

Q    Was that before or after HonorHealth started its contract with Innovative?

30

A    It was after.

Q    How long have you been practicing EP again?

A    25 years.

Q    Were you surprised to learn of the policy last year?

A    I was.

Q    Why was it a surprise to you?

A    It's mostly around the idea of as absolute as it was, right.  If we are being told that we're not going to get coverage to perform a procedure that we feel is in the best interest, of course, of patient care and sometimes is life-saving, that, of course, creates a great deal of angst. And all of us are in the business of taking care of patients, and so, yeah, I was surprised.

Q    What do you think of the Case Coverage Policy, Dr. Doshi?

A    I don't think it's appropriate.

Q    Why not?

A    Number 1, I do feel that we can use reprocessed catheters safely, effectively.  But importantly, it does affect our ability to support patient care.  It does represent of course a cost savings as you can imagine, and that is incredibly important for hospitals and hospital systems these days.  So that is something that -- I mean, it's one of the prime reasons why we do reprocessing.

There are several others as well of course.  We do

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-783**

31

think about the bigger picture as far as whether this is a reduction of a carbon footprint or a reduction of waste or even supporting our local business.

Innovative Health is based in Phoenix, and they had developed a relationship with some of the folks at HonorHealth when we were initially looking at this, and we were very impressed with their facilities and their work, et cetera. So obviously, it's nice to think about supporting somebody locally, right.

But the bigger picture here is that we want to be able to take care of patients, but we need to do this in a cost-effective manner. We're all aware of the high cost of healthcare. And quite frankly, unless we look at trying to manage that cost-effectiveness as best as possible, we simply can't do other things. We can't support certain types of procedures. We can't get new technology. We can't advance patient care. It's really that simple.

Q    Are you aware of any other cardiac mapping machine manufacturer that has a policy like this one?

A    I'm not.

Q    During your entire time practicing at hospitals and teaching at medical schools, has any other cardiac mapping machine maker that you can think of had a policy like this one?

A    Not that I'm aware of.

32

Q    As a practical matter, can you perform a mapping procedure without someone besides you running the CARTO-3?

A    At this time, no.

Q    Does the Biosense manufacturer's representative treat the patient during your cases?

A    They do not.

Q    Who does?

A    I do, or the physician does.

Q    Does the manufacturer's representative diagnose your patients during cardiac mapping procedures?

A    No.

Q    Who does?

A    I do.

Q    Does the Biosense manufacturer's representative handle the catheters during your cardiac mapping procedures?

A    They do not.

Q    Who does?

A    I do.

Q    Where are you positioned physically during the procedure?

A    At the bedside.

Q    Where is the manufacturer's representative?

A    Typically at a desk or behind a cart where the computer equipment is located.

Q    How many EP procedures would you estimate that you have

33

performed during the course of your career?

A     Tens of thousands.

Q     How many with support from a Biosense Webster manufacturer's representative?

A     The vast majority of cases that I have done with CARTO, and that is several thousand, have been done with the support of a CARTO representative.

Q     Dr. Doshi, can you think of any clinical reason why Biosense's manufacturer's representative could not operate the CARTO when you, as a physician, are using an Innovative catheter?

A     I cannot.

Q     Is there any doubt in your mind about that?

A     None whatsoever.

Q     Who interprets the map of the heart that's created by the CARTO 3?

A     I do.

Q     Do you ever delegate that task to the Biosense manufacturer's representative?

A     No.

Q     Who interprets ultrasound images of the heart during your cardiac mapping procedures?

A     I do.

Q     Would you ever ask the Biosense manufacturer's representative to do that interpretation for you?

34

A    No.

Q    Who is responsible for selecting which catheters to use in a cardiac mapping procedure?

A    I am.

Q    Who is responsible for deciding that a catheter is safe to use with a patient?

A    I am.

Q    Who is responsible for assessing whether the catheter you are using is accurate in terms of its location in the heart?

A    I am.

Q    Have you ever asked the Biosense manufacturer's representative to tell you whether the catheter is accurate?

A    No.

Q    Why not?

A    There has never been a need quite frankly, so I have never been in that situation.  If there are issues with any catheter, whether it's reprocessed or brand new, which does rarely occur, usually it's a cable connection or something like that.  But that's something that you see, and you're assessing in realtime, and you're making that determination.

         So in that case, you troubleshoot the system, and that usually goes through a variety of things, right.  You might change the cable.  You might check the connections. You might change the catheter, and then you continue case.

35

Q    Is it any different when you use a reprocessed catheter?

A    Not at all.

Q    What do you do if a new catheter does not work when you plug it in?

A    After troubleshooting -- I mean, these are obviously -- you know, these are medical equipment, so they're expensive. And so we do usually check multiple things before we change a catheter, but after we've checked those multiple things, we just replace the catheter.

Q    Do you do anything differently when a reprocessed catheter does not work?

A    Nothing different.

Q    Is it the same for a sensor-enabled catheter from Innovative?

A    No difference whatsoever.

Q    Do you teach your medical students or fellows any differently?

A    I do not.

Q    How many CARTO 3 mapping systems at HonorHealth?

A    I believe we have four.

Q    Why doesn't the hospital replace their CARTOs with another brand of machine so you can buy Innovative's sensor-enabled catheters?

A    Mostly driven by physician preference.  There's other

36

reasons as well, but it's mostly physician preference.  And they are the predominant mapping system that is used at HonorHealth.  They are the industry leader for certain.

I also do believe that we should have multiple mapping systems and multiple types of mapping systems for a variety of reasons, right.  There are sometimes subtle but real technology differences between systems.  And also, we're a teaching institution, and so we want to expose our trainees to as many different things as possible.  So regardless, I would want to have, you know, as many different technology options as possible.

Q    Are there certain features that are only available on the CARTO 3?

A    There are some.

Q    Can you think of any specific example?

A    One would be the integration with ultrasound imaging to create an anatomic shell of the chamber that we're working with.  So a three-dimensional mapping system allows you to create an anatomic shell of the cardiac chamber that you're manipulating a catheter in, and so that can be formed by a variety of different ways.

The way these are typically done is an electrical catheter moves around that shell and you superimpose that anatomic location with electrical information.  There are other ways to also add to that degree of accuracy, and

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-789

Case 8:19-cv-01984-JVS-KES   Document 540   Filed 06/25/25   Page 37 of 117  Page ID #:26361

37

ultrasound is one example of that where you can superimpose a realtime ultrasound image to make that map.

Q    Putting on your network director hat, how easy is it to get physicians to change from their preferred machine?

A    It depends on the physician.  Some physicians, it's very easy, and that's the minority.  The majority of physicians, it's very difficult actually.

Q    Why don't you just order your doctors to switch from the CARTO to a different brand?

A    As much as that might -- and not specifically for CARTO to a different brand, but in general, as much as that might be a very attractive thing, it's never the right thing to do, right.  I would never want to have a physician doing something that they're not comfortable with.

So if a physician feels that they can treat the patient better doing something a certain way, whether it's just related to comfort or it's experience, we want that physician to do the best they can for that particular patient of course.

Q    Have you ever asked the Abbott mapping technicians to operate the CARTO for you?

A    No.

Q    Why not?

A    They're not trained to do so.

Q    Why don't you ask Innovative to send a mapping

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-790**

38

technician to operate Biosense's CARTO?

A    I'm not aware they have any such people, and I'm not sure -- well, I don't have any experience with a non-CARTO person or one that has not been appropriately trained by Johnson & Johnson to operate those machines, so I just don't know how competent they would be.  As I mentioned before, I think all the companies do an incredible job at training their own personnel.

Q    What about hiring and training hospital staff at HonorHealth to operate the machine when the doctor wants to use the CARTO?

A    It would be a potential solution for this, but it is virtually impossible, again, for some of the reasons I had outlined previously.  We just don't have the bandwidth related to the personnel we have, their availability, their ability, to focus that time on a particular procedure and to go through that adequate training.

It would, of course, just related to even man-hours but even the appropriateness or the level of capacity for a particular staff to be able to do this would be very expensive, very difficult, and, quite frankly, right now virtually impossible.

Q    Dr. Doshi, why don't you just buy Biosense reprocessed catheters from Sterilmed?

A    It's a great question.  I do not know the details of

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

39

cost or other issues that might be associated with this, but I do know that obviously we have a contractual relationship that we have developed with Innovative Health.

Part of that cost is, of course, driven by volume or the number of different catheters that we reprocess, and that does drive down costs.  And so adding another vendor to do reprocessing might increase that cost.  If you asked me what those numbers were, I have no idea.

Q    Were you involved in the decision to reprocess EP devices with Innovative Health?

A    Yes.

Q    Why did HonorHealth pick Innovative Health?

A    I think they were -- and this was not driven by me. This was more sort of essentially presented to me as part of this, you know, committee, if you will.  HonorHealth had done a fair amount of due diligence.  And when I say HonorHealth, our folks in our Procurement Department and the folks that are responsible for ordering catheters and making these types of decisions, that they were both very impressed with the facilities, and they were very impressed with the workflow and the personnel support.

And again, they were a local company that was looking to partner with us, and so they were very enthusiastic about using them.  And what they presented to me when I was seeing this was equally impressive, or I felt

40

was equally impressive, and so we supported it.

Q    How has Innovative Health done so far?

A    I've had no complaints at all.

Q    How has Innovative Health done on product quality?

A    It's been just fine.

Q    How has Innovative Health done on customer service?

A    Very good.

Q    Dr. Doshi, how has Innovative Health performed on technical support for their catheters?

A    I don't know that I even have any direct knowledge of that because it really hasn't been an issue.  I mean, when you say technical support, sure, that might mean something as simple as how the catheters are literally delivered and transported back and forth, right, or how they're kept track of.

Related to any issues troubleshooting a catheter, it's not been an issue.  And so I personally do not have any experience in troubleshooting anything with Innovative, so it has been a seamless process thus far.

Q    Has HonorHealth purchased any reprocessed Abbott sensor-enabled catheters from Innovative?

A    Yes.

Q    What about the HD Grid?

A    HD Grid is one of those catheters.  And again, I want to make one clarification, sensor-enabled versus not, right.

41

And if we're talking about the high-density mapping catheters, HD Grid is a particular catheter that has been reprocessed, yes.

Q    Has HonorHealth had any issues with the quality of Innovative's HD Grid catheter?

A    No.

Q    Dr. Doshi, is it important for HonorHealth to maximize savings from reprocessing?

A    Yes.

Q    Why is that?

A    As I mentioned previously, we are under a tremendous amount of pressure to try to lower costs as much as possible, and this is even as a nonprofit organization.  We just need to do this to maintain the ability to do these procedures.  Obviously, if a procedure costs the system money, we can't keep doing them indefinitely.  And so this is just one example of trying to save certainly where we can.  Again, there are other reasons.  I think we should be looking at more reprocessing, not less.

Q    How does HonorHealth use the savings from reprocessing in the EP lab?

A    So obviously, it supports the bottom line for the hospital.  But specifically, we look at these things, and it helps us make decisions or allows us to actually reinvest that money into newer technologies, newer equipment, or

42

even, quite frankly, just maintenance of the equipment that we have currently.  So it allows us to not just -- you know, it allows us to continue to do what we do but to also keep up with a very rapidly evolving technology space.

Q    Would HonorHealth reprocess sensor-enabled catheters with Innovative if Biosense did not -- well, let me rephrase this.

So would HonorHealth reprocess sensor-enabled catheters from Biosense with Innovative if Biosense did not condition CARTO 3 support on using its own new or reprocessed versions of those catheters?

A    If I followed you correctly, yes.

Q    Does Biosense's Case Coverage Policy increase or decrease choice for your doctors and hospitals?

A    Decrease.

MR. BERHOLD:  Your witness.

MR. FARIDI:  Your Honor, may I approach with some cross-examination documents?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. FARIDI:

Q    Dr. Doshi, it's good to meet you in person today.  We met over Zoom a couple of months ago for your deposition.

A    Yes.

Q    I just want to clean up a couple of things before I

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-795

43

dive into the examination.

During the direct examination, sir, you referenced a mapping-enabled sheath.  Do you recall that?

A    Yes.

Q    That's the VIZIGO sheath manufactured by Biosense Webster, correct?

A    Yes.

Q    You also spoke, sir, during direct examination about the fact that you were not aware of the Biosense Clinical Support Policy until very recently.  Do you recall that?

A    Last fall, yeah.

Q    And you're not here to testify that when you worked at the Keck School of Medicine at the University of California that the supply chain administrators were not made aware of the Biosense policy, correct?

A    Correct.

Q    Okay.  And you're not here to testify to the fact that before you joined HonorHealth in Arizona, the HonorHealth leadership was not made aware of the policy, correct?

A    Correct.

Q    Okay.  And you talked about how HonorHealth signed an agreement with Innovative Health for reprocessing, correct?

A    Yes.

Q    Okay.  Do you know whether, before that agreement was executed, whether Innovative Health made HonorHealth aware

44

of the policy?

A    I have no knowledge of that whatsoever.

Q    The other thing you said on direct examination, sir, is that, and I'll quote:  "There's a tremendous amount of pressure on us to lower costs."  Do you recall that?

A    Yes.

Q    And you also said that HonorHealth is a nonprofit organization, correct?

A    Correct.

Q    Sir, are you aware of the fact that HonorHealth paid its CEO, Todd LaPorte, $2.1 million in 2023?

A    I am not aware of any of the salaries that any of the senior executive team make.

Q    So you're also not aware of the fact that the executive leadership at HonorHealth was paid $14.8 million that year?

A    I am not aware at all.

Q    Now, you talked about how there is a physician preference for the Biosense system.  Do you recall that?

A    Yes.

Q    And I want to talk about some of the reasons why.

Now, you, Dr. Doshi, having been an electrophysiologist for over two decades.  You consider Biosense Webster's CARTO 3 system as -- let me reask the question.

You consider Biosense to be an innovator in

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-797

45

electrophysiology, correct?

A     Absolutely.

Q     And that's because in your view Biosense Webster has been at the forefront of the three-dimensional mapping system, correct?

A     Correct.

Q     And in particular, Biosense has been at the forefront of the magnetic-faced localization catheters that are used to diagnose and treat arrhythmia, correct?

A     Correct.

Q     And, sir, you understand that the CARTO 3 system uses what is known as an electromagnetic field to aid with the mapping exercise, correct?

A     Yes.

Q     And the CARTO 3 system was the first electromagnetic sensor-based technology that was launched into the marketplace, correct?

A     Correct.

Q     The prior technology used x-rays, what's referred to as fluoroscopy in the industry, with respect to the internal electrical recordings, correct?

A     They're not the same thing, but prior to three-dimensional mapping, we relied on fluoroscopy, correct.

Q     The electromagnetic technology in your view, sir, has

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-798**

46

changed the field over the last 28 years by allowing electrophysiologists to treat arrhythmias that they could not previously target, correct?

A    Absolutely.

Q    The other contribution that the CARTO 3 system has made is to reduce the need for the use of x-ray technology during EP procedures, correct?

A    Correct.

Q    And in fact, the CARTO 3 has reduced fluoroscopy because it allows the localization of the catheter inside our hearts without the need to use x-rays, correct?

A    Correct.

Q    And it's because of some of the contributions made by this electromagnetic technology that Biosense innovated, that we are at a point today that many of the EP procedures can be completed without the need to use x-ray technology, correct?

A    Correct.

Q    And the -- obviously, the elimination of x-ray technology has also reduced the risk associated with radiation, correct?

A    Correct.

Q    And that's good for both the patients and the medical staff that operates in the lab, correct?

A    Correct.

47

Q    And CARTO 3, sir, has also contributed to decreasing the amount of time that's used to complete an EP procedure, correct?

A    Correct.

Q    Because in the olden days, it could sometimes take seven to ten hours to complete an EP procedure, correct?

A    Sure.  That's very long, but, yes, the procedure times have decreased with this modern technology.

Q    And that saves money for hospitals, correct?

A    Yes.

Q    Because you can complete more procedures, correct?

A    Correct.

Q    And the contributions of Biosense Webster and its technologies has helped both electrophysiologists like yourself, and your colleagues, and patients?

A    Absolutely.

Q    And hospitals?

A    Absolutely.

Q    I want to talk a little bit about the competition that Biosense faces, okay?

        You spoke a lot about during your direct examination as to how some physicians are not able to operate more than one cardiac mapping machine.  Do you recall that?

A    Yes.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-800**

48

Q    Dr. Doshi, you yourself, sir, have evaluated almost every mapping system in the electrophysiology space, correct?

A    Correct.

Q    You personally have had obviously hands-on experience with the CARTO 3, correct?

A    Yes.

Q    In fact, you had access to CARTO 3 at almost every electrophysiology lab that you worked at?

A    Yes.

Q    You also had access to the Abbott system at almost every electrophysiology lab that you worked at?

A    Yes.

Q    Just a couple of clarifications on the Abbott system. The Abbott system is known in the industry as the open system, correct?

A    Correct.

Q    And that means that you can use that platform to visualize any catheter based on impedence technology, correct?

A    Correct.

Q    The Abbott systems is different from the CARTO 3 because the CARTO 3 is a closed system, correct?

A    Correct.

Q    And that means that only Biosense-originated catheters

49

can be used on it, correct?

A    Correct.

Q    And at HonorHealth, you talked about how many CARTO 3s you have during your direct examination, correct?

A    Correct.

Q    You said you had about five to six, correct?

A    I think we have four or five.

Q    Okay.  But you also have five Abbott cardiac mapping systems, correct?

A    Correct.

Q    And you would admit, sir, that you are not the only electrophysiologist at HonorHealth who knows how to use both the Abbott and the CARTO system, correct?

A    Correct.

Q    In fact, when we spoke during your deposition, HonorHealth was in the process at that time of also acquiring the OPAL system that's manufactured by Boston Scientific, correct?

A    Correct.

Q    And you would agree, sir, that it's not uncommon for electrophysiology labs to have multiple cardiac mapping systems, correct?

A    Correct.

Q    Dr. Doshi, you also believe, sir, that it's a good thing for electrophysiologists to have exposure to different

50

mapping systems?

A    Correct.

Q    And the systems that we've been talking about, the Abbott system and the Biosense system, you would agree, sir, that these systems compete against one another, correct?

A    Correct.

Q    You believe that they all operate, generally speaking, in the same space, correct?

A    Yes.

Q    And in fact, the competition between Biosense Webster and Abbott to use your words in the deposition is very good, correct?

A    Yes.

Q    You spoke during direct examination, sir, about the process that hospitals go through in order to acquire capital equipment such as cardiac mapping systems.  Do you recall that?

A    Yes.

Q    And you referenced the committee system that is used at HonorHealth, correct?

A    Yes.

Q    And purchasing decisions related to cardiac mapping systems are made by these committees, correct?

A    Correct.

Q    In fact, you talked during direct examination about how

51

you've been involved in the committee process?

A    Correct.

Q    And these committees receive input from electrophysiologists like yourself and others, correct?

A    Yes.

Q    And take physician preferences into account, correct?

A    Yes.

Q    They receive feedback from and input from procurement professionals whose job includes evaluating the objective evidence of a given technology, correct?

A    Yes.

Q    And committees also receive input from finance professionals who evaluate the total cost, the lifetime cost, associated with cardiac mapping systems, correct?

A    Yes.

Q    And those lifetime costs that these committees take into account include the cost of disposables, such as catheters, correct?

A    Yes.

Q    And you also agree, sir, that the lifetime costs of disposables far exceed the costs of simply buying the cardiac mapping machine, correct?

A    I'm sorry.  I'm not sure I'm following.  The lifetime cost of a disposable far exceeds that of a mapping system?

Q    That was a terrible question.  Let me reask it.

52

A    Yeah.

Q    Generally speaking, the total costs associated with the catheters that are used on a single cardiac mapping system, those total costs over the lifetime usage of a machine exceed the costs of the capital equipment, correct?

A    In general, yes.

Q    I want to talk a little bit about catheters, the disposables, and focusing on the CARTO 3 system.

You would agree that precision of a catheter is important in diagnosing and treating arrhythmia?

A    Yes.

Q    Lack of precision increases the risk of harm to the patient?

A    Correct.

Q    That's because if the map reflects that a catheter is -- particularly an ablation catheter -- is in a particular location, but you are not actually in that location in real life, you may ablate the wrong area of the heart, correct?

A    Correct.

Q    And you would agree, sir, that in Biosense's promotional materials related to the CARTO 3, the company has focused on the accuracy of the map, correct?

A    Correct.

Q    And you would also agree, sir, that the electromagnetic

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-805**

53

technology that we spoke about earlier contributes to the accuracy of the map, correct?

A    Correct.

Q    And I want to talk very briefly about reprocessed catheters, an issue that you spoke about during direct examination.

When you were at the Keck School of Medicine here in California before you moved to Arizona, you did not use any reprocessed sensor-enabled mapping catheters on the CARTO 3 system, correct?

A    Correct.

Q    At your current employer, HonorHealth, you also have not been using any reprocessed sensor-enabled mapping catheters on the CARTO 3, correct?

A    Correct.

Q    In fact, you have never previously used a reprocessed sensor-enabled catheter on the CARTO 3, correct?

A    Correct.

Q    Now, because you have never personally yourself ever used a reprocessed sensor-enabled catheter on the CARTO 3 system, you can't tell us that you have a preference for a reprocessed sensor-enabled catheter for the CARTO 3 system over an OEM original brand-new sensor-enabled catheter for the CARTO 3 system?

A    I do want to amend my answer if I could.  I do have --

54

but it's different, and I think we had spoken about that previously.  I have used reprocessed sensor-enabled ablation catheters on CARTO OUS, specifically in India, as you recall.  And so I have had that experience, but that would be the only time I have used that.

Q    And you would agree, sir, that the regulatory regime in India is different from the one here?

A    It is different.

Q    And when you said that you used a catheter in India, you're talking about the actual ablation catheter, correct?

A    Correct.

Q    We're not talking about the ultrasound SOUNDSTAR?

A    Correct.

Q    We're not talking about a mapping catheter such as the PENTARAY or an OCTARAY, correct?

A    Correct.

Q    We're not talking about a circular catheter such as LASSO, correct?

A    So all of those catheters that we use that were reprocessed in realtime, there were circular mapping catheters.  And in fact, there were ultrasound catheters, but I'm not sure which ultrasound catheter it was quite frankly, but certainly not PENTARAY and OCTARAY as far as high-density mapping catheters.

Q    You agree, sir, that the FDA doesn't allow reprocessors

55

like Innovative Health to manufacture reprocessed ablation catheters, correct?

A    They're not manufacturing.

Q    They are reprocessing?

A    They are not allowed to reprocess therapeutic catheters.  Correct.

Q    So just to make sure that the record is clear on this, you have never personally used a reprocessed sensor-enabled catheter on the CARTO 3 system that's manufactured or reprocessed either by Biosense Webster, a corporate affiliate called Sterilmed, or Stryker, correct?

A    Correct.

Q    In fact, you also never personally laid your hands on a reprocessed Biosense sensor-enabled catheter, at least as of the date of your deposition, that was reprocessed by Innovative Health, correct?

A    Correct.

Q    And you would agree, sir, that reprocessing can sometimes cause microcracks on a catheter, correct?

A    That is -- I have not -- I have no experience with that whatsoever, so I don't know.  I do understand that that's a possibility.

Q    Well, why don't we just clarify the record on this.  I want to take a look at page 142-12 to 142-17 of your deposition.  This is Clip 39.  Let's play that.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-808

56

(Video clip played)

BY MR. FARIDI:

Q    You also agree, sir, that reprocessing can sometimes cause material degradation of the catheter, correct?

A    Yes.

Q    You understand, Dr. Doshi, that Biosense's catheters are calibrated -- let me withdraw that.

We spoke earlier about the importance of accuracy. Do you recall that?

A    Yes.

Q    You agree, sir, that Biosense's catheters are calibrated to provide location accuracy within one millimeter, correct?

A    Correct.

Q    You are aware, sir, that Innovative Health does not recalibrate the sensors on the catheters that they sell, correct?

A    Correct.

Q    In fact, sir, you are also aware that Innovative Health does not guarantee location accuracy within one millimeter like Biosense Webster and Sterilmed do, correct?

A    Correct.

Q    You would also agree, sir -- and we had some debate about this at your deposition.  Ultimately, I think where we landed is that you would agree that some

57

electrophysiologists are dependent on clinical specialists, on mapping support provided by the manufacturer, in providing some level of accuracy in connection with an EP procedure, correct?

A    We did debate this a little bit.  I understand what you're asking, and I would -- in general, I would agree with the fact that we rely on our mapping specialists as part of the team to help relay information.  I think we were discussing is the person that is ultimately responsible and has the expertise to actually take all the information that's coming in, not just from the map, to determine the accuracy, location, effectiveness of a particular ablation spot, let's say, is the electrophysiologist.

Q    The electrophysiologist has ultimate responsibility, but the electrophysiologist does rely to some degree on the support provided by a clinical account specialist with respect to location accuracy, correct?

A    I don't know that I would use the word "rely."  I would say that it is part of the information that is being given to us that we process and we take into account as we're making an assessment.

Q    That's fair.  Thank you.

I'm skipping a lot of pages here because we don't have to debate this issue.

A    That's good.

58

Q    You also agree, sir, that the clinical account support -- the mapping support provided by a system manufacturer such as Biosense Webster is provided for free, correct?

A    Correct.

Q    And in fact, you've performed electrophysiology mapping procedures with support from Biosense's clinical specialists, correct?

A    Correct.

Q    You said you've done thousands of them, correct?

A    Correct.

Q    And you have found Biosense's clinical specialists to be, quote, "incredibly skilled, very valuable, and very knowledgeable," correct?

A    Correct.

Q    You've been satisfied by their performance?

A    Yes.

Q    And you also agree, sir, that they receive a significant amount of training from Biosense Webster, correct?

A    Correct.

Q    It could take them anywhere between six months to a year and a half in order to become proficient, correct?

A    Correct.

Q    And I also want to talk a little bit about the interplay between the clinical support that the Biosense

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-811**

59

mappers provide and the actual cardiac mapping system, okay?
It is obviously the expectation, as you said during direct
examination, of the electrophysiologist that if they're
doing a case that involves mapping, they will having mapping
support, correct?

A     Correct.

Q     Either from sometimes a hospital or from the
manufacturer, correct?

A     Correct.

Q     And clinical support for the cardiac mapping system
translates that service that the supporters are providing or
that the mappers are providing that can help you take care
of patients, correct?

A     Correct.

Q     And you would agree, sir, that the clinical support
that the Biosense mappers provide is part of a broader
system offering that includes the console and the
disposables, correct?

A     Correct.

Q     Now, you understand, sir, that Innovative Health has
decided to compete against Biosense Webster, correct?

A     I don't know that they're in competition with Biosense
Webster.  They're --

Q     Well, they sell reprocessed sensor-enabled catheters,
correct?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-812

60

A    Yes.

Q    And -- but Innovative Health has -- and we said this on direct examination -- never offered to bring someone in to map your cases, correct?

A    Correct.

Q    They've never offered to bring someone in to train HonorHealth employees to provide clinical support, correct?

A    Correct.

Q    I think you said in your direct examination that you're not even sure whether they have a mapper on staff.  Do you recall that?

A    Correct.

Q    Do you see Mr. DeTate sitting right here, the gentleman to the far left?

A    Yes.

Q    You understand that he works for Innovative Health?

A    Yes.

Q    And he's a very proficient mapper in the CARTO 3 system.  Did you know that?

A    I did not know that.

Q    Do you know, sir, that Innovative Health had discussions with their business partner, Medline, about whether Medline can provide mapping support to hospitals? Did you know that?

A    I had no knowledge of that.

61

Q    You have no knowledge of the fact also that they told Medline not to go down that path, correct?

A    Yeah, correct.

MR. FARIDI:   Your Honor, can I just have a quick moment to confer with my colleague?

(Defense counsel conferring)

BY MR. FARIDI:

Q    Dr. Doshi, just one last subject.  You've consulted with many medical device companies over the years, correct?

A    Correct.

Q    And you've received compensation from them over the years, correct?

A    Correct.

Q    And I think between 2017 and 2023, you've received well over a million dollars either in research funding or remuneration for lost time and expenses from medical device companies, correct?

A    Correct.

Q    And is it fair to say that it's not unusual for doctors to consult with medical device manufacturers, correct?

A    Correct.

Q    And in fact, the fact that a doctor has consulted with a medical device manufacturer doesn't automatically make them biased -- doesn't actually make them biased in favor of the medical device manufacturer, correct?

62

A    Correct.

Q    In fact, you've received remuneration from Biosense Webster over the years, correct?

A    Correct.

MR. FARIDI:  Thank you.

No further questions, Your Honor.

THE COURT:  Mr. Berhold.

MR. BERHOLD:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. BERHOLD:

Q    How long does a cardiac mapping machine typically last?

A    It depends on a variety of things.  If you're talking about how long it physically could be used, I'm not sure I know the information -- or know the answer to that, because most of time we are replacing equipment with newer versions of equipment because of the technology advances.  So the typical mapping system I would say has a shelf life of approximately three years, but that is variable.

Q    How many -- so four cardiac mapping machines -- excuse me, four CARTO 3s at HonorHealth?

A    Correct.  It's four or five.  It's -- I believe it's four, but --

Q    Do you know how old is the oldest CARTO 3?

A    I don't know if you say nuts and bolts.  We do maintain how current they are, and that's related to both hardware

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-815**

63

and software, and currently our systems are considered current for lack of a better term.

Q    When a hospital buys a cardiac mapping machine, do they contract to receive new catheters for as long as they use the machine?

A    There are a whole host of ways people or hospitals, networks, whatever, get their equipment or continue to get their equipment, and they are incredibly complicated and diverse, right.  But certainly you have capital pieces, such as mapping systems.  They can either be acquired outright, and you're spending capital for the machine.  And then certainly, you can buy catheters as disposables, and you acquire them.

