No. 25-6042

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

INNOVATIVE HEALTH, LLC,

*Plaintiff-Appellee,*

v.

BIOSENSE WEBSTER, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Central District of California, No. 8:19-cv-01984-JVS, Hon. James V. Selna

## PLAINTIFF-APPELLEE INNOVATIVE HEALTH'S ANSWERING BRIEF

JEFFREY L. BERHOLD
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street
Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

DEREK T. HO
ANDREW E. GOLDSMITH
MATTHEW D. READE
RACHEL ANDERSON DELISLE
SEAN P. QUIRK
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*Counsel for Plaintiff-Appellee Innovative Health, LLC*

May 20, 2026

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...............................................................................iv

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ........................................................... 6

STATEMENT OF THE ISSUES................................................................ 7

STATEMENT OF THE CASE ................................................................... 8

I.     THE TRIAL EVIDENCE ................................................................. 8

       A.     Background.............................................................................. 8

       B.     Biosense Excludes Competition Through Three
              Coordinated Tactics ............................................................. 10

              1.     The Case Coverage Policy............................................. 11

              2.     Blocking technology ..................................................... 15

              3.     Catheter collections ..................................................... 16

       C.     Hospitals Cannot Escape Biosense's Conduct ..................... 17

       D.     Biosense Had Market Power over CARTO
              Clinical Support and Catheters............................................ 21

              1.     Clinical support............................................................ 21

              2.     Catheters ...................................................................... 23

       E.     Dr. Forister Calculates $147 Million in Lost
              Profits Using a Conservative Benchmark
              Methodology ........................................................................ 27

II.    RELEVANT PROCEDURAL HISTORY ...................................... 29

       A.     This Court's Summary-Judgment Reversal ......................... 29

B.    The Jury's Verdicts and the Denial of Biosense's JMOL Motions ................................................................ 30

C.    The District Court Enjoins Biosense for Five Years .................................................................................. 32

SUMMARY OF ARGUMENT ............................................ 33

STANDARD OF REVIEW ................................................. 38

ARGUMENT ..................................................................... 39

I.    THERE WAS SUBSTANTIAL EVIDENCE OF A VALID TYING MARKET—AS THIS COURT ALREADY HELD ................................................................ 39

    A.    Substantial Trial Evidence Showed That CARTO Clinical Support Is a Separate Product ............................... 39

        1.    This Court already rejected Biosense's claim that clinical support is not separate from catheters ........... 40

        2.    The trial record contains even more evidence ............ 42

        3.    Biosense's counterarguments are meritless ................ 44

    B.    The Jury's Finding of a Single-Brand CARTO Clinical-Support Aftermarket Rests on Evidence of Significant Switching Costs This Court Already Held Sufficient .................................................................... 51

        1.    This Court found Innovative's evidence sufficient, and he trial evidence was even stronger ..................... 52

        2.    Biosense's switching-cost arguments are meritless .... 52

        3.    Switching-cost evidence was unnecessary given Biosense's foremarket power ....................................... 56

ii

II. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING OF MARKET POWER ..................................................57

    A. The Trial Record Is Replete with Direct and Indirect Evidence of Biosense's Market Power in CARTO Clinical Support .......................................................57

    B. Biosense's Factual Arguments Do Not Disprove Market Power as a Matter of Law.........................................60

III. BIOSENSE'S SUFFICIENCY CHALLENGE TO THE DAMAGES EVIDENCE IS FORFEITED AND MERITLESS ...............................................................................66

    A. Biosense Forfeited Its Sufficiency Challenge to Innovative's Damages Evidence.............................................66

    B. Dr. Forister's Damages Estimates Were Supported by Substantial Evidence .....................................68

    C. Biosense Erroneously Confuses Market Power and Definition with Damages................................................70

    D. The Record Belies Biosense's Factual Premise That Some Hospitals Knowingly and Voluntarily Agreed to the Policy ............................................................74

IV. THE JURY'S SECTION 2 MONOPOLIZATION VERDICTS INDEPENDENTLY SUPPORT AFFIRMANCE ...............................................................................79

CONCLUSION ..................................................................................83

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) .................................................................. 80, 81

*Avaya Inc. v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016) ......... 70, 71

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) ........................... 70

*City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373 (9th Cir. 1992) .................................................... 80

*City of Vernon v. Southern California Edison Co.*, 955 F.2d 1361 (9th Cir. 1992) .................................................... 73

*Columbia Steel Casting Co. v. Portland GE*, 111 F.3d 1427 (9th Cir. 1996) .................................................... 73-74

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) .................................................... 80

*CoStar Grp., Inc. v. Commercial Real Est. Exch., Inc.*, 150 F.4th 1056 (9th Cir. 2025), *cert. denied*, No. 25-667 (U.S. Mar. 23, 2026) ...................... 58, 59, 60, 64, 66, 79

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506 (9th Cir. 1985) .................................................... 68, 69

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024), *cert. denied*, No. 24-917 (U.S. Jan. 12, 2026) .................................................... 81

*Dupree v. Younger*, 598 U.S. 729 (2023) .......................................... 39, 68

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .......................................................... *passim*

*Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359 (1927) .................................................... 70

iv

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ........ *passim*

*Ermold v. Davis*, 130 F.4th 553 (6th Cir.), *cert. denied,*
146 S. Ct. 398 (2025) ....................................................................... 41

*Fisher v. City of San Jose*, 558 F.3d 1069 (9th Cir. 2009) ..................... 82

*Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495 (1969)................ 60

*Fox West Coast Theatres Corp. v. Paradise Theatre Bldg.
Corp.*, 264 F.2d 602 (9th Cir. 1958) ............................................... 80

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) .......................... 45

*Greenwood v. FAA*, 28 F.3d 971 (9th Cir. 1994).................................... 79

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
733 F. App'x 380 (9th Cir. 2018).................................................... 72

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ................................ 38, 39, 68, 73, 80

*Innovative Health LLC v. Biosense Webster, Inc.*:

2022 WL 1599713 (C.D. Cal. Mar. 22, 2022), *rev'd and
remanded*, 2024 WL 62948 (9th Cir. Jan. 5, 2024)........................ 29

2024 WL 62948 (9th Cir. Jan. 5, 2024) ................................. *passim*

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ......... 40, 45

*Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222
(9th Cir. 2001)................................................................................ 38

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004)....................... 41

*Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743 (N.D. Cal. 2022) ............... 62

*Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024) ................ 54

*Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365
(9th Cir. 1987)................................................................................ 65

v

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) .................................. 80

*Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426 (9th Cir. 1986) ................................................................................ 67

*M.A.P. Oil Co. v. Texaco Inc.*, 691 F.2d 1303 (9th Cir. 1982) ............. 47, 48

*McSherry v. City of Long Beach*, 423 F.3d 1015 (9th Cir. 2005) ................................................................................ 67

*Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038 (9th Cir. 2008) ........................................................... *passim*

*Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086 (9th Cir. 2007) ............................................................................ 66, 67

*Nordstrom v. Ryan*, 856 F.3d 1265 (9th Cir. 2017) ................................ 40

*Ohio v. American Express Co.*, 585 U.S. 529 (2018) ......................... 57, 72

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021) ................................................................ 38-39, 70

*Ortiz v. Jordan*, 562 U.S. 180 (2011) ............................................... 39, 45

*Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134 (1968) ................................................................. 73

*PLS.com, LLC v. National Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022) ......................................................... 64, 72

*PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997) ............................................................... 49-50

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ....................................................... 70, 71

*Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ................................................................................ 72

*Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) ............. 38

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999)......................................................... 47, 48

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024).............. 62

*Xyrem (Sodium Oxybate) Antitrust Litig., In re*,
2024 WL 4023561 (N.D. Cal. Aug. 26, 2024) ................................. 65

*Yammine v. Toolbox for HR Spolka Z Ograniczona
Odpowiedzialnoscia Spolka Komandytowa*,
2025 WL 957825 (9th Cir. Mar. 31, 2025).................................... 67

## STATUTES AND RULES

Clayton Act, 15 U.S.C. § 12 *et seq.*:

§ 4, 15 U.S.C. § 15 ................................................................. 6

§ 12, 15 U.S.C. § 22 ................................................................ 6

Sherman Act, 15 U.S.C. § 1 *et seq.* .......................................... 1

§ 1, 15 U.S.C. § 1 ................................................................ *passim*

§ 2, 15 U.S.C. § 2 ................................................................ *passim*

Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.* .......................... 1

Fed. R. Civ. P.:

Rule 50 ................................................................. 5, 7, 36, 53, 66

Rule 50(a)................................................................. 30, 68

Rule 50(b)................................................................. 30, 34, 45

**OTHER MATERIALS**

Am. Bar Ass'n, *Proving Antitrust Damages* (3d ed. 2017).......................69

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
(updated May 2026):

    Vol. 3G.......................................................................................... 69, 73

    Vol. 17C........................................................................................... 54

    Vol. 17D........................................................................................... 51

FTC Br., *Surgical Instrument Serv. Co. v. Intuitive Surgical,
Inc.*, No. 25-1372 (9th Cir. filed Aug. 6, 2025) ..............................57

Richard A. Posner, *Antitrust Law* (2d ed. 2001) .....................................81

# INTRODUCTION

This Court previously held that a trial was warranted on Innovative Health, LLC's claims that Biosense Webster Inc., a Johnson & Johnson subsidiary, violated Sections 1 and 2 of the Sherman Act and California's Cartwright Act through unlawful tying and monopolization. *Innovative Health, LLC v. Biosense Webster, Inc.*, 2024 WL 62948 (9th Cir. Jan. 5, 2024) ("*Innovative*").

Innovative prevailed at trial. After eight trial days featuring 29 witnesses and more than 200 exhibits, the jury unanimously found that Biosense waged an anticompetitive campaign targeting Innovative and other independent cardiac catheter reprocessing companies, reducing their market share to near-zero even though they offered safer, better catheters at lower prices. To the once-skeptical district judge, who had nixed Innovative's claims at summary judgment, the trial evidence showed that Biosense's "grave antitrust violation" "clearly warrant[ed] an injunction" to restore competition.

As the jury's two-hour deliberation showed, the evidence supporting the verdicts was ample and often uncontroverted. Biosense dominates the market for cardiac-mapping machines—long-lasting,

quarter-million-dollar consoles used to perform lifesaving heart procedures. Contrary to Biosense's false claim of "intense inter-brand competition," two-thirds of cardiac-mapping cases use Biosense's CARTO—a share that has steadily grown even as Biosense has raised machine prices (and rivals have cut them).

Although CARTOs are expensive, Biosense makes nearly all its profit selling CARTO-compatible catheters. Every procedure requires several catheters, each costing thousands of dollars. Innovative threatened those profits. It developed cutting-edge FDA-approved technology to reprocess (*i.e.*, refurbish) used Biosense catheters— producing devices that work "the exact same" as new ones, are *safer*, and cost half as much. Rather than compete on quality or price, Biosense set out to destroy Innovative and other reprocessors to protect its cash cow.

Biosense wielded three exclusionary tactics. First, it monopolized the clinical support essential to CARTO procedures—specially trained "mappers" who run the CARTO—by stamping out independent providers. It then leveraged that chokehold through its "Case Coverage Policy": Biosense refused to provide clinical support unless a hospital

2

used Biosense catheters, even having its mappers walk out of cases while patients lay on the table, to force doctors to use Biosense catheters instead. Second, Biosense embedded secret "kill switches" in its catheters so they would not work once reprocessed. Third, it hoarded used catheters so rivals could not reprocess them.

This deliberate, multi-pronged strategy worked. Independent reprocessors' share of the affected catheter markets plummeted from 16% to 1%, CARTO catheter prices rose even as Biosense's costs fell, and catheter innovation stalled—all while healthcare providers paid more for less. Care providers large and small tried but failed to switch away from Biosense. As Biosense's architect of the Policy bragged internally, one large national hospital system "didn't like it" but could not "drive [its] business to [Biosense's] competitors" despite its "best efforts." Instead, he crowed, Biosense's sales "actually grew."

Biosense challenges the jury's verdicts solely on three sufficiency-of-the-evidence grounds: the validity of Innovative's asserted Section 1 tying market, power in that market, and damages. To succeed, Biosense must show that the trial record, construed in Innovative's favor, permits only one conclusion that contradicts the jury's verdicts on

3

every claim. Hemmed in by that deferential standard, law of the case, and the trial record, Biosense repackages arguments it already lost in the first appeal—and raises new ones it forfeited below.

