**No. 25-6042**

# United States Court of Appeals
# for the Ninth Circuit

_____

**INNOVATIVE HEALTH, LLC**,

*Plaintiff-Appellee*,

v.

**BIOSENSE WEBSTER, INC.**,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the Central
District of California, No. 8:19-cv-01984-JVS, Hon. James V. Selna

---

**BRIEF OF OPEN MARKETS INSTITUTE AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLEE**

---

SANDEEP VAHEESAN
TARA PINCOCK
OPEN MARKETS INSTITUTE
655 15th Street NW, Suite 310
Washington, D.C. 20005

MAY 27, 2026

## CORPORATE DISCLOSURE STATEMENT

As required by Federal Rule of Appellate Procedure 26.1, I certify that amicus curiae Open Markets Institute is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**.......................................................... i

**INTEREST OF THE *AMICUS CURIAE***...............................................................1

**INTRODUCTION**........................................................................................................1

**ARGUMENT** .................................................................................................................5

    **I.   Courts routinely recognize single-brand aftermarkets.**...........................5

    **II.  Competitors are not able to discipline Biosense's aftermarket manipulations because of its market power in the foremarket.**.....................10

    **III.   Foreclosure from a market is a classic antitrust injury.**.......................12

**CONCLUSION**...........................................................................................................16

**TABLE OF AUTHORITIES**

**Cases**

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)............................4, 13

*Brown Shoe Co. v. U.S.*, 370 U.S. 294 (1962) ........................................................6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ......................13

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988)................................10

*Cargill v. Monfort*, 479 U.S. 104 (1986)........................................................ 12, 13

*Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th Cir. 1995) ......................6

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992)............ passim

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F. 4th 1262 (9th Cir. 2022) ...........................................................................................14

*Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946 (2023) ........................................ 3, 7, 9

*Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ............. 13, 14

*Fortner Enters., Inc. v. U.S. Steel Corp.* (*Fortner I*), 394 U.S. 495 (1969)...............6

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ..........................6, 12

*In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324 (E.D.N.Y. 2019) ..............................................................................................7

*In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008).....8

*In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862 (N.D. Ill. 2023) ..............................................................................................................8

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392 (E.D.N.Y. 2008) ...............................................................................7

*Int'l Salt Co. v. United States*, 332 U.S. 392 (1947)................................................12

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)....................................6

*Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024)...................................8

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)......13

*N. Pac. R. Co. v. United States,* 356 U.S. 1 (1958)...................................................5

*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038 (9th Cir. 2008)....................8, 9

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973)...................................16

*Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145 (9th Cir. 2003) .............13

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)...........................12

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953)..............................5

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468 (3d Cir. 1992) .............................................................................................................9

*United Shoe Mach. Corp. v. United States*, 258 U.S. 451 (1922)............................11

*United States v. Griffith*, 334 U.S. 100 (1948)........................................................11

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)...........................4, 13

**Other Authorities**

Cassandra Thiel et al., *The Case for Hospitals to Boost Single-Use Device Reprocessing Programs*, NAM Persp. 1 (June 16. 2025)....................................15

F.M. Scherer & David Ross, Industrial Market Structure and Economic Performance (3d ed. 1990).................................................................................7

Fed. Trade Comm'n, Nixing the Fix: An FTC Report to Congress on Repair Restrictions (May 2021) ...............................................................................8, 15

*How Has U.S. Spending on Healthcare Changed Over Time?*, Peterson-KFF Health Sys. Tracker (Jan. 22, 2026) ....................................................................1

Kira Liu*, Opening the Door to Right-to-Repair: Deere Co. and Its Implications,* Univ. Chi. Bus. L. Rev. Online (2024) ..............................................................15

Munira Z. Gunja et al., *U.S. Health Care from a Global Perspective, 2022: Accelerating Spending, Worsening Outcomes*, Commonwealth Fund (Jan. 31, 2023) ................................................................................................................2