       Most of the time in this day and age there are packages, if you will, where things are put together, and you can have a variety of different models.  For example, you can use a certain commitment to buy catheters that allows you to get a capital piece.  And that is being used quite commonly these days because of this expense.

Q    When you say buy a cardiac mapping machine, do you also contract for a lifetime supply of clinical support for the machine?

A    I don't know how exactly to answer that.  That has been part of the I want to say assumption, that when we are buying or purchasing a mapping system, there has been that

64

commitment to provide the support for helping to run that system for all of the things I think we've previously discussed, all the reasons we've previously discussed.  And so that has been part of the commitment, and in fact, in some degree, contractual obligations as well, that the companies do agree to support the system.

Q    Okay.  So -- I'm sorry.  You understand that it is part of the contract?

A    It is -- I'm not -- I am not aware of any formal -- I am not a contracts person.  I am not a procurement person.  And so I'm not aware of any formal language that says you're committed to provide service.  I have seen things related in different contracts that, you know, have involved a service burden across different technology platforms, but I don't know that anything is formalized, and I certainly don't know what the contract is at HonorHealth.

Q    Are you aware that Biosense can refuse to provide clinical support for the CARTO 3 if you use reprocessed catheters?

A    Yes.  That was made aware to me as we've previously discussed.

Q    Would you use Innovative's sensor-enabled catheters on the CARTO 3 if Biosense didn't have the Case Coverage Policy?

A    Yes.

65

Q   You've testified earlier that you believe the clinical support is free.

On ablation procedures, does HonorHealth have to buy a new ablation catheter for the case?

A   Yes.

Q   How much do those ablation catheters generally cost?

A   Typically a few thousand dollars.

Q   And for a CARTO 3, would it be a Biosense ablation catheter?

A   Yes.

Q   And it would plug into the CARTO 3?

A   Yes.

Q   And it also has the magnetic sensors?

A   Yes.

Q   And it also appears on the map?

A   Yes.

Q   And for every cardiac mapping procedure, does HonorHealth have to buy a new reference patch set from Biosense to use on the CARTO 3?

A   Yes.

Q   And how much do those cost?

A   I'm not sure.  It's usually several hundred dollars. The total patching thing is around a thousand bucks.

MR. BERHOLD:  No further questions, Your Honor.

THE COURT:  Any recross?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-818

66

MR. FARIDI:  Yes, Your Honor.

RECROSS EXAMINATION

BY MR. FARIDI:

Q    I just want to clarify one thing, Dr. Doshi.

Systems manufacturers, such as Biosense Webster, don't issue an invoice to hospitals for the mapping support that they provide, correct?

A    Correct.

Q    And in fact, sir, there is no contract that requires a system manufacture to provide clinical support in connection with an EP procedure, correct?

A    Correct.

Q    And just on this issue with respect to the ablation catheters, ablation catheters under the FDA's guidance cannot be reprocessed, correct?

A    Correct.

MR. FARIDI:  No further questions, Your Honor.

THE COURT:  Ladies and gentlemen, I think we'll take the mid-morning break here.  We'll be in recess for 15 minutes.  Please remember the admonition.

(Jury not present)

THE COURT:  Sir, you may step down.

We'll be in recess.

(Recess)

THE COURT:  Let's bring the jury in, please.

67

(Jury present)

THE COURT:  Would you call your next witness, please?

MR. HO:  Thank you, Your Honor.

Innovative Health calls Portia Tranguch by videotaped testimony, and moves the admission of the following sponsored by her testimony, Exhibits JX224, JX225, and JX228.

THE COURT:  Any objection?

MR. FARIDI:  No objection, Your Honor.

THE COURT:  They will be received.

(Exhibits 224, 225, and 228 received in evidence)

(Videotaped deposition excerpts played)

THE COURT:  Would you call your next witness, please.

MS. ANDERSON:  Good afternoon, Your Honor.  Rachel Anderson for the plaintiff, Innovative Health.

We call Mr. Troy Tuttle to the stand.

TROY TUTTLE, PLAINTIFF'S WITNESS, SWORN

THE CLERK:  Could you please state your full name, spelling your last name for the record.

THE WITNESS:  Troy David Tuttle, T-u-t-t-l-e.

DIRECT EXAMINATION

BY MS. ANDERSON:

Q    Hello, Mr. Tuttle.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

68

A    Hello.

Q    Could you please tell the jury where you're from?

A    Santa Antonio, Texas.

Q    And what do you do for work, Mr. Tuttle?

A    I'm currently in the medical device industry doing consulting.

Q    Okay.  And before we get into the substance of your testimony, I just want to clarify something for the jury.  You said that you work in the medical device industry.

Have you ever worked for the defendant, Biosense Webster?

A    No, I have not.

Q    Have you ever worked for the plaintiff, Innovative Health?

A    No, I have not.

Q    Are you being paid to testify here today?

A    No, I am not.

Q    Have you been promised anything to testify here today?

A    No, I have not.

Q    Have you and I ever talked about the questions that I'm going to ask you today?

A    No, we have not.

Q    Okay.  Mr. Tuttle, how long have you worked in the healthcare industry?

A    I've been in the healthcare industry for about 25, 30

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-821**

69

years.

Q    And how did you get into the healthcare industry?

A    Health Careers High School, so I was at the Magnet School for Medicine.  So I went there and decided health was my path, and I've been engaged in that sector ever since.

Q    Where did you go to school?

A    Undergrad at Baylor University, Masters at OU, and an online M.B.A.

Q    Okay.  And what did you study in each of those programs?

A    Sure.  An undergrad in biology, and master's is physiology.

Q    And where did you work for your first job out of school?

A    First job out of school, I did early research in healthcare, and then eventually made my way into business development, and then worked in a cardiovascular lab.

Q    Where did you work at a cardiovascular lab?

A    Yeah, UT Physicians in Houston.

Q    Okay.  And what was your role in the cardiovascular lab at UT?

A    Yeah.  For three years, I managed the day-to-day operations and oversaw the cardiovascular lab for imaging nuclear medicine, and then helped build that clinic out to multiple clinics across the city of Houston as well.

70

Q    How long did you work in the cardiovascular lab at UT?

A    About three years.

Q    And where do you work after that?

A    After that, I got recruited for some startups, some startup work in the CV and oncology realms, and then after that, I went to Vizient.

Q    And what is Vizient?

A    So Vizient is the country's largest group purchasing organization.  So think of hospitals banding together to have strength in numbers when it comes to looking at the market from devices, technology, and basic pricing and contracting.

Q    So did Vizient help the hospitals make purchasing decisions?

A    Absolutely.  They looked to me as a -- kind of a consultant and a subject matter expert on cardiovascular spaces, so CRM, coronary, peripheral, EP -- so coronary products, cardiac rhythm management products, peripheral vascular products, perfusion, and neurophysiology products. I knew those sectors and spaces very well, so all the suppliers, the products, and then hospitals would talk to me about their cardiovascular portfolio.

Q    Okay.  And when did you work at Vizient?

A    From 2015 to 2020.

Q    And you were describing that Vizient is a group of

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

71

hospitals or has groups of member hospitals.

How many member hospitals did Vizient have when you worked there?

A    Yeah, so there's about 6,000 hospitals across the country, give or take, and they cover about 20 percent of the facilities across the country.  And notably, Vizient covers 90 percent of the academic medical centers, so I've spent a lot of time in those facilities where tomorrow's physicians were being trained.

Q    And could you just clarify what services a GPO like Vizient offers to hospitals?

A    Sure.  Pretty much everything.  So think about the four walls of a hospital.  Vizient is going to cover the wax on the floor, those contracts, all the way to bedside commodes, all the way to the devices that you implant in somebody.  So the hospitals truly look to Vizient to be their partner, an indispensable trusted ally in all those pieces so they basically can operate well.

Q    And so from 2015 to 2020 when you worked at Vizient, what was your role?

A    Yeah, I started off as a portfolio executive.  So as a PE, my job again was to know the CV segment as a portfolio executive.  So I managed all the national contracts across the country.  And then after those two years, I went into implementation.  So now I traveled across the country in

72

helping hospitals implement their cardiovascular programs. And my last two years was direct consulting for Aptitude, which was the future-forward platform in cardiovascular management for Vizient.

Q    Now, when you talk about interacting with hospitals, what did those interactions look like for you?

A    Sure.  So the engagements were based on what's called a Request for Proposal or an RFP.  So the hospital basically wants to look at their current devices being used and wants to find what partnerships kind of make the most sense for them strategically, for their physicians, a whole number of nuances and reasons there.

So my job was to get to know that hospital, get to know their physicians, their stakeholders, and see, okay, hey, where do you want these particular cardiovascular portfolios to go?  So that would usually be an initial discovery session usually via Teams, so I can kind of -- or Zoom at the time, so I could get to know them pretty well. And then after that, either on-site meetings, depending on how big the initiative was, and they would evolve from there.

So they would get these requests for proposals to go out to different suppliers to get deals or to get offers, and I would help kind of guide them, and say, okay, here is what the national marketing is showing, and then here's

73

what's happening in your region, and here's what may make sense for you.

Q    Now, Mr. Tuttle, when you said that you worked with CV products, does that mean cardiovascular products?

A    It does.

Q    Did that include electrophysiology products?

A    Yes, it does.

Q    And what kinds of electrophysiology or EP products did you work with specifically?

A    Primarily the disposable component, the catheters.  A lot of the hospitals already had their main capital pieces installed.  And so when we would go and look at all the different CV categories to do an RFP or to explore value propositions, when we got to EP, it mainly resolved around the catheters.

Q    And who did you work with at the hospitals to find out what kinds of products they needed?

A    Sure.  So value analysis committees were really hitting their stride during that time.  This is a multi-stakeholder group of different people from across the hospital that want to review ideas and proposals.  So this was physicians, service line directors, finance, quality, you name it.  Each hospital kind of had their own approach to who I worked with, but it was usually a good cross-section of the hospital.

74

Q   And of Vizient's approximately 1,300 member hospitals that you mentioned, how many did you work with to supply electrophysiology products?

A   So in my year three, I was averaging probably ten initiatives or so a month so, you know, roughly over a hundred for year three.  And then years four and five at Aptitude where I had kind of more team and more help, I probably got to 12 to maybe 15 a month that I was working with.

Q   So overall, how many hospitals would you estimate you worked with to help procure their electrophysiology products?

A   Certainly hundreds I can safely say.

Q   Now, did you work on procuring reprocessed electrophysiology products in your work?

A   I did.

Q   Can you describe that a little bit more for the jury?

A   Sure.  Yep, happy to do it.  So EP, when it came to catheters, we wanted to try to find value, and a way to find value is through reprocessing.  And at the time, Biosense Webster was in most hospitals with their machines, with their capital platforms.  And knowing green initiatives, trying to find value for hospitals, they would -- they were looking at reprocessing as an option.

            I give you that color because initial discussions

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-827

75

with like Abbott on value per catheter, I would get replies, and get, you know, a collaboration.  Boston Scientific, same kind of collaboration.  Biosense Webster, pretty much no. The price is the price.  That's what it is.  And so the only value I could really try to articulate with the catheters that had a Biosense machine was through reprocessing because I couldn't get any top line communications done on the initial RFP with them.

Q    And when you say in your negotiations with Biosense Webster, can you describe what you mean by that?

A    Yeah.  It was very transactional.  You know, my job is to create partnerships, and the framing, the atmosphere, just the basic communication was almost nonexistent.  It was at first shocking, but then it became the norm.  When I would go to a hospital and I'd have to do EP work, I kind of knew based on my track record of engagements kind of what was likely going to be happening, and that continued to prove itself out.

Q    And how did that compare to the negotiations you had with other cardiac mapping machine manufacturers?

A    Oh, shockingly different.

        MR. FARIDI:  Objection, Your Honor, relevance.

        THE COURT:  Overruled.

        THE WITNESS:  Shockingly different.  I mean, phone calls would be returned from the other suppliers.  They just

76

-- they weren't from Biosense.  And it just became very -- it was a hostile-type atmosphere to be quite honest.

BY MS. ANDERSON:

Q    Now, Mr. Tuttle, are you familiar with Innovative Health?

A    I am.

Q    How are you familiar with Innovative Health?

A    They were one of the really innovators in reprocessing. So when you look at all the different reprocessing companies that a hospital could work with, Innovative had the biggest offering.  So if I'm hospital A and I'm using this amount of catheters, Innovative can reprocess the most out of those. So I saw value in what they were able to do from a single point of context standpoint.

And they weren't sitting still.  As new catheters were being made by companies, they would look to be able to reprocess them.  And so their cadence and the amount that they could reprocess was usually on the front end.

Q    Are you aware of other reprocessors in the electrophysiology space?

A    I am, yeah.

Q    How did Innovative Health compare to those reprocessors in your opinion?

A    Yeah, again, in my history of getting proposals from the different companies, the collaboration, the hospitals

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-829**

77

seeing the value on the table, Innovative continued to want to just do best in class service.  How can we be a partner to the hospital?  What are they looking for?  They wanted to be a best-in-class partner for hospitals.  They really made it an effort to work with me and to work with the hospital.

Q    Mr. Tuttle, what were the factors that you took into consideration when sourcing and purchasing catheters for hospitals?

A    The current use, what their current treatment patterns were, also what their vision was.  Did they want to expand into other segments?  And so it was really getting a quick pulse check on where they were and where they wanted to go.

Q    Are you familiar with the term "physician preference" as it relates to electrophysiology catheters?

A    Absolutely.  Absolutely.

Q    Can you explain what that means in this space?

A    Yeah.  It's just like it sounds, physician preference. We have doctors that go through training and their residency and fellowship, and when they want to treat a patient, they prefer a certain kind of device because they have the historical precedent.  They know the outcomes.  They get comfortable with it.  That's their physician preference.

        Now, it's interesting in medicine because you have a physician who's using a device, but he's not paying for it, right.  The hospital is paying for it.  So cost should

78

never be on the table.  It shouldn't because the doctor is going to use the best device for the best outcome for that patient.  So physician preference devices, where the doctor is going to be putting an implant inside you, kind of a seminal event, became a category that hospitals wanted to look at thoughtfully with physician direction because they wanted good outcomes, but they also wanted to see what value could we get in such a market.

Q    And what were the ways in which you found you were able to get value?

A    So the physicians -- hey, doc, what do you want to use? Your outcomes are the most important.  That is the cornerstone.  And then, hey, is there flexibility into maybe using another device?  Okay, there's not.  All right.  That was always the pivotal point of what I did, was how do we make sure that we have good clinical outcomes for our docs.

Q    And how did reprocessed catheters fit into that conversation about clinical outcomes?

A    So in a place where most hospitals had a CARTO machine and knowing that Biosense was likely not going to give value -- I never really saw it -- reprocessing those catheters was an avenue for value within the category.  And so knowing what I knew about reprocessing, it was really kind of hitting its stride.  It wasn't proof of concept anymore. Reprocessing was understood to be sound technology.  And in

talking with doctors, they didn't have any resistance to using reprocessed catheters, so that was never an issue in trying to get value there.

Q    Now, Mr. Tuttle, are you familiar with Biosense's Case Coverage Policy?

A    I am.

Q    What is your understanding of the Case Coverage Policy?

A    Yeah, I think the first time you read that letter, you're surprised.  You don't -- it's almost a little -- it's shocking.  The fact that during a case where a physician has an ablation catheter on a patient, and you have typically a Biosense Webster rep running the CARTO, that if then a reprocessed catheter is opened to be used with the CARTO, that case coverage could be paused, and that case coverage might not even happen in the first place if they knew a reprocessed catheter was going to be used.

I've held that letter.  It's a page and a half or a page, and it -- it was -- it was shocking, and it really created an atmosphere of unsettledness and just -- you know, it was -- again, to read the words and to understand it -- I think when I talked to docs, whomever on the value analysis committee on the RFP, it was a really shake your head in disbelief kind of moment when it first came out.

Q    When did you first learn about the Case Coverage Policy?

80

A    I don't know the exact timeline, but I encountered it early and often.  And then so much so that when I would talk with hospitals about doing RFPs and we would look at the different categories we wanted to tackle and really work on together, they would see EP.  They knew what they had in the lab, and they'd be like is it worth it?  Is it even worth it to tackle that category knowing what we're going to go up against?  So it often got deprioritized.  It even often got taken off the table completely as an opportunity for the hospital because do I want that headache?  Do I want that kind of headwind?  It absolutely affected them.

Q    Did you ever discuss the Case Coverage Policy with any employees of Biosense?

A    Yes, I did.  I did.  As a matter of fact, it is what it is.  There was really no discussion around it.  It was just almost like a you can read kind of moment.

Q    And in those conversations, did Biosense representatives give any justifications for why the Case Coverage Policy existed?

A    I mean, you heard different things in the market.  I didn't get a direct reason or reply.  I think it was, hey, those are our catheters.  We know them the best, that kind of narrative.

Q    How did the Case Coverage Policy affect your job, Mr. Tuttle?

81

A    It certainly hurt my EP opportunities for the hospitals to try to find value.  And at this time, EP was an absolute beacon in a hospital.  EP was growing.  You know, Cardiology Departments are often seen by hospitals as being cornerstones for the financial health to be quite honest. CV innovates.  CV drives business.  CV is at the tip.  And EP at the time was really coming into its own and really growing.  So knowing the headwinds that I had talked about in going into it absolutely affected it.

Q    And what kind of impact did you see the Case Coverage Policy have on the member hospitals that you worked with?

A    It created a frenetic atmosphere around it.  They just, again, didn't want to touch it.  And then it became, you know, do we train our own people to run these machines?  If we're going to have this case coverage letter that risks a rep walking out of the room or not even covering a case, can we train our own people?  Well, then the atmosphere got around won't they just hire them out from the hospital, right?

So you just had so many different factors affecting the EP conversation that it just -- it made one, again -- just to say it again, that hospitals just -- hey, no, we got Biosense.  Let's go do something else.  Let's not even tackle that one.

Q    How frequently would you see that happen in hospitals

82

as a response to the Case Coverage Policy?

A    So Biosense did a great job of getting early doctors to CARTO.  I mean, they did a great job.  A lot of doctors came out wanting CARTO from their residency and fellowships.  And so they -- I saw this a lot, especially in academic medical centers.  It was happening I would say 90 percent of the time that I would have that kind of headwind.  And very rarely did I come into a hospital and they had like Abbott and Boston without a CARTO-type nuance to it.

Q    And how frequently did you see hospitals decline to use reprocessed catheters or third-party reprocessed catheters because of the Case Coverage Policy?

A    Again, 90 percent of the time if they had CARTO they were saying -- they were saying to us it's not worth it.  It's not worth it.

Q    So did you discuss ways that hospitals might work around the Case Coverage Policy?

A    I mean, the one I talked about with trying to train your own people up, that was certainly something they would attempt to do.  Again, it just became a roadblock, and I wish I could give you more color or thoughtful ideas, but they just paused on even trying to push too far.  I mean, that letter was real.

Q    Did you ever discuss with hospitals the idea of switching to a different kind of mapping machine?

83

A     Yeah, sure.  So mapping machines are expensive, very expensive.  It's a lot of money to invest in a capital machine when you build a lab.  And to move from that device to another one, to change management, the cost, the training, all of those things that are required to do that is huge, right.  So when you run the simple numbers to change management to another system versus let's just -- let's just get through that and do -- focus on -- let's focus on this category instead.  Let's put that horsepower over here and not even do it.  That's the path of least resistance that they would choose.

So again, change management, very expensive.  And then you have the doctors saying I don't want to change. I'm used to this.  I've got my lab.  I've got my rhythm. I've got my people.  This is what I want, right.  So again, I think the headwinds to change, just too strong.

Q     So did you ever see a hospital successfully switch to a different mapping machine to get around Biosense's Case Coverage Policy?

A     I personally did not.

Q     Now, you mentioned a moment before the idea of a hospital training up their own staff to be able to map on the CARTO 3.  Did you ever suggest that to hospitals?

A     I did.  I did, and it just kind of became the market understood that that person would just be hired out from the

84

lab.

Q    Hired by whom?

A    Biosense or -- you know, it just became a choice we know what can happen.  We're going to spend all this time, energy, and commitment to train somebody up, and then now we're at risk.  And this happens -- it just happens in the labs, right.  So again, it's just another market dynamic that was affecting the category.

Q    So did you ever see a hospital successfully train their own staff to map on the CARTO 3 as a way of getting around Biosense's Case Coverage Policy?

A    I don't believe so.  Could it have happened?  Yeah, absolutely.  I think it would be just an extreme outlier for it to even -- A, them to do it, and then to be able to retain.  So I can confidently tell you 99 percent of the hospitals that I worked with did not do that or would not do that.

Q    Now, Mr. Tuttle, do you have a sense of how large Biosense's footprint is across all of the EP labs in the country?

A    My understanding at the time was that they were probably 70 to 80 percent of the market.  And then you had Abbott who acquired St. Jude as number two.  Then you had Boston, number three, and then you had some early ones kind of tiptoeing in at small single digits.  But, yeah, I think

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-837

85

from my engagements and understanding of the market it was, you know, in that 70 to 80 percent.

Q    Are you aware as to whether or not all of those other cardiac mapping machine companies, Abbott, Boston Scientific -- whether they offer mapping support?

A    They do.

Q    Are you aware as to whether any of these companies, including Biosense, charges for that mapping support?

A    No.

Q    Do you know if any other manufacturer has a Case Coverage Policy like Biosense's?

A    They do not.

Q    So to your knowledge, does Boston Scientific prevent their clinical support personnel from running a mapping machine if the doctor uses a third-party reprocessed catheter in the procedure?

A    They absolutely do not.

Q    To your knowledge, does Abbott prevent their clinical support personnel from running its mapping machine if the doctor uses a third-party reprocessed catheter in their procedures?

A    They absolutely do not.

        MS. ANDERSON:  Thank you, Mr. Tuttle.

        Pass the witness.

        THE COURT:  Mr. Faridi.

86

MR. FARIDI:  May I approach with some documents that may come up during cross-examination?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. FARIDI:

Q    Mr. Tuttle, you no longer work at Vizient, correct?

A    That's correct.

Q    And you're at company called Endologix?

A    That's accurate.

Q    And how long have you been there?

A    I've been here -- started in November '24.

Q    November of 2024?

A    Yes, sir.

Q    And when did you leave Vizient?

A    2020.

Q    So about five years ago?

A    Yes.

Q    Okay.  And is your current company -- I take it that it's in the medical device space.

A    That's accurate, yes, sir.

Q    Vascular diseases?

A    Yes.

Q    Does it do any work in the electrophysiology space?

A    It does not.

Q    So you're not currently dealing with the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-839

87

electrophysiology space at your current employer, correct?

A    That's right.

Q    Now, you gave some testimony, sir, during direct examination about a patient being on the table who was about to be ablated, and then, you know, someone pulled out a reprocessed mapping catheter, correct?

A    Right.

Q    Sir, have you ever personally been involved in an electrophysiology procedure?

A    No.

Q    Have you ever been in the EP lab when an EP procedure is taking place?

A    No.

Q    Okay.  Have you ever been scrubbed in during an EP process?

A    Not scrubbed in for EP but other procedures.

Q    Focus only on EP.

A    Sure.

Q    Okay.  This lawsuit as you understand it involves electrophysiology, correct?

A    Yeah, I understand you.

Q    And, sir, you understand -- well, let me ask it another way.

        Do you know, sir, that the actual mapping that's done in an electrophysiology procedure -- that the mapping

88

exercise is completed before ablation actually begins?

A     Yeah.

Q     Okay.  Thank you.

Now, when you were at Vizient, and that was about five years ago, at that time you considered yourself a strategic partner of Innovative Health, correct?

A     So there were companies that I worked with that I could go to and know when we had an RFP that they would be amenable to working through the RFP thoughtfully and tactfully.

Q     So let me reask the question.  When you were at Vizient, did you consider yourself to be a strategic partner of Innovative Health?

A     A strategic partner?  It was a company that would work collaboratively with me.  I couldn't really show preference in front of the hospitals, right.  So I'd come in, look at their current book of business, and help them understand where they're going, and let them know the approach and the likely feedback we'll get from different companies.

Q     Sir, why don't we take a look at your deposition, page 76, line 4, through 76, line 7.

THE COURT:  Any objection?

THE WITNESS:  I'm sorry.  Am I looking somewhere in here?

BY MR. FARIDI:

Case 8:19-cv-01984-JVS-KES    Document 540    Filed 06/25/25    Page 89 of 117   Page ID #:26413

89

Q      Yeah, page 76, line 4, to 76, line 7.

While you're looking, you were under oath when you gave that deposition?

A      Yes.

MR. FARIDI:  Your Honor, may we play it?

MS. ANDERSON:  No objection.

MR. FARIDI:  Let's play the clip, please.

(Video clip played)

BY MR. FARIDI:

Q      Sir, Innovative Health paid Vizient an administrative fee, correct?

A      That's correct.  All contracted -- oh, I'll just answer the question.  I won't embellish.

Q      And in fact, the fee that Innovative Health paid to your company was three percent of the revenue on the net sales, correct?

A      It's the market standard.

Q      I'm not asking you if it's the market standard.

A      I'm just letting you know it's the market standard.

Q      All I'm asking is whether the fee was three percent on the net sales of the revenue, correct?

A      Sure, which can go as high as 9.9 in other categories. Three was the market standard.

Q      My question was limited only to Innovative Health.

A      Okay.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-842**

90

Q    They paid you a three percent fee, yes?

A    Yes.

Q    And Innovative was the supplier that Vizient worked with, right?

A    That's correct.

Q    And there were a lot of questions at the very beginning of your direct examination as to whether or not you had interactions with Innovative Health's counsel in the lead-up to your testimony here today.  Do you recall that?

A    That's correct.

Q    I think you said something like you have never talked to Innovative Health's counsel about the questions that she was going to ask here today.  Do you recall that?

A    That's right.

Q    Now, you had in the past interacted with Innovative Health's CEO, Mr. Ferreira, correct?

A    When I was at Vizient.

Q    Right.  When you were at Vizient, he referred to you on occasion as his buddy or as one of his boys.  Do you recall that?

A    I'm trying to get the frame of reference here.

Q    Well, I'm just asking you whether he referred to you as one of his buddies and one of his boys?

A    No, that's not accurate.

Q    Well, let's see if we can refresh your recollection on

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-843**

91

that.

A   Sure.  And if it's a friend, it's -- this is -- this is a friend, yeah.

Q   He's a friend?

A   Yes, he's a friend.

Q   So he may have referred to you as one of his buddies?

A   Sure.

Q   Okay.  One of his boys?

A   No.  I mean, it's -- we're talking about conversations over five years ago between two people that worked together, so -- and that collaborated.  So I understand.

Q   I'm not asking you about conversations that may have --

A   Okay.

Q   I'm just asking whether -- do you recall him referring to you as one of his boys, yes or no?  If you don't remember, I can refresh your recollection.

A   Yeah, I just see you wanting to weaponize that, and it's intriguing to --

THE COURT:  Sir --

THE WITNESS:  Yes.

THE COURT:  -- you need to listen to the question and answer that question and only that question, please, okay?

THE WITNESS:  Yes, sir.  Yes, Your Honor.

BY MR. FARIDI:

92

Q    Let me reask the question --

        MR. FARIDI:  Your Honor, I'll move on from that.

BY MR. FARIDI:

Q    In fact, sir, Mr. Ferreira at one point sent you information about this lawsuit, yes?

A    When you say information, did I know that there was a lawsuit going on some time ago?  Oh, yes, I did know.

Q    Okay.  He sent you Innovative Health's talking points about this lawsuit, yes or no?

A    I don't remember receiving that.

Q    Well, let's take a look at JX148.  Take a look at that. That's in the binder in front of you.

A    Sure.

        MR. FARIDI:  Your Honor, actually, we're going to put this one into evidence.

        MS. ANDERSON:  No objection.

        THE COURT:  It will be received.

        (Exhibit 148 received in evidence)

BY MR. FARIDI:

Q    Let's pull that up.

        At the bottom of page 1, sir, it's an e-mail is from Lars Thording.  Do you see that?  The subject line is: "BSW talking points."  Do you see that?

A    I do.

Q    And by the way, scroll up to the top because you

93

ultimately got this e-mail from Mr. Ferreira.  Do you see that?  You're in the "To" line?

A    I do see that.

Q    Okay.  Along with Mr. Beinhorn, who is one of your colleagues at Vizient, correct?

A    That's correct.

Q    All right.  We're going to come back to that e-mail in a second.  Let's look at the e-mail at the bottom of page 1, top of page 2, from Mr. Thording.

And he says here:  "The latest talking points about Biosense Webster's cost reduction prevention effort where you also developed specific talking points for the lawsuit."  Do you see that?

A    Yes, I see this.

Q    In fact, they even sent you a link to the blog post that they had put up related to the lawsuit, right?

A    I'm seeing it here, yeah.

Q    And let's take a look at Mr. Ferreira's e-mail to you where he forwards those talking points.  Do you see that?

A    I do.

Q    The attachment is "Mapping Support Talking Points."  Do you see that?

A    I do see the attachment one.

Q    Okay.  Sir, you looked at those talking points that Mr. Ferreira sent to you about this lawsuit, right?

94

A    I don't recall.

Q    Okay.  And you see where he says:  "Thanks for today, boys"?  Do you see that?

A    I do see that.

Q    He says:  "Here is some info on our suit with Biosense Webster," correct?

A    Yes, I'm seeing it here with you.

Q    In fact, he says:  "We'll send you a copy of the Complaint shortly," right?

A    I don't recall getting a copy of the claim.  In fact, it covered a lot.

Q    Sir, I was only asking about whether you had a copy of the Complaint.  Did you get a copy of the Complaint?

A    No, I don't believe so.

Q    And did you testify earlier that you had no communications whatsoever with Innovative's lawyers about this lawsuit?

A    That's correct.

Q    Okay.  So how is it that you came to be here today?

A    Well, it's my civic duty for the justice system when asked to be here and say what happened.

Q    And who asked you to be here?

A    I was asked by Innovative to be here.

Q    Innovative's - who at Innovative?