All lack merit.

*Market definition.* Biosense repeats the market-definition arguments this Court already rejected: that clinical support is not a separate product and that no single-brand aftermarket for CARTO clinical support exists. The trial evidence was even stronger than this Court held sufficient—especially from economist Dr. Eric Forister, whose testimony's admissibility is unchallenged here.

*Market power.* As the district court found, the trial record brims with evidence of Biosense's market power over CARTO clinical support. Biosense had 95% of the market and successfully blocked independent providers. The Policy's success is direct evidence that Biosense could exploit its dominance in clinical support to extract supracompetitive profits and exclude competition from the catheter aftermarkets. Per Dr. Forister's unchallenged economic analysis, catheter prices rose as costs declined, quality and innovation suffered, and hospitals could not switch.

***Damages.*** Biosense claims the jury was required to reduce its damages award because its Policy was allegedly lawful as to hospitals that Biosense says knew of it before buying more CARTOs. But Biosense forfeited that challenge by not raising it in its Rule 50 motions, and its own expert testified that damages should be calculated by comparing the world with the Policy with a "but-for" world without it—exactly what the jury did. Regardless, Biosense's argument incorrectly conflates market power with damages and ignores substantial evidence that *no* customer knowingly and voluntarily accepted the Policy.

***Monopolization.*** Biosense aims its market-power and market-definition arguments exclusively at the tying market for Innovative's Section 1 claim. But the jury's Section 2 verdicts rest on monopoly power and anticompetitive conduct in the relevant *catheter* markets—jury findings Biosense does not appeal. So regardless of Biosense's arguments, the monopolization and attempted-monopolization verdicts stand and independently support the damages award.

This Court held that Innovative had enough evidence for trial on these classic factual questions. At trial, Innovative introduced that

5

evidence and more. Biosense pressed its case vigorously, but the jury did not credit its arguments. This Court should affirm.

## JURISDICTIONAL STATEMENT

Biosense's Jurisdictional Statement suffices, but 15 U.S.C. § 15 and § 22 also supplied subject-matter jurisdiction.

## STATEMENT OF THE ISSUES

1.    Whether substantial evidence supports the jury's findings that CARTO clinical support is a separate product and a valid single-brand aftermarket, where this Court already held that Innovative proffered sufficient evidence for a jury to find in its favor.

2.    Whether substantial evidence supports the jury's finding of Biosense's market power in the tying market for CARTO clinical support, where the trial record showed that Biosense controlled 95% of that market, excluded independent clinical-support providers, forced hospitals to buy catheters only from Biosense, raised catheter prices while its costs declined, and excluded catheter competition.

3.    Whether Biosense forfeited its sufficiency challenge to the jury's damages award by not raising it under Rule 50 and, if not, whether substantial evidence supports the jury's award based on comparing Innovative's sales of catheters subject to the Policy to its sales of similar, unaffected catheters.

4.    Whether the Section 2 actual-and-attempted monopolization verdicts should be independently affirmed, given Biosense's failure to challenge the sufficiency of the evidence supporting those claims.

7

## STATEMENT OF THE CASE

### I.    THE TRIAL EVIDENCE

#### A.    Background

To treat dangerous irregular heartbeats, electrophysiologists use a cardiac-mapping machine and compatible catheters to map the heart. 6-ER-770.  Each procedure, or "case," requires:  (1) a cardiac-mapping machine, (2) compatible location-sensing ("sensor-enabled") catheters, and (3) a clinical-support specialist—often called a "CAS" or mapper—to operate the machine while the electrophysiologist moves the catheters inside the patient.  4-ER-351-53.  While the machine and catheters are products delivered before a case, clinical support is a service provided during it.  4-ER-493.

Biosense makes the CARTO 3 machine ("CARTO").  1-ER-11. Two-thirds of cardiac-mapping cases use the CARTO—a share that has steadily grown—and 72% of all hospitals with a mapping machine have a CARTO.  6-ER-981-82; 6-ER-1029-30; 4-ER-358.  Barriers to entry are enormous; firms "have spent hundreds of millions of dollars trying to enter" the machine market "and still failed."  6-ER-1030.

8

Biosense also provides clinical support for the CARTO during procedures.  4-ER-358-67.  Without clinical support, a CARTO procedure cannot be performed.  6-ER-780-85.

Finally, Biosense makes three location-sensing catheters:  the Lasso, a circular mapping catheter used to build an electrical map of the heart; the Pentaray, a high-density mapping catheter with five splines that collect electrical data; and the Soundstar, an ultrasound catheter that images the heart.[1]  Those catheters work with no other mapping-machine brand.  4-ER-323; 4-ER-435.

Innovative competes in the CARTO-compatible catheter markets by "reprocessing"—using cutting-edge, FDA-approved cleaning technology to allow healthcare providers to safely reuse those catheters. 4-ER-355-56.  Hospitals frequently reprocess medical devices—from surgical instruments and dental tools to the heart catheters relevant here.  5-ER-727; 6-ER-780-81.

The FDA has approved reprocessing for more than 25 years, 5-ER-607, because it reduces costs and medical waste while improving

---

[1] Other devices—the DecaNav, AcuNav, and Octaray catheters, and the Vizigo sheath, 5-ER-690-94—were also subject to Biosense's anticompetitive conduct.  4-ER-331-32; 4-ER-368-70; 5-ER-690-94.

patient safety, 6-ER-783-84. The FDA forbids reprocessing a device without establishing that the reprocessed version works as well as a new one. 5-ER-557-61; 5-ER-622-23; 12-ER-2374-80. In fact, Innovative's reprocessed catheters, which are individually tested multiple times, are safer than new Biosense catheters, with lower rates of associated patient injuries and deaths. 6-ER-993-97.

A Biosense catheter reprocessed by Innovative costs about 50% less than a new one—but it works "[t]he exact same." 4-ER-469; 4-ER-379; 6-ER-788. Healthcare providers have been eager to reprocess with Innovative and other independent reprocessing companies. In 2013 and 2014—before Biosense's anticompetitive conduct—independent reprocessors held a 23% share of the location-sensing ultrasound catheter market (Soundstar). 6-ER-1034.

### B. Biosense Excludes Competition Through Three Coordinated Tactics

Biosense blocked competition from reprocessors because it makes nearly all its profits selling catheters, especially new ones. By 2023, catheters accounted for more than 98% of Biosense's revenues, 6-ER-987; each new catheter costs hospitals thousands of dollars, 4-ER-470;

12-ER-2359.  Innovative and other reprocessors threatened those profits by offering catheters that work the same at half the price.

Rather than compete on the merits by lowering prices or reprocessing more catheters through its affiliate SterilMed, Biosense excluded independent reprocessors through three coordinated tactics: (1) tying clinical support to buying Biosense catheters through its "Case Coverage Policy"; (2) deploying anti-reprocessing technology; and (3) hoarding used catheters.  These tactics enabled Biosense to exclude competition, inflate prices, and reduce quality and innovation in the affected catheter markets.

### 1. The Case Coverage Policy

Before the Policy, Biosense provided clinical support to CARTO cases regardless of whether independently reprocessed catheters were used.  In 2014, it told customers that it had "no specific corporate policy that prohibits our people from supporting cases" using independently reprocessed items and, in fact, viewed providing clinical support "as part of our Credo responsibility to patients."  10-ER-1979; *see* 12-ER-2346 (listing "doctors, nurses and patients" as "our first responsibility"); 6-ER-971-72.

11

But just as Innovative was entering the market, Biosense chose to break its Credo and use its monopoly over clinical support to thwart competition. 6-ER-963-79. Biosense first tested the Policy at Ascension Health, "a large Catholic nonprofit hospital system with about a hundred hospitals in the U.S." 6-ER-969. When a doctor selected an independently reprocessed catheter for a procedure, Biosense's clinical-support personnel walked out of the procedure room while the patient lay on the table. 10-ER-1985. Ascension was furious. 10-ER-1984-85. But Biosense gloated on an internal sales call that Ascension had no choice: Despite its "best efforts," Ascension could not "drive [its] business to [Biosense's] competitors," and Biosense's sales to Ascension "actually grew with this policy." 2-SER-153 (JX-173) at 58:37-59:29; 6-ER-969-75.

Emboldened, Biosense broadened the Policy—first to one sales region, 8-ER-1411, then nationwide in April 2016, 9-ER-1554. If a hospital expressed interest in buying reprocessed catheters from a company other than Biosense, Biosense threatened to pull the clinical support necessary to perform CARTO procedures. 6-ER-975. Portia Tranguch, Allegheny General Hospital's director of cardiac services,

12

testified that Biosense's clinical support personnel even "pulled [reprocessed catheters] off [the hospital's] shelves" so doctors could not use them. 10-ER-1890-91.

As with Ascension, the Policy forced many hospitals to buy Biosense's catheters instead.[2] Biosense made more money—just as it did after coercing Ascension. Its profit margins in the affected catheter markets "went way up both in percentage and in dollar terms," reaching 76% to 87% per catheter. 6-ER-983-86; 1-ER-20. Biosense called the Policy "key to us protecting our . . . business" from "the competitive activity" from Innovative. 2-SER-324.

The jury also heard evidence that Biosense's justifications for the Policy were pretextual. Biosense's "free-riding" theory was belied by contemporaneous emails and calls exulting in the Policy's sales benefits,

---

[2] *See* 10-ER-1792-93 (Mayo Jacksonville); 2-SER-166-67 (Allegheny); 3-SER-447-48 (MarinHealth); 3-SER-449-50 (Indiana University); 3-SER-451-55 (Erlanger); 3-SER-456-59 (PeaceHealth); 3-SER-460-63 (CentraCare); 3-SER-464-70 (UH San Antonio); 3-SER-489-93 (Crouse); 5-ER-584 (Torrance Memorial; Kaiser Permanente); 5-ER-685-90 (Trinity; Mayo Clinic); 5-ER-729 (Providence St. Joseph); 6-ER-897-98 (Sharp; HCA Far West; HCA Mountain; HCA Tri-Star; HCA South Atlantic; Advent; Valley; New York Presbyterian; Ardent; Carolina East University); 6-ER-781-82 (HonorHealth); 10-ER-1822-23 (Stanford); 1-SER-19, 9-ER-1703 (listing 22 affected hospital systems); 6-ER-961-79 (describing Policy roll-out).

13

*see, e.g.*, 8-ER-1413; 7-ER-1232-39; 2-SER-153 (JX-173); 2-SER-324; 3-SER-497, and by the undisputed evidence that Biosense's mappers are not free to the hospital: they are salespeople who generate $1.5 to $2 million in revenue annually—paying for themselves in just two months and earning handsome commissions—by pitching Biosense products and upselling physicians. 4-ER-321; 6-ER-1007-08; 7-ER-1208-09; 9-ER-1584.

Biosense's "calibration" defense was likewise pretextual. The jury heard evidence that the physician is responsible for assessing a catheter's accuracy, 6-ER-787; that CARTO will not even display an improperly calibrated catheter (nullifying any calibration issue); and that Biosense's affiliated reprocessor told the FDA that "reprocessing has no effect on device's ability to maintain sensor location," 2-SER-299; *see* 6-ER-1012-13; 3-SER-389 (internal Biosense document: "If you can see it [on CARTO], you can trust it."). And as Biosense admitted internally, the "Policy wouldn't change" even if a reprocessor's testing were "exactly identical" and "used the exact same equipment," and even if its catheters were "*more accurate* than [Biosense's]." 2-SER-153 at 40:11-32, 41:20-35; *see* 3-SER-429 (same).

14

Finally, Biosense's claimed concern about quality and patient safety conflicted with the evidence that FDA-cleared reprocessed catheters perform "[t]he exact same" as new ones, 4-ER-469; that Innovative's catheters are safer, 6-ER-993-94; and that Biosense exempted the hospital Providence Alaska from part of the Policy when it feared losing business, 5-ER-733-34; 6-ER-1010; 9-ER-1759-60. Biosense's medical safety officer was never consulted about the Policy or any changes to it, 10-ER-1878-79, which Biosense's "sales organization" devised and "carried out." 8-ER-1413. And no other manufacturer conditions clinical support on using only its own catheters. 6-ER-838.