Pierre Azoulay et al., *Public R&D Investments and Private-Sector Patenting: Evidence from NIH Funding Rules*, 86 Rev. Econ. Stud. 117 (2019) .................15

Salpy Kanimian & Vivian Ho, *US Medical Prices and Health Insurance Premiums, 1999-2024*, 8 JAMA Network Open e2547462 (Dec. 8, 2025)...........2

**INTEREST OF THE *AMICUS CURIAE*[1]**

The Open Markets Institute (OMI) is a non-profit organization dedicated to protecting democracy and individual liberties from concentrated economic power and control. OMI does so by promoting fair competition throughout our political economy, a broadly shared prosperity, and innovation that serves the public interest. OMI regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public. It does not accept any funding or donations from for-profit corporations.

**INTRODUCTION**

Since 2000, national healthcare spending has skyrocketed from $1.32 trillion to $5.28 trillion—a nearly four-fold increase. Shameek Rakshit et al., *How Has U.S. Spending on Healthcare Changed Over Time?*, Peterson-KFF Health Sys. Tracker (Jan. 22, 2026).[2] Consequently, for the average worker, "contributions towards family [health insurance] premiums increased by 308%" or three times their earnings growth over the same period. Salpy Kanimian & Vivian Ho, *US Medical Prices and Health Insurance Premiums, 1999-2024*, 8 JAMA Network

---

[1] All parties consent to the filing of this *amicus* brief. No counsel for any party authored this brief in whole or in part. Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission.
[2] Available at: https://www.healthsystemtracker.org/chart-collection/u-s-spending-healthcare-changed-time/.

Open e2547462, at 1–2 (Dec. 8, 2025).[3] Yet Americans' health outcomes, whether as measured in life expectancy or incidence of assorted morbidities, compare unfavorably to citizens of other developed nations. Munira Z. Gunja et al., *U.S. Health Care from a Global Perspective, 2022: Accelerating Spending, Worsening Outcomes*, Commonwealth Fund (Jan. 31, 2023).[4]

Promoting healthy competition across the health care industry is a critical component to combating the public problems of spiraling costs and poor outcomes. But mergers and exclusionary practices in many health care markets are an important contributor to the sector's failure to promote the public's health and well-being at a reasonable cost.

This case involves a health care equipment manufacturer using its market power to raise medical costs through exclusionary conduct. In May 2025, a federal jury returned a verdict against Biosense Webster, Inc. ("Biosense") for, among other violations, unlawful tying under Section 1 of the Sherman Act. Biosense manufactures CARTO, a cardiac-mapping machine, and provides hospitals with free clinical support to operate CARTO. Biosense illegally tied the free clinical support services to the purchase of catheters used with its heart-mapping machines.

---

[3] Available at: https://doi.org/10.1001/jamanetworkopen.2025.47462.
[4] Available at: https://www.commonwealthfund.org/publications/issue-briefs/2023/jan/us-health-care-global-perspective-2022.

Biosense is the only manufacturer of catheters for CARTO. Catheters produced by other manufacturers cannot be used as substitutes. In 2016, Innovative Health, LLC ("Innovative") obtained FDA approval to reprocess (*i.e.*, refurbish) used CARTO catheters. It sells these reprocessed catheters to hospitals for about 50% less than the cost of new catheters. Biosense competes with Innovative and other independent reprocessors in the market for CARTO catheters. At trial, Innovative proved that Biosense acted illegally to shut down this competition, by using a tying scheme, hoarding used catheters, and implementing technical restrictions against reprocessing in order to foreclose Innovative and other independent reprocessors from the market. Its conduct resulted in the combined market share of independent firms dropping from as high as 23% to 1%.

The jury verdict in favor of Innovative rests on well-established precedent. Innovative's legal theory is entirely faithful to Supreme Court and Ninth Circuit case law on aftermarkets, restraints of trade, and antitrust injury. Biosense's arguments, in contrast, are contrary to both binding law and good policy.