A    I don't recall the specific person, but I was asked to

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-847**

95

testify.

Q    When?

A    I don't recall the exact date.

Q    Who?  No recollection?

A    I mean, it's by Rick.  I mean, it's - yeah.

Q    When did you speak with him last?

A    I don't recall.

Q    Okay.  I want to make sure I follow the protocol.

Mr. Ferreira, right, Rick Ferreira?

A    Right, right.  Yeah.

Q    Now, you said, sir, on your direct examination that you considered Vizient -- the hospitals within the Vizient network to be your partners, correct?

A    Yes.

Q    And you told the jury earlier that they were not able to realize savings from Innovative Health because of this policy, this Biosense policy, that you spoke about during your direct examination, right?

A    Yes.

Q    But your hospital partners are sophisticated purchasers, right?

A    I would classify that as accurate.

Q    In your view, they make informed decisions about purchasing medical devices, right?

A    Yes.

Case 8:19-cv-01984-JVS-KES    Document 540    Filed 06/25/25    Page 96 of 117   Page ID #:26420

96

Q    And before they purchase medical devices, before they purchase electrophysiology devices, your partners at the hospitals will review and evaluate, and I'll quote:  "A medical device's clinical, economic, and operational qualities," right?

A    Yes.

Q    Hospitals also research the mapping systems and the catheters before they make their purchasing decisions, right?

A    Right.

Q    In fact, your hospital partners took the life cycle costs of the cardiac mapping systems, including the disposables, the catheters, into account when they made their purchasing decisions, right?

A    I can't confirm that.  You know, I would guess so.

Q    Well, why don't we take -- we don't want guesses here. We'll take a look at your deposition testimony on page 37, 6, to 37, line 10.

        MR. FARIDI:  Your Honor, I want to play the clip.

        MS. ANDERSON:  No objection.

        MR. FARIDI:  Let's play the clip.  This is 15.1.

        (Video clip played)

BY MR. FARIDI:

Q    That wasn't a guess, right?

A    Yeah.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-849**

97

Q    Thank you.

     And you agree, sir, that hospitals have choices in the cardiac mapping system they want to purchase, yes or no?

A    Yes.

Q    And there are certainly a number of cardiac mapping systems available on the -- in the marketplace, right?

A    Yes.

Q    There's Abbott.  There's Boston Scientific.  Medtronic has a new system, right?

A    I know about the first two.  I don't know about Medtronic's mapping system.

Q    Right, because you haven't been in the electrophysiology space for some time, right?  That's correct, right?

A    I know the window of what we're talking about today, correct.

Q    So you're not aware that Medtronic has put out a new system called Affera?

A    I wouldn't be surprised.  They need to innovate.  They had the first cryoballoon.

Q    I can't -- can you speak up a little bit?

A    Yeah.  I'm not surprised.  Medtronic, it needs to innovate, and they have the cryoballoon.  They had the first cryoballoon for EP.

Q    Did you say that you're not sure whether they need to

Case 8:19-cv-01984-JVS-KES    Document 540    Filed 06/25/25    Page 98 of 117   Page ID #:26422

98

innovate?

A     No, no.  I'm not surprised that they have continued to innovate.

Q     In fact, most hospitals have more than one mapping system, right?

A     Yeah, they do.  Most do.

Q     And I want to talk a little bit about this issue of whether someone other than a system manufacturer can provide mapping support.  Do you recall talking about that during your direct examination?

A     Yes.

Q     Okay.  It's true, sir, that Innovative has offered clinical mapping support and a training program to hospitals before, correct?

A     I heard about that, yes, coming into the market.

Q     Sorry.  I couldn't catch the last --

A     Sure.  Yes.

Q     Okay.  And who did you hear about that from?

A     Mr. Ferreira.

Q     But in the end, Innovative actually chose not to offer training programs to any of Vivient's members, correct?

A     I did not track the progress of that project.  I knew about it.  I didn't know that it eventually termed.

Q     It's true, sir, that in the end, Vizient has not provided mapping support or a training program to the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-851

99

hospital customers at Vizient, correct?

A    Not to my knowledge.

Q    In the discussions that you had with Mr. Ferreira, did he tell you that he also had discussions with Medline, Innovative's distributor, as to whether Medline should provide mapping support?

A    I was not aware of that.

Q    So you're also not aware of the fact that Innovative actually told Medline not to move forward with their own mapping program?

A    No, I did not know that.

Q    Speaking about the issue of catheters, are you aware that Biosense Webster and its corporate affiliate, Sterilmed, made claims as to the accuracy of -- provided by their catheters?  Are you aware of that?

A    I probably knew it well at the time.  I don't know offhand.

Q    Are you aware that Sterilmed and Biosense Webster guarantee one-point millimeter accuracy in cardiac mapping procedures if their catheters are used?

A    I did not know that.

Q    Okay.  And you're not aware of the fact that -- withdraw.  I'm going to reask the question.

Innovative Health to your knowledge does not make those claims, correct?

100

A    Yeah, I don't know if they do or not.

Q    And you spoke about the choices that hospitals have to make between Biosense and Innovative Health's reprocessed catheters.

You understand that Sterilmed, Biosense's corporate affiliate, also offers reprocessed Biosense catheters, correct?

A    Yes.

Q    Okay.  And you also understand that Sterilmed's reprocessed catheters actually come with clinical mapping support provided by Biosense, correct?

A    Yes.

MR. FARIDI:  Your Honor, may I just have a quick moment.

(Defense counsel conferring)

MR. FARIDI:  Thank you for your time today, sir.

THE WITNESS:  Thank you.

MS. ANDERSON:  Very brief redirect, Your Honor.

REDIRECT EXAMINATION

BY MS. ANDERSON:

Q    Mr. Tuttle, did you have to feel personally comfortable about the products that you were recommending to hospitals?

A    I did.

Q    Why is that?

A    These were implants and devices that we're going to

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-853**

101

have a seismic outcome on patients' lives, so I absolutely had to know the caliber and context of them that the hospitals are looking at.

Q    And did you have any safety concerns or accuracy concerns about Innovative Health's catheters?

A    Yeah, zero.  And I think the lens that the reprocessed companies had on them was huge, because I think they knew that if they had any issues, any hiccups in reprocessed catheters, people would easily turn away and not want to explore that as an option.  So I think they had an extra level of certainty on what they did, and I never saw any issues with reprocessed catheters.

Q    Mr. Tuttle, just to clarify, why are you testifying here today?

A    To do the right thing.  I'm here to do the right thing, and to tell the story as I saw it, and the facts as I encountered them as a hospital partner in working for a GPO.

          MS. ANDERSON:  Thank you, Mr. Tuttle.

          Nothing further.

          THE COURT:  Any further examination?

          MR. FARIDI:  Nothing further, Your Honor.

          THE COURT:  Okay.

          MS. ANDERSON:  We would just ask that Mr. Tuttle be allowed to step down.

          THE COURT:  Yes.

102

MS. ANDERSON:  Thank you, Your Honor.

THE COURT:  Sir, you're excused.  Thank you.

I think we'll take the lunch break here.  Recall, ladies and gentlemen, we're just going to take an hour today, so let's come back at 12:50, please.  Please remember the admonition.

(Jury not present)

THE COURT:  Okay, anything for the record at this time?

MR. HO:  Nothing from the plaintiff, Your Honor.

MR. CAVANAUGH:  Nothing from the defendant.

THE COURT:  Very good.  We'll be in recess.

(Recess)

(Miriam Baird reported Vol. II)

*   *   *

103

**CERTIFICATE**

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 10, 2025

/s/   Sharon A. Seffens  5/10/25
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE JAMES V. SELNA, JUDGE PRESIDING

INNOVATIVE HEALTH, LLC,           )
                                  )
                                  )
                                  )
                 Plaintiff,       )
                                  )
                                  )
                                  )
        Vs.                       )   No. SACV-19-01984-JVS
                                  )
                                  )
                                  )
BIOSENSE WEBSTER, INC.,           )
                                  )
                                  )
                                  )
                 Defendant.       )
                                  )
_____ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

DAY 4, VOLUME II

SANTA ANA, CALIFORNIA

FRIDAY, MAY 9, 2025

MIRIAM V. BAIRD, CSR 11893, CCRA
OFFICIAL U.S. DISTRICT COURT REPORTER
350 WEST FIRST STREET
FOURTH FLOOR
SANTA ANA, CA 92701

UNITED STATES DISTRICT COURT

ER-857

# A P P E A R A N C E S

APPEARANCES OF COUNSEL:

For the Plaintiff:
DEREK T. HO
ANDREW E. GOLDSMITH
MATTHEW D. READE
KELLEY C. SCHIFFMAN
RACHEL T. ANDERSON
ANNAMARIA M. MORALES-KIMBALL
SEAN P. QUIRK
KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

PANTEHA ABDOLLAHI
THEODORA ORINGHER, PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, CA 92626-7109
(714) 549-6200
JEFFREY L. BERHOLD
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309
MATTHEW I. SUMMERS
JOSHUA PAUL DAVIS
BERGER MONTAGUE, PC
505 Montgomery Street, Suite 625
San Francsico, CA 94111

For the Defendant:
WILLIAM F. CAVANAUGH, JR.
ALEJANDRO H. CRUZ
ISAAC J. WEINGRAM
PATTERSON BELKNAP WEBB &
TYLER, LLP
1133 Avenue of the Americas
New York, NY 10036

KARLA J. KRAFT
STRADLING YOCCA CARLSON &
RAUTH, LLP
660 Newport Center Drive,
Suite 1600
Newport Beach, CA 92660-6422

MUHAMMAD U. FARIDI
NADAV BEN ZUR
LINKLATERS, LLP
1290 Avenue of the Americas
New York, NY 10104

ALSO PRESENT:
AARON DETATE
Innovative Health Corporate
Representative

KATHRYN MEISEL
Johnson & Johnson and
Biosense Webster
Corporate Representative

UNITED STATES DISTRICT COURT

**ER-859**

**4**

**INDEX**

**WITNESS:**                                                                                    **PAGE:**


**Meredith Snider, Plaintiff's witness, sworn**                            6
**DIRECT EXAMINATION**                                                          6
**CROSS-EXAMINATION**                                                          44

*****

**EXHIBITS:**

Exhibits JX211, JX215, JX216, JX219,                                 5
Exhibit 4454 received                                                         21
Exhibit 4345 received                                                         25
Exhibit 4346 received                                                         31
Exhibit 3971 received                                                         34
Exhibit 3972 received                                                         35
Exhibit JX2641 received                                                     56

*****

**UNITED STATES DISTRICT COURT**

**ER-860**

5

SANTA ANA, CALIFORNIA; FRIDAY, MAY 9, 2025; 1:50 P.M.

---

THE COURT:  Good afternoon.

Ready for the jury?

MR. HO:  We are.

THE COURT:  Okay.

THE CLERK:  All rise for the jury.

(Open court - jury present)

THE COURT:  Good afternoon, ladies and gentlemen.

Mr. Ho.

MR. HO:  Your Honor, Innovative Health calls Joseph Koenig by videotaped testimony and moves the admission of the following exhibits sponsored by his testimony:  JX211, JX215, JX216, JX219, JX220, JX221, JX222, and JX223.

THE COURT:  Any objection?

MR. CRUZ:  No objection.

THE COURT:  Those exhibits will be received.

MR. HO:  Thank you.

**(Exhibits JX211, JX215, JX216, JX219, JX220, JX221, JX222, and JX223 received)**

(Videotaped deposition played)

THE COURT:  Next witness.

MS. MORALES-KIMBALL:  For the record, Annamaria Morales-Kimball for plaintiff.

Plaintiff's next witness, we call Ms. Meredith

UNITED STATES DISTRICT COURT

**ER-861**

6

Snider.

**Meredith Snider, Plaintiff's witness, sworn**

THE CLERK:  Please state your full name, spelling your last name for the record.

THE WITNESS:  Meredith Snider, S-n-i-d-e-r.

MS. MORALES-KIMBALL:  Permission to approach, Your Honor.

THE COURT:  You may.

**DIRECT EXAMINATION**

BY MS. MORALES-KIMBALL:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Please introduce yourself to the jury.

A.   My name is Meredith Snider.

Q.   Where do you work?

A.   I work at Innovative Health.

Q.   What is that?

A.   That is a reprocessing device company.

Q.   What is your role there?

A.   I am the senior director of sales operations.

Q.   Other than Innovative Health, have you worked at other reprocessing companies?

A.   Yes, I have.

Q.   Which ones are those?

A.   I worked at Alliance.  I worked at Ascent Healthcare

UNITED STATES DISTRICT COURT

**ER-862**

7

Solutions. Both of those formed into Stryker Sustainability Solutions.

Q. What products did those companies reprocess?

A. They reprocessed operating-room devices, patient-care devices, and electrophysiology devices.

Q. So how many years approximately has your work involved reprocessing electrophysiology devices?

A. I'd say probably around 15 years.

Q. Why have you focused on reprocessing electrophysiology devices?

A. I have absolutely loved it. I have a passion for reprocessing. In fact, my father had ablation procedures done, so I have even more of a passion for the electrophysiology side.

Q. What specifically about reprocessing are you passionate about?

A. Well, I love the environmental aspect, of course, you know, being able to divert waste, carbon emissions. But also it's waking up every day being able to provide cost savings to healthcare and the industry that desperately needs it. So I love it.

Q. And you mentioned your father underwent an EP procedure?

A. Yes. He's had several.

Q. How does that connect to your passion for reprocessing?

A. With all of his procedures, I made sure that all devices

UNITED STATES DISTRICT COURT

**ER-863**

that could be reprocessed, that reprocessed devices were utilized for him.

Q.   Why was it important to you that his procedure utilized reprocessed devices?

A.   Because I've studied and believe in the quality, and I knew that it was going to be safe and effective and the best opportunity for him.

Q.   Returning to your work history.  When did you join Innovative Health?

A.   In 2022.

Q.   And at a high level, what are your responsibilities at Innovative Health?

A.   So with the sales operations, I oversee the order logistics, business analytics, project management team, as well as our customer concierge team.

Q.   What do you mean by order logistics?

A.   So when customers in hospitals need to purchase product, we make sure that the orders come in, that they're filled appropriately; that communication is sent back, and that the items are shipped and received then properly to the hospitals.

Q.   And you oversee this process?

A.   Yes, a portion of that, correct.

Q.   Does Innovative provide any support to its customers and the Innovative catheters that they purchase?

UNITED STATES DISTRICT COURT

**ER-864**

9

A.    Yes, they do.

Q.    Which teams provide that support to customers and Innovative catheters?

A.    I would say mainly the clinical integration team.

Q.    And are there any other teams that provide support to customers of Innovative Health?

A.    Absolutely.  That would be our customer concierge team, our business analytics, and our project management team.

Q.    Let's start with customer concierge.  What does that team do?

A.    So our customer concierge team is an advanced form of customer service, account management.  They're really there. They're aligned with the customers to make sure that they're achieving their savings goals and that they're getting the appropriate devices and catheters that they need.

Q.    Based on your experience in the industry, is this type of concierge service typical?

A.    No.

Q.    What do you mean by that?

A.    I think we go above and beyond.  We're really there making sure on a daily basis that our customers are well taken care of and that it's really truly like a partnership, and making sure that each month they're saving what they could potentially be saving.

Q.    Do you oversee the customer concierge team?

UNITED STATES DISTRICT COURT

**ER-865**

10

A.   I do.

Q.   You also mentioned business analytics.

A.   Yes.

Q.   What does that team do?

A.   So that team, there's a lot of data that needs to be worked on to understand what the true opportunity of savings is when it comes to reprocessing.  So this team works on scrubbing that data, putting a full analysis together, and then they work with the concierge team to build savings goals.

Q.   Where do they get that data from?

A.   They get that data from the hospitals.

Q.   And what would that data encompass?

A.   So that's going to be all of the purchase history.  So typically what we like to get is to understand what the hospitals have been utilizing for a six- to twelve-month period so we can get an idea over an annual basis of what their savings would be.

     So they will provide all that data for us, like how many devices per item, and then we'd scrub the data and put the analysis together.

Q.   What do you mean by scrub the data?

A.   So they have to work through it and put the correct elements into the spreadsheets to make sure and remove any items that are not needed from the data.

UNITED STATES DISTRICT COURT

**ER-866**

11

Q.   And do you oversee the business analytics team?

A.   I do.

Q.   You also mentioned project management?

A.   Yes.

Q.   What does that team do?

A.   So that team helps the hospital to oversee the entire program from pretty much the start; so, an assessment, going into an implementation and actually maintaining a successful reprocessing program.

So they take an organized approach at walking them through.  So they start with building a plan for them and then helping them to walk through nicely and execute it.

Q.   And just to be clear, by walk them through, who do you mean?

A.   Okay.  So that's going to be various departments in the hospital, and they're helping them to customize how they're going to start the reprocessing program, implement it, and then maintain it.

Q.   You also used the term assessment?

A.   Yes.

Q.   What do you mean by assessment?

A.   So an assessment is -- you know, every hospital absolutely provides patient care, but we -- every hospital is very unique.  So you need to be able to go in and understand the flow of the hospital, of the department, of supply chain.

UNITED STATES DISTRICT COURT

**ER-867**

12

And so we need to do a full assessment on site, that's done on site, so that we can customize the plan for them.

Q.   And I believe you also mentioned implementing?

A.   Yes.

Q.   If you --

A.   Yeah, absolutely.  So implementing is when we actually bring in our collection systems.  That is where we start the program, where we'll begin collecting devices and then providing devices back for them to utilize.

Q.   If you would like to take a sip of water, please go ahead.

A.   Thank you.

Q.   You mentioned that the clinical integration team supports Innovative catheters?

A.   Yes.  They do.

Q.   What specifically does the clinical integration team do to support Innovative catheters?

A.   So they're really there to help educate the staff and the physicians.  They're there to, you know, make sure that, you know, do they have any questions on the functionality, the performance, the quality, sterilization.

        And then they're there, of course, if there's any need for any type of, like, troubleshooting.

Q.   What do you mean by troubleshooting?

A.   So, you know, if there's ever like an issue or a

13

particular complaint, like, for a catheter or anything like that, they just want to make sure that they can better understand what type of concern or issue took place and help see if they can resolve it for them.

Q.   Do you and your teams handle complaints on some occasions?

A.   Yes, we do.

Q.   What happens when there's an issue or a complaint that comes in?

A.   Well, the absolute first thing that we do is, whether it's my team or the clinical team, we ask the customer to hold onto the product.  We want to be able to do a full investigation on that.  We gather as much information as possible, and then we notify the quality team to start immediately an investigation.

Q.   And what does -- what recourse does the hospital have after a complaint?

A.   So absolutely no matter, this happens before the investigation is completed.  So whether we find out we're able to replicate it or we're not able to, find the actual complaint, we offer either a credit, so a reimbursement, or a replacement product.  It just depends on the purchasing system at the hospital of whether or not which one they can receive in.

Q.   And briefly, what do you mean by replicate or not?

14

A.    So, you know, if they have a complaint about a specific issue, we want to investigate and see what that complaint was.

Q.    And specifically what does the clinical integration team do when -- if and when there is a complaint?

A.    So typically, especially if it comes in from, like, my team, they will make another phone call, speaking to the staff and the physicians to really truly understand the complaint.  They're the ones that really know the ins and outs of procedures in the lab.

So they'll do a further investigation.  Then most of the time after that, they will actually go on site to speak with the physicians and the staff, observe the procedures, and see if they can identify the issue as well.

Q.    So just to be clear, when they go on site to identify issues --

A.    Uh-huh.

Q.    -- what product is the clinical integration team there to support?

A.    They're there to support all Innovative Health catheters.

Q.    How many people make up the clinical integration team?

A.    Currently right now there are five.

Q.    And generally what are their backgrounds?

A.    It ranges, but they all have extensive experience in the

UNITED STATES DISTRICT COURT

**ER-870**

15

EP and cath lab.

Q.   And to be clear, do the clinical integration team members map cases?

A.   No, they do not.  That is the Biosense Webster mapper.

Q.   And why, if they all have these clinical backgrounds -- let me rephrase.

If they are not mapping, why does the clinical integration team have clinical backgrounds?

A.   In the EP and cath lab, it's a space that really is a very clinical space.  It's -- the staff and the physicians really prefer to speak to somebody with similar backgrounds.

They want to be able to talk to them about specific procedures, specific ways the devices work.  They would really truly prefer to speak to clinicians versus somebody like myself that doesn't have a clinical background.

So we've found that it's really good to have a clinician in there to support the reprocessing efforts.

Q.   Ms. Snider, do you interact with customers or potential customers?

A.   Yes, I do.

Q.   How often?

A.   Daily.

Q.   And how many times in any given day?

A.   Multiple times a day.

Q.   What do those interactions generally look like?

UNITED STATES DISTRICT COURT

**ER-871**

16

A.   So with existing customers we're doing business reviews, looking at their programs.  So those are kind of like program reviews.  My team is providing reports to them, interacting with them.

And then with our potential customers, we're really -- honestly, I'm going presentations and conference calls and in-person meetings that you go all the way from like an introduction and introducing ourselves, going over what their savings potentials are to taking them to the next step of doing an onsite assessment and contracting with them.

Q.   Who are Innovative's customers generally?

A.   They're hospitals and health systems across the United States.

Q.   Who within hospitals do you interact with?

A.   So it ranges.  We do a lot of work with the supply chain.  We do a lot of work with value analysis and, of course, then with leadership within the EP and cath lab, and sometimes with the executive officers.

Q.   You mentioned -- I'm sorry.  You mentioned health systems?

A.   Uh-huh.

Q.   What's that?

A.   Health systems are just a collaboration of hospitals that are formed under one entity.

Q.   Are you familiar with the term GPO?

UNITED STATES DISTRICT COURT

**ER-872**

17

A.    Yes, I am.

Q.    What is that?

A.    That is a group purchasing organization.

Q.    What might you compare it to?

A.    So for, like, healthcare, I think of it like a Costco or a Sam's Club.  You join that with, like, a membership to be able to access specific companies.

Q.    At what type of rate?

A.    At a discounted rate.

Q.    Do you work with GPOs?

A.    Yes.  We work with GPOs across the major national ones.

Q.    And where are Innovative Health's customers located?

A.    Throughout the United States.

Q.    Are you familiar with Biosense's case coverage policy?

A.    Yes, I am.

Q.    Does the policy come up in your line of work?

A.    Yes, it does.

Q.    How often?

A.    Pretty much every day.

Q.    And how does the policy come up?

A.    Well, with existing customers we'll be discussing this lost savings opportunity where they weren't able to capture the savings due to the case coverage policy.

        We'll talk about making sure the collections are going in the correct locations if they have dual collection

UNITED STATES DISTRICT COURT

**ER-873**

18

sites.  And then with really potential customers, it's doing their savings analysis and really focusing on which devices they can truly reprocess and which devices they cannot due to the case coverage policy.

Q.   You used the term capture savings?

A.   Uh-huh.

Q.   What does that mean?

A.   To actually get the savings.  So in order to really have savings, you need to be able to purchase and utilize the devices.  So we want to make sure that the hospitals know how to purchase and then utilize the devices to be able to get the savings.

Q.   Why does the case coverage policy come up with customers?

A.   Because it prevents them from saving a significant portion of what the true opportunity is for them to.

Q.   Ms. Snider, are you familiar with a hospital called University Health San Antonio?

A.   Yes, I am.

Q.   Does it go by any other name?

A.   Yeah.  It goes by University Hospital, University, University Health System.  And then some will just call it UH and UH San Antonio.

Q.   What is UH?

A.   It's a current customer of ours.

UNITED STATES DISTRICT COURT

**ER-874**

Q.    When did you first become familiar with them?

A.    So first in my career I became familiar with them back when I was with Stryker Sustainability.  But then I became familiar with them again, started working with them again in 2022.

Q.    Focusing on your work with Innovative, did you have any presentations to University Hospital?

A.    We did.  We had several.

Q.    Approximately how many?

A.    I would have to go with, I think, around three or four.

Q.    During what time period?

A.    It would've been the beginning of summer, so probably June, to about the end of November.

Q.    Of which year?

A.    Of 2022.

Q.    Who attended those meetings on behalf of UH?

A.    So it started with their Premier representative, and Premier is their GPO.  So it started with their Premier representative, and then also supply chain leadership, and then also the EP and cath lab leadership and some of the staff.

        And then, of course, some physicians also join. And then in this particular case, the president wanted to get involved with this hospital -- excuse me, with this program.

Q.    And what's the name of the Premier representative?

UNITED STATES DISTRICT COURT

**ER-875**

20

A.    Miguel.

Q.    And who joined from UH's supply chain?

A.    From supply chain that would have been Horacio.  And I apologize.  I don't know all their last names.  And Jodie. And then from -- and Alex Garcia.  And then from -- I believe there's one other person that may have joined.  Wes, I believe his name was.  He wasn't as much involved, but he joined.

Q.    And who was the EP or cath lab leadership representative that joined?

A.    That would be Virginia.  And then she also had Jimmy Wilkinson and Francisco.

Q.    You mentioned that the president of University Hospital joined as well?

A.    He did -- Mr. Chris Sandles.

Q.    Is that typical?

A.    Not usually.

Q.    What do you make of Mr. Sandles joining these Innovative presentations?

A.    He was really excited about the savings opportunity. The lab really needed it.  It was a great savings opportunity for them.  So he also kind of wanted to make sure that we knew what we were talking about and that we were actually going to be able to capture the savings for him.

Q.    I'd like to direct you to what has been marked as JX4454

UNITED STATES DISTRICT COURT

**ER-876**

21

in your binder.

A.    (Witness complies.)

Q.    Ms. Snider, do you recognize this document?

A.    Yes, I do.

Q.    What is it?

A.    It's an e-mail -- it's an e-mail chain.

Q.    Looking at the top level, the most recent e-mail, did you receive this?

A.    Yes, I did.

Q.    When was that?

A.    That was on November 2nd of 2022.

        MS. MORALES-KIMBALL:  I'd like to move JX4454 into evidence.

        MR. CRUZ:  No objection, Your Honor.

        THE COURT:  4454 will be received.

        **(Exhibit 4454 received)**

BY MS. MORALES-KIMBALL:

Q.    Who sent this e-mail?

A.    Mr. Sandles did.

Q.    Following your meetings with Mr. Sandles, did he indicate whether he intended to purchase reprocessed products from Innovative?

A.    Yes, he did.

Q.    Do you see that reflected in this document?

A.    Yes.  You can see that he says:  Thank you, Meredith.  I

UNITED STATES DISTRICT COURT

**ER-877**

22

look forward to proceeding soon.

Q.   Do you have an understanding as to why Mr. Sandles wanted to move forward -- rather, proceed with purchasing from Innovative?

A.   Yes.  We had significant cost savings for his lab.  We had a very organized approach, and he thought that we would do a great job to be able to get these savings for them.

Q.   Up to this point were you aware of any reprocessing being done in the EP lab at UH?

A.   No, we were not.

Q.   At some point did you go to UH?

A.   Yes, I did.

Q.   When?

A.   I went there for a presentation in September, and then I also went for the onsite assessment in October.

Q.   And where is UH located?

A.   It's located in San Antonio, Texas.

Q.   Where are you personally located?

A.   I'm located in Fort Worth, Texas, right outside of Dallas.

Q.   About how far apart are you from UH?

A.   So it's about a five-hour drive.

Q.   Did you drive to UH for these meetings?

A.   Yes.  Absolutely.

Q.   Why not do a Zoom?

UNITED STATES DISTRICT COURT

**ER-878**

23

A.   I think it's that customer concierge, that white-glove service.  We wanted to make sure that we were there, that we were there for our customer.  They hadn't reprocessed before, so we wanted to make sure that they were comfortable with everything.

Q.   What time did you have to leave your house to get to UH?

A.   Most mornings, because you have to go through Austin and San Antonio, typically I left between two and three o'clock in the morning.  Didn't want to hit traffic.

Q.   Going back to the assessment in October of 2022.  When you did the assessment, what did you see?

A.   So when we go -- when I went and did the assessment, we went in and quickly observed the lab, made sure that we understand where the collection cart needed to be placed so that the staff had easy access to be able to place the catheters into the collection cart.

     Then we observed some of their purchasing systems they were utilizing at the time, like in the labs, and -- yeah.  I mean, it was a good assessment.

Q.   Did you go back to UH after that?

A.   Yes, I did.

Q.   When?

A.   I went back on December 6th for implementation.

Q.   And what is implementation again?

A.   So when I went back, we placed the collection cart in

UNITED STATES DISTRICT COURT

**ER-879**

24

the collection room.  That's where I had educated the staff on just the collection piece, on how to collect the catheters after they had been utilized in a procedure, and make sure that they understood where they would go into the collection cart.

Q.   Why do that application?

A.   So that, number one, they're not actually throwing the devices away where they're going into the local landfills, but also so that we could start taking the devices for them and reprocessing.

Q.   After implementing at UH on December 6, 2022, did the timeline to reprocess with Innovative at UH progress as expected?

A.   No, it did not.

Q.   All right.  I'd like to direct you to what has been marked as JX4345.  Do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   It is an e-mail that Kara Reyes forwarded to me.

Q.   Who is Ms. Reyes?

A.   Ms. Reyes was the S2S Global reprocessing director that I worked with with University Hospital's implementation.

Q.   What is S2S Global?

A.   It's one of our distribution partners that we work through.  So S2S Global has the contract with Premier, and

UNITED STATES DISTRICT COURT

**ER-880**

25

then we contract with them to be able to supply Premier customers the GPO.

Q.    Turning back to the document, when did you receive this?

A.    On December 7th, 2022.

MS. MORALES-KIMBALL:  I'd like to move JX4345 into evidence.

MR. CRUZ:  No objection, Your Honor.

THE COURT:  4345 is received.

**(Exhibit 4345 received)**

BY MS. MORALES-KIMBALL:

Q.    I'd like to direct you to page 2 of 39.  There's an e-mail here from Vanessa Amaya on December 7, 2022.  Do you know Ms. Amaya?