### 2. Blocking technology

Biosense also deployed "anti-reprocessing technology." 2-SER-155. Biosense's "Falcon Project" created a custom-encrypted "Falcon chip" to embed in its catheters. 2-SER-155; 6-ER-953; 8-ER-1470. The project was kept secret: Senior executives insisted on discussing it "live" rather than by email. 2-SER-212; 2-SER-156; 6-ER-953; 8-ER-1470-72. But the few existing internal emails confirm that the Falcon Project's motive—like the bird it was named after—was predatory: its "main driver" was to stifle competition, by "preventing [Biosense's]

competitors to reprocess" the devices. 2-SER-307; 2-SER-154; 6-ER-950-55; *see* 10-ER-1813-14 (Biosense manager projecting "25 percent to 75 percent" Lasso-catheter market-share growth from Falcon). Biosense embedded the Falcon chip and similar chips called EEPROMs into all sensor-enabled catheters. 5-ER-634-43; 6-ER-951. After one use, the EEPROM would "lock that device" and render it inoperable. 5-ER-635.

The Falcon chip responded to no customer demand. Nor did it promote patient safety: Biosense's medical safety officer testified that he had never heard of it. 10-ER-1878-79. Its only purpose was to foreclose reprocessing competition. 6-ER-951-52. Although Innovative eventually overcame these "kill switches," they delayed Innovative's reprocessing by 6 to 37 months, depending on the device. 5-ER-633-43; 5-ER-669-73; 6-ER-999; 6-ER-1005-06.

### 3. Catheter collections

Biosense also hoarded used catheters to starve independent reprocessors of necessary inputs. 6-ER-955-61. A senior marketing director put it plainly: "If we control supply, we can greatly minimize competitive activity." 2-SER-160-61; *see* 2-SER-195-96 (Biosense

16

document touting collections as means to "control the market" and "drive [reprocessors] out of the [reprocessing electrophysiology] business altogether"); 3-SER-442 (collections were to "prevent the competition from getting access to our catheters"). One executive even proposed structuring hospital contracts to "cut off [a competitor's] supply and crush them"—attaching an image of the Austin Powers movie villain Dr. Evil. 2-SER-311; *see* 3-SER-424-26; 6-ER-960-61 (collections targeting Innovative).

This strategy worked, too. Biosense celebrated "Remarkable Results!" when Stryker, another independent reprocessor, "stopped selling Acunav 10F due to supply constraints (caused by BWI collections)." 2-SER-330. Biosense's own data showed that it withheld tens of thousands of collected catheters from the market, despite customer demand, and even collected devices that Biosense could not reprocess—removing them from the market solely to injure rivals. 6-ER-957-60; 2-SER-319-20.

## C. Hospitals Cannot Escape Biosense's Conduct

Care providers could not escape Biosense's anticompetitive policies by switching mapping machines because they were locked into

17

the CARTO ecosystem. *See Innovative*, 2024 WL 62948, at \*2-3;

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 473 (1992)

("significant information and switching costs" characterize single-brand

aftermarkets).

Biosense concealed the Policy from customers. Even when it

adopted it "nationwide," Biosense never put the Policy in its contracts or

disclosed it to hospitals when selling a CARTO. 6-ER-1018-19; 3-SER-

456-57. Instead, Biosense sprung the Policy—an undated, unsigned

form letter, 10-ER-1842-43—on customers that had already bought

CARTOs, waiting to invoke it "until a hospital wants to use an

independently reprocessed catheter." 6-ER-975. Dr. Rahul Doshi, the

Chief of Cardiovascular Medicine at HonorHealth and a practicing

electrophysiologist for 25 years, did not hear of the Policy until 2024—

eight years after it was adopted and only after his hospital sought to

reprocess with Innovative. 6-ER-782-83. Biosense told UH San

Antonio about the Policy only after it canceled its SterilMed contract to

switch to Innovative. 6-ER-893; 3-SER-464-70. PeaceHealth bought its

CARTOs in 2018 and 2021 but learned of the Policy only after later

trying to buy independently reprocessed catheters. 3-SER-456-57;

18

6-ER-1018-19; *see, e.g.*, 3-SER-489-93 (Crouse); 3-SER-447-48 (MarinHealth); 10-ER-1885 (Allegheny); 3-SER-451-55 (Erlanger); 3-SER-460-63 (CentraCare); 2-SER-301-03 (MedStar).

Even when hospitals learned of the Policy, they could not accurately predict its economic effects, because Biosense kept changing it without warning. In 2022, for example, Biosense added the Vizigo sheath to the Policy within three months of Innovative's FDA clearance to reprocess it, shutting down Innovative's sales, even though the Vizigo is not a catheter. 5-ER-690-94; *see* 6-ER-978; 3-SER-437 ("leveraging" the Policy after Innovative's DecaNav clearance); 8-ER-1372-83; 9-ER-1589; 2-SER-227 (harshening Policy as to Soundstar in 2023).

The CARTO's lifespan exceeds 10 years, and near-constant changes in available products, prices, patient demand, and reimbursement rates compound the difficulty of calculating lifetime cost. 6-ER-1020-21; *see Kodak*, 504 U.S. at 473-74. And when negotiating contracts, Biosense misled customers about their costs. *See* 2-SER-163 ("[Biosense] constantly tell[s] us one thing and then when agreements are signed they tell us we misunderstood and it ends up costing us much more").

The jury also heard evidence of significant switching costs between machine brands. The quarter-million-dollar per-machine price tag requires a "huge" capital investment. 6-ER-836; 10-ER-1858; *see* 10-ER-1887-88 ("[P]urchasing a brand new system to be able to use a reprocessed catheter is not financially responsible."). Physicians who have spent years or decades training on CARTO find it "very difficult" to switch systems. 6-ER-790; *see* 6-ER-834-37 (explaining why hospitals could not switch to avoid the Policy).

Those switching costs locked in even highly sophisticated hospital systems. Torrance Memorial tried to pay doctors to switch from CARTO, but they refused. 4-ER-390-91. Ascension Health hated the Policy and tried to switch; it failed. 2-SER-153 at 58:37-59:29; *see* 6-ER-895 (UH San Antonio); 5-ER-748 (Providence). A former executive at Vizient, the country's largest group purchasing organization, testified that, over five years, he *never* saw "a hospital successfully switch to a different mapping machine to get around Biosense's Case Coverage Policy." 6-ER-823; 6-ER-836; *see* 3-SER-494; 6-ER-1013-14 (Forister switching analysis).

The jury heard still more evidence that mapping-machine competition could not discipline Biosense's aftermarket conduct. Innovative proved that 58% of all CARTOs were installed before the Policy was imposed—far more than the 23% that this Court already deemed sufficient. 6-ER-1017; *Innovative*, 2024 WL 62948, at *3. The CARTO also is unique—the only machine that integrates ultrasound images (via the Soundstar catheter) into the cardiac map. 6-ER-789.

**D. Biosense Had Market Power over CARTO Clinical Support and Catheters**

**1. Clinical support**

When Biosense started selling the CARTO, Biosense provided clinical support in only half of CARTO cases. 6-ER-962-64; 12-ER-2318. But by 2015, Biosense had achieved an 87% market share.



**2009**
~120 CAS*
>50% of NAV cases covered

**2015**
~425 CAS*
~87% of NAV cases covered

**2-SER-240**

21

Biosense did that through exclusionary means: poaching clinical-support staff from hospitals, enforcing noncompete agreements barring former employees from training others, withholding training from hospitals, and even secretly changing the CARTO's software "as a blocking tactic" to prevent hospital staff from providing self-support. 6-ER-964-69 (Forister) (quoting 3-SER-434); *see* 6-ER-964-68; 4-ER-383-86 (contrasting Biosense's "pretty engaged" approach to training independent mappers before monopolizing the clinical-support market with its refusal to train them during the Policy); 4-ER-336. Meanwhile, other manufacturers eagerly trained hospitals how to run their machines independently. 10-ER-1888-89. By erecting those barriers, Biosense thwarted independent providers and many hospitals from supplying clinical support themselves. *See* 5-ER-683 (lack of access to training materials made it infeasible for Innovative to offer clinical support at scale); 3-SER-446; 3-SER-471-80; 10-ER-1833-34; 6-ER-1031; 9-ER-1577-79.

These efforts enabled Biosense to rapidly monopolize the CARTO clinical-support market. 4-ER-399; 7-ER-1133; 6-ER-836-37. Biosense recognized that, once independent providers were eliminated, replacing

22

its support personnel was "not sustainable" for hospitals. 2-SER-146; *see* 6-ER-968 (Biosense's control over training made replacing Biosense mappers "impossible"). After 2015, Biosense's clinical-support market share rose further from 87% to 95%. 12-ER-2318; 6-ER-963-64.[3] And as Biosense recognized internally, its near-total dominance of CARTO clinical support was "unmatched" by competing manufacturers with respect to their own machines. 10-ER-2036.

Biosense's successful imposition of the Policy is direct proof of its market power. The Policy forced more than 200 existing Innovative customers to stop buying CARTO sensor-enabled catheters from Innovative. 6-ER-897-98. At the same time, Biosense raised the price of the CARTO by $55,000 over seven years "without losing sales even while its competitor" Abbott "was slashing prices." 6-ER-1030-31.

### 2. Catheters

The Policy was "devastating to both Innovative and [its] clients that . . . wanted to have substantial savings." 5-ER-701. Dr. Forister computed that the Policy reduced independent reprocessors' share of

---

[3] Biosense's 95% share of CARTO clinical support equates to about 60% of all cases across mapping-machine brands. *See* 6-ER-1029.

the catheter markets subject to the Policy from 16% down to 1%; during the same period, their share of catheters not subject to the Policy grew. 6-ER-1033-35; 9-ER-1702-03; *see* 5-ER-679 (Innovative does "extremely well selling diagnostic catheters" but is "extremely curtailed in selling the sensor-enabled catheters due to the [Policy]"). Innovative's CEO Rick Ferreira testified that Innovative could "double" in size without Biosense's interference. 4-ER-490.



**3-SER-499**

Meanwhile, the Policy boosted Biosense's profit margins. 6-ER-983-86; 1-ER-20. Biosense raised catheter prices "far more than their

costs." 6-ER-985; *see* 6-ER-1027 (Biosense increased average Soundstar prices once "it achieved [its] near total monopoly position"). Yet, as Dr. Forister explained, "in a competitive market, economics tells us that if costs are going down, prices would go down." 6-ER-984.

Although Biosense nominally offered reprocessed catheters through SterilMed, internal documents revealed "the hard truth": Biosense offered reprocessing as "a last resort only . . . and in the most restrictive manner possible." 2-SER-313; *see* 4-ER-471 (SterilMed was a "defensive measure" against Innovative). With the Policy, Biosense could force customers to buy its new catheters, so it stopped offering reprocessing alternatives—restricting output—to avoid "cannib[a]lizing" new-catheter sales. 3-SER-431. Even when Biosense had reprocessing agreements, it did not fill hospitals' orders. At UH San Antonio, for example, SterilMed failed to reprocess *any* devices during its contract. 6-ER-888. Frustrated, the hospital tried to switch to Innovative, but Biosense invoked the Policy. 6-ER-890-94.

Biosense's conduct reduced the quality of catheters in the market. 6-ER-991-92. Innovative's reprocessed catheters are safer and more effective than Biosense's—whether new or reprocessed by SterilMed.

25

6-ER-993-94.  Biosense's adverse-event rates, reflecting patient injuries and deaths, and its customer complaint rates exceeded Innovative's. *Id.*; *see* 3-SER-495-96; 3-SER-481-88 (study finding OEM devices defective 4.9 times more often than reprocessed); 9-ER-1581-84 (discussing academic research on superiority of reprocessed devices).

Hospitals forced to use SterilMed also suffered degraded quality. Stanford Hospital's lab manager summarized:  "SterilMed . . . did a terrible job with reprocessing," their "pick-up area . . . looks like garbage," and their catheters "don't work."  10-ER-1826.