1. Despite Biosense's assertions, the antitrust laws do not disfavor single-brand aftermarkets. A single-brand aftermarket may be found when "demand for a good is entirely dependent on the prior purchase of a durable good in a foremarket." *Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946, 976 (2023). Over the years, courts have frequently held that the relevant market may include only

products from a single brand when that brand's aftermarket equipment or services cannot be interchanged with equipment or services from a different brand. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992). Because the catheters used with CARTO are unique and cannot be used with other cardiac-mapping systems, a single-brand aftermarket is appropriate in this case.

2. Further, unlike companies in unconcentrated markets, firms with high market share face little to no discipline from rivals. A manufacturer like Biosense, with a large market share in the foremarket for equipment, can wield its power to gain control of aftermarkets for accessories, parts, and service. There is limited rivalry in the upfront goods market to prevent the company from unfairly marginalizing or excluding independent providers of parts and services to capture these lucrative aftermarkets. When a manufacturer controls a monopolistic share of the relevant market, it will face no "deterrent effect of interbrand competition." *Id.* at 501 (Scalia, J., dissenting).

3. An antitrust injury may be found when a company prevents a rival from effectively participating in the relevant market. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 289 (3d Cir. 2012) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)). Biosense's exclusionary conduct, including tying free clinical support services to the purchase of new catheters and hoarding used catheters to prevent reprocessing, unfairly impeded Innovative's ability to compete

4

and substantially foreclosed it from the catheter market. Accordingly, Innovative suffered a cognizable antitrust injury. Additionally, Biosense's conduct harmed hospitals and patients as well because it excluded a lower-priced option that could have lowered health care costs and freed up capital for other uses. Reprocessing has been shown to lower prices and extends the lifespan of expensive medical devices.

## ARGUMENT

### I.      Courts routinely recognize single-brand aftermarkets.

The antitrust laws restrict the use of tying as a competitive practice. Under a tying arrangement, the selling party agrees to sell a product to their customer "only on the condition that the" customer "also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992) (quoting *N. Pac. R. Co. v. United States,* 356 U.S. 1, 5–6 (1958)). Firms are not allowed to "exploit [their] dominant position in one market to expand [their] empire[s] into the next." *Id.* at 479 n. 29 (quoting *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953)).

The proscription against illegal ties "is meant to guard" against the "use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the" tied product. *Fortner Enters., Inc. v. U.S.*

*Steel Corp.* (*Fortner I*), 394 U.S. 495, 512 (1969) (White, J., dissenting). The

Supreme Court recognized the harms of certain tying arrangements to consumers

and rivals and described the evils of the practice as follows:

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), abrogated on other

grounds by *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

Not all ties are categorically illegal, however. To qualify as a per se violation

of the Sherman Act, three elements must be present: (1) the tying arrangement

must have "a tie-in between two products or services sold in different markets," (2)

the seller has "market power in the tying product," and (3) the "arrangement affects

a not insubstantial volume of commerce." *Datagate, Inc. v. Hewlett-Packard Co.*,

60 F.3d 1421, 1423–24 (9th Cir. 1995). Market definition in these cases is not rigid

or formulaic but rather is flexible and allows courts to take "a pragmatic, factual

approach" when identifying the product and geographic bounds of competition.

*Brown Shoe Co. v. U.S.*, 370 U.S. 294, 336 (1962). Only where the seller has the

market power to "force a purchaser to do something that he would not do in a

competitive market" will an illegal tie be found. *Jefferson Par.*, 466 U.S. at 13–14.