A.    Yes, I do.

Q.    Who is she?

A.    She's the Biosense Webster mapper for University Hospital San Antonio.

Q.    And Ms. Amaya wrote to Virginia Travieso.  Do you know Ms. Travieso?

A.    Yes, I do.

Q.    Who is she?

A.    She's the director of the EP and cath lab for University Hospital San Antonio.

Q.    All right.  Looking at the screen, I'd like you to read the sentence that's highlighted, beginning with yesterday.

A.    "Yesterday I saw and heard about an in-service for Innovative Health.  We have a current fully executed contract for reprocessing with the hospital through December 2023."

Q.    When you received this e-mail, what did you understand this highlighted text to convey?

A.    It sounded like because it was becoming -- because it was coming from Vanessa, that they had some sort of Sterilmed agreement.

Q.    Prior to receiving this, had you been aware of that?

A.    No, we had not.

Q.    What was your reaction when you learned of this contract?

A.    I was surprised, but I have to also say I was not surprised.

Q.    What do you mean by that?

A.    So University Hospital did a great job at really doing their due diligence, making sure they didn't have any OEM contract interference, any capital agreements that would prevent them from getting all the reprocessing savings that they wanted to get.  So I was kind of surprised that we didn't know about this.

Q.    And why were you not surprised when you learned about this?

A.    Because this isn't the first time I've had this happen with customers where they had no idea that they had a

27

Sterilmed agreement.

Q.   Would you please turn to page 11 of 39.

A.   (Witness complies.)

Q.   Please read the highlighted sentence in section 2.1.

A.   "Either party may terminate this agreement at any time by giving 30 days' advance notice to the other party."

Q.   Based on your experience in the industry, what is the significance of a provision like this?

A.   This allows either the hospital or the company to get out of the contract, to essentially cancel it.  And you need to provide usually a 30-day written or verbal notice to actually get out of the contract.

Q.   Turning back to the e-mail from Ms. Amaya, when did she send this e-mail?

A.   She sent this e-mail on December 7th, 2022.

Q.   And how many days after you had implemented at UH was that?

A.   One day.

Q.   Have you met Ms. Amaya?

A.   Yes, I have.

Q.   When was that?

A.   I met her on December 6th, 2022.

Q.   What happened during that interaction?

A.   So we met in the collection room at the University Hospital of San Antonio.  I was in there doing -- making sure

UNITED STATES DISTRICT COURT

**ER-883**

the collection cart was set up correctly because Jimmy was going to come in and take a look, and I wanted to see how it was set up.  And Vanessa was in the collection room, followed me in there.

Q.   What happened after she followed you in there?

A.   Well, I needed to take care of all the items that needed to be taken care of, making sure the bags and the correct signage was put up.  And she just honestly stood there and stared at me.

Q.   What happened next?

A.   Afterwards I left.  Actually I did speak with her.  I told her to have a great day.  Then I left and I met Jimmy over by the front hallway.

Q.   And then what happened?

A.   So Jimmy and I discussed the education that was provided in the morning because he had a meeting, and so he couldn't attend the in-service when I was reviewing with the staff how to collect the devices.

So we talked a little bit about that, and then we proceeded over to the collection room so that he could see the collection cart.

Q.   What happened when you went into the collection room with Mr. Wilkinson?

A.   So we went in.  He was very pleased with how everything looked.  And then honestly I -- I started laughing a little

29

bit.  And I had pointed out that there was a change to the Sterilmed collection bins, and I had not touched them.

Q.    What do you mean by there was a change?

A.    So the Sterilmed collection bins are these green totes. They just have, like, little lids that go like this (indicating), and they're solid green.

Now in permanent marker written all over it, it said:  Do not touch.  Stay away -- all over all the containers.

Q.    Had you seen that signage previously?

A.    No.

Q.    And had you touched the Sterilmed collection bins?

A.    Absolutely we do not touch Sterilmed collection bins.

THE COURT:  I think we'll take a 10-minute break here, ladies and gentlemen, and then we'll continue on to three.

Please remember the admonition.

THE CLERK:  All rise.

(Open court - jury not present)

(Recess taken at 2:03 p.m.; proceedings resumed at 2:14 p.m.)

THE CLERK:  All rise for the jury.

(Open court - jury present)

THE COURT:  Ms. Morales-Kimball.

MS. MORALES-KIMBALL:  Thank you, Your Honor.

30

BY MS. MORALES-KIMBALL:

Q.   Ms. Snider, before the break you were testifying about Sterilmed collection bins?

A.   Yes.

Q.   In your work have you seen many Sterilmed collection bins?

A.   Oh, yes.

Q.   Approximately how many?

A.   Hundreds.

Q.   And have you seen products in those bins?

A.   Yes.

Q.   How would you describe the products in Sterilmed bins based on your observations?

A.   They have a very different collection procedure. Everything just goes in, and most of the time it's overflowing.

Q.   What do you make of that?

A.   Well, we have a very systematic collection cart because we want to make sure that all the devices are handled very carefully so that we can take them back to our facility, reprocess them, and they're not rejected out.

     So we want to make sure that -- you know, when we have a lot of catheters on top of one another, you can get a lot of kinks or, you know, bending of the catheter that will cause it not to be able to be reprocessed.

UNITED STATES DISTRICT COURT

**ER-886**

So when they're all shoved into one, a lot of times you'll have a whole lot of rejections.

Q.   Turning back to UH, I'd like to direct you to what has been marked as JX4346.

Ms. Snider, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   It is an e-mail chain that Kara Reyes had forwarded to me.

Q.   When was that?

A.   That was on December 9th of 2022.

MS. MORALES-KIMBALL:   I'd like to move JX4346 into evidence.

MR. CRUZ:   No objection, Your Honor.

THE COURT:   4346 will be received.

**(Exhibit 4346 received)**

BY MS. MORALES-KIMBALL:

Q.   How does this document compare to the one we looked at just before the break, JX4345?

A.   So this is the continued -- this is the continued e-mail chain that she forwarded to me.

Q.   And who was the original sender of this e-mail chain?

A.   The original was -- oh, Kara forwarded this to me, but this was the e-mail from Vanessa Amaya.

Q.   I'd like to direct you to page 2 of 5, an e-mail sent by

32

Ms. Travieso on December 7th.  Please read the highlighted text.

A.    "There was a current recycling process/contract in the cath lab, but that utilization was zero."

Q.    How does this relate to the Sterilmed contract you have testified about?

A.    That's what she was referring to.

Q.    Did -- what did you make of the phrase "utilization was zero?"

A.    So they had found out they had a contract in place, and they had done nothing with it for an entire year.

Q.    Who is the they you're referring to?

A.    University Hospital had had a contract, a Sterilmed contract, and they had not been reprocessing or purchasing from any Sterilmed for the entire year of the contract.

Q.    What do you attribute that to?

A.    I don't think Vanessa wanted a reprocessing program in the University Hospital lab.

Q.    Did you each move forward with reprocessing through Innovative even after learning of this contract?

A.    Yes, we did.

Q.    Do you see that reflected in this document?

A.    Yes.  You can see right here:  I would like to move forward with Innovative Health.

Q.    And who sent that?

UNITED STATES DISTRICT COURT

**ER-888**

33

A.    That was Virginia.

Q.    After this e-mail did you interact with anyone from UH about their intent to move forward with Innovative?

A.    Yes.  Later on I had met with Virginia and Jimmy to discuss this.

Q.    Based on your interactions with Ms. Travieso and Mr. Wilkinson, did you have an understanding as to why UH wanted to, quote, move forward with Innovative?

A.    Yes.  They had trusted us that we were going to provide the cost savings that they needed for the lab, and they were very not pleased that they had a contract and that their Sterilmed contract hadn't been executed.

Q.    I'd like to direct you to what has been marked as JX3971 in your binder.

       Ms. Snider, do you recognize this document?

A.    Yes, I do.

Q.    What is it?

A.    This is an e-mail chain with Miguel, Kara, and myself.

Q.    Looking at the top-level e-mail, did you receive this e-mail chain?

A.    Yes, I did.

Q.    When was that?

A.    On December 22nd of 2022.

       MS. MORALES-KIMBALL:  I'd like to move JX3971 into evidence.

UNITED STATES DISTRICT COURT

**ER-889**

34

THE COURT:  Any objection?

MR. CRUZ:  No objection, Your Honor.

THE COURT:  3971 will be received.

**(Exhibit 3971 received)**

BY MS. MORALES-KIMBALL:

Q.   I'd like to direct you to the highlighted text in Mr. Cardenas's December 22nd e-mail on the first page. Please read it.

A.   "Yesterday afternoon UH and myself met with Biosense Webster and informed them that UH will be exercising the 30-day opt-out clause on their current contract."

Q.   How does this relate to the Sterilmed contract you've been testifying about?

A.   That's exactly what they were referring to.  They had opted out because of the terms.

Q.   What happened after UH opted out of the Sterilmed contract?

A.   They had -- I met with them, and we had decided that we were going to move forward with the program once the 30 days had concluded.

Q.   I'd like to direct you to what has been marked as JX3972.

Ms. Snider, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

UNITED STATES DISTRICT COURT

**ER-890**

35

A.    This is an e-mail that was forwarded to myself, Dave Distel, and Rick Ferreira from Kara Reyes.

Q.    When was that?

A.    That was on January 3rd of 2023.

Q.    Did you receive this full thread when it was forwarded to you on that date?

A.    Yes, I did.

        MS. MORALES-KIMBALL:  I'd like to move JX3972 into evidence.

        MR. CRUZ:  No objection, Your Honor.

        THE COURT:  3972 will be received.

        **(Exhibit 3972 received)**

BY MS. MORALES-KIMBALL:

Q.    I'd like to direct you to Mr. Cardenas's January 2nd, 2023, e-mail on the first page.  Please read the highlighted text.

A.    "What is y'all's take on the highlighted OEM products below not being reprocessed by another company?

Q.    What is Mr. Cardenas referring to here, if you know?

A.    He's referring to the case coverage policy.

Q.    Whose case coverage policy?

A.    The Biosense Webster case coverage policy.

Q.    Mr. Cardenas refers to highlighted -- something highlighted.  Do you see that reflected in this e-mail thread?

UNITED STATES DISTRICT COURT

**ER-891**

A.   Yes, I do.

Q.   You see Mr. Cardenas's highlighting?

A.   Yes, I do.

Q.   Where is that?

A.   It's in the paragraph starting with "as you are looking."

Q.   Who is the original sender of this e-mail?

A.   This is Phil Lunday.

Q.   Who is that?

A.   He's the executive territory manager for Biosense Webster.  Oversees University Hospital San Antonio.

Q.   And focusing on the text that was highlighted by Mr. Cardenas, what do you understand that to convey?

A.   He's referring to the case coverage policy with the sensor-enabled devices.

Q.   And just because there's some acronyms, what does ULSD mean?

A.   Ultrasound.

Q.   What does OEM mean?

A.   Original equipment manufacturer.

Q.   Do you see Biosense's case coverage policy included in this document?

A.   Yes.

Q.   Where is that?

A.   Page 7.

Q.   Did you interact with anyone from UH about the policy after this e-mail was sent?

A.   Yes, I did.

Q.   Who did you interact with?

A.   With Virginia and Jimmy in particular.

Q.   How did they react to Mr. Lunday's e-mail?

A.   They were not pleased.

Q.   What do you mean by that?

A.   They were pretty upset that due to the devices, the catheters that were mentioned in this case coverage policy that they did not know about, their cost savings was pretty much going to be almost cut in half.

Q.   When was Mr. Lunday's e-mail sent to UH?

A.   It was sent on December 27th.

Q.   How many days was that after UH opted out of the Sterilmed contract?

A.   It was six days.

Q.   Is UH a customer, an Innovative customer, today?

A.   They are.

Q.   When did they formally become a customer?

A.   So that would be February and March of 2023.

Q.   Has UH been a customer continuously since that time?

A.   Yes, they have.

Q.   And since February or March 2023, has UH ever purchased reprocessed LASSO NAV catheters from Innovative?

38

A.   No, they have not.

Q.   And since becoming a customer in February or March 2023, has University Hospital ever purchased reprocessed PENTARAY catheters from Innovative Health?

A.   No, they have not.

Q.   And during that same time frame, has UH ever purchased reprocessed SOUNDSTAR catheters from Innovative Health?

A.   No, they have not.

Q.   Do you have an understanding as to what University Hospital would like to do with respect to these catheters?

A.   Oh, they would love to be able to purchase those from us, all the sensor-enabled -- any device that we can provide to them back they will want to purchase.

Q.   Do you have an understanding of what University Hospital intended to do with respect to Biosense OEM purchases after receiving this policy?

A.   Well, they wanted to look at all options to be able to switch devices so that they could have more devices that weren't in the sensor-enabled in the case coverage policy so that they could reprocess more.

Q.   What do you mean?

A.   So since the -- due to the case coverage policy, they couldn't, you know, they couldn't reprocess and purchase those devices for Innovative Health.  So they were looking at other catheters from other OEMs to be able to start

UNITED STATES DISTRICT COURT

**ER-894**

purchasing devices, catheters that we could actually reprocess for them.

Q.   And these catheters reprocessed by other OEMs, what mapping device, if any, would they connect to?

A.   They were in particular looking at the EnSite X.

Q.   Where is that?

A.   Abbott St. Jude.

Q.   Was UH successful in transitioning to Abbot's mapping catheter?

A.   No, not really.

Q.   I'm sorry.  Let me rephrase.  Mapping machine?

A.   No.

Q.   Do you know why?

A.   Yeah.  It really came down to physician preference.

Q.   Physician preference for what?

A.   The physicians wanted to utilize the CARTO 3 system.

Q.   In your dealings with Innovative customers, are you aware of any besides UH that have formed an opinion about Sterilmed?

A.   Yes.

Q.   How did you obtain that understanding?

A.   I -- just with my interactions with supply chain cath lab management potential customers.

Q.   And generally how do customers view Sterilmed?

        MR. CRUZ:  Objection, Your Honor, both relevance

and hearsay.  We're clearly going to get testimony here based on conversations from third parties.

THE COURT:  Sustained.

BY MS. MORALES-KIMBALL:

Q.   Ms. Snider, hospitals have -- have hospitals conveyed their state of mind with respect to Sterilmed?

MR. CRUZ:  Objection, Your Honor.  This is not state of mind.  These are opinions of third parties.

THE COURT:  Sustained.

BY MS. MORALES-KIMBALL:

Q.   Are you aware of any other customers beside University Hospital that had made a plan to move product from Biosense Webster to another manufacturer's mapping machine?

A.   Yes.

Q.   And generally were they successful in doing so?

A.   No.

Q.   And why is that?

A.   The majority of the time it comes down to physician preference.  Other times it's too much of a capital -- too costly for them.

Q.   Besides UH, are there any current Innovative customers that will not purchase sensor-enabled catheters from Innovative due to Biosense's policy?

A.   Oh, yes.

Q.   How would you know that?

41

A.   Well, I work with all of our customers at some sort of level and go through their data.

Q.   And approximately how many customers will not purchase sensor-enabled catheters because of Biosense's policy?

A.   Almost all of them.

Q.   How many would that be?

A.   Over 200.

Q.   Has that impact been tied to any specific region?

A.   No.  It's across the United States.

Q.   And are any located in California?

A.   Yes.  Several of them are.

Q.   Which ones?

A.   Kaiser Permanente, Stanford Health, Sharp Health, Torrance Memorial.  Those are the ones that come to mind right now.

Q.   Does Biosense's policy come up with potential customers?

A.   Oh, yes.

Q.   How often?

A.   Pretty much with each potential customer.

Q.   Let's focus just on 2025 so far.

A.   Okay.

Q.   So in the last five months, about how many potential customers have you interacted with about Biosense's case coverage policy?

A.   I would have to say about probably, like, 10 to 15

UNITED STATES DISTRICT COURT

**ER-897**

42

hospitals and health systems.

Q.    Which ones can you recall?

A.    HCA Far West, HCA Mountain, HCA Tri-Star, HCA South Atlantic, Advent Health, Trinity Health, the Valley Health system, New York Presbyterian, Ardent Health, and Carolina East University Health.

Q.    You mentioned health systems.  Are any of those health systems?

A.    Yes.  Those are all health systems.  Sorry.

Q.    So how many EP labs approximately are represented by the list you just provided?

A.    So with those particular hospitals, they have hospitals that range from 2 to 25, around there.

Q.    And where are those hospitals you just described located?

A.    They're across the United States.  You've got -- you know, HCA Far West is in California, Nevada, all the way -- Advent is in Florida.  New York Presbyterian is up in New York.  Valley Hospital is in New Jersey.  And you've got a ton of them in central areas.

Q.    Ms. Snider, how has the case coverage policy impacted Innovative?

A.    I mean, tremendously.  We have these 510(k) clearances and devices that we can sell, but we can't sell them.

Q.    How has it impacted the sales that you oversee?

UNITED STATES DISTRICT COURT

**ER-898**

43

A.    By millions of dollars.

Q.    How has Biosense's case coverage policy impacted the hospital customers you work with?

A.    It has really impacted them so much that it's sad.

Q.    What do you mean by that?

A.    Well, in healthcare right now they're, like, desperately needing to save money.  And, you know, it's great to be able to walk in with the environmental aspect of it and be able to divert this from local landfills.  But the cost savings they really need, and there's not a lot of opportunities nowadays to be able to get cost savings in hospitals and especially in specific areas like procedures like the EP lab.

Right now there are no choices.  They really don't have control, and it's really preventing them from saving millions of dollars where they need to put that back into innovation.  They need to put that back into their staff.

I think I get passionate about it because I -- I talk to these customers on a daily basis about finding ways to save money.

Q.    Thank you.

MS. MORALES-KIMBALL:  I'll pass the witness.

THE COURT:  Mr. Cruz.

MR. CRUZ:  Yes, Your Honor.  May I approach to provide the binder to the witness?

THE COURT:  You may.

UNITED STATES DISTRICT COURT

**ER-899**

44

MR. CRUZ:  Thank you.

**CROSS-EXAMINATION**

BY MR. CRUZ:

Q.   Good afternoon, Ms. Snider.

A.   Good afternoon.

Q.   My name is Alejandro Cruz.  I'll be asking you a couple of follow-up questions if that's all right.

A.   That's good.  Thank you.

Q.   So, Ms. Snider, on direct you talked about the experience you had with University Health, right?

A.   Yes, sir.

Q.   And that was late 2022 into early 2023, correct?

A.   Yes.

Q.   At the time in late 2022, University Health had an existing contract with Sterilmed, correct?

A.   Yes.

Q.   In using that contract, University Health could have reprocessed sensor-enabled Biosense catheters, correct?

A.   Yes.

Q.   Now, at any point in your interactions with University Health, did you tell them that they could go to Sterilmed to get access to the Biosense Sterilmed reprocessed catheters?

A.   Are you referring to the sensor-enabled ones?

Q.   Yes.

A.   Yes, I did.

UNITED STATES DISTRICT COURT

**ER-900**

45

Q.    Yes.  So you told them that they could reprocess through Sterilmed for the sensor-enabled catheters that they can no longer reprocess through you, correct?

A.    Yes.

Q.    And Innovative Health no doubt has some exclusive contracts with people, correct -- with customers?

A.    Yes.

Q.    And just in your own experience, if an exclusive Innovative Health customer brought in another reprocessor, you might remind the hospital that they have a contract with you, right, because it's exclusive?

A.    Yes.

Q.    And you might even be a little surprised that they brought in a third-party reprocessor, correct, because you have that exclusive contract?

A.    Yes.

Q.    And, ma'am, I'd like to go back just for a second to make sure I understand.  You said, I believe it was, December 6th you had an interaction in the collection room of University Health with a Sterilmed employee, correct?

A.    No.

Q.    Was it December 7th?

A.    No.  It wasn't with a Sterilmed employee.

Q.    Oh, my apologies.  It would be the Biosense employee?

A.    Yes.

UNITED STATES DISTRICT COURT

**ER-901**

46

Q.   Okay.  So on December 7th --

A.   6th.

Q.   December 6th -- apologies.  There's a lot of dates flying around.  So on December 6th you had that interaction with the Biosense employee, right?

A.   Yes.

Q.   And that she was the CAS.  I think you said her name was Ms. Amaya, the CAS at University Health, the clinical account specialist?

A.   Yes.

Q.   And in terms of the story you told, in the collection room you saw -- well, let me go back one.  You understand that Sterilmed and Biosense are sister companies, correct?

A.   Yes, I do.

Q.   And that Sterilmed reprocesses Biosense catheters, correct?

A.   Yes.

Q.   So in terms of the story that we were hearing, you witnessed a Biosense employee -- or, you didn't actually witness her write something on the Sterilmed container, correct?

A.   Correct.

Q.   But you saw what appeared to you to be writing by a Biosense employee on the Sterilmed container, correct?

A.   Yes.

UNITED STATES DISTRICT COURT

**ER-902**

Q.   And it wasn't on the Innovative Health collection container, right?

A.   No.

Q.   If we can go back, Ms. Snider.  If you would turn back to JX4345, please.  It should be still in your binder.  Let me know when you're there, ma'am.

A.   Okay.

Q.   If you turn to page 2, this is just the very same e-mail that your counsel was having you read something from.  Do you see it?

A.   Yes.

Q.   And do you see -- your counsel had you read the sentence I believe that started:  "We have a current fully executed contract for reprocessing with the hospital through December '23."  Do you recall that?

A.   Yes.  I see it.

Q.   Do you recall testifying about it?

A.   Yes.

Q.   And I just want to -- I'd like you to read -- to read with you the line after that that your counsel didn't have you read that says that this is the senior clinical account specialist writing:  I have been putting a lot of work to get materials to change the vendor name, and they continually tell me they are behind and will eventually get to it.  John and Anthony have also actively been trying to get it done.

48

Everything is set up in ordering system.  They just need to change the vendor name and we can order reprocessed items tomorrow.  You see that, right?

A.    Yes, I see that.

Q.    In terms of this process with University Health, Ms. Snider, I think you've testified regarding a time when University Health, you testified, learned about the case coverage policy, correct?

A.    Yes.

Q.    Based on an e-mail that you looked at, correct?

A.    Yes.

Q.    And that e-mail -- I have a lot of paper here, ma'am, so just bear with me, please -- I think it was JX3972.  If you could turn to that exhibit in your binder, ma'am.

A.    I don't -- I don't have that.

Q.    JX3972?  My apologies, ma'am.  Are you looking in the binder I gave you or in the binder that your counsel --

A.    That you --

Q.    It's in the binder that your counsel gave you.

A.    Oh, okay.  Yes.

Q.    Are you with me, Ms. Snider?

A.    Yes.

Q.    So I think we looked at with your counsel the e-mail on Tuesday, December 27th, from Phil Lunday.  Do you see that?

A.    Yes.

UNITED STATES DISTRICT COURT

**ER-904**

49

Q.   Okay.  So we looked at that.  Now, your -- I think it was your testimony that some of the interactions with University Health began in November of 2022, correct?

A.   Yeah.  We had discussions in November.

Q.   And then it was in December, early December, that you had additional discussions, correct?

A.   Yes, after we had implemented.

Q.   The implementation took place on or around December 6th, 2022, correct?

A.   Yes.

Q.   And on December 27th we see this e-mail from Phil Lunday that you testified about before, correct?

A.   Yes.

Q.   At no time before December 27th did you inform University Health of your knowledge of the Biosense case coverage policy, correct?

A.   I don't know.

Q.   Well, it stands to reason that they -- I think you testified that they were surprised by this information from Biosense, correct?

A.   Yes.  They had never seen it before.

Q.   Right.  And they had never heard of the policy before, correct?

A.   I don't know if they had heard about the policy.  We had asked them to look into if they had the policy, and they

UNITED STATES DISTRICT COURT

**ER-905**

50

didn't have it.

Q.   Well, normally one wouldn't be surprised if you know of a fact prior to learning it, correct?

A.   Okay.

Q.   That's right, correct?

A.   Can you repeat the question.  I'm sorry.

Q.   Well, I can rephrase it.

A.   Thank you.

Q.   If University Health had known about the case coverage policy, they wouldn't have been surprised in late December when you testified that they learned about it, correct?

A.   I don't think they knew about it.

Q.   And that was because you didn't tell them about it, correct?

A.   Yeah, because they had done -- correct.

Q.   Just to be clear, you were interacting with them throughout November '22, correct?  And by them, I mean University Health.

A.   Interact -- yes.

Q.   You were pitching them in November of 2022, correct?

A.   Yes.

Q.   And you were pitching them in December of 2022, correct?

A.   Yes.

Q.   And you said you formalized the agreement in January of -- in early 2023, correct?

UNITED STATES DISTRICT COURT

**ER-906**

51

A.   We had -- it's kind of complicated with this one.  So we had actually more formalized it in December, but because of the delay with the Sterilmed contract, we didn't fully execute it so they could get out of the contract until February.

Q.   February of 2023, correct?

A.   Correct.

Q.   I think you testified that some of those interactions with University Health began actually as early as June 2022, correct?

A.   Yes.

Q.   So between June and December of 2022, in pitching this new customer of yours, you didn't tell them at any point about the Biosense case coverage policy, correct?

A.   I do not know.

Q.   So you don't recall ever telling University Health between June and December of 2022 about the case coverage policy, correct?

A.   I don't think so.

Q.   That's a correct statement, right?

A.   Yes.

Q.   In fact, you talked about driving early in the morning from your home to University Health, correct?

A.   Yes.

Q.   And that was because you said you wanted to give them

UNITED STATES DISTRICT COURT

**ER-907**

52

white-glove service, correct, to the new customer?

A.    Well, we had early meetings, and I wanted to make sure that I was there on time.

Q.    Well, you wanted to make sure that you were there on time for this new customer, right?

A.    Yes.

Q.    To give them the white-glove service, right?

A.    Yes.

Q.    But that white-glove service did not include telling them about a policy that would make it more difficult for them if they reprocessed with you to reprocess certain sensor-enabled catheters, correct?

A.    I don't fully agree with the statement.

Q.    Let me break it down a little bit.  In terms of your interactions with them, we've already established that you never told them about the case coverage policy, correct?

A.    Yeah.  I believe I didn't.

Q.    You believe you did not?

A.    I really don't know.

Q.    So let's just go back.  I think your testimony today is that you don't recall ever telling them about the case coverage policy between June and December of 2022, correct?

A.    Correct.

Q.    Thank you.

Let's just move back just a little bit in time,

UNITED STATES DISTRICT COURT

**ER-908**

53

Ms. Snider.  You've worked for Innovative since approximately 2022, correct?

A.   Yes.

Q.   And is it fair to say that you've worked with Innovative's CEO, Mr. Rick Ferreira, on and off since 2005-ish?  Is that correct?

A.   Yes.

Q.   And one of the companies that you worked with Mr. Ferreira at in your career was a company called Intraline, correct?

A.   Yes.

        MS. MORALES-KIMBALL:  Objection.  Relevance.

        THE COURT:  Overruled.

        MR. CRUZ:  Thank you, sir.

BY MR. CRUZ:

Q.   And in terms of that period of your career, that was focused on placing certain individuals with various types of licenses in surgical procedures to assist physicians, correct?

A.   Yes.

Q.   Now, that support for physicians in surgical procedures had nothing to do with assisting physicians in EP procedures, correct?

A.   Correct.

Q.   And Intraline is not operating anymore, correct?

54

A.    Correct.

Q.    And is it fair to say that there wasn't really a market for that type of surgical/clinical support in the surgical operating room?

A.    No.

Q.    But that business is no longer operating, correct?

A.    That business as a whole, the surgical first assistants are now working at other surgical first assistant companies that provide the same.

Q.    And Intraline is no longer operating, correct?

A.    Correct.

Q.    Just a couple of questions on a slightly different topic, Ms. Snider.

You have seen instances in your career, Ms. Snider, where you see hospitals -- actually I think you -- well, let me phrase it this way.  You testified earlier about hospitals shifting procedures from one cardiac mapping system to the other, correct?

A.    Yes.

Q.    So I just -- I'd like to look at a document.  This time we can switch to the other binder.  I want to make sure we're close together on this one.  So I'd like you to please turn to JX2461 in the white binder that I provided to you.

A.    (Witness complies.)

Q.    Let me know when you're there, ma'am.

UNITED STATES DISTRICT COURT

**ER-910**

55

A.   Yes.  I'm there.

Q.   So, Ms. Snider, you see this is an e-mail you sent, correct?

A.   Yes, it is.

Q.   On June 21st, 2024, correct?

A.   That is correct.

Q.   And it's titled in the subject line, ECU Health savings model, Vidant Health savings model, correct?

A.   Correct.

          MR. CRUZ:  I'd like to move JX2461 into evidence.

          MS. MORALES-KIMBALL:  Objection, Your Honor.  Rule 106.  This document is incomplete.  It appears that there is an attachment that is not included in this document.  It is an incomplete exhibit.

          MR. CRUZ:  Your Honor, we're happy to use a different series.  We'll look at JX2461.

          MS. MORALES-KIMBALL:  Your Honor, that is the document we are currently looking at that I objected to as an incomplete document.

          MR. CRUZ:  Your Honor, what counsel is objecting to is the native format that's on the back of the page.  That spreadsheet is a 19,000-page spreadsheet that I don't think we should really bring up to the witness in a box.

          It has been submitted to the Court.  It can be put into evidence.  I'm only going to be referring to the cover

UNITED STATES DISTRICT COURT

**ER-911**

e-mail.

THE COURT:  Has it been produced?

MR. CRUZ:  Absolutely, Your Honor.

THE COURT:  Okay.  Overruled.

**(Exhibit JX2461 received.)**

BY MR. CRUZ:

Q.   Ms. Snider, this was an e-mail that you sent to Mr. Rick Ferreira, correct?

A.   Yes, it was.

Q.   As well as Michael Ferreira, correct?

A.   Yes.

Q.   And is Michael Ferreira Mr. Rick Ferreira's son?

A.   Yes.

Q.   And he also works at Innovative, correct?

A.   Yes.

Q.   What's his role at Innovative?

A.   He is an account executive.

Q.   So in June of 2024 you wrote this e-mail.  And I just --

MR. CRUZ:  Can we publish it and maybe zoom in on the center, please, on the text starting with "Rick and Michael."