The Policy reduced innovation, too.  It "convinced companies like Innovative and Stryker not to reprocess the OCTARAY"—an advanced catheter subject to the Policy—"because they knew they would be excluded from the market."  6-ER-997; *see* 4-ER-370 (same).  SterilMed likewise delayed seeking regulatory approval to reprocess the Pentaray "unless Stryker rolls it out"—an "unlikely" possibility because "we wouldn't map those cases."  2-SER-146; *see* 3-SER-497; 2-SER-150 at 1 (instructing SterilMed "to take [Pentaray] internally as far as possible, then stop" short of seeking regulatory approval); 3-SER-437-40 (similar for DecaNav).

26

The Policy harmed hospitals and patients. 4-ER-402. Mary Roberts of Providence St. Joseph's Hospital testified that the Policy "stops us from being able to meet our goal of making healthcare affordable to everyone." 5-ER-731. Dr. Doshi of HonorHealth similarly testified that being unable to use reprocessed catheters affected HonorHealth's "ability to support patient care." 6-ER-783. He explained that "cost savings" from reprocessing are "incredibly important for hospitals and hospital systems these days." 6-ER-783; *see* 2-SER-163 (Tranguch); 6-ER-876 (UH San Antonio); 4-ER-380 (Torrance Memorial sought "to control costs mainly because the margins associated with the procedures are pretty narrow, pretty tight"); 3-SER-462 (CentraCare). As Dr. Forister and other witnesses testified, Biosense's conduct "took away the choice from doctors and hospitals." 6-ER-982; 6-ER-795; 5-ER-737.

### E. Dr. Forister Calculates $147 Million in Lost Profits Using a Conservative Benchmark Methodology

To calculate Innovative's lost profits, Dr. Forister identified comparable catheters not subject to the Policy and used Innovative's market shares for those benchmark catheters to project the shares Innovative would have achieved for the affected CARTO catheters

27

absent Biosense's anticompetitive conduct. He also derived benchmark price-discount ratios—the ratio of reprocessed to new catheter prices in the benchmark markets—and applied them to the affected markets to estimate Innovative's but-for-world prices. After projecting Innovative's competitive profits using those but-for shares and prices, he subtracted actual profits to yield lost profits. 6-ER-1000-05.

Dr. Forister calculated that the Policy caused approximately $139 million in lost profits, with an additional $8 million attributable to the market-entry delays caused by Biosense's blocking technology. 6-ER-999. He separated total damages by catheter product line, 6-ER-999, and he explained why his $147 million figure was conservative: It excluded damages from Biosense's collections policy and from the AcuNav and DecaNav catheters and the Vizigo sheath—all of which were subject to the Policy, too. It also excluded the out-of-pocket expenses Innovative incurred to overcome Biosense's anti-reprocessing technology. 6-ER-1006.

## II.    RELEVANT PROCEDURAL HISTORY

### A.    This Court's Summary-Judgment Reversal

This Court previously reversed the district court's grant of summary judgment for Biosense, which rested on two grounds. *Innovative Health LLC v. Biosense Webster, Inc.*, 2022 WL 1599713 (C.D. Cal. Mar. 22, 2022). *First*, the district court thought no jury could find that "clinical support" is a separate product from the tied products (catheters). *Id.* at *13. *Second*, the court thought CARTO clinical support and catheters were not proper aftermarkets, deeming "robust competition" in the cardiac-mapping-machine foremarket sufficient to discipline Biosense's aftermarket conduct. *Id.* at *12.

In reversing, this Court held that "Innovative has produced sufficient evidence for a rational trier of fact to conclude that clinical support services and catheters are distinct products." *Innovative*, 2024 WL 62948, at *2. The Court also held that a jury could find single-brand aftermarkets for CARTO clinical support and catheters. *Id.* (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023)). It held that Innovative had "produced sufficient evidence of the first three factors" required by *Epic* to show a single-brand aftermarket.

29

*Id.* at \*3.  On the fourth factor, it specifically rejected the district court's

conclusion that "competition in the foremarket" could "discipline"

Biosense's "anticompetitive behavior in the aftermarket." *Id.*  The

evidence that at least 23% of Biosense's customers had bought their

CARTO machines "before the tying policy officially went into effect" was

sufficient to show a "high" number of "locked in" customers and satisfy

the fourth factor.  *Id.*

### B.  The Jury's Verdicts and the Denial of Biosense's JMOL Motions

After an eight-day trial, the jury rendered unanimous verdicts for

Innovative on all its claims.  9-ER-1763-64.  The jury also awarded

Innovative all the damages it sought—$147,406,481—which the

antitrust laws automatically trebled.  1-ER-33; 1-ER-3; 9-ER-1766.

During trial, Biosense sought judgment as a matter of law

("JMOL") under Rule 50(a).  1-SER-120-40.  Renewing that motion

under Rule 50(b), Biosense advanced three arguments relevant here.

*First*, Biosense reprised its argument that clinical support is not a

separate product from catheters.  1-SER-35-38.  *Second*, it reprised its

argument that no rational jury could find single-brand aftermarkets.

1-SER-38-43.  *Third*, it claimed that Innovative had not adequately

proved market power. 1-SER-30-35. Neither motion challenged the sufficiency of the damages evidence.

The district court's JMOL denial rejected all three contentions.

*First*, the court found that the trial evidence reinforced this Court's prior holding that clinical support is a separate product— relying on much of the same evidence, including that "5% of hospitals provide their own clinical support services." 1-ER-13-14.

*Second*, the court upheld the jury's finding that single-brand aftermarkets existed, finding "ample evidence" on each *Epic* factor: hospitals were not generally aware of the Policy; information costs prevented accurate life-cycle pricing; monetary and non-monetary switching costs were significant; and mapping-machine competition did not discipline Biosense's aftermarket conduct. 1-ER-15-17.

*Third*, the court found ample evidence of Biosense's market power in both the clinical-support and catheter markets, including its 95% clinical-support market share, significant entry barriers (including Biosense's efforts to exclude independent providers), reprocessors' market-share collapse in the catheter markets, rising catheter prices despite declining costs, and decreased catheter quality. 1-ER-18-21.

31

## C.  The District Court Enjoins Biosense for Five Years

The district court enjoined all three of Biosense's anticompetitive tactics:  anti-reprocessing technology, catheter collections, and the Policy.  *See* 1-SER-2-18 (order); 1-ER-4-10 (final injunction). Considering the witnesses and exhibits he saw firsthand over eight trial days, the district judge concluded that Biosense committed a "grave antitrust violation under both sections of the Sherman Act" that "clearly warrants an injunction."  1-SER-9.

## SUMMARY OF ARGUMENT

**I.** Law of the case resolves Biosense's separate-products argument. The trial evidence was stronger than what this Court already deemed sufficient, confirming that hospitals obtain clinical support and catheters separately, that Biosense deliberately eliminated independent sources of both, and that separate demand for each persists. Indeed, as Biosense's own caselaw shows, the "very existence" of companies like Innovative, which supply catheters without clinical support or machines, shows that the jury could find separate demand and, thus, separate products.

Biosense's counterarguments—that clinical support is part of an integrated "system," that the existence of suppliers who provide both catheters and clinical support precludes a separate-products finding, and that independent clinical-support providers have not flourished— all fail. This Court rejected Biosense's "system" argument; bundling does not negate separate demand; and the jury had sufficient evidence to conclude that Biosense's efforts to eliminate independent clinical-support providers explain their absence. Insofar as Biosense argues that clinical support must be separate from the mapping machine

33

rather than from catheters, it forfeited that argument by failing to raise it in its Rule 50(b) motion, the argument is legally irrelevant, and there was ample contrary evidence regardless. And even if clinical support were not separate from the machine, the evidence sufficed to show that Biosense illegally tied catheters to that combined product.

Substantial evidence likewise supports the jury's finding of a single-brand aftermarket for CARTO clinical support. This Court already decided this issue, too, so law of the case applies. Regardless, the evidence of switching costs—the only factor Biosense challenges— was ample. Mapping machines cost a quarter-million dollars, physicians develop deep familiarity with the CARTO over years of practice, and hospital after hospital tried to switch but failed. Biosense misreads *Kodak* as reducing switching costs to a simplistic comparison of console cost against catheter savings. Instead, *Kodak* demands examination of actual market behavior, and substantial evidence showed that the monetary and non-monetary switching costs—like physician familiarity and retraining, and disruption to patient care— were insurmountable. Also, sufficient evidence showed that Biosense

34

had power in the machine market—obviating the need to satisfy this Court's four-factor *Kodak* distillation at all.

II.    Substantial evidence supports the jury's finding that Biosense had power in the CARTO clinical-support market.  By 2018, Biosense had acquired 95% market share by case volume, having eliminated independent providers by poaching trained staff, enforcing noncompete agreements, withholding training, and deploying software "updates" to block hospitals from running the CARTO themselves. Biosense then exploited that dominance through the Policy, withholding clinical support from any procedure using an independently reprocessed catheter.  Independent reprocessors' market share in the affected catheter markets plummeted from 16% to 1%, catheter prices rose while costs fell, quality and innovation declined, and hundreds of customers were forced to stop buying from Innovative.

Biosense's arguments that inter-brand competition and "free" clinical support disprove market power as a matter of law fail.  This Court already held that foremarket competition did not discipline Biosense's aftermarket conduct.  Further, Biosense admits that it deliberately (and profitably) restricted the output of clinical support—

35

textbook direct evidence of market power. Biosense's remaining arguments raise fact disputes that the jury was entitled to (and did) resolve against it.

**III.** Biosense forfeited its challenge to the jury's damages award by failing to raise it in either Rule 50 motion. That failure deprived Innovative of any opportunity to cure the alleged deficiency in its damages evidence—and means this Court cannot address Biosense's damages challenge.

Regardless, Biosense's challenge lacks merit. The jury needed only make a "just and reasonable" estimate of Innovative's damages, and it reasonably awarded Innovative the difference between its actual profits and the "but-for world" profits it would have earned absent the Policy—the standard measure of damages for exclusionary conduct. Notably, Biosense's own expert, Dr. Lawrence Wu, agreed that the appropriate but-for world is one without the Policy; the jury was entitled to credit that concession.

Biosense's contrary arguments confuse market power with damages. As this Court held, liability can be established where a "high" percentage of customers are locked in by *economic* rather than

36

contractual forces. Once that is shown, as it was here, no precedent requires a customer-by-customer showing to estimate damages. Anyway, the trial record does not support the premise that any hospitals knowingly and voluntarily agreed to the Policy. The Policy does not appear in the CARTO sales contract, which disclaims any extracontractual obligations. Biosense concealed the Policy until hospitals had committed to the CARTO ecosystem, invoked it selectively, and repeatedly changed it without warning. Biosense's own examples confirm that post-Policy CARTO purchases reflected captivity and coercion, not consent—so the jury reasonably concluded.

**IV.** The jury's Section 2 monopolization verdicts are unchallenged and support the damages award independent of the Section 1 verdict. Biosense's evidentiary challenges to *tying* market definition and market power do not undermine the Section 2 verdicts because Section 2 does not require proof of a tying market or power, only of monopoly power and anticompetitive conduct in the *catheter* markets—which Biosense does not challenge on appeal. And overwhelming evidence showed that Biosense crippled catheter competition through its multi-pronged campaign against independent reprocessing companies.

37

## STANDARD OF REVIEW

"A jury's verdict must be upheld if it is supported by substantial evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). JMOL is proper "only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Reese v. County of Sacramento*, 888 F.3d 1030, 1036 (9th Cir. 2018) (cleaned up).

A jury's damages award is likewise reviewed for substantial evidence, but in antitrust cases "that standard is relaxed once liability is shown because market uncertainties often preclude a precise showing of 'where' the plaintiff would have been absent the proven antitrust violation." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997). Where the jury has found the defendant liable, the Court "must uphold the jury's finding as to the amount of damages unless that finding is grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculative guesswork." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 485 (9th

38

Cir. 2021) (cleaned up). The jury may "rely on probable and inferential proof" and "approximate" damages. *Kodak*, 125 F.3d at 1221.

A "party must raise a sufficiency-of-the-evidence claim in a post-trial motion to preserve it for review on appeal." *Dupree v. Younger*, 598 U.S. 729, 734 (2023). If it does not, the appeals court is "powerless" to excuse that forfeiture. *Ortiz v. Jordan*, 562 U.S. 180, 189 (2011).