6

The tying market may be limited to a single brand. For example, when a company sells durable goods such as medical equipment or photocopiers, they commonly also sell related products such as replacement parts and maintenance and repair services that are purchased over time. These parts and services are called "aftermarket products." A relevant single-brand aftermarket is found when "a product's characteristics make it unique or circumstances prevent consumers from substituting alternatives for the same purposes." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 344 (E.D.N.Y. 2019) (quoting *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 403 (E.D.N.Y. 2008)). A single-brand aftermarket is more likely to be found where "[a] firm can exact leverage [because] other equipment is not a ready substitute." *Kodak*, 504 U.S. at 476 n. 23 (quoting F.M. Scherer & David Ross, Industrial Market Structure and Economic Performance 16–17 (3d ed. 1990)).

Switching and information costs can create a captive customer base vulnerable to exploitation in aftermarkets. *Epic Games, Inc. v. Apple,* 67 F.4th 946, 977 (2023). As the Supreme Court noted, "If the cost of switching is high, consumers who already have purchased the equipment, and are thus 'locked in,' will tolerate some level of service-price increases before changing equipment brands." *Kodak*, 504 U.S. at 476. Further, obtaining and processing the information

7

to estimate life cycle costs at the time of purchase may be impossible for many customers. *Id.* at 473–75.

The courts have repeatedly accepted single-brand aftermarkets over the years. Numerous cases have "limited the market to parts for a particular brand of equipment." *See id.*, at 482 n. 31 (citing cases); *see also, e.g.*, *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008) ("the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue[.]"); *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 839 (N.D. Cal. 2024) (finding that plaintiffs sufficiently alleged the existence of a single-brand aftermarket for car repair services and parts); *In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1303–04 (N.D. Cal. 2008) (finding that "there can be a legally cognizable aftermarket in a single brand's products, even if that market is created by a contractual relationship" and that plaintiffs sufficiently alleged a single-brand aftermarket in voice and data services); *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 896 (N.D. Ill. 2023) (finding that the plaintiffs stated a single-brand aftermarket claim for tractor repair services under a "bait-and-switch theory").[5]

---

[5] *See also* Fed. Trade Comm'n, Nixing the Fix: An FTC Report to Congress on Repair Restrictions 9 (May 2021) (explaining that "a manufacturer with market power that has refused to provide consumers or aftermarket service providers with key inputs (such as parts, manuals, or diagnostic software and tools) may be subject to antitrust liability."),

While Biosense contends that single-brand aftermarkets are disfavored, the case law indicates otherwise. This Court recently held in *Epic Games* that a single-brand aftermarket can be a relevant market when "demand for a good is entirely dependent on the prior purchase of a durable good in a foremarket." 67 F.4th at 976 (citing *Newcal Indus.,* 513 F.3d at 1048 ("[T]he law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue[.]")). Biosense cites *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 (3d Cir. 1992) for the premise that Innovative's aftermarket definitions "failed to overcome the presumption against single-brand product markets." (Appellant's Brief, Dkt. No. 34.1 at 37). But that case is inapplicable because it predates the Supreme Court's controlling decision in *Kodak* that validated the single-brand product market concept.

Innovative introduced sufficient evidence to establish a single-brand aftermarket in this case. Biosense designed and developed catheters that can only be used with CARTO, and catheters that are designed and sold by rival manufacturers cannot be used as substitutes with Biosense's cardiac-mapping machines due to technical incompatibility. Likewise, because the clinical support technicians that Biosense provides are trained only on Biosense's equipment and

---

https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf.

9

are not qualified to provide services on rivals' equipment, these services are also unique and not substitutable. (Appellant's Brief, Dkt. No. 34.1 at 21). Moreover, the information and high switching costs in this case support a single-brand aftermarket because they locked in hospitals and gave Biosense a captive customer base that it could exploit.