BY MR. CRUZ:

Q.   If you look at the first paragraph, Ms. Snider, you see it says:  Rick and Michael, please see below for Vidant and the analysis info from Ira, including his notes.  Let me know

UNITED STATES DISTRICT COURT

**ER-912**

57

how you want to proceed.  Do you see that?

A.   Yes, I do.

Q.   And ECU Health, Vidant, was a potential customer, correct?

A.   Yes.

Q.   You see two paragraphs down in the text that you wrote to Mr. Ferreira, to Messrs. Ferreira, you write:  Usage has shifted from Biosense Webster to Abbott St. Jude.

Do you see that?

A.   Yes.

Q.   And with respect to ECU Health, you wrote ViewFlex up 180 percent.  Do you see that?

A.   Yes, I do.

Q.   And ViewFlex is an Abbott ultrasound catheter, correct?

A.   Yes.

Q.   And then next to that you wrote ACUNAV and SOUNDSTAR down 40 percent, correct?

A.   Yes.

Q.   All with respect to ECU Health, right?

A.   Yes.

Q.   You also write, a couple of bullets down, Advisor HD up 52 percent, correct?

A.   Yes.

Q.   And ECU Health is currently -- is not currently an IH customer, right?

UNITED STATES DISTRICT COURT

**ER-913**

58

A.   No, they are not.

Q.   So I'd like to ask you about one more document, Ms. Snider.

THE COURT:  Well, I'm afraid we have to stop here.

MR. CRUZ:  Understood, Your Honor.

THE COURT:  I have a doctor's appointment.  On the grand scale of things in the world, doctors rank way above federal judges.  So I have to obey the doctor's dictate.

So we'll resume Tuesday at the regular time.  I trust you'll have a good weekend.

THE CLERK:  All rise.

(Proceedings adjourned at 2:59 p.m.)

**ER-914**

59

CERTIFICATE

I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

THE ABOVE MATTER.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


_____                    07/16/2025

MIRIAM V. BAIRD                               DATE
OFFICIAL REPORTER

UNITED STATES DISTRICT COURT

**ER-915**

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

INNOVATIVE HEALTH, LLC,      ) CERTIFIED TRANSCRIPT
               Plaintiff,  )
     vs.                    )
                           )   SACV-19-01984-JVS
BIOSENSE WEBSTER, INC.,      )
               Defendant.  ) TRIAL DAY 5, VOL. I
--------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 13, 2025

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

2

APPEARANCES OF COUNSEL:

For the Plaintiff:

DEREK T. HO
ANDREW E. GOLDSMITH
MATTHEW D. READE
KELLEY C. SCHIFFMAN
RACHEL T. ANDERSON
ANNAMARIA M. MORALES-KIMBALL
SEAN P. QUIRK
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
(202) 367-7900

PANTEHA ABDOLLAHI
THEODORA ORINGHER, PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, CA  92626-7109
(714) 549-6200

JEFFREY L. BERHOLD
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia  30309
(404) 872-3800

MATTHEW I. SUMMERS
JOSHUA PAUL DAVIS
KYLA GIBBONEY
BERGER MONTAGUE, PC
505 Montgomery Street, Suite 625
San Francsico, CA  94111
(415) 906-1626

For the Defendant:

WILLIAM F. CAVANAUGH, JR.
ALEJANDRO H. CRUZ
ISAAC J. WEINGRAM
CHRISTINE HARPER
ANDREW KIRSCHENBAUM
DANHUI XU
PATTERSON BELKNAP WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, NY  10036
(212) 336-2000

ER-917

3

**KARLA J. KRAFT**
**STRADLING YOCCA CARLSON & RAUTH, LLP**
**660 Newport Center Drive, Suite 1600**
**Newport Beach, CA  92660-6422**
**(949) 725-4000**

**MUHAMMAD USMAN FARIDI**
**NADAV BEN ZUR**
**LINKLATERS, LLP**
**1290 Avenue of the Americas**
**New York, NY  10104**
**(212) 903-9000**

**ALSO PRESENT:**

**AARON DETATE**
**Innovative Health Client Representative**

**KATHRYN MEISEL**
**Johnson & Johnson and Biosense Webster**
**Client Representative**

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-918**

4

```
                          I-N-D-E-X
```

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MEREDITH SNIDER (Continued) | | 17 | 23 | |
| ERIC FORISTER | 25 | | | |

| PLAINTIFF'S EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| Exhibit 464 | | 20 |
| Exhibit 219 | | 37 |
| Exhibit 3099 | | 39 |
| Exhibit 298 | | 41 |
| Exhibit 3114 | | 44 |
| Exhibit 3270 | | 45 |
| Exhibit 3329 | | 48 |
| Exhibit 3981 | | 50 |
| Exhibit 3415 | | 52 |
| Exhibit 2 | | 53 |
| Exhibit 3626 | | 55 |
| Exhibit 173 | | 58 |
| Exhibit 3193 | | 61 |
| Exhibit 3437 | | 62 |
| Exhibit 3325 | | 64 |
| Exhibit 4419 | | 78 |
| Exhibit 4421 | | 79 |
| Exhibit 4406 | | 88 |
| Exhibit 4405 | | 89 |
| Exhibit 3236 | | 97 |
| Exhibit 4392 | | 99 |
| Exhibit 3963 | | 103 |
| Exhibit 4457 | | 119 |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-919

5

| DEFENSE WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (None) | | | | |

| DEFENSE EXHIBITS: | | MARKED | RECEIVED |
|---|---|---|---|
| (None) | | | |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-920**

6

SANTA ANA, CALIFORNIA; TUESDAY, MAY 13, 2025; 8:34 A.M.

(Jury not present)

THE CLERK:  Calling Item No. 1, SACV-19-01984-JVS, Innovative Health, LLC versus Biosense Webster, Inc.

Counsel, please state your appearances for the record.

MR. HO:  Good morning, Your Honor.  Derek Ho from Kellogg Hansen on behalf of plaintiff Innovative Health.

THE COURT:  Good morning.

MR. GOLDSMITH:  Andrew Goldsmith from Kellogg Hansen for the plaintiff.  Good morning, Your Honor.

THE COURT:  Good morning.

MS. MORALES-KIMBALL:  Annamaria Morales-Kimball from Kellogg Hansen for the plaintiff.  Good morning.

THE COURT:  Good morning.

MS. SCHIFFMAN:  Kelley Schiffman from Kellogg Hansen for plaintiff.

THE COURT:  Good morning.

MR. SUMMERS:  Matt Summers for plaintiff.

THE COURT:  Good morning.

MS. GIBBONEY:  Kyia Gibboney for plaintiff.

THE COURT:  Good morning.

MR. DAVIS:  Joshua Davis for plaintiff.

THE COURT:  Good morning.

MR. CAVANAUGH:  Good morning, Your Honor.  Bill

7

Cavanaugh of Patterson Belknap on behalf of Biosense.

THE COURT:  Good morning.

MS. KRAFT:  Good morning, Your Honor.  Karla Kraft of Stradling on behalf of Biosense.

THE COURT:  Good morning.

MR. CRUZ:  Good morning, Your Honor.  Alejandro Cruz of Patterson Belknap for Biosense.

THE COURT:  Good morning.

MR. FARIDI:  Good morning, Your Honor.  Muhammad Faridi on behalf of Biosense.

THE COURT:  Good morning.

MS. HARPER:  Good morning, Your Honor.  Christine Harper from Patterson Belknap on behalf of Biosense.

THE COURT:  Good morning.

Thank you for the e-mail yesterday.  You wanted to take up a couple of things.  I ruled on the additional objections, so you should have those back.

Admissibility of JX279 related to the Saxby testimony.

MS. HARPER:  Good morning, Your Honor.  And may it please the Court, Christine Harper for Biosense Webster.

This document is not hearsay because it's not being offered for the truth of the matter asserted.  Instead, it's being offered for two non-hearsay purposes.

THE COURT:  Could you hand up a copy, please?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-922**

8

MS. HARPER:  Yes, of course.

May I approach?

THE COURT:  Yes.

(Document handed to the Court)

MS. HARPER:  Thank you, Your Honor.  Instead, this document is being offered for two non-hearsay purposes:  the first of which is hospital notice of the policy.  This document clearly demonstrates that as of early or mid-2016 hospitals had notice that Biosense was enforcing its clinical account specialist policy.

THE COURT:  Tell me what this is, though.

MS. HARPER:  This is a document that Cheryl Saxby, as a member of a cardiac committee -- she drafted this memorandum, which she disseminated amongst members of that committee, which consisted of physicians and lab staff at Providence.

THE COURT:  Okay.  So this is just notice of the policy?

MS. HARPER:  Yes, Your Honor, but also notice of Biosense's willingness to provide training to hospitals on the CARTO-3 machine.

THE COURT:  Okay.  Ms. Schiffman.

MS. SCHIFFMAN:  Good morning, Your Honor.

We believe this is hearsay being asserted for the truth of the matter, specifically on that second point with

9

regard to the training. It says: "Biosense Webster CAS are available to start the training with your staff." That goes to a key point of dispute here. Both here and in her deposition testimony, she discusses the availability of CAS. So it's not just for their notice. It's to establish that availability.

There is no certification, no business record certification, for this document. They have not laid a foundation in the deposition testimony for it being a business record, and so we think it's inadmissible hearsay.

THE COURT: She is going to testify via deposition?

MS. SCHIFFMAN: Correct. There is nothing in there that would establish this being a business record.

THE COURT: It will be excluded.

Objections to Coldiron's testimony.

MS. SCHIFFMAN: Your Honor, first we have a Rule 611 objection to a portion of testimony that is both leading, and as a result, prejudicial. The witness's answer illustrates how --

THE COURT: Do you have the text?

MS. SCHIFFMAN: Yes, I do.

THE COURT: Could you hand that up?

MS. SCHIFFMAN: I'm sorry.

(Document handed to the Court)

10

MS. SCHIFFMAN:  Your Honor, the first portion is the Saxby testimony.  So if you skip beyond that, you will have stapled the Coldiron testimony.

THE COURT:  Wouldn't it be better if I read this first and looked at it?

MS. SCHIFFMAN:  Sure.

THE COURT:  When do we need to take this up?

MS. HARPER:  Your Honor, if possible, we would love the ability to recut this video for today, but if that's not possible to have your ruling --

THE COURT:  These are the only objections on the first page?

MS. HARPER:  I believe there are four objections.

THE COURT:  Yeah, okay.  Well, when I get off the bench, I'll take a look at this.

Where are you in plaintiff's case-in-chief?

MR. HO:  Your Honor, Ms. Snider is on cross-examination.  After Ms. Snider, we plan to call Dr. Eric Forister, our economics expert.  After Dr. Forister, we have a very short videotape deposition, no more than two minutes I believe, and then we will rest our case-in-chief.

THE COURT:  Okay.

Mr. Cavanaugh.

MR. CAVANAUGH:  Thank you, Your Honor.  Two just kind of ministerial issues.

11

Dr. Forister -- as the Court knows, we filed Daubert motions as to his testimony.  Could I just have a standing objection?

THE COURT:  You don't have to repeat --

MR. CAVANAUGH:  I read the Ninth Circuit cases that said I probably don't have to.

THE COURT:  That's fine.

MR. CAVANAUGH:  But if I could just have a standing objection.

THE COURT:  You can have a standing objection to his testimony as reflected in your Daubert motion.

MR. CAVANAUGH:  Thank you, Your Honor.

The second question, Your Honor, obviously when the plaintiff closes their case, we're going to make a Rule 50 motion.

THE COURT:  Right.

MR. CAVANAUGH:  Procedurally, how do you want to handle that?

THE COURT:  How long are you going to run today, estimate?

MR. HO:  I think Dr. Forister's testimony on direct examination will be between two to two-and-a-half hours.

THE COURT:  All right.  Depending on where we are, I'm not going to stop to take the motion, but I'll deem it

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-926

12

having been made at the time plaintiff rests.  If you want to supplement it with a memorandum, that's fine.

MR. CAVANAUGH:  That's fine, Your Honor.  Thank you.

THE COURT:  Okay.

MR. CAVANAUGH:  I expect my cross-examination will be about an hour-and-a-half.

THE COURT:  Okay.  So we'll definitely be into tomorrow with the expert.

MR. CAVANAUGH:  Hopefully, we can finish him today.

THE COURT:  Okay.  But I need to stop again at 3:00 p.m.  We'll take one hour for lunch.  And from here on out, if the jury can come at 8:30, I'm suggesting we start at 8:30 with the jury and one hour for lunch for the rest of the duration.

MR. CAVANAUGH:  We agree with that, Your Honor.

THE COURT:  Yes, sir.

MR. DAVIS:  Josh Davis for plaintiff.  Just one clarifying question.  If Biosense submits a 50(a) memorandum, just the logistics of -- do we respond to the memorandum?  How would you prefer for that to work?

THE COURT:  Well, in my experience, unless there is an obvious dead-bang defect, I don't grant 50(a)'s at the end of plaintiff's case.  I take a closer look at the end of

13

the evidence, but really I can only recall one instance where I granted a 50(a), and it was a very clear failure of evidence of damages.  So I want you to make your motion.  We'll have time for a brief argument probably at the end of one day or during a break, but if you want to respond to their written memorandum, fine.

MR. DAVIS:  Thank you very much, Your Honor.

THE COURT:  Okay.  Ms. Vargas sent out my first cut of the jury instructions.

When do you see getting this case to the jury?  To me, it looks like Friday at the moment.  We need to get the defense case.

MR. CAVANAUGH:  We do, Your Honor.  They're down to seven hours.  If they use two-and-a-half with their expert -- we have six witnesses -- they would only have four-and-a-half hours for crosses, so I don't think their crosses can be very long.  We are hopeful that this case can go to the jury on Friday.

THE COURT:  All right.  Can we take some time at the end of the day tomorrow to sit down with the jury instructions?

My practice is to just have an informal session. We gather in the jury room and go page by page.  As I said in the note, the briefing on the instructions has been extensive.  I think every position you could possibly assert

14

has been asserted and preserved.  So at this point, I'm looking to move to a final edit.

MR. CAVANAUGH:  That's certainly fine.

THE COURT:  So end of the day tomorrow, that works?

MR. CAVANAUGH:  That works for both sides, Your Honor.

MR. HO:  Yes, Your Honor.

THE COURT:  Okay.

MR. CAVANAUGH:  At 4:30, Your Honor?

THE COURT:  Yes.

MR. CAVANAUGH:  Your Honor, I would say if we're going to do the 8:30 and the one hour for lunch, I'm confident the case can go to the jury on Friday with that additional time.

THE COURT:  Okay.  Good.

Anything else?

MR. FARIDI:  Your Honor, we have one semi-housekeeping issue.  You will recall that Innovative Health filed a motion in-limine to preclude any mention of advice of counsel in connection with the account policy.

THE COURT:  Right.

MR. FARIDI:  Your Honor issued a ruling, and there is a paragraph in the ruling that stated that if Biosense can make a proffer that the liability concerns that gave

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-929

15

rise to the policy were the impetus of the policy and we could make a proffer that those concerns came from non-lawyers, from business acumen, business people, then Your Honor would allow the liability-related testimony and proof to come into evidence.

So we have a witness, Your Honor, Mr. Conrad Ramos, who actually put pen to paper and drafted the policy document that Your Honor has been hearing about.  He is scheduled to testify tomorrow, and we can make him available for a proffer.

I will tell you now what he will testify to, Your Honor, and it's also backed up by the contemporaneous evidence.  In my view, Your Honor, the proffer from the witness is not necessary because the documents are actually clear-cut on it.

His testimony will be that the liability concern that served as an impetus of the policy --

THE COURT:  Why don't you share that with Mr. Ho and his colleagues, and if there's still a dispute after that discussion, someone thinks it doesn't fall within the exception the Court carved out, we can take it up.

MR. FARIDI:  We'll try to work that out, Your Honor.

THE COURT:  Okay.  Mr. Cavanaugh.

MR. CAVANAUGH:  Your Honor, just procedurally, if

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-930**

16

we're going to start with the jury at 8:30, do you want us here then at 8:00 to deal with any evidentiary issues?

THE COURT:  How about 8:10?

MR. CAVANAUGH:  That's fine.

THE COURT:  Not that it makes that big a difference.  You know, I appreciate your being here, and we're able to deal with these things at the start of the court date.  It obviously makes the jury portion of the case go smoother if we can get these things ironed out beforehand.

MR. CAVANAUGH:  Understood.  Thank you.

THE COURT:  Okay.  I don't have anything else at the moment.  Okay, we'll be in recess until the jury comes in.

(Recess)

THE COURT:  Are you ready for the jury?

MR. CRUZ:  Yes, Your Honor.

THE COURT:  Okay.

(Jury present)

THE CLERK:  Ma'am, just as a reminder, you're still under oath.

THE WITNESS:  Yes, ma'am.

MEREDITH SNIDER, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Mr. Cruz.

MR. CRUZ:  Thank you, Your Honor.

17

CROSS-EXAMINATION (Continued)

BY MR. CRUZ:

Q    Good morning, Ms. Snider.

A    Good morning.

Q    So I want to round back to just a couple of things that we talked about on your direct examination.  The first one is Innovative's collection of catheters.

I think you testified that Innovative collects catheters from hospitals to reprocess, correct?

A    Yes.

Q    And we can certainly agree that Innovative Health is in the business of reprocessing cardiac catheters, correct?

A    Yes.

Q    And I think you also mentioned you used to work at Stryker, right?

A    Yes.

Q    And Stryker is, in part, in the business of reprocessing cardiac catheters?

A    Yes.

Q    And you're also aware that Sterilmed reprocesses cardiac catheters, right?

A    Yes.

Q    And we can agree no doubt that in order to sell reprocessed catheters, you need a supply of used catheters to reprocess, correct?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-932**

18

A     Yes.

Q     Innovative Health collects catheters, correct, to reprocess?

A     Yes.

Q     Stryker collects catheters to reprocess, correct?

A     Yes.

Q     And Sterilmed collects catheters to reprocess, correct?

A     Yes.

Q     And are you aware that just a couple of days ago, your colleague, Mr. Distel, testified that, I think, Innovative was, quote, "swimming in SOUNDSTARs to reprocess"?

A     Can you repeat that?  Sorry.

Q     I was just asking if you're aware that Mr. Distel testified that Innovative Health is "swimming in SOUNDSTAR catheters"?

A     I don't know that he said that.

Q     And if a customer of Innovative Health wanted to order a Biosense sensor-enabled catheter reprocessed by Innovative Health, you would have those in stock to sell, correct?

A     Yes.

Q     And then it's also true, Ms. Snider, Innovative Health's inventory of Biosense sensor-enabled catheters would also be sufficient to sell to customers if the Case Coverage Policy were not in effect, correct?

A     Can you repeat that one more time?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-933

Case 8:19-cv-01984-JVS-KES   Document 541   Filed 06/25/25   Page 19 of 139   Page ID #:26460

19

Q    Sure thing.  I guess my question is simply -- I think you just testified that if a customer wants to buy a Biosense sensor-enabled catheter from Innovative, Innovative has that to sell them today, correct?

A    Yes, we have that product on our shelves.

Q    Yeah, and I guess my next question is along the same lines, and it's simply:  It's true that Innovative Health's inventory today of Biosense sensor-enabled catheters would be sufficient to meet its customers' demand even if the Case Coverage Policy were not in effect today, correct?

A    So basically you're asking if we have enough product?

Q    I'll ask my question one more time.

If the Case Coverage Policy were not in effect today, Innovative Health would have the product it needs of Biosense sensor-enabled catheters to sell to its customers, correct?

A    Yes.

Q    I think you also testified, Ms. Snider, when you were talking about University Health about implementation with your customers, right, of Innovative's program?

A    Yes.

Q    So I would like you to -- if you can pick up the white binder that you have up there.  Hopefully, I'm directing you to the right one.

It should say, Ms. Snider, "Cross-Examination

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-934**

Binder" on it, correct?

A    Yes.

Q    Yeah.  If you could turn, Ms. Snider, to the tab marked JX464, please.

So, Ms. Snider, do you see this is an e-mail dated June 9, 2022?

A    Yes.

Q    And do you see that this e-mail was sent by Mr. Lars Thording, right?

A    Yes.

Q    And Mr. Thording is Innovative Health's Vice-President of Marketing, correct?

A    Yes, that's correct.

Q    And you see that you received this e-mail, correct?

A    Yes, I do.

MR. CRUZ:  Move 464 into evidence.

THE COURT:  Any objection?

MS. MORALES-KIMBALL:  No objection.

THE COURT:  464 will be received.

(Exhibit 464 received in evidence)

MR. CRUZ:  If we could publish it now, thank you. And let's maybe zoom in on the first line, please, just on that list of words at the top.  Thank you.

BY MR. CRUZ:

Q    So, Ms. Snider, you see in this e-mail Mr. Thording

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-935

21

writes in the first line right under his salutation: "Thanks for a great call today and a good start to our projects.  Here are my notes on best practices"?  Do you see that, Ms. Snider?

A    I see that.

Q    And then under that, you see a bulleted list of best practices that Mr. Thording sent you, correct?

A    Yes, I see that.

Q    And if you look at the second bullet down, Ms. Snider, do you see that Mr. Thording wrote:  "A best practice is to set up reprocessed as the primary product, new as the secondary product," correct?

A    Yes, I see that.

Q    And we can agree that reprocessed here refers to Innovative Health's catheters, correct?

A    Okay.

Q    That's correct, right?

A    I'm assuming so, yes.

Q    And "new product" is an OEM catheter, correct?

A    Yes.

Q    Now, if you look further down the list to the sixth bullet down, you will see that another best practice -- I'm sorry.  He shares:  "Following, there is often hesitancy to change par levels to reprocessing with buyers wanting to see how it works first."  And then he writes:  "Push on buyers

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-936**

22

to set reprocessed up as primary right away from the beginning.  Reprocessed replaces new in the system."  Do you see that?

A    Yes, I see that.

Q    And then I think you testified that you received this, but you note also if you look at the top that Mr. Michael Ferreira received this e-mail, correct?

A    Yes, I see that.

Q    And Mr. Michael Ferreira is an account executive at IH, correct?

A    Yes.

Q    He's also the son of Mr. Rick Ferreira, the CEO, correct?

A    Yes.  We discussed that.

Q    And then you can also see up top if we look up at the recipients -- you see that Mr. DeTate, who's sitting right here today, received this e-mail, correct?

A    Yes.

Q    So let's just go back down to that list to the seventh bullet down.  And you also see that Mr. Thording writes in his list of best practices:  "In the supply room, hide the new products.  If a new product gets pulled, a new product gets ordered"?  You see that, correct?

A    Yes, I see that.

            MR. CRUZ:  No further questions.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-937

23

THE COURT:  Okay.

MS. MORALES-KIMBALL:  Brief redirect.  Thank you.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MS. MORALES-KIMBALL:

Q    Good morning, Ms. Snider.

A    Good morning.

Q    Do you recall on Friday Biosense's counsel asking you about University Hospital San Antonio's ability to purchase certain devices?

A    Yes.

Q    Since it has been a few days, can you please remind the jury why University Hospital cannot buy sensor-enabled Biosense catheters from Innovative?

A    It's because they have the Case Coverage Policy in place.

Q    Thank you.

        You were asked just now about Mr. Thording's reference to, quote, "hiding catheters."  Do you recall?

A    Yes.

Q    Have you ever hidden OEM catheters at a hospital?

A    No.

Q    Are you aware of any Innovative employee who has hidden OEM catheters at a hospital?

A    No.

24

Q    Now, during your cross-examination on Friday, Biosense's counsel asked whether you had told UH about Biosense's Case Coverage Policy.  Do you recall that?

A    Yes.

Q    Do you view it as your responsibility to educate hospitals on Biosense's Case Coverage Policy?

A    No.

Q    And even though you do not view it as your responsibility, do you provide that education on some occasions?

A    Yes.

Q    How often?

A    Pretty much every time we provide a savings analysis.

Q    Why is that?

A    Because we want to be able to show them all the devices that we can reprocess and then what their true capabilities of savings are.  And then we identify which devices are sensor-enabled and which devices are not sensor-enabled.

Q    And what's the importance of it being sensor-enabled with respect to the savings analysis?

A    Because if there is a Case Coverage Policy in there, they won't be able to get that savings.

        MS. MORALES-KIMBALL:  No further questions.

        THE COURT:  Anything further?

        MR. CRUZ:  No further questions, Your Honor.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-939**

25

THE COURT:  You may step down.  Thank you.

Would you call your next witness, please?

MR. HO:  Thank you, Your Honor.  We call Eric Forister.

Your Honor, may I approach with exhibit binders?

THE COURT:  You may.

ERIC FORISTER, PLAINTIFF'S WITNESS, SWORN

THE CLERK:  If you could please state your full name, spelling your last name for the record.

THE WITNESS:  Eric Forister, F-o-r-i-s-t-e-r.

THE COURT:  Mr. Ho.

DIRECT EXAMINATION

BY MR. HO:

Q    Good morning.  Could you please introduce yourself to the jury?

A    I'm Dr. Eric Forister.

Q    Dr. Forister, what is your role in this case?

A    I'm an expert economist for Innovative Health. Economists evaluate economic, business, and market issues.

Q    Could you please describe your educational background?

A    Yes.  I have a Bachelor's of Science In Mathematics/Economics from UCLA, magna cum laude.  And I have a Ph.D. in Business Administration in the field of Economics from Stanford.

Q    What is your current job?

26

A    I'm currently a managing director at Econ One Research, Incorporated.

Q    And what is that?

A    Econ One is an economic research and consulting firm. We help analyze market issues related to competition or calculating lost profits.

Q    Do you specialize in any subfield of economics?

A    Yes, in what would be called antitrust or competition economics.

Q    Can you describe your experience in that field?

A    Yes.  Over the course of my career, I have analyzed dozens and dozens of industries, starting when I was at Stanford and continuing through my almost 20-year career as a consultant.

Q    Could you maybe pull the microphone a little closer?

A    Sure.  Better?

Q    Okay.  Have you written on the subject of antitrust or competition economics?

A    Yes.  For example, I have written a book chapter on market power and market definition, which are topics that we'll get into in a little bit, for the American Bar Association.

Q    Have you worked as an economic consultant on other cases?

A    Yes, on hundreds of cases over the past 20 years or so.

27

Q    Have you testified at deposition or at trial in any of those cases?

A    Yes, about ten times.

Q    In all of the consulting work that you have done in those cases, approximately how often have you been retained by the plaintiff in the case as opposed to the defendant?

A    Over my career, it's been a fairly even split.  It's about 50/50.

Q    Have you been retained by Innovative Health as an expert in any case other than this one?

A    No.

Q    How about Biosense Webster?  Have you been involved in any case other than this one?

A    No.

MR. HO:  We offer Dr. Eric Forister as an expert in antitrust economics.

MR. CAVANAUGH:  No objection, Your Honor, subject to that.

THE COURT:  Dr. Forister will be received as an expert in the stated field.

When I make that finding, it indicates that the witness has at least the minimum qualifications to express opinions in the particular field.  It is for you to determine how much weight to give the evidence.

BY MR. HO:

28

Q    Dr. Forister, what was your assignment in this case?

A    Generally speaking, my assignment had three parts. First, it was to evaluate if Biosense's conduct was competition on the merits, which we'll explain in a bit, or anticompetitive conduct.  Second, it was to quantify the effect, if any, of that anticompetitive conduct.  And third, it was to evaluate competition in the markets at issue.

Q    What materials did you review to arrive at your opinions in this case?

A    A lot of materials.  Hundreds and hundreds of documents, dozens of depositions.  I visited an EP lab to see a procedure so I could get a better understanding of how these products are used.  I analyzed over ten years of sales data, and looking at academic research and studies on reprocessed medical devices.  All of that culminating in writing six expert reports.

Q    Did you charge for your work in this case?

A    I did.  I charged my usual hourly rate.

Q    And does your compensation depend in any way on the outcome of this case?

A    No, not in any way.

Q    Dr. Forister, have you prepared a slide to help summarize your opinions for the jury?

A    I have.

      MR. HO:  Could we please publish Slide 2.

Case 8:19-cv-01984-JVS-KES    Document 541    Filed 06/25/25    Page 29 of 139    Page ID #:26470

29

BY MR. HO:

Q    Dr. Forister, could you please summarize the first of your three opinions?

A    So related to the first part of my assignment, I determined that Biosense has engaged in anticompetitive conduct.  This includes three things:  The blocking technology that was inserted into the catheters, the Catheter Collections and Withholding Policy, and the Case Coverage Policy.

Related to the second part of my assignment, I found that Biosense has harmed competition, and it's harmed Innovative Health at least $147 million in lost profits, and that's spread over about ten years, from 2016 to present.

And the third, Biosense has market and monopoly power in relevant antitrust markets.  And there's a lot of terminology there that I will be unpacking over the next few hours.

Q    Dr. Forister, in a competitive marketplace, without the anticompetitive conduct that you list on Slide 2, can you describe where competition would occur in the CARTO 3 environment?

A    Yes, I think we have a slide on that.

Q    Okay.

A    So one of the questions when evaluating competition is where would it occur?  And the first place would be

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-944

30

hospitals would have a choice over which mapping machine to get.  They could pick among the CARTO, the Abbott machine, and so on.

Once a hospital had chosen a machine, they would then in a competitive world be able to choose where they got their mappers, the clinical account specialists.  And then they would also be able to choose where they got their sensor-enabled catheters and other kinds of catheters.  And again, this would be a hospital that has a CARTO 3, so they would be getting CARTO 3-compatible products.

Q    Dr. Forister, were you present in court for the opening statement of Biosense's counsel?

A    I was.