## ARGUMENT

## I. THERE WAS SUBSTANTIAL EVIDENCE OF A VALID TYING MARKET—AS THIS COURT ALREADY HELD

### A. Substantial Trial Evidence Showed That CARTO Clinical Support Is a Separate Product

To decide whether a tie involves two separate products—here, CARTO clinical support and catheters—this Court applies the "'consumer-demand test,'" which requires "'(1) that it is possible to separate the products, and (2) that it is efficient to do so, as inferred from circumstantial evidence.'" *Innovative*, 2024 WL 62948, at *1 (quoting *Epic*, 67 F.4th at 995); *see* 1-SER-77-78, 1-SER-109-10. This test "does not require a full-blown economic analysis"; "[e]vidence that the two products 'have been sold separately in the past and still are sold

39

separately' will satisfy this inquiry." *Innovative*, 2024 WL 62948, at *1 (quoting *Kodak*, 504 U.S. at 462).

As Biosense admits (at 38), this Court already held that Innovative's summary-judgment evidence satisfied that test—and the trial record was even stronger. Innovative, Stryker, and SterilMed all offer catheters but not clinical support or machines; Biosense and other manufacturers willingly sell their catheters without either. Those facts alone show hospitals' demand for catheters separate from those other products—and that the jury could find it's "efficient to offer [the tied product] separately from the [tying product]." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984). That fact also explains why Biosense deployed the Policy—to block customers' separate catheter demand, which every other manufacturer must accommodate, to avoid having to compete with Innovative's superior catheters.

### 1. This Court already rejected Biosense's claim that clinical support is not separate from catheters

The "law of the case doctrine applies to issues decided explicitly or by necessary implication in the previous disposition." *Nordstrom v. Ryan*, 856 F.3d 1265, 1270 (9th Cir. 2017) (cleaned up). "[W]hen the court of appeals, on a prior appeal in the same case, has held that the

40

evidence in the record is legally sufficient to prevent summary judgment in favor of a given party, that party is foreclosed from arguing that virtually the same evidence, presented at trial, is not legally sufficient to avoid judgment as a matter of law." *Kerman v. City of New York*, 374 F.3d 93, 118 (2d Cir. 2004); *accord Ermold v. Davis*, 130 F.4th 553, 558-60 (6th Cir.), *cert. denied*, 146 S. Ct. 398 (2025).

Rather than show the trial evidence is substantially different, Biosense disputes the same evidence this Court already held created a jury question. For example, Biosense stresses (at 40) that cardiac-mapping machine makers provide clinical support "free of charge" and argues (at 47) that 5% self-support by hospitals cannot show separateness. But this Court rejected both points, holding that "Innovative has produced sufficient evidence for a rational trier of fact to conclude that clinical support services and catheters"—the tying and tied products—"are distinct products" that "have been sold separately in the past and . . . still are sold separately." *Innovative*, 2024 WL 62948, at *2-4. Law-of-the-case principles preclude relitigating those issues.

41

### 2. The trial record contains even more evidence

Even if evaluated afresh, the trial record amply shows that clinical support and catheters are separate. It confirmed each fact this Court previously found sufficient: Roughly 5% of CARTO hospitals currently provide their own clinical support while buying their catheters separately. 6-ER-1025. Many more did so before Biosense pushed out competition. 6-ER-947. Before the Policy, hospitals bought about one in four catheters from independent reprocessors while still obtaining clinical support from Biosense. *See* 6-ER-1033-35 (up to 23% of Soundstars purchased independently pre-Policy). And no other machine maker ties clinical support to use of its catheters. 6-ER-838; 6-ER-1025; *see Innovative*, 2024 WL 62948, at *2 (deeming this evidence sufficient).

The trial record contained much more. It is undisputed that Innovative, Stryker, and SterilMed all offer catheters but not clinical support or machines, and non-Biosense machine manufacturers offer clinical support without requiring purchase of their catheters. 9-ER-1567-68; 6-ER-838. Numerous hospitals wanted to buy catheters separately from Biosense's clinical support but were blocked by the

Policy. *Supra* pp.18-19. And when CARTO launched in 2009, Biosense supplied catheters but not clinical support in *half* of cases. 6-ER-947. Only after Biosense's years-long campaign to exterminate independent CARTO clinical support, *supra* pp.22-23, did independent suppliers' share fall to 5%. Even today, strong demand for independent clinical support persists. *See, e.g.*, 9-ER-1577 (summarizing hospitals' continued demand); 10-ER-1834 (Stanford); 5-ER-745 (Providence); 9-ER-1578-79 (hospital tried training its own mappers to use reprocessed catheters but was thwarted by Biosense). These market realities reflect consumers' demand to "mix and match" sources of clinical support and catheters.

As Biosense's expert conceded on cross-examination, clinical support and catheters are nothing like his example of "a pair of shoes," where no one buys or sells each shoe separately. 9-ER-1566-68; *see* 9-ER-1576-77 (Forister rebuttal). Rather, Biosense—unlike any other manufacturer—conditioned clinical support on buying its catheters to *suppress* independent catheter demand that threatened its profits. The district court agreed: "Innovative marshaled sufficient evidence to meet the consumer-demand test." 1-ER-14; *see* 6-ER-946-48 (Forister).

43

### 3. Biosense's counterarguments are meritless

**a.** Conceding that this Court already held that clinical support and catheters are separate products, Biosense claims (at 37-38) its argument here is different: that clinical support is part of an integrated "mapping system" comprising the machine, catheters, and clinical support. *See* Biosense Br. 12-14 (listing "Consoles," "Clinical support," and "Catheters" as the three components of this "system"); 9-ER-1723-25 (machines, catheters, and mappers are "a system . . . . 'The whole thing is one thing.'").

But that repackaging does Biosense no good, because this Court already held that a reasonable jury could conclude that the whole thing is ***not*** one thing—clinical support and catheters are separate products, not part of a single "system" product. *Innovative*, 2024 WL 62948, at *2. Also, even assuming competition in a broader "system" market, clinical support and catheters can still be valid *submarkets*. *See Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). If clinical support, catheters, and mapping machines were inseparable as a matter of law, this Court would not have remanded for trial on the separate-products question.

**b.** Insofar as Biosense argues that clinical support is not separate from the mapping *machine*, that argument would fail, too, for three additional reasons.

*First*, it is forfeited, because Biosense's Rule 50(b) motion argued only that clinical support and *catheters* are not separate. *Ortiz*, 562 U.S. at 189.

*Second*, it is legally irrelevant to the key question: whether catheters are a separate product market. *See Jefferson Parish*, 466 U.S. at 12-14. Whether the tying product is support alone or support plus the machine, this Court already concluded that a jury could find that there *is* separate demand for catheters, the tied product. Quibbling with the boundaries of the tying product market also cannot undermine the tying verdict given the substantial trial evidence that Biosense abused its power over clinical support "to control prices or exclude competition" in the catheter markets. *Epic*, 67 F.4th at 998; *see FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("elaborate market analysis" unnecessary given "actual detrimental effects").

*Third*, were it necessary to show that clinical support is itself separate from the machine, substantial evidence showed demand for

clinical support apart from the CARTO. Clinical support is not included contractually with a CARTO purchase, contrary to Biosense's suggestion. 6-ER-819; 10-ER-1794. Hospitals obtain it separately. That's why Biosense could threaten to withhold it from CARTO owners if they didn't use Biosense's catheters—and why hospitals often looked to obtain it elsewhere. Hospitals' attempts to obtain independent CARTO clinical support, and Biosense's efforts to suppress it, further confirm separateness.

c. The jury could readily reject Biosense's remaining separate-products arguments—which all ignore hospitals' distinct, independent demand for catheters.

*First,* Biosense argues (at 38-41, 44-46) that, because all mapping-system manufacturers offer clinical support without charge, clinical support must be part of an integrated "system offering" as a matter of law. That is wrong. The key question is whether there is demand for catheters independent of support, and the "commercial reality" here is that there is. Biosense's choice to tie two things that consumers want to obtain separately does not make them one product. *See Epic,* 67 F.4th at 996 (holding district court "erred as a matter of law" by concluding

46

two products were not separate because seller "integrated" them). And the fact no other manufacturer *forces* customers to buy its catheters to get clinical support supports separateness and refutes Biosense's insinuation (at 38) that its Policy was needed to "remain competitive."

Regardless, Biosense's own case, *SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*, shows that universal tying would not *compel* treating "two seemingly separate items . . . as components of a single product." 188 F.3d 11, 15 (1st Cir. 1999). Neither tying nor bundling by suppliers is dispositive; what is dispositive is evidence of separate *demand* for the two products, which exists here. *See Innovative*, 2024 WL 62948, at *1.

*Second*, citing *M.A.P. Oil Co. v. Texaco Inc.*, 691 F.2d 1303 (9th Cir. 1982), Biosense argues (at 41-42) that, because mappers perform "a sales and marketing function" and are a "free" service, "no rational jury could find two distinct products." This Court correctly rejected that argument. Unlike *M.A.P. Oil*, where no customers paid separately for gasoline distribution services or obtained them separately from gasoline, 691 F.2d at 1307, there clearly was demand to obtain catheters separate from clinical support: Hospitals demanded

47

independent reprocessed catheters while using Biosense's clinical support. *E.g.*, 6-ER-897-98. And as this Court already held, hospitals' choice to self-support CARTO procedures demonstrates separate demand for catheters and clinical support because it is, "in effect," "buying the products separately." *Innovative*, 2024 WL 62948, at *2; *see SMS*, 188 F.3d at 15 ("significant demand for separate components," plus some separate supply, means "no single product").

In "economic reality," *M.A.P. Oil*, 691 F.2d at 1307, Biosense mappers are not "free." Although providing a valuable service, they are salespeople who each produce more than $1.5 million in annual revenue for Biosense. 4-ER-321; 6-ER-1007-08; 7-ER-1208-09; 9-ER-1584. That is why Biosense offered clinical support separately from catheters before the Policy, offered clinical support separately *during* the Policy, and will continue to offer clinical support for "free"—just like other manufacturers—now that the Policy has been enjoined. 6-ER-988-90.

That fact also explains why many hospitals seek to pay for their own mappers, and find it efficient to do so, even though Biosense charges no fee for its own. *See Innovative*, 2024 WL 62948, at *2; 4-ER-487-88; 6-ER-835. As Biosense acknowledges (at 40-41), embedding

48

Biosense's salespeople in the operating room costs hospitals money. Once Biosense monopolized clinical support and blocked access to independent catheters with the Policy, hospitals could not avoid taking Biosense catheters to get Biosense clinical support. But what matters under the consumer-demand test is that they *wanted* to—and fervently. *See* 3-SER-447 ("While I'd like to just tell [Biosense] to (^&% off, we are dependent on them.").

Third, citing *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997), Biosense contends (at 43-44) that the absence of independent third-party clinical-support companies is dispositive. But that contention is backwards. In *PSI*, service was the *tied* product, and the Sixth Circuit held that the "very existence" of an independent servicer who did not make the tying product *supported* finding that service was a separate product. *Id.* at 816 (citing *Kodak*, 504 U.S. at 462). Here, Innovative's (and Stryker's) "very existence" shows that many hospitals "would welcome" being able to buy catheters separately from support. *Id.*; *see* 9-ER-1567-68.

Moreover, Biosense's "own actions," unique to the industry, "essentially limited the existence of a separate market" for CARTO

49

clinical support. *PSI*, 104 F.3d at 816; *see supra* pp.22-23; Biosense Br. 62-63 (conceding such evidence existed). Biosense's own emails said these "blocking tactic[s]" were "necessary to protect [its] business." 6-ER-967-68. Other manufacturers enabled independent clinical support; Biosense thwarted it. *Compare* 10-ER-1888-89 *with* 4-ER-386, 4-ER-336, 6-ER-964-68. Other manufacturers let customers use their clinical support without buying their catheters; Biosense alone tied the two. *See Innovative*, 2024 WL 62948, at *1; *Epic*, 67 F.4th at 996 (crediting evidence that competitors "delink[]" the products). And although Biosense highlights testimony that 95% of hospitals have mappers provided by *some* machine manufacturer, 4-ER-359, that testimony does not support Biosense's claim (at 63) that "*each*" manufacturer supports 95% of cases on its respective machines. Rather, as Biosense admitted internally, its clinical-support dominance is "unmatched by competitors." 10-ER-2036. The jury reasonably rejected Biosense's appeal (at 17, 47) to purported industry-wide trends.