**II. Competitors are not able to discipline Biosense's aftermarket manipulations because of its market power in the foremarket.**

In theory, the potential for aftermarket abuse can be mitigated by robust competition in the foremarket. When a foremarket includes many firms, rivalry between them can, in principle, discipline aftermarket conduct because customers may consider the ease and affordability of maintenance and repair when selecting a product to purchase. *Kodak*, 504 U.S. at 495 (Scalia, J., dissenting). Under these circumstances, firms compete to provide replacement parts at a lower price or offer simpler repair options as part of the package they sell. Manufacturers in a competitive market that restricted the availability of parts and independent repair options could pay the price in the foremarket through the loss of sales and market share. *Id.* at 502, *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 725 (1988) ("[S]o long as interbrand competition existed, that would provide a

significant check on any attempt to exploit intrabrand market power.") (internal quotations omitted).[6]

By contrast, a firm that has a large share of the relevant market faces little or no "deterrent effect of interbrand competition." *Kodak*, 504 U.S. at 501 (Scalia, J., dissenting). In the case of a monopolist that faces no competitive check by rivals, it may monopolize aftermarkets to "more fully exploit its interbrand power." *Id.* at 499. In other words, it can use its monopoly power as a competitive weapon to unfairly capture related but distinct markets. *United States v. Griffith*, 334 U.S. 100, 107 (1948).

When rivals' disciplining presence is absent, product manufacturers commonly use their market power to unfairly marginalize independent providers of accessories, parts, and services. Their market power can be used as a competitive weapon that enables them to take over aftermarkets and capture lucrative sales for parts and services for themselves. Indeed, the Supreme Court understood this when it ruled in a pair of decisions that monopolistic manufacturers could not use tying to extend their power into markets for complementary parts and equipment. *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 456, 465 (1922); *Int'l Salt Co. v.*

---

[6] As described in Part I, *supra*, even in these markets though, the existence of switching and information costs can sever the connection between foremarkets and aftermarkets.

*United States*, 332 U.S. 392, 396–97 (1947), abrogated on other grounds by *Illinois Tool Works Inc.*, 547 U.S. 28.

According to the jury's verdict, Biosense implemented an illegal tie in violation of Section 1 of the Sherman Act, among other violations of the antitrust laws. Biosense has a high market share in the cardiac-mapping market—sufficient to possess market power per this Court. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). CARTO is installed in 72% of hospitals, and 66% of all cardiac-mapping procedures are performed using CARTO. (Ord. Dkt. No. 593 at 11). Even when hospitals have Biosense's competitors' machines installed, many doctors are unwilling to use the competitors' machines "because they were trained in and are most comfortable with using CARTO." (Ord. Dkt. No. 593 at 6).

As a result of its market power, Biosense faces limited discipline by its rivals in the foremarket. The lack of competitive checks in the foremarket empowered Biosense to engage in unfair exclusionary conduct in the aftermarket. As such, this case does not turn on Innovative proving the existence of information and switching costs to establish a single-brand aftermarket.

## III.  Foreclosure from a market is a classic antitrust injury.

For an antitrust claim to succeed, the plaintiff must demonstrate an actionable antitrust injury. *Cargill v. Monfort*, 479 U.S. 104, 109–10 (1986). A valid antitrust injury has two elements: (1) it must "flow[] from that which makes

defendants' acts unlawful" and (2) are "of the type that the antitrust laws were intended to prevent[.]" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 477 (1977). This Court has distinguished "anticompetitive" conduct (illegal under the antitrust laws) from "hypercompetitive" conduct (legal). *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020). Plaintiffs can only obtain relief when their injury is due to the former.

A plaintiff in an antitrust case is required to show that its losses are the result of the defendant's illegal exclusionary acts, as opposed to competition on the merits. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). A plaintiff does not have a valid antitrust injury if it loses profits as a result of a competitor lowering prices based on a lower cost structure, improving existing products, or launching a popular new product. *Cargill*, 479 U.S. at 115. On the other hand, reduced market share is evidence of an antitrust injury when the defendant used illicit methods to foreclose the plaintiff from effectively participating in the market. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 289 (3d Cir. 2012) (citing *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344 (1990)). The plaintiff does not need to show that all competition has been displaced, but rather that the defendant's actions "diminished consumer choices and increased prices [which] result[ed in] a less competitive market due to either

13

artificial restraints or predatory and exclusionary conduct." *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F. 4th 1262, 1274 (9th Cir. 2022) (quoting *Qualcomm, Inc.*, 969 F.3d at 990).