MR. HO:  If we could put up Slide 4.

BY MR. HO:

Q    Do you recall Biosense's counsel saying that separate competition for mapping machines, CARTO 3 clinical support, and CARTO 3 sensor-enabled catheters was, quote, "not the real world"?

A    I heard him say that.

Q    Do you agree with that?

A    No, not at all, and this is a really important point. Their attorneys have told you that there is only competition when the hospital buys a machine, and that makes no sense. It's completely disconnected from the real world.

In the real world, hospitals have often provided their own mappers, and so we see that there is competition for CARTO 3 mappers.  They have also often purchased sensor-enabled catheters from independent reprocessors, at least prior to the Case Coverage Policy.

Q    Do economists have a method for analyzing whether there would be separate competition for mapping machines, CARTO 3 mappers, and CARTO-3 sensor-enabled catheters?

A    Yes.  In competition economics, we've come up with a series of tests to evaluate whether products are separate or whether they're really sold together.

MR. HO:  Could we publish Slide 5, please.

BY MR. HO:

Q    Could you please explain what the factors are that you list on Slide 5?

A    Yes.  So when you're looking at whether products or services are sold together or whether they're separate products, we look to see if they're offered separately.  Is it efficient to supply them separately?  And then we also look at whether customers want to buy them separately.  Is there demand to obtain them separately?

Q    So let's go through the three pairs of products one by one.

Is there real-world evidence that there was separate supply and demand of CARTO 3 machines separate from

32

CARTO 3 clinical support?

A    Yes, absolutely.  If we go back in time when the CARTO 3 was new, hospitals provided about half of their own mapping.  And so at that time, we could see a significant amount of the mapping was provided separately, and we're talking about the hospitals.  They obviously demanded it.  They wanted it separately.  And so those are two separate products.

Q    Now, if we go to the next line, is there real-world evidence that there is separate supply and demand for CARTO 3 clinical support and CARTO 3 sensor-enabled catheters?

A    Yes, in particular, the fact that Biosense is providing mappers, and the hospitals provide mappers.  And then we can see that the catheters can sometimes be sold by independent reprocessors.  So there's a whole mix of ways that a hospital could be receiving support and catheters separately, and that's what they choose to do, that sort of mixing and matching in a competitive market before the Case Coverage Policy was in place.

Q    And then finally, is there real-world evidence that there was separate supply and demand for CARTO 3 machines separate from CARTO 3 sensor-enabled catheters?

A    Yes.  Essentially the presence of independent reprocessors and the hospital demand or desire to purchase from them shows us that, because they're being supplied

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-947

33

separately, the catheters from the machines, and then hospitals want them separately.  It's somewhat the main point of this case that hospitals want to get their catheters separately from machines.  And there are companies that could efficiently supply them in the absence of the anticompetitive conduct.

Q    And so how do these factors -- how does this analysis relate to your opinion about what competition would look like absent the anticompetitive conduct?

A    It shows us that there would be separate markets for these different products.  Put another way, those different products and services -- the machines, the clinical support, and the catheters -- are in separate markets.

Q    And what would competition in those markets look like if it were not for Biosense's anticompetitive conduct?

A    A significant number of hospitals would purchase, and doctors would choose, independently reprocessed catheters from companies like Innovative and Stryker.

Q    Let's talk a little bit about what competition is.

Dr. Forister, what do economists mean by "competition on the merits"?

A    So competition on the merits is about competition on the benefits or attractiveness of your company's own products so, for example, improving your products, maybe better packaging, let's say.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-948**

34

Put it in the context of potato chips.  A potato chip company comes out with better packaging.  They advertise.  They come up with better flavors of chips, new varieties.  All of these things that make you or the customer want to choose their product, that's competition on the merits.

Q     And what role does consumer choice play in a competitive mark?

A     Consumer choice is the bedrock of how free markets work.  The fact that consumers can choose the best product is what gives companies an incentive to make better products, to lower their prices.  Basically, to compete.

Q     Now, Dr. Forister, how does anticompetitive conduct differ from competition on the merits?

A     So anticompetitive conduct -- instead of a company focusing on making their product better, they focus on eliminating consumer choice, so stopping customers from being able to choose another company's product instead of making the customer want to choose their product on their own.

Q     So let's go to your potato chip example.  Let's say a company disrupted its competitor's supply of potatoes so that the competitor couldn't make the potato chips.

Would that be anticompetitive conduct or competition on the merits?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-949**

35

A    That would be anticompetitive conduct.  Nothing would be better about that company's product.  It would just be harming or eliminating the ability or reducing the ability of customers to buy another company's chips.

Q    Now, Dr. Forister, with that distinction in mind, could you please summarize why Biosense's conduct, the three forms of conduct that you have on Slide 2, was anticompetitive and not competition on the merits?

A    Yeah.  The short summary would be that none of those three things -- the blocking technology, the collection and withholding, and the Case Coverage Policy -- none of those things made Biosense's products better.  They just eliminated or restricted the choice of customers to buy their preferred catheters, which happened to be offered by other companies.

Q    So let's start with the blocking technology, which is the first of three on your list.

         Could you please explain what the blocking technology was?

A    Yes.  The blocking technology consisted of hardware and software elements embedded on a chip that's in the device.  And that included some encryption of the information on the chip.

Q    On what catheters did Biosense install that blocking technology?

36

A    They installed it on the SOUNDSTAR, the LASSO NAV, and the PENTARAY.  They were intending to put it on the OCTARAY, so those catheters.

Q    Why in your opinion is that blocking technology anticompetitive and not competition on the merits?

A    Going back to that fundamental principle, did it do something that the customers wanted?  Did it enable a new feature that customers wanted?  And the evidence I've seen points to the opposite.

MR. HO:  Could we put up Slide 6, please.

BY MR. HO:

Q    Have you prepared a slide to explain the basis for your opinion?

A    Yes.  This walks through three topics that economists would look at to evaluate whether the blocking technology was competition on the merits or anticompetitive.

Q    Okay.  Could you start with the first of three topics?  "Function of the technology," what does that mean, and how is it relevant?

A    Yes.  It's asking the question what does the technology do?  Does it provide a function or benefit a feature that customers want?  And that the answer is simply no.

Q    Moving on to the second topic, it says:  "No positive consumer feedback."

Can you explain what you mean by that?

37

A    Yes.  If a company developed a new feature, you would expect that customers react to that with some positive feedback, right.  If you are buying a product and it has something you like, you often would tell other people.  That possible feedback would be out in the world, but we don't see that here.

Q    And then the third topic is "Internal Biosense documents."

What documents did you review in connection with this opinion?

A    Economists often review internal documents to see what the company describes its technology as doing, and so I reviewed internal Biosense correspondence and presentations.

Q    Okay.  Could you turn in your binder, please, to JX219?

Dr. Forister, is this one of the documents that you reviewed?

A    Yes, it was.

MR. HO:  We move to admit Exhibit 219.

THE COURT:  Any objection?

MR. CAVANAUGH:  No objection.

THE COURT:  219 will be received.

(Exhibit 219 received in evidence)

BY MR. HO:

Q    Dr. Forister, what is Exhibit 219?

A    This is an e-mail chain, the latest e-mail being from

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-952

38

Marius Fine to Joseph Koenig, both Marius Fine at Johnson & Johnson and Joseph Koenig at Biosense, sent December 3, 2018.  And the Subject is "SOUNDSTAR reprocessing by Stryker and status of the Falcon chip."

Q   Dr. Forister, could you please explain what is the Falcon chip?

A   The Falcon chip is the blocking technology, and it was developed as part of Project Falcon.

Q   And what was Project Falcon?

A   Project Falcon was a capital P project, a secret project that Biosense used to develop the blocking technology.

Q   Now, you said "secret project."

What do you mean by "secret project"?

A   Well, they told their employees not to tell anyone that they were doing this.  And there were -- there was internal correspondence where employees were asking about it, and they told them basically go away.  This is none of your business.

Q   Could you please explain how Exhibit 219 relates to your opinion as to whether Project Falcon and the blocking technology were anticompetitive?

A   Yes.  So if we go to the top of the second page -- okay, there we go.  There's an e-mail that straddles both pages.  We can see how Biosense's own employees describe it.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-953

That second line, "The status of the Falcon chip anti-reprocessing technology."

Q    And what is the significance of that phrase to you, "anti-reprocessing technology"?

A    So Biosense is describing in its own correspondence that the technology is anti-reprocessing.  It's to stop independent reprocessors.

Q    Now, if I could ask you to look at JX3099 in your binder.

A    Okay.

Q    Is this one of the documents you relied on?

A    Yes, it is.

MR. HO:  We move 3099 into evidence.

MR. CAVANAUGH:  No objection.

THE COURT:  3099 will be received.

(Exhibit 3099 received in evidence)

BY MR. HO:

Q    Dr. Forister, what is Exhibit 3099?

A    This is an e-mail chain, the latest e-mail being from Mario Garcia at Biosense to Avi Shalgi and others at Biosense sent April 11, 2018.

Q    Okay.  And how does this document relate to your opinion?

A    This again gives us an example of Biosense's employees describing the purpose of the technology.

40

Q    Could you point us to the language that reflects that, please?

A    Yes.  If we go to page 4 of the exhibit, the second e-mail on the page from Mario Garcia.

In the first line of that e-mail, he writes: "Last time we met, I clarified the main driver of implementing the Falcon EEPROM" -- which is just another word for a chip -- "is preventing our competitors to reprocess."

Q    Can you actually read on a little bit further?

A    Sure.  "To reprocess the VIZIGO sheath and not, as previously understood, as to reprocess them ourselves."

Q    Okay.  And what is the significance of that to your opinion?

A    So this is in their own words.  The main driver of the Falcon chip for the anti -- or the blocking technology is to prevent reprocessing, and even for a device they didn't plan to reprocess.

Q    If we could go back to Slide 2, I want to move on now to catheter collections, the second form of conduct that you describe as anticompetitive.

Can you please summarize why Biosense's collection practices were anticompetitive and not competition on the merits?

A    Yes.  And to be clear, it's not just that they were

41

collecting catheters.  It was that they were collecting and withholding catheters.  And as you may have gathered, in order to reprocess catheters, the reprocessors need to get used catheters.  And so if a company is able to withhold those used catheters, they can restrict the supply available to the rivals and to the market.

Q    Okay.  Could I ask you to turn to JX298, please?

Is this a document you relied in forming your opinions?

A    It is.

MR. HO:  We move the admission of JX298.

THE COURT:  Any objection?

MR. CAVANAUGH:  No objection.

THE COURT:  298 will be received.

(Exhibit 298 received in evidence)

BY MR. HO:

Q    Dr. Forister, what is Exhibit 298?

A    This is a Biosense 2019 kickoff meeting and internal presentation.

Q    And could you refer us to the portion of the presentation that's significant for your opinion?

A    Yes.  If we go to page 28 of that and we start at the bottom, there is some text that straddles the two pages if we start at the bottom line of that first text box. "Maximize collections.  The RPO, the reprocessed market, is

42

unique in the way that there is a finite amount of raw materials. If we control ACUNAV collections, we control the market. In fact, it's not far-fetched to believe that if we were able to collect back 75 percent of the OEM that is new ACUNAV we sell, we could drive Stryker out of the reprocessed electrophysiology business altogether."

Q    And could you explain what that means and why it's significant to your opinion?

A    Yes. This is Biosense's internal discussion confirming what we just discussed, that if a company is able to collect back enough catheters, it can drive its rivals out of the business.

Q    Now, this is relating to ACUNAV collections.

Were you here in the courtroom when Mr. Dave Distel testified about -- I'm sorry, I skipped one thing.

Did you consider data about Sterilmed's reprocessing of ACUNAV catheters?

A    Yes, I did.

Q    Okay.

MR. HO:  Could we put up Slide 7, please.

BY MR. HO:

Q    What does Slide 7 show?

A    So this shows Sterilmed's collection and sales of the ACUNAV catheter from 2015 to 2020. And it's significant that we start on the left. They collected about 156,000

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-957

43

catheters.  They discarded, starting at the top on the right, about 42,000 as not fit for reprocessing.  They sold 59,000.  But then they ended up with 54,000 catheters in excess, and they just withheld those from the market.  And that's anticompetitive because customers wanted those reprocessed catheters, and so Biosense/Sterilmed is restricting the supply and restricting their choice.

Q    And were you here in the courtroom when Mr. Dave Distel testified about Innovative facing shortages of ACUNAV catheters?

A    Yes.

Q    And how is that relevant to your opinion?

A    So that's relevant because it tells us that this withholding of catheters had an effect on a rival, and it had an effect that there were customers who wanted the choice of an Innovative reprocessed ACUNAV, and they were denied that choice because all of those catheters that they would have liked to buy were sitting at Sterilmed, not being sold.

Q    Just to be clear, I think you said "an effect on a rival."

In antitrust economics, what does a "rival" refer to?

A    So it refers to a company that's competing with it, so it's an effect on competition more broadly.

44

Q    Could I now ask you to turn to Exhibit 3114?

A    Okay.

Q    Did you rely on Exhibit 3114?

A    Yes, I did.

MR. HO:  Move to admit Exhibit 3114.

MR. CAVANAUGH:  No objection.

THE COURT:  3114 will be received.

(Exhibit 3114 received in evidence)

BY MR. HO:

Q    Dr. Forister, what is Exhibit 3114?

A    This is an e-mail with an attachment from Joseph Koenig, the Product Director of Sustainability at Biosense, sent to Andrew Landers on June 27, 2018, with the Subject: "Expand ULS" -- that is ultrasound, which would include the ACUNAV -- "buy-back program" -- which is their collections -- "to DECANAV and PENTARAY."

Q    Okay.  And how does this document relate to your opinion?

A    Well, bear with me because I need to introduce a few other facts.  So this is 2018, a time when Innovative has clearance to reprocess the DECANAV and the PENTARAY.  At that same time, Sterilmed does not have that clearance, so Sterilmed and Biosense cannot reprocess these catheters.

So they are suggesting to expand the collections policy, which we saw restricted supply in the ACUNAV

45

business to the DECANAV and PENTARAY business.  And because Sterilmed wasn't going to be reprocessing these catheters at that time, this simply eliminated the choice of those reprocessed catheters from customers.

Q    So given that Biosense/Sterilmed didn't reprocess the DECANAV, was there any purpose in terms of competition on the merits for them to collect those catheters?

A    No, there is no evidence that it was competition on the merits.

Q    Now, if we could turn, please, to Exhibit 3270, is this another document you relied on?

A    It is.

        MR. HO:  We move the admission of Exhibit 3270.

        MR. CAVANAUGH:  No objection.

        THE COURT:  3270 will be received.

        (Exhibit 3270 received in evidence)

BY MR. HO:

Q    Dr. Forister, what is Exhibit 3270?

A    It's an e-mail with an attachment from Joseph Koenig again at Biosense to Nathan Summers and others at Biosense sent July 10, 2018, with the Subject field "Intel requested - DECANAV collections."

Q    So we're still on the topic of DECANAV collections.

        How is this e-mail relevant to your opinion?

A    We can see how Biosense is describing these efforts if

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-960**

46

we go to the second sentence starting with:  "In an effort to better understand how Innovative Health will source the supply for their reprocess iteration, could you please reply if you are aware of any collections in the electrophysiology lab besides us or Stryker?  Based on your feedback, we may consider proposing programs that could divert these collections to us."

Q    Why is that significant?

A    It's significant because it tells you in Biosense's own words what they're doing.  And it's -- they're looking to collect and divert supply from a competitor and thereby harm or eliminate competition.

Q    If we could go back to Slide 2, please, the third form of conduct that you address here is the Case Coverage Policy.

Did you prepare slides to explain why the Case Coverage Policy is anticompetitive?

A    Yes.

Q    Okay, let's start with this one.

Could you please explain to the jury what a tying arrangement is?

A    Yes, and we're going to start with the definition from economics.  What is tying or a tying arrangement?  And economists use that to describe a situation like this.  A company, on one hand, has a must-have product, a product

47

that people want to buy from them.  On the other hand, it has another product, one that customers would like to buy from someone else.

Now, if a company has a dominance of a must-have product, it can force customers to source that product -- sorry, it can force customers to buy the second product that they didn't want to in order to get access to the first product.  And we call that situation a tie.

Q    When does a tying arrangement become anticompetitive?

A    It becomes anticompetitive when the company with the must-have product has market power or dominance, that they are controlling the market for that product, the must-have product.

Q    Okay.  And if we can move on to the next slide, could you explain why in your opinion the Case Coverage Policy is an anticompetitive tie?

A    Yes.  It's because Biosense had the CARTO 3 mappers. That's the must-have product.  If you want to do a CARTO 3 procedure, you must have a mapper.  And they had other products that some customers wanted to buy from independent reprocessors.  And instead of competing in those markets, they implemented the Case Coverage Policy, which tied access to their mappers to the purchase of these sensor-enabled catheters.

Q    Now, in 2009 when the CARTO 3 was first released, did

48

Biosense have a Case Coverage Policy?

A   No.

Q   Did reprocessed catheters exist in 2009?

A   Yes, they did.  As you may have heard last week, the FDA has been regulating reprocessing since 2002.

Q   What portion of EP procedures did Biosense mappers cover in 2009?

A   So back in 2009, Biosense's mappers covered about half of the procedures, and the hospitals provided the other half of the mappers.

Q   Okay.  What about by 2015?

A   By 2015, Biosense had increased its share to 87 percent.

Q   And what about by 2018?

A   By 2018, it had increased it even further to a dominant 95 percent.

Q   Could you please turn in your binder to Exhibit 3329?

A   Okay.

Q   Did you rely on Exhibit 3329?

A   I did.

        MR. HO:  We move 3329 into evidence.

        MR. CAVANAUGH:  No objection.

        THE COURT:  3329 will be received.

        (Exhibit 3329 received in evidence)

BY MR. HO:

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-963**

49

Q    If you can turn to page 9 of 3329, what does page 9 of this slide presentation show?

A    So this shows what we had just discussed.  Back in 2009 when the CARTO 3 was introduced, the Biosense mappers covered about half of the cases.  And by 2018, Biosense had increased that to 95 percent of cases.

Q    And why is that important to your economic analysis of whether the Case Coverage Policy is an anticompetitive tie?

A    It's relevant because Biosense realizes that they have a dominant position, and that dominant position would give them leverage over the hospitals.

Q    Did you analyze how Biosense came to have that dominant position in the CARTO 3 clinical support market?

A    Yes.

        MR. HO:  If we could turn to Slide 10, please.

BY MR. HO:

Q    So you have four factors listed here.

        Could you please explain how Biosense took over control of the market for CARTO 3 clinical support?

A    Yes.  So these are four of the activities that Biosense undertook to take over the market for mappers.  The first being poaching mappers.  That is, when there is a mapper at a hospital, they would go and give that mapper big financial incentives to hire them away from the hospital.

Q    What was the next?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-964**

50

A    The next would be withholding of training.  So Biosense makes the CARTO 3.  They have the training materials for people who want to learn how to map on it, and they would withhold that training from hospitals.

Q    Okay.  And what about noncompetes?

A    Noncompetes are agreements that Biosense made its mappers sign that said after they leave Biosense, they can't map or train mappers for a rival for 18 months.

Q    Could you please turn in your binder to Exhibit 3981?

A    Okay.

Q    Dr. Forister, did you rely on Exhibit 3981?

A    Yes.

          MR. HO:  We move 3981 into evidence.

          MR. CAVANAUGH:  No objection.

          THE COURT:  3981 will be received.

          (Exhibit 3981 received in evidence)

BY MR. HO:

Q    Dr. Forister, could you explain what Exhibit 3981 is?

A    Yes.  This is a letter from attorneys representing Biosense, writing to a former Biosense mapper who left the company who was planning to train mappers at a hospital on how to use the CARTO 3, how to do mapping.  And this is a letter demanding that this former employee stop that, to not do it.

Q    And what was the former employee's name?

51

A    Under that FATEX at the top, you can see it was -- I may mispronounce it -- Ashley Toussaint.

Q    And what is the relevance of this attorney letter to your opinion?

A    So this shows us that Biosense was enforcing, or trying to enforce, its noncompetes.  Sometimes you have a situation where there's noncompetes for the employees, but the company doesn't enforce them.  This shows us that they were actively enforcing them.

Q    To go back to Slide 10, please, the last factor you list is software changes.

Could you explain what you mean by that?

A    Yes.  The CARTO 3 relies on software to perform the mapping, and so the mappers are trained on a particular version of the software.  If that software version changes, the mappers would need new training in order to continue mapping.  And so one of the blocking tactics that Biosense undertakes is to what it calls upgrade the software and change that software so that existing mappers at hospitals can no longer do mapping.

Q    Okay.  Can you please turn in your binder to Exhibit 3415?  Did you rely on Exhibit 3415?

A    I did.

MR. HO:  We move Exhibit 3415 into evidence.

THE COURT:  Any objection?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-966**

52

MR. CAVANAUGH:  No objection.

THE COURT:  3415 will be received.

(Exhibit 3415 received in evidence)

BY MR. HO:

Q    Dr. Forister, what is Exhibit 3415?

A    This is an e-mail chain, the latest e-mail being from Jonathan Fanger at Biosense to Andrew Jeser at Biosense.  It was sent May 9, 2018, and the Subject is "Stryker CARTO education."

Q    And could you please explain to the jury what is going on in this e-mail exchange?

A    So we saw that noncompete, the letter attempting to enforce the noncompete with Ashley.  She was going to be hired by Stryker to train mappers at a hospital, and this is Biosense's discussion of what to do about that.

Q    Okay.  And what do they say they want to do about that?

A    If we turn to the second page, the second e-mail on that page from Jonathan Fanger sent on May 3, Jonathan writes:  "Andrew and Mitch, looks like we will need to upgrade one of your accounts as a blocking tactic."

Q    And what does that mean?

A    That means that they were upgrading or changing the software on the CARTO in order to block these independent mappers from receiving training and conducting the mapping.

Q    Was this a one-off situation?

53

A    No, it doesn't appear to be that way.

Q    How do you know that?

A    If we turn to the first page of the document, that first e-mail, Jonathan writes:  "Hi, Andy.  Feel free to upgrade any accounts necessary to protect your business."

Q    Now, how does the fact that Biosense controls the training for the CARTO 3 and can modify the software at any time affect competition in the market for CARTO 3 clinical support?

A    Well, as a practical matter, it makes it essentially impossible for another company, Innovative, Stryker, or the hospitals themselves to train new mappers to replace a Biosense mapper.

Q    Did you see evidence of Biosense itself acknowledging how difficult it would be for independent reprocessors to have their own training programs?

A    Yes, I've seen that.

Q    Would you please turn to Exhibit 2 in your binder?

Did you rely on Exhibit 2?

A    I did.

MR. HO:  Your Honor, we move Exhibit 2 into evidence.

MR. CAVANAUGH:  No objection.

THE COURT:  2 will be received.

(Exhibit 2 received in evidence)

54

BY MR. HO:

Q    What is Exhibit 2?

A    This is an e-mail chain, the latest e-mail being from Michael Bodner at Biosense to Fairy Zare at Biosense that was sent June 12, 2017.

Q    And how was this e-mail significant to your opinion?

A    On this particular topic, it's significant, because in the second paragraph of the second e-mail starting with: "We've heard Stryker is working on reprocessing PENTARAY even though it's unlikely they would be successful since (1) it's very tough to reprocess, and (2) we wouldn't map those cases, so they would need to train the hospital staff to map, and we know that's not sustainable."

Q    Dr. Forister, were you here in court for the videotaped deposition of Noah Martin?

A    I was.

Q    And do you recall Mr. Martin testified about what happened at Ascension Health?

A    Yes, I do.

Q    What is Ascension Health just to remind the jury?

A    Ascension Health is a large Catholic nonprofit hospital system with about a hundred hospitals in the U.S.

Q    Did you review Biosense's internal documents about that episode and prepare a timeline of the events?

A    I did.

55

Q    Can I ask you to turn to Exhibit JX3626?

A    Okay.

Q    Did you rely on that exhibit in reaching your opinions on this issue?

A    Yes.

        MR. HO:  Your Honor, we move 3626 into evidence.

        MR. CAVANAUGH:  No objection.

        THE COURT:  3626 will be received.

        (Exhibit 3626 received in evidence)

BY MR. HO:

Q    Okay, let's go to your timeline on Slide 11, please.

A    Okay.

Q    Could you explain what happened at Ascension Health beginning with the first event on the timeline from April 2014?

A    Sure.  So in April 2014, a Biosense mapper walked out of a procedure because a doctor chose to use an independently reprocessed sensor-enabled catheter.  In response, the doctor didn't want to stop the procedure.  He wanted the mapper to stay, and so they did away with the independently reprocessed catheter, and they opened and used a new Biosense catheter.

Q    And do the documents show that that was a single episode?

A    No.  Ascension had seen this happen several times in or

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-970**

56

around April 2014.

Q    Okay.  What happened next?

A    So you can imagine Ascension was furious about this, and so they e-mailed Biosense to resolve this problem.

Q    Okay.  And if I could ask you to turn to Exhibit 153, please.

        MR. HO:  And we can publish this to the jury because it's already in evidence.

BY MR. HO:

Q    Do you recognize Exhibit 153?

A    I do.

Q    And does 153 contain Biosense's response to Ascension?

A    Yes, it does.  We can see at the top an e-mail from Neil Warman at Biosense.

Q    Could you please read the underlined sentence in the response?

A    And to be clear, this was underlined by the Biosense person, Neil Warman, who is sending the e-mail.  "There is no specific corporate policy that prohibits our people from supporting cases, as we view this as part of our credo responsibility to patients."

Q    And so just to be clear, he is saying that there is no such thing as what we now have been referring to in this case as the Case Coverage Policy, right?

A    Correct.  He is essentially saying the opposite of

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-971

57

that.

Q    And he's saying that the reason is J&J's credo responsibility to patients.

Could you explain what the J&J credo is?

A    Yeah.  The credo is a promise or oath to patients to take care of them, to compete fairly for their business by providing better healthcare.

Q    How does J&J advertise or disclose the credo?

A    For example, it's on their website.

Q    So what is the economic significance of the J&J credo?

A    So the economic significance is that they're making a promise to take care of patients, and that's something that patients, doctors, hospitals would find attractive.  And it gets back to is this competition on the merits?  Is it attracting patients to you because your product is being improved?

Q    Now, did Mr. Warman's e-mail satisfy Ascension?

A    No, it did not.

Q    So then what happened?

A    There was continued back and forth e-mails because Biosense -- not Biosense, Ascension wanted a stronger promise.

Q    And did it receive one?

A    It did.

Q    Could you please explain?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-972**

58

A    Sure.  In May, Biosense promised that its mappers would support cases even if independently reprocessed sensor-enabled catheters were used.

Q    What happened after that?

A    Well, this was in the context of a contract renegotiation.  And so after receiving that promise, Ascension in July signed a three-year contract to buy catheters and other disposables from Biosense.

Q    After the contract was signed, did Biosense follow through on its assurance to Ascension?

A    No.  Almost immediately, Ascension noticed Biosense's mappers were back to walking out or refusing to map on cases involving independently reprocessed catheters.

Q    What happened then?

A    So then a few months later in October, the first Case Coverage Policy letter was written and sent to Ascension.

MR. HO:  Your Honor, we move the admission of JX173.

THE COURT:  Any objection?

MR. CAVANAUGH:  No objection.

THE COURT:  173 will be received.

(Exhibit 173 received in evidence)

MR. HO:  I would like to play a portion of the audio clip that's now been admitted as Exhibit 143.  In particular, 58:37 to 59:30.  And we have slides that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-973

59

transcribe the words in the audio recording.

(Video clip played)

BY MR. HO:

Q    So, Dr. Forister, could you explain what we just heard?

A    Yes.  So this is Conrad -- can we have the slide back up?

So this is Conrad Ramos, the Corporate Account Director at Biosense, describing what happened at Ascension when they imposed the Case Coverage Policy.  And if we go back one slide, they see Ascension didn't like it, and they spent the next six to nine months trying to drive the business away from us.

So Ascension didn't like it.  They tried to move their business elsewhere, but they couldn't.  Ultimately what happened, even though Ascension didn't like it, was Ascension spent another $4 million with Biosense because of the Case Coverage Policy.

Q    And how was that significant to you in terms of whether the Case Coverage Policy is anticompetitive?

A    So circling back, was this something the customers liked?  And the answer from Biosense is, no, they didn't like it.  They didn't want it.  They wanted to buy from independent reprocessors.  And so this wasn't competition on the merits.  This was about eliminating choice and reducing or harming competition.

60

Q    Now, after the Ascension episode, did Biosense expand the implementation of the Case Coverage Policy?

A    They did.  Ultimately, in April of 2016, they began enforcing the policy nationwide.

Q    Now, when you say "enforcing the policy nationwide," did Biosense tell all of its customers about the policy in April 2016?

A    No, and this is an important distinction.  Biosense is not announcing to the world, to the market, that we have this policy.  Evidence shows that they are waiting until a hospital wants to use an independently reprocessed catheter, and then they tell them, hey, you have a CARTO 3.  You've been using it for a while, but now you want to do this new thing, buy independently reprocessed catheters.  No, you don't have that choice.

Q    Did you see documents showing that Biosense was concerned about Innovative Health in particular as a competitor?

A    Yes.

Q    Could you please turn to Exhibit 3193 in your binder?

Did you rely on Exhibit 3193?

A    I did.

MR. HO:  We move that in evidence.

MR. CAVANAUGH:  No objection.

THE COURT:  3193 will be received.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-975**

61

(Exhibit 3193 received in evidence)

BY MR. HO:

Q    What is Exhibit 3193?

A    This is an e-mail chain from Fairy Zare at Biosense to John Kowalski at Biosense sent 2/9/2017, and the Subject is "Medline Reprocessing."

Q    And to remind us, what is Medline?

A    As you heard last week, Medline is a distribution partner for Innovative Health.  And so in the context of this e-mail, when they talk about Medline reprocessed, what they mean is Innovative Health reprocessed catheters.