Independent providers' absence shows Biosense's clinical-support market power—not that catheters aren't demanded separately from clinical support. "Bundling in . . . a noncompetitive market carries no

50

single-product implication," because it may "reflect tying that increases market power exploitation or derives profits anticompetitively." 17D Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1744g (updated May 2026) ("Areeda"). Exactly so here.

### B. The Jury's Finding of a Single-Brand CARTO Clinical-Support Aftermarket Rests on Evidence of Significant Switching Costs This Court Already Held Sufficient

To prove a single-brand aftermarket for CARTO clinical support, it sufficed for Innovative to show that "'(1) the challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase; (2) significant information costs prevent accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market.'" *Innovative*, 2024 WL 62948, at *2 (quoting *Epic*, 67 F.4th at 977). As the district court concluded, and this Court held before, Innovative had substantial evidence for every factor. 1-ER-15.

Biosense contests (at 48-58) only *Epic*'s third factor, arguing that Innovative lacked evidence of switching costs. But this Court already held there was sufficient evidence to meet Innovative's light burden of

51

proof. *See Epic*, 67 F.4th at 979 (switching-cost evidence "need not be extensive"; "among other things, a plaintiff can point to the 'heavy initial outlay' for the foremarket good and brand-specific purchases").

### 1. This Court found Innovative's evidence sufficient, and the trial evidence was even stronger

Law of the case forecloses Biosense's switching-cost argument. In the prior appeal, Biosense argued there was no evidence of switching costs. Biosense Br., 2022 WL 17476831, at *56-59. This Court disagreed: "A rational trier of fact . . . could conclude" that "hospitals would face significant potential switching costs, because cardiac mapping systems are expensive and because physicians develop familiarity with an existing system." *Innovative*, 2024 WL 62948, at *3.

The trial evidence reinforced those points. The quarter-million-dollar price tag per machine is "huge." 6-ER-836; 10-ER-1858. And numerous witnesses testified how physician familiarity with the CARTO impeded even the most sophisticated hospitals from switching to avoid the Policy. *See supra* p.20; *infra* pp.55-56.

### 2. Biosense's switching-cost arguments are meritless

**a.** As to monetary switching costs, Biosense argues (at 52) Innovative was required to prove a "cost disparity"—that the monetary

52

cost of switching away from Biosense exceeds the inflated prices Biosense charged for catheters.

*First*, Biosense did not preserve that argument. It never argued for a legal "cost disparity" requirement in the prior appeal, its requested jury instructions, or its Rule 50 motions. It never introduced any expert evidence on relative costs or argued this point in closing. It is too late to conjure up new arguments.

*Second*, *Kodak* imposed no "cost disparity" requirement. Cherry-picking one phrase out of the Supreme Court's opinion—while plumbing the depths of *Kodak*'s record—cannot change what *Kodak* held sufficient to support aftermarket liability: "significant" switching costs that, combined with other factors (like significant information costs), "could create a less responsive connection between service and parts prices and equipment sales." 504 U.S. at 473. *Kodak* never said high monetary costs alone must make switching irrational. Such a bright-line requirement would contradict *Kodak*'s rejection of rigid economic tests in favor of a holistic focus on "the actual market behavior revealed in the record." *Id.* at 466-67, 473. It would also flout *Epic*'s admonition that a plaintiff's showing of switching costs "need not be extensive" and

53

can be made simply with evidence of "the 'heavy initial outlay' of the foremarket good and brand-specific purchases." 67 F.4th at 979-80.[4]

*Third*, the trial record supported the conclusion that monetary switching costs were significant relative to potential savings. The machines are a "heavy initial outlay" for hospitals. *Epic*, 67 F.4th at 979-80. And even if hospitals own other machines, they aren't sitting idle; hospitals would still need to buy more machines—often *many* more—to meet the increased usage from switching. 5-ER-725; 6-ER-802. Contrary to Biosense's argument (at 53), the ability to finance those costs does not reduce their economic significance, any more than a mortgage reduces the price of a house.

There was also evidence that hospitals would incur additional monetary costs to retrain doctors on and transition them to a new brand of machine and to buy all the aftermarket products needed for the new machines. 6-ER-836; 6-ER-776; 6-ER-1015-16; 4-ER-361; *see* 17C Areeda ¶ 1740c8 (switching costs include "brand-specific investments in

---

[4] *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024), applied the *Epic* standard; it did not adopt a "cost disparity" test. Nor does Areeda, which treats cost disparity as merely an "example" of "proof of substantial switching costs." 17C Areeda ¶ 1740c8.

training and accessories"). Meanwhile, because a new catheter is "the raw material" for reprocessing and because only some catheters can be reprocessed, hospitals' economic savings from switching are limited. 8-ER-1481; 4-ER-490. And if a physician needs an ultrasound map of the heart, she has no choice but CARTO—the only machine with that feature. 6-ER-789.

**b.** Under *Epic*, "monetary *or non-monetary* switching costs" suffice, and the evidence showed non-monetary switching costs were also "significant." *Epic*, 67 F.4th at 977 (emphasis added); *see* 6-ER-836; 10-ER-1858; 10-ER-1887-88. If hospitals switched systems, they risked doctors leaving for other hospitals. *See* 9-ER-1585-86. Many doctors were unable or unwilling to switch because they had spent years (or decades) mastering the CARTO and "may not have training" on other machines. 6-ER-1020; *see* 10-ER-1789; 6-ER-836 ("[Y]ou have the doctors saying I don't want to change. I'm used to this. . . . [T]he headwinds to change [are] just too strong."); 10-ER-1792-93 (Mayo Jacksonville). Switching also requires disrupting patient care during

the transition.  6-ER-836; 6-ER-790.[5]  Torrance Memorial literally tried to pay doctors to switch from the CARTO, and they refused.  4-ER-391. These non-monetary switching costs independently sustain the Section 1 verdict.  *See Innovative*, 2024 WL 62948, at *3.

Contrary to Biosense's argument (at 56), the jury was not required to attribute the lack of switching to customer "loyalty" or "preference." Many hospitals detested the Policy but could not switch from the CARTO.  That proves lock-in, not loyalty.  6-ER-1025.  Simply put:  "If it were easy to switch to another device, then there would be less usage of the CARTO after the Policy.  However, CARTO usage steadily increased after the Policy."  1-ER-17.  The jury had sufficient evidence to conclude that significant switching costs locked customers into the clinical-support aftermarket.

### 3. Switching-cost evidence was unnecessary given Biosense's foremarket power

Biosense's challenge to Innovative's switching-cost evidence is futile for another reason:  evidence of Biosense's foremarket power

---

[5] Although *some* doctors use multiple machine types, for "[t]he majority of physicians, it's very difficult" to switch, 6-ER-790, and many physicians "absolutely only will want to use a particular system because they just don't have the familiarity with another one."  6-ER-775-76.

56

would suffice even without proof of *Epic*'s aftermarket factors. "When a company has market power in the foremarket, consumers lack the ability to use their foremarket purchase decisions to discipline the company's conduct in an aftermarket—regardless of factors such as information costs and switching costs." FTC Br. at 15, *SIS v. Intuitive Surgical, Inc.*, No. 25-1372 (9th Cir. filed Aug. 6, 2025). Switching-cost evidence, though ample, thus was "not required to establish an aftermarket as a relevant market." *Id.* at 16.

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING OF MARKET POWER

### A. The Trial Record Is Replete with Direct and Indirect Evidence of Biosense's Market Power in CARTO Clinical Support

"Market power is the ability for a defendant to profitably raise prices by restricting output"—"'to force a purchaser to do something that he would not do in a competitive market.'" *Epic*, 67 F.4th at 983 (quoting *Jefferson Parish*, 466 U.S. at 13-14); *see* 1-SER-80-81. A plaintiff can prove market power "directly or indirectly." *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018) ("*Amex*"). Direct evidence includes "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality." *Id.*

57

(cleaned up; citation omitted); *see CoStar Grp., Inc. v. Commercial Real Est. Exch., Inc.*, 150 F.4th 1056, 1069 (9th Cir. 2025) (proof of any one suffices), *cert. denied*, No. 25-667 (U.S. Mar. 23, 2026); 1-SER-71; 1-SER-97. Indirect evidence includes "high market share" and "significant barriers to entry." *Epic*, 67 F.4th at 983.

As the district court concluded, "Innovative adduced ample evidence of market power" in the CARTO clinical-support market. 1-ER-18.

### 1. Direct evidence and competitive harm

Many hospitals wanted independent clinical-support providers unbeholden to Biosense, but Biosense excluded them by withholding training, siccing lawyers on former staff to prevent them from training others, and changing the CARTO's software to block hospitals from self-supporting. *See supra* pp.22-23. That is direct evidence of Biosense's ability to reduce clinical-support competition, output, and quality.

So is the Policy's efficacy. Ample evidence showed that Biosense used its dominant position in CARTO clinical support to force customers to buy its catheters. The Policy clearly harmed competition. It drove independent reprocessors' catheter market share from 16% to 1%.

58

6-ER-1033-35. It raised catheter prices, boosting Biosense's profit margins to between 76% and 87% even as costs declined. 6-ER-983-86; 6-ER-990. It reduced output: Biosense stopped offering reprocessed catheters to avoid "cannib[a]lizing" new-catheter sales. 3-SER-431; *see* 6-ER-888-94 (UH San Antonio). It reduced quality: Innovative's reprocessed catheters work better and fail less often. 6-ER-994-96; 3-SER-495-96. And it stifled innovation: Biosense held back new reprocessed products, 3-SER-437-40; 2-SER-146-49; 3-SER-497-98; and Innovative and Stryker did too "because they knew they would be excluded from the market," 6-ER-997-98; *see Epic*, 67 F.4th at 984-85 (affirming market-power finding based on use of "market power to foreclose would-be competitors" and extract "extraordinarily high operating margins" exceeding "75%" while "reducing innovation and [defendant's] own investment").

## 2. Indirect evidence

By 2018, Biosense controlled about 95% of all CARTO clinical support, 12-ER-2318; 6-ER-1031—more than enough for a *prima facie* case of market power. *See CoStar*, 150 F.4th at 1070. Contrary to Biosense's spin (at 62-65), Biosense achieved that market share not

59

because hospitals liked its "attractive pricing," but because it erected significant entry barriers to thwart independent clinical-support providers. *See supra* pp.22-23; 6-ER-1031. Those barriers had even more bite because CARTO support requires months (or even years) of specialized training. 4-ER-399; 7-ER-1133.

## B. Biosense's Factual Arguments Do Not Disprove Market Power as a Matter of Law

1.     Biosense contends (at 59-60) that "intense inter-brand competition" among mapping-machine makers precludes any finding of market power. But the jury reasonably concluded that inter-brand competition is not "intense" at all. It heard evidence of Biosense's sustained high (and growing) machine market share, which established a *prima facie* case of market power, *CoStar*, 150 F.4th at 1070, and evidence of enormous entry barriers, CARTO's unique ultrasound integration, and Biosense's ability to significantly raise CARTO prices without losing sales. *Supra* p.8; 6-ER-789; 6-ER-1030-31; *see Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502-03 (1969) (market power can stem from "product's desirability" or "uniqueness").

60

**Biosense CARTO 3 Usage Share**



**3-SER-494**

This Court already held that there was sufficient evidence that foremarket competition could *not* discipline Biosense's anticompetitive aftermarket conduct. *See Innovative*, 2024 WL 62948, at *3. This Court stressed that at least 23% of CARTOs "were sold before the tying policy officially went into effect"—making "a sizable portion" of "locked in" consumers. *Id.* On remand, after Biosense produced the full dataset, Dr. Forister calculated that this portion was 58%, more than 2.5 times larger. 6-ER-1017.

61

Dr. Forister's quantitative analyses also showed limited inter-brand switching while Biosense implemented the Policy, 6-ER-1014-22—which "undermin[es] [Biosense's] claim that supracompetitive prices in the [clinical-support] market" would "lead to ruinous losses in [mapping-machine] sales." *Kodak*, 504 U.S. at 476. Customers hated the Policy, *supra* pp.18-20, yet the "easy" switching Biosense claims (at 5) never materialized. Biosense "[r]epeating the mantra 'interbrand competition,'" 504 U.S. at 471 n.18, cannot overcome all the contrary evidence.