Here, Innovative showed that it lost a substantial market share due to Biosense's exclusionary practices. The conduct included illegally tying catheters to clinical support in the aftermarket, hoarding catheters, and implementing anti-reprocessing technology to block independent reprocessors. Biosense's exclusionary conduct prevented Innovative and other independent reprocessors from participating in the market and caused their market share to significantly drop. As the district court noted, "Biosense prevented independent reprocessors from competing in the catheter market, which would have led to more sales of Innovative catheters and allowed customers to buy lower-price alternatives in a but-for world. Loss of substantial revenue resulting from foreclosure of competition is a type of harm antitrust law aims to prevent." (Ord. Dkt. No. 593 at 11).

In addition to unfairly excluding rivals in the market for cardiac-mapping catheters, Biosense's efforts to foreclose cost-saving innovation also hurt hospitals and patients at large. Innovations in the market for high-technology medical devices do not merely affect the immediate product by lowering costs on health

14

care providers, they also free up capital to improve healthcare quality and services more generally.

In such markets, techniques to improve existing products are especially important, and "[a] growing body of peer-reviewed research supports reprocessing as a strategy to reduce costs[.]" Cassandra Thiel et al., *The Case for Hospitals to Boost Single-Use Device Reprocessing Programs*, NAM Persp. 1 (June 16. 2025).[7] Reprocessing innovations extend the lifespan of costly medical devices while also lowering prices and stretching the return on technologies that are often the culmination of decades of publicly funded research. *See* Pierre Azoulay et al., *Public R&D Investments and Private-Sector Patenting: Evidence from NIH Funding Rules*, 86 Rev. Econ. Stud. 117 (2019).

At a time when many families are struggling to afford basic medical care, promoting healthy competition in the industry overall is critical to improving health care quality and lowering costs. Our free enterprise system is undergirded by the expectation that companies will compete by "operating with superior service, lower costs, and improve[d] efficiency." *Otter Tail Power Co. v. United*

---

[7] Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC12393226/pdf/nampsp-2025-202506c.pdf. Indeed, the broader "right-to-repair" movement is premised on the significant benefits to consumers and competition more generally from opening up durable goods to maintenance beyond the original manufacturer. *See generally,* Fed. Trade Comm'n, *Nixing the Fix, supra*; *see also* Kira Liu*, Opening the Door to Right-to-Repair: Deere Co. and Its Implications,* Univ. Chi. Bus. L. Rev. Online (2024).

*States*, 410 U.S. 366, 380 (1973). As the jury properly found, Biosense's conduct ran afoul of these principles and violated our nation's antitrust laws.

## CONCLUSION

For the reasons stated above, the Court should affirm the jury verdict and the permanent injunction issued by the district court.

Dated: May 27, 2026

Respectfully submitted,

*s/ Sandeep Vaheesan*

SANDEEP VAHEESAN
OPEN MARKETS INSTITUTE
655 15th Street, NW, Suite 310
Washington, DC 20005
vaheesan@openmarketsinstitute.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and accurate copy of the foregoing to be served to counsel of record for all parties via ECF.

Dated: May 27, 2026

*s/ Sandeep Vaheesan*

Sandeep Vaheesan

OPEN MARKETS INSTITUTE

655 15th Street, NW, Suite 310

Washington, DC 20005

vaheesan@openmarketsinstitute.org

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number 25-6042**

I am the attorney or self-represented party.

**This brief contains 3592 words,** excluding the items exempted by FRAP 32(f). The brief's

type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** __s/ *Sandeep Vaheesan*_____ **Date** May 27, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

18