Q    And where in the e-mail do you see Biosense talking about Innovative as a competitive threat?

A    If we turn to the second page, the e-mail from Stephanie Orsini.  So we can zoom in on what will be the first and last paragraphs.  So the first one:  "I wanted to update you regarding the competitive activity we have been seeing in the mid-Atlantic.  Several months ago, Megan updated us regarding Medline, a third player in reprocessing."  And, of course, that references Innovative's reprocessed catheters.  "We are now seeing them in the mid-Atlantic."

Q    And how did Biosense say it would respond to Innovative as a competitive threat?

A    So in response to this competitive activity, we can

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-976**

62

look at the last paragraph.  It reads:  "The Coverage Policy will be key to us protecting our LASSO NAV and SOUNDSTAR business."

Q    And why is that significant?

A    It's significant because it gives us an indication of whether Biosense is meeting competition on the merits or it's going to prevent competition.  And here, instead of meeting competition and improving its product, it's using the Case Coverage Policy to eliminate competition.

Q    Can I ask you to look at Exhibit 3437 in your binder?

Did you rely on Exhibit 3437?

A    I did.

MR. HO:  We move Exhibit 3437 in evidence.

MR. CAVANAUGH:  No objection.

THE COURT:  3437 will be received.

(Exhibit 3437 received in evidence)

BY MR. HO:

Q    Dr. Forister, what is Exhibit 3437?

A    This is an e-mail from Joseph Koenig from Biosense to Marius Fine that was sent August 16, 2018.

Q    Okay.  And what is the Subject line?

A    The Subject is "DECANAV reprocessed cath."

Q    Okay.  At this time, had Innovative received FDA 510(k) approval to sell the reprocessed DECANAV catheter?

A    Yes.  Innovative receiving that FDA approval is what

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-977

63

kicks off this e-mail chain.

Q    And how does Biosense and Sterilmed respond to Innovative getting that 510(k) approval?

A    Well, they considered whether Sterilmed would reprocess the DECANAV, whether they would meet competition with their own reprocessed version, and Biosense decided that Sterilmed would not do so.

Q    Okay.  What did Biosense say it would do instead?

A    Then that was one of the questions that its own sales staff had, and the answer is in the first e-mail, the first sentence that starts with -- sorry, the second sentence, starting with:  "I have since spoken to the field teams who cover the majority of the DECANAV business in the U.S. We're prepared to address with any potential user's customers by leveraging our current coverage policy."

Q    Have you seen evidence that Biosense holds back competition from Sterilmed?

A    Yes.  In fact, this e-mail contains that sort of evidence, that there was competition, and Biosense is talking about -- or saying that Sterilmed will not become a reprocesser of DECANAV.

Q    Okay.  If I can ask you to turn to Exhibit 3325.

Did you rely on Exhibit 3325?

A    Yes.

MR. HO:  Your Honor, we move 3325 into evidence.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-978

64

MR. CAVANAUGH:  No objection.

THE COURT:  3325 will be received.

(Exhibit 3325 received in evidence)

BY MR. HO:

Q    Dr. Forister, what is Exhibit 3325?

A    This is an e-mail chain from Sandor Palfi at Biosense to Fairy Zare at Biosense sent 10/6/2016, and the Subject is:  "Sterilmed cannibalization of our single-use DX." Single-use DX would be new diagnostic catheters.

Q    And could you explain how the discussion in this e-mail relates to your opinion?

A    Yes.  So there was a situation where a Sterilmed sales representative convinced a hospital to switch away from Biosense new diagnostic catheters to Sterilmed reprocessed catheters.  And in response, Biosense identified that this was cannibalization because Biosense and Sterilmed are both owned by Johnson & Johnson.  If Sterilmed takes business away from Biosense, then J&J's profits go down.  Customers are spending less.  I mean, they're getting the same amount of catheters, but they're giving the Johnson & Johnson family of companies less money.

BY MR. HO:

Q    Could we turn to Slide 14, please.

Do you recall Biosense in its opening statement presenting this slide?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-979**

65

A    Yes.

Q    And do you recall Biosense's counsel saying that this analysis shows that doctors prefer new catheters over reprocessed catheters?

A    That's what he told you.

Q    What is your reaction to that assertion?

A    That claim is absolute nonsense.  From an economic perspective, we know that the PENTARAY catheter market has competition being foreclosed by the Case Coverage Policy, and we've seen that Sterilmed is not a true competitor of Biosense.  So the orange line they showed you, and they said only six percent of the time do physicians prefer these catheters, that's not telling you what physician's prefer because Biosense can influence and withhold or hold back Sterilmed from offering these catheters.  So this is not an indication of what physicians prefer when there is free and fair competition.

Q    Now, if we could go to Slide 15, please.

Did you prepare Slide 15?

A    I did.

Q    And what does it show?

A    So this shows you what happens in a market without the Case Coverage Policy.  Back in 2013 when reprocessing of the SOUNDSTAR was being done by Stryker -- it had been done for a few years already -- we see 27 percent of the time a

66

reprocessed SOUNDSTAR is being chosen by the doctors and hospitals.  And this is as I mentioned relatively early, and interest in reprocessing has grown over time.

Q    And that's -- 27 percent is far higher that the 5.9 percent that we saw on the previous slide?

A    Yes.

Q    If we could go to Slide 16, please.

So what does this show?

A    So this shows what happens when doctors and hospitals get to choose among catheters not covered by the Case Coverage Policy.  This is the Webster CS, not included in the Case Coverage Policy, and it's the share of reprocessed from 2020 to 2023, a more mature market than the SOUNDSTAR market.  It's about ten years later.  And we can see -- I don't know if -- maybe you can't read the numbers.  Let's see, 47 percent in 2020, 45 percent in 2021, and then growing to 55 percent of the time in reprocessed catheters chosen in 2023.  And that's why I said the previous slide from the opposing attorney over there was nonsense.  This is ten times the amount that doctors choose when there's not a Case Coverage Policy in place.

Q    Now, Dr. Forister, did you analyze the effect of Biosense's anticompetitive conduct on hospitals and doctors?

A    I did.

Q    What percentage of hospitals with an EP lab have a

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-981**

67

CARTO 3 machine?

A    Of those hospitals, 72 percent.

Q    Did you prepare a slide to explain the harm to competition in this case?

A    I did.

Q    Could we put up Slide 17.

So could you explain generally what these four factors relate to?

A    Yes.  Looking from an economic perspective at these markets and at the consumers and what happened to them because of Biosense's conduct, there's four types of economic harm.  First, prices were inflated.  The hospitals had to pay more.

Quality was decreased, and we'll talk about what the data show about the relative quality of Innovative's catheters and Biosense and Sterilmed's catheters.

Third, there would be a decrease in innovation. There were innovations that were excluded from the market by the Case Coverage Policy, and there were also innovations that were entirely foregone because of that policy.

And finally, a harm to the consumers.  An economic harm was decreased choice.  They took away the choice from doctors and hospitals.

Q    Let's start with the first of those, inflated prices, and if we could turn to the next slide.

68

Could you explain the two ways in which prices were inflated?

A    Yes.  From an economic perspective, we can see two ways that prices were inflated.  First, the hospitals that wanted to use reprocessed catheters were forced instead to buy much more expensive new catheters, and so the price they faced went way up.  Second, Biosense, by excluding competition, was able to continue to inflate its own prices for new catheters.

Q    So let's start with the first of the two, forced switching.

Could we turn to the next slide, please.

And could you explain with reference to this slide the effect of that forced switching?

A    So when I say a hospital that wanted a reprocessed catheter had to pay about twice as much if they switched to a new Biosense catheter -- and this is using 2023 numbers -- the SOUNDSTAR, a new one, $2,500.  A reprocessed one, a little under $1,300.  So it's two times as expensive.  For the PENTARAY, 1.5 times as expensive.  And for the LASSO NAV, about three times as expensive.

Q    Okay.  And the second point was that they were inflated Biosense prices.

Let's turn to Slide 20 if we could.

Could you explain what Slide 20 shows, please?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-983**

69

A    Yes.  This shows the change in SOUNDSTAR price from 2017 to 2023.  So this is the change relative to 2017.  This shows that the price went up $187 while the costs fell by $125.

And to give you -- you know, what's the economic background?  Well, in a competitive market, economics tells us that if costs are going down, prices would go down.  But that's not what we see in what Biosense did.  When its costs went down, its prices went up.

Q    If we could turn to Slide 21.

Do we see that in another way in this slide?

A    So this shows the same information in a different way. So you can see its costs went down -- the cost is the blue section -- but its price, which is the top of where the red bar is, went up.  And that means that red bar, which is the profit, went up.  And that would be in absolute dollar terms.  You see the several hundred dollars more they earn in profit per catheter but also in percentage terms.

Q    And do you see a similar trend for the PENTARAY catheter?

A    Yes.  So similarly for the PENTARAY, their costs went down.  Their price went up.  Their margins went up in terms of both dollars and in percentage terms.

Q    And do you see the same trend for the LASSO NAV?

A    Yes, a slight nuance that their costs went up slightly,

70

but their price went up far more than their costs, and so their margins went way up both in percentage and in dollar terms.

Q    And so again, what is the significance of these last four graphs where you see the price going up even though the costs are going down?

A    It ties back to the economics.  If this was a competitive market, we would expect when the costs go down, the prices would go down.  We would expect the increased competition that would have occurred from Innovative entering the market -- if the Case Coverage Policy hadn't excluded them, we would expect the margins to go down with increased competition, but we see the opposite.

Q    And have you prepared a slide showing Biosense's profit margins?

A    Yes, I have.

Q    Could we put up Slide 24, please.  Thank you.

What is the economic significance of these profit margins?

A    So these are high profit margins, 76 percent to 87 percent.  To put that in concrete terms, that means for each dollar that a hospital pays for, say, the PENTARAY, it only costs 13 cents to make the catheter.  So these are high profit margins.  And the significance is that Biosense was able to earn or get these profit margins without losing a

71

significant number of customers.

Q   And why is that significant?

A   Well, it's significant because if there was intense competition, if a company was charging 87 percent markup, you would expect some customers to switch, a significant number, but we don't see that.  Instead, the customers are continuing to buy from Biosense, and Biosense is achieving market shares of more than 90 percent, sometimes 99, 99.9 percent for some of these catheters.

Q   Now, is it economically sensible to compare Biosense's profit margins to Innovative Health's profit margins?

A   No.

Q   Why not?

A   So economists would be concerned about high profit margins if a company had dominance in a market.  If they were achieving those high profit margins and a high market share, then you might be worried that there was abuse of market power.  Innovative is not in that situation.

Q   Now, Dr. Forister, did you ask whether Biosense might have offset the inflated catheter prices by lowering its prices for cardiac mapping machines?

A   Yes.

Q   And what did you conclude?

A   I concluded that they would not have.  The evidence that I've seen on the pricing indicates that -- a variety of

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-986

pieces of evidence on pricing indicates that they would not have raised machine prices in response to removing the Case Coverage Policy.

Q    Did you prepare a slide showing Biosense's revenues related to the CARTO 3 in 2023?

A    I did.

Q    Would you put up Slide 25, please.

How much revenue did Biosense earn on catheters and disposables in 2023?

A    About a billion dollars in the U.S. alone.

Q    And what about from the sale of the CARTO 3 machine itself?

A    $19 million.

Q    And why is that significant to your opinion?

A    So that's significant because if we think about if Biosense were to raise the price of machines to offset any decrease in price of catheters, the amount that customers are spending on machines is so low that it wouldn't make economic sense that they'd offset the additional price that they're charging for catheters with higher CARTO 3 prices.

Q    Did you analyze whether Biosense might have offset the inflated catheter prices with lower prices for CARTO 3 clinical support?

A    Actually, I'd continue my answer on the previous one, if I may.

73

Q    Please.

A    There's a few other reasons why the evidence shows they wouldn't have raised CARTO 3 prices if they took away the Case Coverage Policy.  The first is that when they implemented the Case Coverage Policy, they didn't lower machine prices.  So if we roll things back and we think about, well, if we take out the Case Coverage Policy and we go back in time, does that mean prices were higher?  The answer is no.

The other factor to consider in that offset is a lot of the customers already bought the machine, and there's no way that a change in the machine price later would compensate them for the fact they're paying more for catheters right now.

Q    Now, did you do any analysis of whether Biosense might have offset those inflated catheter prices with lower prices for CARTO 3 clinical support?

A    Yes.

Q    Could we put up Slide 26, please.

And could you explain how this relates to your conclusion?

A    So it's industry standard to offer clinical support for free.  And so consistent with that, we would -- as an economic matter, one would expect that absent the Case Coverage Policy, clinical support would still be free.  And

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-988**

74

here's a few scenarios or situations in which we see that occurring.  For example, the first one, all other mapping machine manufacturers offer free clinical support and no Case Coverage Policy.  Biosense for the approximately seven years before the tie offered free clinical support without a Case Coverage Policy.

Even today, on cases involving non-sensor-enabled independently reprocessed catheters, they still have free clinical support for those procedures.  And in Alaska -- you heard last week from Ms. Roberts at Ascension Health that in Alaska, Biosense made an exception, and they continued to offer free clinical support even while allowing them to use independently reprocessed SOUNDSTARs.

And so all these real-world examples of these situations where there's free clinical support without a Case Coverage Policy provide a basis to conclude that Biosense would have continued to offer free clinical support even if there were no Case Coverage Policy.

Q    Now, Dr. Forister, does Biosense make money or lose money by providing clinical account specialists to hospitals?

A    This is a good question.  You might think the case coverage is a cost center, but it's not.  Biosense recognizes that having its mappers in the hospital earns it a lot of money.

75

Q    How much?

A    Biosense itself estimates that each mapper earns Biosense $1.5 to $2 million each year.

Q    And how does that compare to the cost of providing a mapper?

A    So that's much higher than the cost of providing a mapper.  Biosense's internal calculations are that a mapper pays for their full year of cost in just two months of work.

Q    Dr. Forister, did you reach any conclusions about the effect of the Case Coverage Policy on the combined prices that hospitals paid for mapping machines, mappers, and catheters?

A    Yes.

Q    And what was your conclusion?

A    My conclusion was that the Case Coverage Policy had the effect of raising the total price or total cost to hospitals of the machine, the clinical support, and the catheters.

Q    And what, if any, is your opinion about the effect of the tying arrangement on the individual and average prices hospitals pay for catheters?

A    So both the individual and the average prices were inflated by the Case Coverage Policy.

Q    If we could turn back to Slide 17, please.

        THE COURT:  Before we do that, why don't we take the mid-morning break here.

76

Ladies and gentleman, I was so eager to get going, I was remiss this morning in not saying good morning to you.

Today, we're only going to take an hour for lunch, and we're going to stop at 3:00. I've spoken with counsel. For the rest of the way along, we'd like to start at 8:30 if that's doable, and we'll only take one hour for lunch so it will speed us along.

Very good. We'll be in recess for 15 minutes. Please remember the admonition not to discuss the case with anyone. You're not to form any opinions on the issues in the case until it's submitted to you.

(Jury not present)

(Recess)

THE COURT: Let's bring the jury in, please.

(Jury present)

THE COURT: Mr. Ho.

MR. HO: Thank you, Your Honor.

BY MR. HO:

Q    Dr. Forister, could we turn back to your Slide 17.

Before the break, we talked about the inflated prices caused by Biosense's anticompetitive conduct. I'd like to turn now to the decrease in quality.

Could you explain how Biosense's anticompetitive conduct reduced quality in the market?

A    Okay, so looking at the data on catheter complaint

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-991

77

rates, the FDA's own database of adverse events like injury and death associated with these catheters, and academic studies, all of that indicates that excluding the reprocessors in this case has reduced the quality that was available to hospitals and doctors.

Q    Okay.  Before we turn to the data, I'd like to play two additional segments of the conference call that we heard earlier, JX173, in particular, 40:49 through 41:16 and then 41:42 through 41:46.

        (Video clips played)

BY MR. HO:

Q    So Dr. Forister, could you explain what we just heard?

A    Yes.  So that was a conference call.  It included statements by Noah Martin, who you saw deposition testimony of last week, and Conrad Ramos, both at Biosense.

Q    And what is the significance of that back and forth between the two of them?

A    So one of the economic harms that we looked at is quality, and one of the potential justifications that was put forward for the Case Coverage Policy was whether it ensured hospitals higher quality, and Biosense itself is indicating that that's not why they're imposing the policy.

Q    Okay.  Now, let's turn to the data that you were referring to.  I'd like you to turn in your binder to Exhibit 4419, please.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-992

78

A     Okay.

Q     Did you create Exhibit 4419?

A     I did.

MR. HO:  We move Exhibit 4419 in evidence.

MR. CAVANAUGH:  No objection, Your Honor.

THE COURT:  4419 will be received.

(Exhibit 4419 received in evidence)

BY MR. HO:

Q     What does Exhibit 4419 show?

A     So this shows the complaint rates for the SOUNDSTAR, PENTARAY, and LASSO NAV separately for Innovative, Biosense, and Sterilmed.

Q     And how do the complaint rates for Innovative compare to the complaint rates for Biosense and Sterilmed?

A     You can see that the complaint rates for Innovative on that top line are significantly lower than the complaint rates for Biosense or Sterilmed.  And you may recall these complaint rate numbers from the testimony of Innovative's representative last week.

Q     I'll ask you now to turn to JX4421.

Did you also create Exhibit 4421?

A     Yes.

MR. HO:  We move 4421 in evidence.

MR. CAVANAUGH:  No objection.

THE COURT:  4421 will be received.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-993

79

(Exhibit 4421 received in evidence)

BY MR. HO:

Q     Could you explain what Exhibit 4421 is?

A     Yes.   So this shows the adverse events, the injury and death rates, recorded in the FDA's database for the catheters and manufacturers at issue.  So you can see Biosense SOUNDSTAR, 116 injuries, ten deaths, from 2013 to 2023.

Q     And how do the adverse events, the injuries and deaths, compare for Biosense and Sterilmed versus Innovative?

A     So Biosense and Sterilmed's rates are higher than Innovative's both in terms of the total number in that column with the green highlighting, and then if we go over to the number of events per 10,000 catheters that were sold, Innovative's rate of zero is lower than that of Biosense or Sterilmed -- or lower or equal to.

Q     How do the two tables that you just showed about the complaint rates and about the FDA MAUDE data relate to your opinion as to whether the Biosense conduct in this case decreased quality in the market?

A     So both of those data sources indicate that Innovative has higher quality than Biosense or Sterilmed.  And so excluding Innovative from the market, preventing customers from choosing them, reduced the quality that was available to their customers.

80

Q    In preparing this exhibit in particular, did you consider the FDA's guidance as to how the MAUDE data should be used?

A    Yes, I did.

Q    And is the analysis in your table consistent with that guidance?

A    Yes.  The FDA on their website indicates that this dataset alone, the adverse event data alone, should not be used to evaluate the adverse event rate.  And so what I did was I included additional data, the sales.  I corroborated it against the complaint data, and then I looked at the academic research to see are there any findings that are contrary to this?  And there's no academic studies contrary to what I'm showing you here.

Q    Now, could you explain why it might well be that Innovative's reprocessed catheters are higher quality, safer, more effective than new catheters?  In other words, why does your empirical analysis make sense?

A    Well, there's a few reasons, and one is this.  The catheters that are getting to customers that are reprocessed --

          MR. CAVANAUGH:  Your Honor, I'm going to object. This is not an expert on quality of catheters.  He's done an analysis based on some data.  That's fine, but I don't think he's qualified to give his opinion.

81

THE COURT:  Mr. Ho.

MR. HO:  Your Honor, I think he's allowed to explain why his empirical findings are consistent with his understanding of the way these markets work.

THE COURT:  Overruled.

THE WITNESS:  Okay.  I'm allowed to answer the question?

THE COURT:  Yes.

THE WITNESS:  Okay.  All right, so a reprocessed catheter -- sorry, I need to reset.  All right, so a new catheter, Biosense makes it.  They do their inspection process.  It goes to the customer.  The reprocessed catheter in contrast to that one checkpoint going through the Biosense process -- sorry, going through the -- yeah, going through the Biosense process, it has three checkpoints.  It's going to go through that initial process.  Then it's going to go and be used in a procedure.

And for a lot of medical devices, the first time the device is used is when it's the most likely to have an issue.  And so it goes to the procedure.  They see it doesn't work.  The ones that are lemons are taken out, not used, and then the used catheters go through another checkpoint, which is Innovative's own quality assurance and testing.  And you've heard last week that Innovative checks each catheter six times with six different people to make

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

82

sure that the catheter is good to use.

BY MR. HO:

Q    Now, if we could go back to Slide 17, please, and move on to decreased innovation.  What do you mean by that?

A    Well, we can start with a fundamental economic principle, which is competition spurs innovation.  Companies come out with new and better products because they're facing competitive pressure to convince customers to buy from them.  So reducing competition on a theoretical basis would reduce innovation.

Q    And do you see real-world examples of that here?

A    Yes, and real-world experience here confirms that, and I'll give two examples.  First, you heard testimony last week about Innovative's patented technology for cleaning the lumen, this narrow tube that's in the catheter that's really hard to get clean.  They came up with a way to clean it that was new, so a new process that made it even cleaner than a new catheter's lumen.  By excluding Innovative's sales, they prevented that technology from getting to customers.

Q    Are there other examples?

A    Yes.  A second example would be because of the Case Coverage Policy, that convinced companies like Innovative and Stryker not to reprocess the OCTARAY because they knew they would be excluded from the market.  And so that innovation of a reprocessed OCTARAY has not occurred, and it

looks like that is due to the Case Coverage Policy.

Q    Now, lastly, if we could talk about the fourth bullet point, decreased choice, how did Biosense's conduct decrease choice?

A    Well, the Case Coverage Policy itself is cutting off choice.  The customer that wants to choose independently reprocessed and use Biosense's mappers can't do so, so that choice is removed.

And I can give you an example of why that choice matters.  You heard last week the testimony that there was a shortage at one point of the 8 French SOUNDSTAR, the 8 French being the narrow diameter.  And instead of letting doctors go and get their preferred catheter size, the 8 French, from an independent reprocessor, doctors were forced to use a different catheter or the larger diameter catheter.

And looking at the medical research, larger diameter catheters are associated with needing to make a larger incision in the patient to put them in.  And so we can see that decrease in the choice can have a direct impact on customer health and safety.

Q    Now, Dr. Forister, what did you calculate to be Innovative's lost profits from Biosense's anticompetitive conduct?

A    I calculated that their lost profits were at least $147 million.

Q     Over what time period?

A     And that was about a ten-year period from 2016 through until now last week.

Q     Okay.  Could you please put up Slide 29.

Dr. Forister, you prepared Slide 29?

A     I did.

Q     What does it show?

A     So this breaks out the lost profit for these three sets of catheters:  the SOUNDSTAR at approximately $95 million, the PENTARAY and OCTARAY at approximately $43 million, and the LASSO NAV at about $9 million.

Q     Did you prepare a slide to help illustrate your lost profits calculation?

A     I did.

Q     Could we put up Slide 30.

Could you explain generally what Slide 30 shows?

A     Yes.  So to get to that $147 million in total lost profits, I started by looking at just what was the effect of the Case Coverage Policy, and that had $139 million in lost profits.  I then asked, well, what effect did the blocking technology have?  And the blocking technology delayed entry. And so if the blocking technology was removed, Innovative could have started selling earlier.  It would have had more months of sales.  And so I calculated how much that would be, and it was about $8 million.

85

Q    Okay.  Let's start with lost profits from tying on the left there.

What are the components of lost profits from tying?

A    So if we want to see what were the lost profits, we first would need to estimate -- or sorry, I should say calculate what Innovative's profits would be in the absence of the Case Coverage Policy, what I'll call Innovative's competitive profits, and then we subtract off what Innovative actually had as profits, and that difference is the lost profits.

Q    So if you could explain what the blue box is, Innovative's actual profits, how do you calculate that?

A    So that's simply taking their total sales units, how many catheters did they sell, how much did they charge per catheter, multiply those two together, and subtract off the cost of supplying those catheters.

Q    Okay.  Now, turning to the green box, what economic method did you use to determine Innovative's competitive profits?

A    So I used what's called a benchmark approach or benchmark analysis.

Q    What do economists use a benchmark approach for?

A    So in a benchmark analysis, we look at another market or product, the benchmark, to infer what performance would

have been like in the market of issue for these catheters.

Q    Could we put up Slide 31, please.

Could you explain what Slide 31 shows?

A    So we're looking for benchmark, and there's two important factors to have.  First, that benchmark should be unaffected by the challenged conduct.  We're looking for an example to use of where the conduct didn't occur.  The second is we want a benchmark that's comparable.  So we can say with those two things, one, it wasn't affected by the challenged conduct; and, two, it looks like we can use it to infer what would have happened in the market that we're interested in.

Q    And so using those criteria, what benchmarks did you choose?

A    For the SOUNDSTAR ultrasound catheter, I used the Abbott ViewFlex ultrasound catheter, and for the mapping diagnostic catheters at issue, I used the Biosense WEBSTER CS diagnostic catheter.

Q    Okay, let's turn to the next slide.

Could you please explain why you chose the Abbott ViewFlex as the benchmark catheter for the Biosense SOUNDSTAR?

A    So going to those two topics we just talked about, first, was the Abbott ViewFlex unaffected by the challenged conduct?  Abbott doesn't have a Case Coverage Policy for the

ViewFlex, so it's unaffected.  Satisfied.

Second, is it similar enough to the affected product that it makes a reliable benchmark?  And we can see a few points of similarity, starting with it's an ultrasound catheter like the SOUNDSTAR.  It's used in these EP procedures.  It's a catheter that has independent reprocessors.  And it's the closest in sales volume of the unaffected ultrasound catheters to the SOUNDSTAR.  So based on those points of comparison, it looks similar and reliable to use as a benchmark.

Q    Okay.  Could we turn to the next slide, please.

And could you explain based on those criteria why you chose the WEBSTER CS as the benchmark catheter for the three affected catheters?

A    So the WEBSTER CS is a Biosense catheter, but it's not covered by the Case Coverage Policy.  So it's unaffected. It satisfies that.  The second, is it similar to the affected products?  Well, it's a diagnostic catheter.  It's used in EP procedures.  It has independent reprocessors, and it's the closest in volume of unaffected catheters to the LASSO, PENTARAY, and OCTARAY volume.

Q    Okay.  So now that you've chosen your two benchmark catheters, what do you do after that?

A    So next we calculate the market shares and price discounts in the benchmark markets so we can apply them to

Case 8:19-cv-01984-JVS-KES    Document 541    Filed 06/25/25    Page 88 of 139   Page ID #:26529

88

our markets at issue.

Q    Okay.  Could you turn in your binder to Exhibit 4406, please.

A    Okay.

Q    Did you create 4406?

A    I did.

            MR. HO:  We move 4406 into evidence.

            MR. CAVANAUGH:  No objection.

            THE COURT:  4406 will be received.

            (Exhibit 4406 received in evidence)

BY MR. HO:

Q    Dr. Forister, could you explain what 4406 shows?

A    Yes.  So this shows for the Webster CS benchmark on the green line what Innovative's market share was.  You can see it growing up to eight percent and sort of leveling off towards ten percent.  And we see the dashed lines.  The dashed gray is the LASSO NAV, and the black is the PENTARAY.

Q    And did you use the Webster CS as the benchmark for the OCTARAY as well?

A    For the OCTARAY as well, yes.

Q    Did you do the same comparison as you see here for the ViewFlex and the SOUNDSTAR?

A    I did.

Q    Okay.  Could we look at 4405, please.

            Did you prepare 4405?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-1003**

89

A    I did.

MR. HO:  We move 4405 into evidence.

MR. CAVANAUGH:  No objection.

THE COURT:  4405 will be received.

(Exhibit 4405 received in evidence)

BY MR. HO:

Q    Could you please explain what 4405 shows?

A    So this shows the benchmark for the ultrasound catheter.  The ViewFlex benchmark is the dark blue line. You can see it growing before leveling off a bit.  And then the dashed gray line is the SOUNDSTAR.

Q    Okay.  So now you've done these comparisons of the affected catheters with respect to the benchmark catheters. What did you do next?

A    We go back to our profit formula, quantity times price minus cost.  So for quantity, we look at the market share that they would have earned.  And so we take that path of market share performance, and we line it up with the entry date that Innovative had with the catheters of interest. For example, if they had entered January 1, 2016, we'd start our market share growth from that point.

So then we project what their market share would have been, and we multiply their market share by the actual sales of that catheter to compute what they would have earned.  So if they would have had, you know, a ten percent

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-1004**

90

market share of catheter sales, and there were a hundred thousand catheters sold, they would have sold 10,000 catheters.  So that's how we calculate the quantity they would have sold.

The next question is what price they would have sold it at.  So we again look to the benchmark market.  And for reprocessed devices like this, they're often sold at -- the reprocessed is often sold at a discount off the new price.  So we look at what that discount was for the benchmarks, and we apply that discount in the markets at issue to get our price that they would have sold it.  So then we multiply the quantity they would have sold times the price they would have sold it at, subtract off costs, and we have their profits.

Q    Okay.  So if we could put Slide 30 back up.

I think you've now explained how you arrived at the blue box and the green box and, as a result, how you got to lost profits from tying.

How did you determine the an additional lost profits from blocking, the red box in the middle?

A    Yes.  So I talked about lining up that market share -- the benchmark market share performance with the actual entry date of Innovative for these catheters.  I simply moved that back by however many months the blocking technology was causing a delay.  So if there was a three-month delay, I

just shifted that back three months, and they made sales for an additional three months.

Q    Okay.  And I think you said in the summary of your opinions that the total lost profits that you calculated was at least $147.4 million.

Could you explain why you said at least?