2.      Biosense next denies (at 61-62) it had power over price, output, or competition in clinical support. The jury was not required to credit that spin.

First, Biosense says it offered clinical support for free. But "free" goods that generate "profit in other ways" may constitute valid antitrust markets. *Epic*, 67 F.4th at 978-79; *accord United States v. Google LLC*, 747 F. Supp. 3d 1, 109 (D.D.C. 2024); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 773 (N.D. Cal. 2022). And here, Dr. Forister explained: "Biosense could charge for its mappers . . . if [it] wanted to," given the valuable service they provide. 6-ER-1007. But Biosense

62

opted not to, and would not have even absent the Policy, because "having its mappers in the hospital earns [Biosense] a lot of money." 6-ER-989-90; *see* 6-ER-1007; *supra* pp.13-14. Biosense leveraged its market power to extract supracompetitive *catheter* prices instead, 1-ER-37, getting the best of both worlds: a salesperson to upsell physicians, plus an enforcer to stamp out reprocessed catheters so it could charge more for *catheters*.

As to output, Biosense asserts (at 62) that it "significantly expanded the volume of CARTO 3 clinical support it provides." But clinical-support output would have been even *higher* had Biosense not thwarted independent providers or withheld support for cases using independently reprocessed catheters. *Supra* pp.12, 22-23.

Finally, Biosense claims (at 62-65) that its 95% clinical-support market share is benign—resulting from "efficiency" and its nominal price. But as the district court observed, "[e]fficiency is not the only viable explanation" for Biosense's market share. 1-ER-14. The jury reasonably concluded that the better explanation is exclusion. *Supra* pp.22-23.

63

**3.** As Biosense implicitly acknowledges (at 69), proof of market power is unnecessary where there is direct "evidence of the actual anticompetitive impact of the challenged practice." *PLS.com v. National Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022). Biosense's factual claim (at 66-69) that there was no evidence of supracompetitive prices for catheters again re-wages the battle of experts it lost at trial.

Dr. Forister testified that Biosense's conduct caused supracompetitive catheter prices through at least two mechanisms. 1-ER-19. *First*, by forcing hospitals to buy far more expensive new catheters, Biosense inflated *average* prices paid for CARTO catheters. 6-ER-990; 6-ER-983-85. *Second*, by excluding reprocessed catheters, Biosense also inflated prices for its *new* catheters. 6-ER-983-86.

Biosense is wrong to say that Dr. Forister's analysis of average prices makes an "apples-to-oranges" comparison of new and reprocessed catheter prices. Average catheter prices do not *compare* the prices of new and reprocessed catheters, much less treat them as the same. They are instead a reasonable proxy for the overall marketwide price of catheters, which undisputedly includes both new and reprocessed catheters. *See CoStar*, 150 F.4th at 1069 (alleging increased average

64

prices sufficed to plead supracompetitive prices). And besides consulting average price, which inherently accounts for cost differences, Dr. Forister addressed costs by showing that Biosense raised its own prices even as its costs fell—the opposite of what would happen with competition. 6-ER-984. As Biosense's own case shows, its contrary "argument merely goes to the weight of [Dr. Forister's] testimony," which was for the jury to decide. *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2024 WL 4023561, at \*20 (N.D. Cal. Aug. 26, 2024).

Nor was the jury required to credit Biosense's expert's comparison of Biosense catheter prices with prices of certain other manufacturers' catheters that he cursorily deemed the "most comparable." 9-ER-1535. Assessing Biosense's expert's credibility was within the jury's exclusive province, *see Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987); the jury was not required to give that testimony any weight, especially given the significant bias and other doubts that emerged on cross-examination. 9-ER-1561-72.

Biosense also claims (at 67) that SterilMed offers "lower" or "comparable" prices relative to independent reprocessors. In fact, evidence shows Innovative's average prices were lower than SterilMed's

65

in all but one year (when they were identical). 11-ER-2083. And even if SterilMed offered lower prices, substantial evidence showed Biosense restricting SterilMed's output so it could sell "new catheter[s] at double the price" instead. 4-ER-471; *see supra* pp.25-26. The jury was entitled to credit the full picture, including the other independently sufficient evidence of catheter-market harm—like Biosense's 99% catheter market share, and the evidence of reduced quality, innovation, and output. *Supra* pp.25-26; 3-SER-499; *CoStar*, 150 F.4th at 1069.

## III. BIOSENSE'S SUFFICIENCY CHALLENGE TO THE DAMAGES EVIDENCE IS FORFEITED AND MERITLESS

Biosense's challenge to the damages award was forfeited below, rests on a legal error, and ignores evidence that would sustain the award even under Biosense's mistaken legal test.

### A. Biosense Forfeited Its Sufficiency Challenge to Innovative's Damages Evidence

Because Biosense's Rule 50 motions did not challenge the legal sufficiency of Innovative's damages evidence, 1-SER-120-40; 1-SER-20-51, that challenge is forfeited, and this Court cannot reach it. *See Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089-90 (9th Cir. 2007);

*Yammine v. Toolbox for HR Spolka Z Ograniczona Odpowiedzialnoscia Spolka Komandytowa*, 2025 WL 957825, at *1 (9th Cir. Mar. 31, 2025).

Although Biosense notes (at 76-77) it challenged the admissibility of Dr. Forister's damages opinions before trial, that does not suffice to preserve its argument on appeal, which seeks not to overturn the admission of Dr. Forister's testimony (under an abuse-of-discretion standard), but instead asks for *de novo* review of the sufficiency of Innovative's damages "evidence at trial." *See*, *e.g.*, Biosense Br. 33 (appealing JMOL motion's denial). These are distinct challenges requiring distinct preservation: "a post-verdict motion under Rule 50(b) is an absolute prerequisite to any appeal based on insufficiency of the evidence." *Nitco*, 491 F.3d at 1089; *see Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426, 1430 (9th Cir. 1986) (JMOL motion preserves only "distinct" grounds it asserts).

Biosense's strategic choice to focus its JMOL arguments elsewhere denied Innovative the "opportunity to cure" the claimed "deficiency" in its proof, *McSherry v. City of Long Beach*, 423 F.3d 1015, 1020 (9th Cir. 2005). Indeed, Dr. Forister prepared an alternative damages calculation that excluded damages for catheter sales associated with

CARTOs bought post-April 2016.  1-SER-143-44.  Had Biosense raised this issue under Rule 50(a), Innovative could have presented that alternative calculation and more evidence showing hospitals did not knowingly and voluntarily accept the Policy.  This Court is "powerless" to reward Biosense's appellate ambush.  *Dupree*, 598 U.S. at 735.

## B.  Dr. Forister's Damages Estimates Were Supported by Substantial Evidence

Courts have long held that the proper measure of damages for exclusionary conduct is "the difference between what the plaintiff could have made in a hypothetical free economic market and what the plaintiff actually made in spite of the anticompetitive activities." *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985); *see Kodak*, 125 F.3d at 1221 (affirming in part damages based on "a 'yardstick' methodology . . . comparing [plaintiffs'] business to a comparable business not affected by the anticompetitive conduct"). Treatises likewise advise "comparing the competitor-plaintiff's actual profits versus the profits the plaintiff would have earned in a world free of the market restraint—as was the case in *Eastman Kodak*, *Story Parchment*, and *Bigelow*"—to calculate damages "for competitors prevented from fully competing in the marketplace by anticompetitive

conduct." Am. Bar Ass'n, *Proving Antitrust Damages* § II.4.B, at 91 (3d ed. 2017); *accord* 3G Areeda ¶ 397a.

That comparison is exactly what Innovative's damages model did—and what Biosense's own expert, Dr. Wu, agreed it *should* do. As Dr. Wu testified on direct examination, "[t]he but-for world is a world where there is no clinical support policy." 9-ER-1546. The damages question is straightforward: in a world without the Policy, what would Innovative's profits have been?

Innovative's model answered that question. 6-ER-998-99. Dr. Forister testified that Biosense's conduct caused Innovative at least $147 million in lost profits over about 10 years, from 2016 through trial. To isolate the Policy's effect, Dr. Forister compared Innovative's sales of similar, unaffected catheters to its sales of catheters subject to the Policy, using the difference to estimate lost profits. *Supra* pp.27-28; *see Dolphin Tours*, 773 F.2d at 1511 ("projecting the market share which the plaintiff would have attained absent the anticompetitive activity, and then projecting plaintiff's profits accordingly," properly measures exclusionary-conduct damages).

69

Once the jury found Biosense liable, it needed only "make a just and reasonable estimate of the damage based on relevant data." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *accord Optronic*, 20 F.4th at 485; *see* 1-SER-108. The jury did so. It awarded Innovative the difference between the profits it would have earned absent the Policy and the profits it actually earned—crediting Dr. Forister's calculations. "[T]he question as to the amount of the plaintiff's damages having been properly submitted to the jury, its determination as to this matter is conclusive. The judgment [should be] accordingly [a]ffirmed." *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927).

## C. Biosense Erroneously Confuses Market Power and Definition with Damages

Relying on *Newcal*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), and *Avaya Inc. v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016), Biosense argues (at 69-73) that Dr. Forister had to subtract from Innovative's lost profits catheters sold to customers who bought an additional CARTO after April 2016—on the ground that those hospitals supposedly knew of and voluntarily accepted the Policy.

70

As the district court correctly explained, Biosense's argument erroneously "collapses the market power and damages analysis."  1-ER-39.  "The point of an *Eastman Kodak* lock-in analysis is to assess *market power*"; it should not "be confused with the amount of damages." *Id.* (cleaned up).  Both this Court's prior decision and Biosense's cited cases address market definition and power.  *See Newcal*, 513 F.3d at 1048; *Queen City Pizza*, 124 F.3d at 438; *Avaya*, 838 F.3d at 405.  None holds that a plaintiff must conduct a customer-by-customer damages analysis to determine whether each buyer "knowingly and voluntarily" accepted an alleged restraint.  In *Avaya*, for example, the Third Circuit held there could be no aftermarket, market power, or liability once the defendant incorporated the aftermarket restriction into the sales contract for all customers marketwide.  But it never adopted Biosense's proposed rule that, even when the plaintiff has proved a distinct aftermarket meeting the *Epic* factors, it must perform a customer-specific lock-in analysis to estimate damages.

Biosense's unprecedented rule rests on a conceptual error.  Market definition and power turn on the nature of competition *market-wide*; they do not vary by customer.  "A firm has market power when, 'by

71

restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices.'" *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (quoting *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)); *see, e.g.*, *PLS.com*, 32 F.4th at 834; *Amex*, 585 U.S. at 547 (reviewing market "as a whole"). In finding that Biosense exploited its market power through anticompetitive means, the jury reasonably concluded that it harmed "all Biosense customers who 'bore the higher aftermarket prices'" instead of buying better, less-expensive catheters from Innovative. 1-ER-39.

Biosense misinterprets this Court's comment that "[s]ophisticated customers . . . assuredly were aware of the policy and yet chose to purchase the CARTO 3 anyway" as requiring a customer-by-customer damages analysis. *Innovative*, 2024 WL 62948, at *2. That comment concerned whether enough customers were locked in to establish Biosense's "market power." *Id.* Once Innovative crossed that market-power threshold, the jury could find that the Policy was unlawful and harmed every hospital by reducing competition and increasing prices market-wide. *See id.*

72

Likewise, the principle that an award should "disaggregate damages" resulting from "lawful conduct" does not aid Biosense. The jury did not find the Policy lawful as to *any* of Biosense's customers (nor was it required to); it unanimously found against Biosense on every count. So this is nothing like *City of Vernon v. Southern California Edison Co.*, 955 F.2d 1361, 1373 (9th Cir. 1992), where damages were sought on *dismissed claims*. *See Kodak*, 125 F.3d at 1223-24 (same). "[D]isaggregation is not necessary if all of the defendant's conduct is unlawful." 3G Areeda ¶ 392g.