A    Yes.  There's a variety of factors that make it an underestimate of what the true lost profit is.  For example, I didn't include the ACUNAV catheter, the DECANAV catheter, and the VIZIGO Steerable Sheath.  I didn't calculate damages due to the collections policy.  And I also didn't include damages from the additional cost, the monetary cost, of overcoming the blocking technology.  You heard from Innovative's engineer last week that it took time and effort to overcome the blocking technology.  I only accounted for that time delay.  I didn't account for the cost of overcoming the blocking delay.

Q    Now, Dr. Forister, I think you've heard since you've been sitting in this courtroom Biosense's counsel offer a number of arguments as to why the Case Coverage Policy was legitimate.  Do you recall those?

A    Yes.

Q    And do you recall Biosense's attorney discussing free riding in his opening statement?

A    He did.

92

Q    If we could put up Slide 34, please.

And do you recall Biosense's counsel making this statement in his opening statement?

A    I recall that.

Q    Okay.  Now, do you agree with that statement?

A    No.  From an economic standpoint, there is a lot of error packed into this short sentence.

Q    Could you explain why?

A    Okay.  There's two errors that I'll talk through. First, Biosense is saying that -- they're claiming that Innovative wants Biosense to provide the mappers, the CAS service, for free.  I'll pause there.  That is not the economic issue here.  Biosense could charge for its mappers. The claim is not that Biosense can't do that.  They could if they wanted to.

The second part is that Biosense is claiming that the mappers help sell Innovative's product, and from an economic standpoint, that's very misleading.  You heard last week from Biosense's own mapper, Ms. Tam, that she is paid commissions for making more sales.  If we look at Biosense's documents, they categorize these mappers as salespeople. They have a whole host of competitions and rewards for selling more catheters, and Biosense describes all the ways that the mappers can upsell and increase their own product. So to say that their salesperson is selling Innovative

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-1007**

93

catheters doesn't make any economic sense.

Q    Just to make one point clear, you said the issue in this case is not whether Biosense can charge for CAS services if it wanted to.  What is the issue in this case?

A    Oh, so the issue is that -- or the claim is that Biosense shouldn't be allowed to withhold that from customers if they use just one independently reprocessed catheter.

Q    Dr. Forister, how does Biosense profit from procedures even if there is a reprocessed catheter used?

A    Well, each procedure uses multiple catheters and disposables.  You heard from both Biosense and Innovative witnesses last week to that effect.  In particular, there's -- for ablation procedures, they use ablation catheters, and those can cost more than $3,000, and there's no reprocessing done on those.  So for an ablation procedure, Biosense is basically guaranteed to make that $3,000 in revenue for a procedure.

There's other types of products, like the reference patches that are used for the navigation aspect that only Biosense sells.  So Biosense is always going to make a sale for each procedure that's done, regardless of how many independently reprocessed catheters are used.

Q    Dr. Forister, economically, is it free riding for a company like Innovative to want to compete in the market for

94

catheters but not to compete in the market for clinical support?

A    No.  From an economic standpoint, from looking at the business world, it's completely normal to expect a company competes in the market it's best suited for.  All the time you'll see companies that compete in just one market without competing in the market for, say, a related product.

Q    Could you give an example?

A    Yeah.  So you might want to go for a bike ride, and you might want a bicycle and a helmet.  There's companies that just make helmets, and there's companies that just make bicycles, even though you use them together.  There's many other examples.  You might think of cereal and milk.  People generally eat cereal with milk, but there's companies that just provide cereal, and companies that just provide milk, even though those are products used together.

Q    In your opinion, Dr. Forister, is free riding the real economic justification for the Case Coverage Policy?

A    Based on my economic analysis, no.

Q    And have you prepared a slide to explain why?

A    Yes.

Q    Could you please put up Slide 35.

        And could you explain what Slide 35 shows?

A    Yes.  So if we want to consider whether a claimed reason for a policy like this is what they claim, we can use

95

a variety of economic tools, and one is to see if that claim holds up with the use of that policy or absence of that policy in various situations.

Q     So if you could walk us through the four considerations on this slide.

A     Sure.  So if free riding was an issue, one would have expected Biosense to have put in place this policy when they first started selling the machines and the catheters because there was reprocessing at that time.  Even today, the policy doesn't cover independently reprocessed non-sensor-enabled catheters.  And the same free-riding issue that they're claiming would apply there, Biosense doesn't apply it.  They only apply it to their most expensive catheters.

We can look at other mapping machine manufacturers.  And if free riding was a problem, if they would experience that same problem, we would have expected them to have the same policy, but they don't.

And then I'll go back to the example from last week of Ms. Roberts talking about Ascension Hospital in Alaska.  Biosense doesn't apply its policy in Alaska when the Providence Hospital uses independently reprocessed SOUNDSTARs.  So Biosense if there was a real free-riding problem, from an economic standpoint, it's inconsistent that Biosense would do that.

Q     I think you also heard Biosense's counsel ask a lot of

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-1010**

96

questions about recalibration of catheters.

Do these same factors relate to your economic assessment of whether recalibration is a sound justification for the Case Coverage Policy?

A    Yes.

Q    Could you please explain?

A    So we take those same -- the same situations.  If recalibration was a real problem, is the Case Coverage Policy being applied in a way that's consistent with that?  Well, I wouldn't -- you know, from an economic standpoint, you wouldn't have expected Biosense to wait six years to apply it nationwide.  Biosense clinical support staff have covered cases with tens of thousands of Stryker reprocessed catheters that would under their theory suffer from this recalibration issue.

All the other mapping machine manufacturers would face this same recalibration issue.  Yet, they don't use the Case Coverage Policy.  And in Alaska, Biosense makes an exception, and they use what they claim are non-calibrated catheters -- sorry, they allow mappers to cover cases with what they claim are non-calibrated catheters.

So if we compare their claimed justification to how they're actually using the tie and whether other companies are, those two don't match up from an economic standpoint.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-1011**

97

Q    Dr. Forister, could I ask you to turn to Exhibit 3236 in your binder?

A    Okay.

Q    Did you rely on 3236?

A    I did.

MR. HO:  We move to admit Exhibit 3236.

MR. CAVANAUGH:  No objection.

THE COURT:  3236 will be received.

(Exhibit 3236 received in evidence)

BY MR. HO:

Q    Dr. Forister, what is Exhibit 3236?

A    This is a Biosense presentation about the CARTO.

Q    And if we could turn toI think it's Slide 13 of the presentation.

A    Yes.

Q    How is this relevant to your assessment of the recalibration arguments that you've heard in court?

A    So what economists will do is they'll corroborate an economic analysis with facts on the ground.  And so this is one of the ways that I corroborated the analysis I just showed you with case facts.  And here, Biosense is describing calibration.  The smaller text, if you can see it -- I'll start with the tiny text:  "If you can see your catheters, the field is calibrated, and the image is accurate.  That is, if you can see the catheters displayed

98

on the CARTO machine, the system will not display a catheter with semi-accuracy."

Q    And how is that significant?

A    So this explains from a technical standpoint why we see that inconsistent -- seemingly inconsistent pattern in the economics of the recalibration, which is the machine already has a way to self-correct for any calibration issues.  If the catheter is not calibrated, it won't be displayed, and in the operation, you just use a replacement catheter.

Q    Dr. Forister, did you do any analysis weighing the anticompetitive harms of Biosense's conduct against any benefit of that conduct to competition?

A    I did.

Q    And what did you conclude?

A    I looked for any benefits to consumers, and across the variety of claimed benefits, I didn't see any actual economic value that they were giving to customers.  Against that, we saw these four types of economic harm.  And so if we look at the net effect, there was economic harm to customers, the hospitals, and the doctors.

Q    Dr. Forister, I think you also heard Biosense ask questions about whether hospitals have a choice just to switch away from a CARTO 3 machine to another cardiac mapping machine in order to avoid the Case Coverage Policy.

Did you do an economic empirical analysis of that

99

question?

A    Yes, I did.

Q    Would you please turn to Exhibit 4392 in your binder.

Q    Did you prepare Exhibit 4392?

A    Yes.

MR. HO:  Move to admit Exhibit 4392.

MR. CAVANAUGH:  No objection.

THE COURT:  4392 will be received.

(Exhibit 4392 received in evidence)

BY MR. HO:

Q    Dr. Forister, could you explain what Exhibit 4392 shows?

A    This shows the share of electrophysiology procedures that are being been done using the CARTO 3.

Q    And what does it show?

A    Well, it shows -- you can see a somewhat flat share for the first few years after the Case Coverage Policy rolled out nationwide and then increasing share.

Q    And so we talked at some length about how Biosense's conduct caused increased prices and decreased quality.  And yet, based on this chart, we see that their share of procedures went up.

What is the economic significance of that?

A    The economic significance is this.  If it was easy to switch, if there were low costs of switching in response to

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-1014

100

that increase in prices and the other harms, we would expect hospitals to be switching away from using the CARTO 3 after the policy went nationwide in 2016.  Instead, we don't see significant switching away from the CARTO 3, which indicates that there are significant switching costs.

Q    Now, Dr. Forister, once a hospital buys a CARTO 3 mapping machine, do they have a choice to buy non-CARTO 3 compatible mapping catheters for their procedures?

A    Effectively, they would not have that choice because of the Case Coverage Policy.

Q    Well, do they have the ability to buy non-CARTO 3 catheters?

A    Oh, sorry, I misheard.  In theory, they do.  But there's a variety of challenges and difficulties they'd face that economists refer to as switching costs.

Q    And so why is it an economic issue that once you buy the CARTO 3 machine you can only use CARTO 3 compatible catheters?

A    So that's an issue because once a hospital and a doctor has chosen to use the CARTO 3, they're locked in to buying the aftermarket products for the CARTO 3.

Q    Now, you use the word "aftermarket."

        Could you explain what an aftermarket is?

A    The aftermarket is simply the purchases you make after that initial equipment purchase.

Q    Okay.  I think you used the phrase "locked in."

Could you explain what you mean by "locked in"?

A    Being locked in is what occurs when you buy this original equipment, and then you're stuck buying the compatible equipment in the aftermarket.  For example, you get -- you buy an iPhone.  Well, then you're locked into buying the apps and accessories for the iPhone.

Q    And in your opinion, do a substantial number of CARTO 3 buyers face substantial lock-in?

A    Yes.  The evidence in this case indicates that they have substantial lock-in.

Q    And have you prepared a slide to help explain that to the jury?

A    Yes.

Q    Would you put up Slide 36.

Now, the title of the slide is "Single-Brand Aftermarket Lock-In Factors," and so a lot of words.

Could you explain generally what this slide is about?

A    So we talked about a customer being locked in in the aftermarket for that original equipment, the CARTO 3.  That original equipment is the single brand that's being referenced there.  And these are four factors that economists consider when evaluating the extent to which a customer is locked in, and they might experience then

102

anticompetitive effects in the aftermarket.

Q    So let's talk about the first of the four factors.  It says:  "Consumers do not generally know about the anticompetitive conduct."

And let's talk about hospitals that bought the CARTO 3 before April of 2016.  Could you explain how that factor would apply to them?

A    Yes.  So the policy had not been rolled out nationwide, and so with limited exception, like Ascension, the hospitals would not have known about the policy.  And so if you don't know the policy exists when you buy the machine, then you're stuck with it.  You're locked in dealing with that policy after the point of initial purchase.

Q    Of all the CARTO 3 machines that hospitals operate today, what percentage were installed prior to April of 2016?

A    Fifty-eight percent of the machines today were installed prior to April 2016.

Q    And now, could you apply that first factor to hospitals that bought their machines after April 2016?

A    Yes.  And an important factor here is that Biosense is not informing the market about this as a broad matter.  And so a lot of customers -- it looks like the customers who were buying the CARTO 3 even after April of 2016 are not being informed at the time they decided to purchase the

CARTO 3.

Q   Have you reviewed CARTO 3 contracts to see whether the Case Coverage Policy is in the contract?

A   I've reviewed those contracts and haven't seen evidence of disclosure of the policy in the contracts.

Q   And based on your review of the evidence, is the policy disclosed at the time of purchase in any other way?

A   No.

Q   Could you please turn to Exhibit 3963.

Did you rely on Exhibit 3963?

A   I did.

MR. HO:  We move to admit Exhibit 3963.

MR. CAVANAUGH:  No objection.

THE COURT:  3963 will be received.

(Exhibit 3963 received in evidence)

BY MR. HO:

Q   Now, Dr. Forister, what is Exhibit 3963?

A   So this is an e-mail from Pamela Krnavek at PeaceHealth sent January 9, 2024, to Rick Ferreira.  You saw him last week.  He is the CEO of Innovative Health.

Q   All right.  And how is this document relevant to your opinion as to lock-in for customers who bought after April 2016?

A   So this is a hospital system communicating with Innovative, and three dates are significant here.  The date

104

of this communication if you can see is from January of 2024, and this e-mail chain is a discussion of the hospital having been surprised that the Case Coverage Policy exists. They wanted to buy independently reprocessed catheters from Innovative.  This is in 2024.  They then internally asked, well, when did we sign the contract for the CARTO 3?  And that was back in 2018 and 2021.  And yet, these if I do the math right six or three years later after they bought the machine, now they're finding out a Case Coverage Policy exists.

I suppose a fourth date is also important.  The nationwide rollout of the policy was in 2016.  So you had the policy's been rolled out nationwide.  Customers are buying it many years later and not finding out about it until several years after that point.

Q    Okay.  Could we please turn back to Slide 36.

The second factor on your list is significant switching costs.  What are switching costs?

A    Switching costs are the economic term for the cost that someone incurs from trying to switch to something new.

Q    And do hospitals face significant switching costs between systems?

A    They do.  And that consists of both financial and other impediments or costs.

Q    Okay.  And what are the financial impediments?

105

A      So the financial part of the switching cost is the cost to buy a new machine.  If you don't have that other machine, you have to buy it.  They cost hundreds of thousands of dollars.

Q      And what the non-financial switching costs?

A      So these are particularly challenging to deal with, and you heard from Dr. Doshi on Friday describing them.  The hospital, or the situation, would have to convince the doctor to switch away from the machine they were planning to use to a new machine.  And the doctors are comfortable with one machine.  They might not have training on another machine, which is another barrier or cost to switching. They may want to stick with the mapper on the CARTO 3 and not switch to a new mapper on, say, an Abbott machine.  So these are all costs to switching that indicate that lock-in is happening.

Q      Okay.  The third item on your list is the difficulty of lifecycle pricing.

Before we get to the difficulty part, what is lifecycle pricing?

A      So that's just predicting the total cost over the life of a CARTO 3.

Q      And why in your opinion is it difficult for hospitals to accurately engage in lifecycle pricing?

A      Well, there's a few factors.  The first is that the

106

CARTO 3 is a long-lived device.  It has a lifespan of ten or more years.  And you can imagine it's difficult to predict ten years in the future, particularly in light of the fact that the hospital would need to predict when new and more expensive catheters are coming online, when reprocessors might enter at lower prices.  They need to figure out what patient demand is going to be, what reimbursements are going to be, so a host of challenges to predicting a ten-year or more lifecycle price.

Q    You heard some testimony in court during the trial that hospitals tried to engage in lifecycle pricing.  Did that affect your opinion?

A    No.

Q    Why not?

A    Well, one would expect the purchaser of a product to make some attempts to do lifecycle pricing, but for all the reasons I mentioned, it's challenging to do that accurately.  And if it's -- if you can't accurately predict those things, you may not be able to avoid the choice of buying the CARTO 3 and getting locked in.

Q    Now, the last factor on your list is cross-elasticity of demand.  Could you explain what that means?

A    Yeah.  So that's just a fancy economic way of saying if the price of one product goes up, do customers switch to another product?

Q   Okay.  And did we see cross-elasticity of demand between sensor-enabled catheters for different kinds of cardiac mapping machines?

A   So I looked at whether we could see that substitution, say, between the mapping catheters on the CARTO and mapping catheters on the Abbott machine.  And the evidence in this case indicates that there is not significant switching going on between those in response to price or other changes.

Q   Now, what proportion of CARTO 3 machines in operation today in your opinion are subject to the single-brand aftermarket lock-in factors that you see on this slide?

A   Essentially, all of them would be.  And particularly relevant is whether they knew about the policy at the time they first bought into the CARTO 3.

Q   I'd like to shift gears a little bit and ask you to help the jury understand what is a relevant antitrust market?

A   So a relevant antitrust market consists of the products and services that are reasonably interchangeable or reasonably substitutable.

Q   Did you evaluate what relevant antitrust markets exist in this case?

A   I did.

Q   And do you have a slide to help explain your opinions?

A   Yes.

Case 8:19-cv-01984-JVS-KES   Document 541   Filed 06/25/25   Page 108 of 139   Page ID #:26549

108

Q    Okay.  So in the two columns there on the right, you have first "Practical Indicators," and then something called "SSNIP Test."

Could you first explain what you mean by practical indicators?

A    Yes.  Practical indicators are common sense things that economists look to to define a market.  For example, is there a set of products that have unique characteristics that put them in their own group?  Are there unique production facilities to make a set of products?  Are there distinct customers for a product?  Are the products at a distinct price, or is there industry recognition that there's a distinct market?

Q    Okay.  And then what do you mean by a SSNIP test -- what does SSNIP stand for?

A    I apologize for throwing out an acronym.  It stands for small but significant non-transitory increase in price.

Q    And what does that mean in ordinary terms?

A    Well, I'll try to get it in ordinary terms.  It's if a company had control of a market, could they impose this small and significant let's say five percent non-transitory, which just means long-term, one year, increase in price?  So could a monopolist of a set of products raise their price five percent above -- or sorry, I should say inflate their price five percent above the competitive level for more than

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-1023**

109

a year and do so profitably?  If a monopolist that controlled that set of products could do so, economists say that that is a relevant antitrust market.

Q    And did you apply both those tests, the practical indicators and the SSNIP test, in arriving at your opinions about the three sets of relevant antitrust markets in this case?

A    Yes.

Q    Okay.  So could we please start with the cardiac mapping machine market, and explain why in your opinion that is a relevant antitrust market?

A    Well, I'll start with practical indicators.  You've heard about these machines.  They do cardiac mapping. That's a unique service.  There's not a close substitute that you could go to if you wanted to map the heart. There's not really something else you could use that's closely interchangeable.  And from that perspective, then it looks like a relevant market.

There's distinct customers.  Electrophysiology labs are the ones buying mapping machines.  And so we can see for a variety of factors this looks like a relevant market.

Then we can turn to this SSNIP Test.  Could a company that controls that market raise the price of them if they controlled all the machines?  And given how unique they

110

are and the relative price of machines, the economic answer is they could.

Q    Dr. Forister, could you now explain why in your opinion there is a relevant antitrust market for CARTO 3 clinical support?

A    So again, we turn to these practical indicators.  This is a unique service.  It's providing the mapping support for CARTO 3 machines.  You can't do that with an Abbott mapper.  People need a lot of training to do it.  It's specialized.  You have a distinct customer group, these EP labs with Carto 3 machines.  So for those reasons, it looks like for practical reasons it's a relevant market.

Then we can look at the SSNIP test.  What if a company controlled all of the market for mappers.  Could they force customers to pay more?  Well, we have the answer here with what Biosense did.  They didn't even obtain a complete monopoly, just 95 percent of the market, and they were able to force customers to pay more for catheters.  So we can see that the SSNIP test is also satisfied.

Q    Now, for the CARTO 3 sensor-enabled catheters, the last set of markets, do you have another slide to help explain that to the jury?

A    Yes.

Q    Okay.  Could you please explain your opinion as to the three relevant antitrust markets relating to catheters?

111

A    So on the one hand, we have the distinct customers, the EP labs with CARTO 3 procedures.  And then we look at are these unique features that put them in their own buckets.  In the first place, Biosense puts them in these buckets, categorizing them as LASSO NAV's sensor-enabled circular mapping for the Carto 3, and the PENTARAY, OCTARAY, OPTRELL are sensor-enabled high-density mapping catheters.  You also heard testimony last week from Ms. Tam at Biosense and a representative from Innovative describing the unique features of the LASSO NAV versus the other mapping catheters, and that puts them into separate relevant markets.

Q    And then why is there yet a third separate relevant market for sensor-enabled ultrasound catheters?

A    Well, this gets to the ultrasound is doing something much different than the mapping catheter.  It's showing that ultrasound picture, as opposed to collecting and displaying the electronic information of the heart, and so that puts it in a separate market.

Q    And why is there no for use with the CARTO 3 in your description of the sensor-enabled ultrasound catheter market?

A    That's because there's only one sensor-enabled ultrasound catheter.  It's the SOUNDSTAR.  So it's in its own market without the full use of CARTO 3 attached.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

112

Q    If we could go back to Slide 37.

Do markets consisting of the OEM and reprocessed catheters you identified satisfy the SSNIP Test?

A    Yes, they do.

Q    And what is your basis for that conclusion?

A    We can see what happens when a company is able to achieve a near monopoly in sales of those catheters, and that it raises prices.

Q    Did you do an analysis of average prices?

A    Yes.

Q    And does that analysis relate to your opinion on this point?

A    It does.  For example, for the SOUNDSTAR, we saw that there was significant purchasing of reprocessing prior to the Case Coverage Policy.  And by implementing the Case Coverage Policy, Biosense was able to raise the average price of the SOUNDSTAR.  As it achieved that near total monopoly position, it raised the average price ten percent.

Q    Are you aware of any other markets that are similar to this one in that they include a new device like the Biosense OEM catheter as well as reprocessed devices?

A    Yes.  Each of these catheter markets would include both the new and the OEM catheters.

Q    If we could go back to Slide 36.

Does the CARTO 3 clinical support market have the

113

characteristics of aftermarket lock-in that you described earlier in your testimony?

A    Yes.

Q    And do the sensor-enabled catheter markets that you identified also have the characteristics of lock-in that you described?

A    Yes.

Q    Dr. Forister, just so the record is clear, what is the geographic scope of these markets?

A    The geographic scope of these markets is the United States.

Q    I would like to turn from the question of relevant antitrust markets to another term, "market power."  What is market power?

A    So market power refers to the ability of a company to force customers to do something they wouldn't do in a competitive market.

Q    What is monopoly power?

A    Monopoly power is significant and sustained market power.  And to give some examples of what market power would look like, it would be forcing customers to pay inflated prices or taking away choices from customers by excluding competition.

Q    Have you analyzed whether Biosense has market power or monopoly power in the relevant antitrust markets in this

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**ER-1028**

114

case?

A    Yes.

Q    Have you prepared a slide to illustrate your opinions?

A    Yes.

Q    Okay.  Now, you have again two factors.  The first is high market share and barriers to entry.  What does that mean?

A    One way economists evaluate market power is whether a company has a dominant share and whether there's high barriers to entry.  If a company has a dominant share, it would appear that competition is not knocking it out of its position in the market.  And if there's high barriers to entry, it indicates that it wouldn't be easy for a new company to come in and provide that competition and discipline or restrain the behavior of a dominant firm.

Q    And then could you explain what you mean by inflated price or excluded competition?

A    Inflated prices or excluded competition are direct evidence that a company has abused its market power, and that tells us that the company has market power.

Q    Okay.  So again, let's start with the cardiac mapping machine market.

        What is Biosense's market share in that market?

A    We have a slide for this.  It's currently 66 percent.

Q    And how do you measure that?

115

A    We measure that on the share of usage, the share of procedures that use the CARTO 3.

Q    Why is that the appropriate measure?

A    That's appropriate, because to have dominance in a market, a machine manufacturer would have to not just sell the machine to a hospital but also convince the doctors to use it.  If the doctors aren't using it, the machine company is not going to have much power in the market.

Q    And what barriers to entry are there in the cardiac mapping machines market?

A    A variety of barriers.  This is a high-tech product, so there's technical barriers.  It's regulated by the FDA, so there's regulatory barriers.  And there's a huge financial and time commitment to getting into this market.  Some companies have spent hundreds of millions of dollars trying to enter and still failed.

Q    What evidence is there that Biosense can inflate prices or exclude competition in this market?

A    For example, in the years following the imposition of the Case Coverage Policy, Biosense was able to raise its price without losing sales even while its competitor was slashing prices.

Q    Do you have a slide to demonstrate that?

A    Yes.

Q    What does this show?

116

A    So this shows -- there's a red line that has the CARTO 3 price.  You can see it going up from $203,000 in 2016 to $258,000 in 2023.  At the same time, their unit sales, the blue bar, is essentially flat.  And this contrasts with the price of the Abbott machine, which was falling during this period.

Q    And if we go back to Slide 39.

     Let's turn to the CARTO 3 clinical support market.  What is Biosense's market share in that market?

A    As we saw earlier, 95 percent.

Q    And are there barriers to entry in that market?

A    Yes.  Beyond simply having to train the mapper, there's all these barriers that Biosense has put up, such as withholding the training materials, upgrading or changing the software on the machines, so that even if you entered the market, you get knocked out right away.

Q    Did you see evidence that Biosense can inflate prices or exclude competition?

A    Yes.  So we see that using its market power in clinical support it's able to force customers to pay more for catheters.  So it's able to inflate prices using market power in clinical support.

Q    And then turning lastly to the CARTO 3 sensor-enabled catheter markets, do you have a slide to show Biosense's market share in those markets?

117

A    Yes.

Q    What is Biosense's market share in those three catheter markets?

A    So for the sensor-enabled circular mapping, 92 percent. For those high-density mapping catheters, PENTARAY, OPTRELL, OCTARAY, over 99 percent. And for the SOUNDSTAR, the sensor-enabled ultrasound, 99 percent.

Q    Can that share also be calculated in terms of the money spent on these catheters?

A    Yes. That's another way to look at the economic footprint of the companies.

Q    Okay. Could we please go to the next slide.

So what does this slide show?

A    So this shows the revenues that Biosense/Sterilmed earned as opposed to independent reprocessors for these catheters from 2016 to 2023. And I break out the SOUNDSTAR, the PENTARAY/OCTARAY, and the LASSO NAV. If we look at just the total Biosense/Sterilmed received, it's $3.6 billion of revenue for these catheters, and the independent reprocessors less than one percent, just under $26 million.

Q    What barriers to entry exist in these markets?

A    Well, there is the technical difficulty of entering, and the cost, approximately half a million dollars to get FDA clearance, but the bigger barrier is the Case Coverage Policy. Even if you brought your own independently

118

reprocessed catheter to market, the Case Coverage Policy would exclude you from almost the entire market.

Q    Did you see evidence that Biosense can inflate prices and exclude competition in these catheter markets?

A    Yes.

Q    What evidence?

A    Well, so the Case Coverage Policy and what happened in those markets is one, and the economic analysis that we've been talking about thus far is another.

Q    In your opinion, Dr. Forister, did Biosense's anticompetitive conduct allow Biosense to achieve its monopoly power in these markets?

A    Yes.

Q    What is the basis for your opinion?

A    Well, the economic analysis we discussed, as well as a few specific quantitative comparisons of shares across different markets and over time.

Q    Okay.  Let's go to the first of those quantitative analyses.

        Could we put up Slide 44, please.

        Did you prepare Slide 44?

A    Yes.

Q    And could you please explain what this shows?

A    Okay.  So one point of comparison would be to say what happened to independently reprocessed market share before

the tie and after the tie?  And here's what it was for sensor-enabled ultrasound, that is, the SOUNDSTAR.  2013 and 2014, independent reprocessors had a 23 percent share of that market.  After the tie, 2022-2023, down to one percent.

Q    Did you find similar trends with respect to the other CARTO 3 catheters?

A    Yes.  The LASSO NAV, we also see a decrease in the share over time.

Q    Would you please find JX4457 in your binder.

Did you prepare 4457?

A    I did.

MR. HO:  We move 4457 into evidence.

MR. CAVANAUGH:  No objection.

THE COURT:  4457 will be received.

(Exhibit 4457 received in evidence)

BY MR. HO:

Q    Could you please explain what 4457 shows?

A    Yes.  So we've been talking about several catheters, the SOUNDSTAR, the PENTARAY, and the LASSO NAV.  So if we roll up those in a bigger group, we can look at third-party or independent reprocessor share in 2013 to 2014, 16 percent, and that gets taken down to one percent in 2022 to 2023 after the tie.  So we can see a before the tie and after the tie comparison shows independent reprocessors' share of the navigational catheters going down

120

significantly.

Q    Did you do a second quantitative analysis?

A    Yes.

Q    Could we please put up Slide 45.

What does Slide 45 show?

A    So this compares independent reprocessors' share for catheters that were unaffected -- CARTO 3 catheters that were unaffected by the policy.  So one might have been concerned in that previous slide that we see this decline, but what if it's due to something else?  What if people are just becoming less interested in reprocessing?  And this answers that question.  The share of independent reprocessing went up between 2013 to 2014 and 2022 to 2023 for the catheters on the CARTO 3 that weren't covered by the Case Coverage Policy.

Q    Dr. Forister, to summarize, in your opinion, was Biosense's Case Coverage Policy anticompetitive or competition on the merits?

A    It was anticompetitive.

Q    And what about Biosense's Project Falcon, the blocking technology?

A    The blocking technology was anticompetitive.

Q    What about Biosense's catheter collections practices?

A    The catheter collection and withholding was anticompetitive.

121

Q    What impact did that anticompetitive conduct have on hospitals' choices to buy CARTO 3 sensor-enabled catheters from Innovative Health?

A    It eliminated the choices that hospitals would have made in a competitive market.

Q    And how much money did Innovative Health lose as a result?

A    At least $147 million.

MR. HO:  Pass the witness.

THE COURT:  Why don't we take the lunch break here.  We'll come back at ten to 1:00, ladies and gentleman.  Please remember the admonition.

(Jury not present)

THE COURT:  Anything for the record before we take the noon break?

MR. HO:  Just one ministerial thing.  I know Dr. Wu isn't testifying for some time, but if we could make the standing objection something that both sides could have, we would appreciate that.

MR. CAVANAUGH:  No objection, Your Honor.

THE COURT:  Fine.

(Recess)

(Miriam Baird reported Vol. II)

*    *    *

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER-1036

122

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  May 13, 2025


/s/   Sharon A. Seffens  5/13/25
_____
SHARON A. SEFFENS, U.S. COURT REPORTER