In essence, Biosense contends that its Policy was lawful as to any hospital that bought additional CARTOs while knowing of the Policy. But the Supreme Court long ago held that customer acquiescence does not create antitrust immunity. *Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134 (1968), held that even "enthusiastic[]" "additional" dealings with an antitrust violator with "full knowledge" of the challenged contract restrictions could not justify "denying recovery" to plaintiffs, where the record showed that the restrictions were "thrust upon them," "quite clearly detrimental to their interests," and thus "not voluntary in any meaningful sense." *Id.* at 139-41; *see Columbia Steel*

73

*Casting Co. v. Portland GE*, 111 F.3d 1427, 1446 (9th Cir. 1996) (rejecting argument that "captive customer" suffered "no damages" because contract required it to buy from defendant). So here: The Policy was a non-contractual term thrust upon hospitals at Biosense's discretion and was "detrimental to their interests," as every hospital witness confirmed. *See, e.g.*, 6-ER-795; 5-ER-737; 10-ER-1889; 10-ER-1786; 10-ER-1824-25. And if hospitals could recover even if, despite the Policy, they later bought CARTOs, Innovative was not required to exclude those hospitals from its lost profits.

> **D.** **The Record Belies Biosense's Factual Premise That Some Hospitals Knowingly and Voluntarily Agreed to the Policy**

Even if Biosense's unprecedented and unpreserved damages rule governed, substantial evidence permitted the jury to reject the factual predicates Biosense's cases require.

*First*, as Biosense acknowledges (at 70-71), those cases apply only where "consumers within *a competitive* market . . . nonetheless chose the defendant's brand over rival alternatives." (Emphasis added.) But the jury heard substantial evidence (*see supra* pp.8, 60-61) that the mapping-machine foremarket is *not* "indisputably competitive" and did

74

not "suffice to discipline" Biosense's aftermarket abuse. *Newcal*, 513 F.3d at 1049-50. Biosense had market power in CARTO clinical support on top of market power in the mapping-machine foremarket, 6-ER-1028-35 (Forister), and the jury found that Biosense abused its power to coerce hospitals to use its catheters instead of catheters from independent reprocessors. 1-SER-79; 1-SER-109-10.

*Second*, the evidence also showed that hospitals did not freely accept the Policy by purchasing additional CARTOs. Not one hospital witness testified that their hospital system sought or embraced the Policy. The Policy appeared nowhere in the sales contract or any other "explicit contractual provision." *Newcal*, 513 F.3d at 1046; *see* 6-ER-1018-19; 10-ER-1794. Biosense did not even disclose the Policy at the point of sale, 6-ER-1018—it was an undated, unsigned form letter that Biosense held up its sleeve until hospitals later showed interest in reprocessing alternatives, *supra* pp.18-19; 9-ER-1695.[6] That is why, "[e]ven after Biosense introduced the Policy in 2016, numerous

---

[6] The cases *Newcal* analyzed involved explicit contractual provisions. Regardless, *Newcal*'s dictum that something short of a contract might suffice does not help Biosense, because hospitals did not buy the CARTO "knowing that they were agreeing to" the Policy. 513 F.3d at 1048-49.

hospitals that purchased hundreds of CARTO[s] were unaware of the tying arrangement." 1-ER-15; *see* 6-ER-1017-19; 6-ER-782-83, 6-ER-891-94; 3-SER-465. Biosense also enforced the Policy selectively and unilaterally made exceptions and changes that prevented hospitals from knowing what it entailed. *E.g.*, 5-ER-733-34 (limited enforcement in Alaska); *supra* pp.14-15. In short, the Policy was not "fully transparent in the primary market," as Biosense's cases require. *Avaya*, 838 F.3d at 409.

The evidence "rebut[s]" the conclusion that Biosense "consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market" to buy a CARTO. *Newcal*, 513 F.3d at 1050. Indeed, Biosense actively misled hospitals at the point of sale to conceal the CARTO's true costs. After learning of the Policy, Allegheny's Ms. Tranguch wrote: "[Biosense] has not been upfront with us from the beginning. [T]his is just another example of the shady business practices that are normal for them." 2-SER-163. And after testing the Policy at Ascension, Biosense promised not to enforce it to secure a new three-year contract—only to start enforcing it again "[a]lmost immediately" after Ascension signed. 6-ER-969-75.

76

Biosense's examples (at 74-75) confirm captivity, not consent. Biosense admits that Ascension and Allegheny "already owned CARTO 3 systems at the time they learned of the clinical support policy." And after Ascension learned of the Policy (when Biosense's mappers walked out of procedures), it tried to switch machines but couldn't, as Biosense itself boasted. *Supra* p.12. That Ascension later bought more CARTOs after trying and failing to switch brands proves its captivity, not that it freely agreed to the Policy. 1-ER-17; 6-ER-969-74.

Same with Allegheny. Ms. Tranguch testified that Allegheny preferred to maximize reprocessing through Innovative for "cost savings" but "had to reject" those savings "to keep [its] case coverage from Biosense." 10-ER-1889. Allegheny couldn't switch because its physicians "very rarely use" the other machines Allegheny owns—and buying brands doctors will not use would "not [be] financially responsible." 10-ER-1887-88, 10-ER-1891. The jury could view Allegheny's post-Policy CARTO purchases as evidence of lock-in, too.

That leaves HealthTrust, a GPO that Biosense assertedly notified "through conversations" and a letter. 8-ER-1349-50; 12-ER-2384. HealthTrust does not buy CARTOs. 6-ER-873. Its members review its

77

contracts and then decide whether to buy "under th[ose] Agreements," 11-ER-2157. But Biosense's 150-page HealthTrust contract does not incorporate the Policy, 11-ER-2151-2306, and in fact "expressly reject[s] and supersede[s]" any "terms and conditions contained in . . . other documents supplied by [Biosense]" beyond the contract itself, 11-ER-2182; *see* 11-ER-2118 (similar language in Ascension's contract). Even if HealthTrust's members had been told about the Policy, they would have had every reason to think the contract *excluded* it.

Biosense's conduct refutes its claim that hospitals chose freely. Biosense concealed the Policy until customers tried to reprocess, repeatedly and unilaterally expanded it, and faced no meaningful competitive constraint from mapping-machine rivals. Biosense's meager effort to argue otherwise at trial, 9-ER-1554-55, did not require the jury to find that even a single hospital made "an eyes-open choice" to embrace the Policy. Instead, overwhelming evidence showed they had no choice at all. 6-ER-795 (Doshi: Policy "decrease[d]" choice); 5-ER-737 (Roberts: same); *see* 10-ER-1889; 10-ER-1786; 10-ER-1824-25. Given Biosense's marketwide coercion, Dr. Forister was not required to

78

exclude any hospital from damages—even under Biosense's unprecedented damages rule.

## IV. THE JURY'S SECTION 2 MONOPOLIZATION VERDICTS INDEPENDENTLY SUPPORT AFFIRMANCE

Biosense does not independently challenge the jury's Section 2 monopolization and attempted-monopolization verdicts—and it cannot do so for the first time on reply. It merely asserts, in a law-free footnote (at 58 n.1), that its challenges to the Section 1 verdict also doom those verdicts. That passing argument is insufficient to appeal the Section 2 verdicts. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (argument forfeited where "no authorities" presented "to support" it). The argument is also wrong.

Section 1 and Section 2 have different elements. Section 1 requires separate tying and tied products—but Section 2 does not. Section 2 simply requires proof of "monopoly power" (or "a dangerous probability of achieving" it) and "anticompetitive conduct" in the catheter markets. *CoStar*, 150 F.4th at 1066-67. Biosense's failure to challenge the jury's findings that the catheter markets were valid, that

79

Biosense had power in them, or that Biosense's conduct harmed competition in those markets means those verdicts stand uncontested.[7]

Numerous cases show that conduct can violate Section 2 independently of Section 1. *E.g.*, *Kodak*, 125 F.3d at 1201, 1228 (affirming Section 2 verdict although Section 1 tying claim withdrawn); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-11 (1985) (affirming monopolization-only verdict); *see, e.g.*, *LePage's Inc. v. 3M*, 324 F.3d 141, 157 (3d Cir. 2003) (en banc) (affirming Section 2 verdict despite jury's finding for defendant on Section 1 exclusive-dealing claim; exclusive-dealing evidence supported Section 2 liability). Indeed, acts that are otherwise "in themselves legal" "lose that character when they become constituent elements of an unlawful scheme" to monopolize. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962).[8] "Section 2 focuses on anticompetitive

---

[7] The Soundstar—the only navigational ultrasound catheter available on *any* mapping-machine brand, 6-ER-789—is not even a single-brand product and thus need not satisfy the *Kodak* factors. *See Kodak*, 504 U.S. at 454 (aftermarket analysis premised on "lack of market power in the primary equipment market").

[8] *Accord City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992); *Fox West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp.*, 264 F.2d 602, 606 (9th Cir. 1958).

conduct, not on court-made subcategories of that conduct." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354-55 (4th Cir. 2024), *cert. denied*, No. 24-917 (U.S. Jan. 12, 2026).

Treating the Section 2 verdicts as having no independent existence from the tying verdict would be inappropriate because this case falls in Section 2's heartland. Excluding competition "on some basis other than efficiency" is quintessential anticompetitive conduct. *Aspen Skiing*, 472 U.S. at 605; *see* Richard A. Posner, *Antitrust Law* 194-95 (2d ed. 2001) (conduct is anticompetitive if "likely" to "exclude from the defendant's market an equally or more efficient competitor"). And that is exactly what the jury found Biosense did: its coordinated anticompetitive strategy—the Policy, the Falcon Project, and catheter hoarding—raised catheter prices, reduced quality, stifled innovation, and suppressed Innovative's catheter market share to near-zero even though Innovative offered better catheters at a lower price. 6-ER-948-50 (Biosense's conduct was not "competition on the merits") (Forister). Tie or no tie, the jury reasonably concluded that Biosense's conduct violated Section 2, and those verdicts should be affirmed.

81

Although the jury was instructed not to consider the Policy under Section 2 unless it also violated Section 1, that incorrect instruction cannot save Biosense on appeal. 1-SER-84; *see* Dkt.441 at 116-24 (for parties' arguments). When reviewing denial of JMOL, this Court applies "the law as it should be, rather than the law as it was read to the jury." *Fisher v. City of San Jose*, 558 F.3d 1069, 1074 (9th Cir. 2009) (en banc). And the instruction did not impact the verdicts: because the jury found tying liability, it correctly considered the Policy in finding that Biosense violated Section 2.

The Section 2 verdicts also independently support the damages award. Biosense's damages challenge (at 70) focuses only on the tying claim, and it has forfeited any challenge to the jury's findings of market power in the relevant catheter markets. Consequently, Biosense has conceded that its power to coerce customers in those markets derived from *economic* power, not "contractual exclusivity." *Newcal*, 513 F.3d at 1050. Moreover, the trial evidence amply supported the jury's conclusion that—long after April 2016—hospitals marketwide were locked into that economic relationship, and Biosense's exploitation of that lock-in to exclude independent reprocessors unlawfully harmed

82

catheter competition for all hospitals.  *See supra* Part III.  The damages award is thus legally sound under Section 2.

## CONCLUSION

The Court should affirm the judgment and jury verdicts.

Respectfully submitted,

/s/ *Derek T. Ho*

JEFFREY L. BERHOLD
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street
Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

DEREK T. HO
ANDREW E. GOLDSMITH
MATTHEW D. READE
RACHEL ANDERSON DELISLE
SEAN P. QUIRK
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dho@kellogghansen.com

*Counsel for Plaintiff-Appellee Innovative Health, LLC*

May 20, 2026

83

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form17instructions.pdf](http://www.ca9.uscourts.gov/forms/form17instructions.pdf)

**9th Cir. Case Number(s)** | 25-6042

The undersigned attorney or self-represented party states the following:

⦿ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Derek T. Ho     **Date** | May 20, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* [forms@ca9.uscourts.gov](mailto:forms@ca9.uscourts.gov)

**Form 17**      *New 12/01/2018*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-6042

I am the attorney or self-represented party.

**This brief contains** 13,987 **words,** including 59 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Derek T. Ho   **Date** May 20, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 20, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Derek T. Ho*
Derek T. Ho
*Counsel for Plaintiff-Appellee*
*Innovative Health, LLC*