No. 25-6042

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————

INNOVATIVE HEALTH, LLC,
*Plaintiff-Appellee,*

v.

BIOSENSE WEBSTER, INC.,
*Defendant-Appellant.*

———————

On Appeal from the United States District Court
for the Central District of California
Civil Action No. 8:19-CV-01984-JVS

———————

**BRIEF OF AMICUS CURIAE
ASSOCIATION OF MEDICAL DEVICE REPROCESSORS
IN SUPPORT OF APPELLEE INNOVATIVE HEALTH, LLC**

———————

Conor R. Harvey
Raffi Melkonian
WRIGHT CLOSE BARGER
& GUZMAN, LLP
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321
harvey@wcbglaw.com
melkonian@wcbglaw.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for amicus curiae certifies that amicus does not have any parent corporations and no publicly held corporation owns 10% or more of its stock. Amicus is separately filing a Form 34 Disclosure Statement as required by Ninth Circuit Rule 26.1-1.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES ……......................................................iii

IDENTITY OF AMICI & STATEMENT OF INTEREST IN CASE........ 1

SUMMARY OF ARGUMENT ................................................... 2

ARGUMENT ....................................................................... 3

    I.    The FDA extensively regulates reprocessed catheters just like their original counterparts.................................................... 3

    II.   Reprocessing provides low-cost alternative products, reducing costs for hospitals and patients. ................................. 8

    III.  Anticompetitive barriers to reprocessing harm hospitals, patients, and the public............................................................ 13

CONCLUSION ................................................................... 14

CERTIFICATE OF COMPLIANCE ....................................... 15

CERTIFICATE OF SERVICE................................................ 16

# TABLE OF AUTHORITIES

**Cases**

*Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008) ....................................... 4

**Statutes**

21 U.S.C. §§ 360 *et seq.* ................................................................. 4

§ 321 ........................................................................................... 5

§ 360c ..................................................................................... 4–6

**Regulations**

21 C.F.R. § 870.1200 ...................................................................... 4

**Rules**

FED. R. APP. P. 29 .......................................................................... 1

NINTH CIR. R. 29-1 ....................................................................... 1

**Administrative Materials**

FDA, 510(k) Letter (K153090) (Feb. 5, 2016) ..................................... 6

FDA, 510(k) Letter (K153153) (Mar. 14, 2016) ................................... 6

FDA, 510(k) Letter (K190785) (Mar. 26, 2019) ................................... 6

**Other Authorities**

AMDR, *Bibliography of Peer-Reviewed Articles and Other Scientific Literature on Reprocessing* (last visited Apr. 23, 2026) ......................................................................... 9–10

Anna Schulte *et al.*, *Combining Life Cycle Assessment and Circularity Assessment to Analyze Environmental Impacts of the Medical Remanufacturing of Electrophysiology Catheters*, 13 SUSTAINABILITY 898 (2021)........................................................11

Bruce D. Lindsay *et al.*, *Reprocessing of Electrophysiology Catheters: Clinical Studies, Regulations, and Recommendations*, 24 J. PACING & CLINICAL ELECTROPHYSIOLOGY 1297 (2001) ..................................................10

Cassandra L. Thiel *et al.*, *Simple Steps Towards Sustainability in Healthcare: A Narrative Review of Life Cycle Assessments of Single-Use Medical Devices (SUDs) and Third-Party SUD Reprocessing*, 17 SUSTAINABILITY 5320 (2025) ....................... passim

Chantelle Rizan & Mahmood F. Bhutta, *Environmental impact and life cycle financial cost of hybrid (reusable/single-use) instruments versus single-use equivalents in laparoscopic cholecystectomy*, 36 SURGICAL ENDOSCOPY 4067 (2022).................12

Damola Ikeoluwa Akano *et al.*, *Hierarchical analysis of factors influencing acceptance of remanufactured medical devices*, 2 CLEANER AND RESPONSIBLE CONSUMPTION (100017) (2021) .....6, 8

GAO, GAO-08-147, *Reprocessed Single-Use Medical Devices: FDA Oversight Has Increased, and Available Information Does Not Indicate That Use Presents an Elevated Health Risk* (2008)...........8

Joris Deschamps, *Comparative Carbon Footprint of Reprocessed Single Use Medical Devices* (Anthesis 2023).................................11

Julia A. Meister *et al.*, *Assessing Long-Term Medical Remanufacturing Emissions with Life Cycle Analysis*, 11 PROCESSES 36 (2024) .......................................................11, 14

Lisa W.M. Leung *et al.*, *Remanufactured circular mapping catheters: safety, effectiveness and cost*, 56 J. INTERVENTIONAL CARDIAC ELECTROPHYSIOLOGY 205 (2019) .........................................9

Mattis Keil *et al.*, *The impact of switching from single-use to reusable healthcare products: a transparency checklist and systematic review of life-cycle assessments*, 33 EURO. J. OF PUB. HEALTH 56 (2022) ........................................................................ 13

Philip Jacobs *et al.*, *Economic Analysis of Reprocessing Single-Use Medical Devices: A Systematic Literature Review*, 29 INFECT. CONTROL HOSP. EPIDEMIOLOGY 297 (2008) ....................... 11

Sabrina Lichtnegger *et al.*, *Comparative Life Cycle Assessment Between Single-Use and Reprocessed IPC Sleeves*, 16 RISK MANAGEMENT & HEALTHCARE POLICY 2715 (2023) ....................... 11

Samantha Huynh *et al.*, *Reprocessing of single-use medical devices in cardiology: a systematic literature review of safety and performance characteristics applied to cardiac electrophysiology*, 28 EP EUROPACE (EUAF316) (2026) ................... 8

Scott Unger & Amy Landis, *Assessing the environmental, human health, and economic impacts of reprocessed medical devices in a Phoenix hospital's supply chain*, 112 J. CLEANER PROD. 1995 (2015) ...................................................................... 8, 11, 13

Terrence J. Loftus, *A Comparison of Defect Rate Between Original Equipment Manufacturer and Reprocessed Single-Use Bipolar and Ultrasound Diathermy Devices*, 9 J. MED. DEVICES (044501) (2015) ............................................................... 9

## IDENTITY OF AMICI & STATEMENT OF INTEREST IN CASE

Per Federal Rule of Appellate Procedure 29(a) and Ninth Circuit Rule 29-1, Amicus Curiae Association of Medical Device Reprocessors ("AMDR") submits this brief in support of Appellee Innovative Health, LLC.[1] AMDR is a global trade association representing members of the regulated, commercial medical-device reprocessing industry. Founded in 1999, AMDR's member-companies collectively serve more than 11,000 hospitals and surgical centers worldwide. AMDR's mission is to advance patient safety, affordability, sustainability, and fair competition in healthcare. For decades, AMDR has worked with the Food and Drug Administration, Congress, and global regulators to ensure that single-use device (often called an "SUD") reprocessing is governed by strict scientific standards.

AMDR has an interest in this appeal because this case involves practices that have long undermined lawful reprocessing—such as tying,

---

[1] Counsel for all parties have consented to the filing of this brief. AMDR affirms that no counsel for any party authored this brief in whole or in part, no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than AMDR or its counsel has made a monetary contribution to this brief's preparation or submission.

firmware blocking, and supply hoarding—that restrict hospitals' right to use safe, FDA-cleared reprocessed devices. Such anticompetitive practices raise both financial and environmental costs and make medical-device supply chains more vulnerable for hospitals, patients, and the broader public.

## SUMMARY OF ARGUMENT

Reprocessed medical devices are not inferior substitutes for original devices. They are FDA-cleared products that must demonstrate substantial equivalence to their original counterparts and meet the same regulatory requirements as original equipment. Two decades of FDA data and independent, peer-reviewed studies find no elevated health risk from reprocessed single-use devices. In fact, every reprocessed single-use device is individually tested or inspected before redeployment, a quality-control measure far greater than the batch testing undergone by original device manufacturers.

The financial and environmental case for reprocessing is equally strong. There is an average direct-cost savings of between twenty and fifty percent across reprocessed devices before even accounting for multiple reprocessing cycles. Life-cycle assessments of reprocessed

2

cardiac catheters and other reprocessed single-use devices likewise show greenhouse gas emission reductions of twenty to sixty percent compared to original equivalents. These financial and environmental savings are greatly reduced or disappear when anticompetitive conduct—such as tying, firmware blocking, and supply hoarding—denies hospitals access to reprocessed alternatives. When that happens, hospitals lose the ability to purchase less costly reprocessed medical devices, patients lose downstream savings, and the public bears the environmental cost.

## ARGUMENT

Reprocessed catheters are regulated medical devices subject to the same rigorous manufacturing standards as the original devices from which they are created. Indeed, they must demonstrate substantial equivalence to the original device, and independent, peer-reviewed studies confirm they present no elevated health risk compared to their original counterparts.

**I.    The FDA extensively regulates reprocessed catheters just like their original counterparts.**

The Food and Drug Administration regulates medical devices, such as the cardiac catheters at issue here, under the 1976 Medical Device

Amendments[2] to the Food, Drug, and Cosmetic Act.[3] The FDA classifies devices in three categories: Class I, which contains items such as elastic bandages and gloves; Class II, which includes items such as powered wheelchairs, electrocardiograph machines, and, relevant here, diagnostic catheters; and Class III, which consists of items such as heart valves and pacemakers.[4] Whereas Class I devices are subject to only "general controls" such as labeling requirements, Class II devices are subject to both general controls and "special controls," such as performance standards and post-market surveillance measures.[5]

Single-use device reprocessors are required to comply with all of FDA's general controls, including registering all reprocessed products, complying with FDA's quality system regulation, submitting adverse event reports, tracking devices whose failure could have serious outcomes, correcting or removing from the market unsafe devices,

---

[2] 21 U.S.C. §§ 360 *et seq.*

[3] *Id.* §§ 301 *et seq.*

[4] *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 315–20 (2008) (discussing medical-device regulation); 21 C.F.R. § 870.1200(b) (classifying intravascular diagnostic catheters as Class II).

[5] 21 U.S.C. §§ 360c(a)(1)(A)–(B).

4

meeting manufacturer labeling requirements, and submitting facilities to regular inspection.

Class II devices may not be marketed until they also pass through the pre-market notification (i.e., "510(k)") process. Most Class II devices, including reprocessed devices, undergo the 510(k) process. A reprocessed medical device is simply "an original device that has previously been used on a patient and has been subjected to additional processing and manufacturing for the purpose of an additional single use on a patient."[6] These devices are subject to "special controls" including performance standards and post-market surveillance measures, and they must show "substantial equivalence" to their original counterparts through exhaustive validation data.[7]

The 510(k) substantial-equivalence requirement extends beyond safety. To obtain clearance, a reprocessed device must have the same intended use as the predicate device and either the same technological characteristics or, where there are differences, performance data

---

[6] 21 U.S.C. § 321(ll)(2)(A).

[7] *Id.* §§ 360c(a)(1)(B), (f)(1)(A)(ii).

demonstrating that the device is as safe and effective as the original.[8] FDA-cleared reprocessed catheters thus have been independently demonstrated to perform comparably to original counterparts.[9]

Reprocessed cardiac catheters, such as the catheter lines here, are Class II devices that underwent two different pre-market reviews: one that applied to Biosense Webster (when the catheters were made and originally placed on the market) and another that applied to Innovative Health (when the catheters were reprocessed).[10] They are devices regulated and cleared by the FDA.

Reprocessors are not free-riders on original clinical support. They are FDA-regulated manufacturers operating under the same statutory framework as original equipment manufacturers, and they compete by innovating. Each reprocessor must secure its own 510(k) clearance for every device it reprocesses, comply with the FDA's quality system

---

[8] *Id.* § 360c(i)(1)(A).

[9] Damola Ikeoluwa Akano *et al.*, *Hierarchical analysis of factors influencing acceptance of remanufactured medical devices*, 2 CLEANER AND RESPONSIBLE CONSUMPTION (100017), at 2 (2021).

[10] *See, e.g.*, FDA, 510(k) Letter (K153153) (Mar. 14, 2016) (reprocessed Lasso); FDA, 510(k) Letter (K190785) (Mar. 26, 2019) (reprocessed PentaRay); FDA, 510(k) Letter (K153090) (Feb. 5, 2016) (reprocessed SoundStar).

regulation, individually test or inspect each reprocessed device, submit adverse-event reports, and bear product-liability exposure like original manufacturers. That regulatory burden is matched by real technological investment. Innovative Health, for example, was the first to develop the technology necessary to clean the PentaRay catheter's lumen—a tube as narrow as "two or three of your hair strands"—and to inspect for particles as small as two red blood cells during the process. *See* 5-ER-629–32. And original manufacturers themselves participate in this same reprocessing industry. Biosense's own affiliate, SterilMed, reprocesses catheters too.

When independent reprocessors cannot compete on the merits, innovation slows, output falls, and prices rise. That is what happened here. After Biosense imposed its policy to block independent reprocessors' sales, Innovative Health and Stryker lost the incentive to pursue additional regulatory clearances. *See* IH Ans. Br. at 26. Biosense, in turn, lost the same incentive to seek clearance to reprocess its own catheters through SterilMed. *Id.* By breaking that competitive cycle, Biosense reduced innovation, constrained output, increased prices, and degraded quality and service. *See id.* at 23–27.

## II. Reprocessing provides low-cost alternative products, reducing costs for hospitals and patients.

Reprocessed medical devices are safe, effective, and often superior to their original counterparts. As discussed, the FDA regulates the reprocessing industry to ensure safety and effectiveness, and commercial reprocessors must receive FDA clearance for each device that they reprocess before it can be returned to a hospital for use.[11] The evidence bears that out. In 2008, the Government Accountability Office reported that the FDA's analysis of reported adverse events does not show that reprocessed single-use devices present an elevated health risk.[12] More recent peer-reviewed studies have reached the same conclusion.[13]

---

[11] Cassandra L. Thiel *et al.*, *Simple Steps Towards Sustainability in Healthcare: A Narrative Review of Life Cycle Assessments of Single-Use Medical Devices (SUDs) and Third-Party SUD Reprocessing*, 17 SUSTAINABILITY 5320, 5321 (2 of 20) (2025).

[12] GAO, GAO-08-147, *Reprocessed Single-Use Medical Devices: FDA Oversight Has Increased, and Available Information Does Not Indicate That Use Presents an Elevated Health Risk* at 19 (2008); *see also* Scott Unger & Amy Landis, *Assessing the environmental, human health, and economic impacts of reprocessed medical devices in a Phoenix hospital's supply chain*, 112 J. CLEANER PROD. 1995, 1996 (2015).

[13] *See, e.g.*, Samantha Huynh *et al.*, *Reprocessing of single-use medical devices in cardiology: a systematic literature review of safety and performance characteristics applied to cardiac electrophysiology*, 28 EP EUROPACE (EUAF316), at 1 (2026) ("Under stringent reprocessing protocols, reprocessed EP catheters showed comparable safety and mechanical performance to new devices."); Akano *et al.*, *supra* note 9, at 2

Safety equivalence alone understates the value of reprocessing, as reprocessed devices often have lower defect rates than their original equivalents.[14] Every reprocessed single-use device is individually tested for performance or inspected before it is returned to a hospital for use, whereas original devices generally undergo only batch testing.[15] The scientific community considers the defect-rate advantage an accepted feature of medical device reprocessing.[16] Innovative Health's reprocessed

("Remanufactured circular mapping catheters . . . had good mechanical performance when tested against the specifications of the OEM [original equipment manufacturer] and its use did not put patient safety at risk."); Lisa W.M. Leung *et al.*, *Remanufactured circular mapping catheters: safety, effectiveness and cost*, 56 J. INTERVENTIONAL CARDIAC ELECTROPHYSIOLOGY 205, 208–10 (2019) (evaluating 100 consecutive AF ablation procedures using reprocessed Lasso catheters and finding no complications attributable to catheter, procedural duration comparable to matched controls, and cost savings); *see also generally* AMDR, *Bibliography of Peer-Reviewed Articles and Other Scientific Literature on Reprocessing*, *available at* https://amdr.org/newsroom/peer-review/ (last visited Apr. 23, 2026).

[14] Thiel *et al.*, supra note 11, at 5321, 5332 (2 and 13 of 20); *see also generally* Terrence J. Loftus, *A Comparison of Defect Rate Between Original Equipment Manufacturer and Reprocessed Single-Use Bipolar and Ultrasound Diathermy Devices*, 9 J. MED. DEVICES (044501) (2015).

[15] Thiel *et al.*, supra note 11, at 5321 (2 of 20); *see also generally* Loftus, supra note 14.

[16] Thiel *et al.*, supra note 11, at 5332 (13 of 20); *see also* Bruce D. Lindsay *et al.*, *Reprocessing of Electrophysiology Catheters: Clinical Studies, Regulations, and Recommendations*, 24 J. PACING & CLINICAL

catheters, for example, have lower rates of customer complaints and adverse events (patient injuries or deaths) than Biosense's new catheters. 6-ER-993–94.

The financial case for reprocessing follows directly from the safety and performance record. Reprocessed devices save hospitals an estimated thirty to fifty percent on device purchases.[17] In 2025 alone, AMDR-member reprocessors saved hospitals approximately $495 million in device costs and $8.6 million in waste disposal costs, freeing up resources for hospitals to reinvest in items such as staff or patient care and to pass along as savings to patients.[18] But even that figure understates the true economic incentive of reprocessing because each additional reprocessing cycle saves the full original device cost less only the reprocessing cost.[19] Compounding those savings, reprocessing reduces regulated medical-

---

ELECTROPHYSIOLOGY 1297, 1298 (2001) (reprocessors test every device, whereas original manufacturers test only a sample).

[17] Thiel *et al.*, supra note 11, at 5321 (2 of 20).

[18] *See generally* AMDR, *Reprocessing by the Numbers, available at* https://amdr.org/newsroom/reprocessing-by-the-numbers/ (last visited Apr. 23, 2026).

[19] *Id.*

waste disposal costs.[20] The same body of literature also found no statistically significant adverse clinical events associated with reprocessed device use across various device types.[21]

The environmental benefits build on the financial ones. Peer-reviewed life-cycle assessments analyzing eight medical devices found greenhouse gas emission reductions ranging from twenty-three to sixty percent when reprocessed single-use devices were used in place of original devices, with electrophysiology catheters averaging a fifty-one percent reduction.[22] The dominant emission source in original devices is raw material extraction and production—precisely what reprocessing

---

[20] Unger & Landis, supra note 12, at 1996, 2001.

[21] Philip Jacobs *et al.*, *Economic Analysis of Reprocessing Single-Use Medical Devices: A Systematic Literature Review*, 29 INFECT. CONTROL HOSP. EPIDEMIOLOGY 297, 299–300 (2008).

[22] Thiel *et al.*, supra note 11, at 5327 (6 of 20); *see also generally* Julia A. Meister *et al.*, *Assessing Long-Term Medical Remanufacturing Emissions with Life Cycle Analysis*, 11 PROCESSES 36 (2024); Anna Schulte *et al.*, *Combining Life Cycle Assessment and Circularity Assessment to Analyze Environmental Impacts of the Medical Remanufacturing of Electrophysiology Catheters*, 13 SUSTAINABILITY 898 (2021); Sabrina Lichtnegger *et al.*, *Comparative Life Cycle Assessment Between Single-Use and Reprocessed IPC Sleeves*, 16 RISK MANAGEMENT & HEALTHCARE POLICY 2715 (2023); Joris Deschamps, *Comparative Carbon Footprint of Reprocessed Single Use Medical Devices* (Anthesis 2023) (report prepared for Stryker Sustainability Solutions).

avoids.[23] Purchasing 100,000 reprocessed single-use devices instead of 100,000 original devices reduces emissions from approximately 369,000 kilograms of $CO_2e$ to 215,000 kilograms, and those numbers increase at scale.[24] Because reprocessed single-use devices are procured at a discount and bypass the costs of manufacturing new raw materials, the financial and environmental benefits move together.[25]

The literature confirms the magnitude of these reductions. A peer-reviewed life-cycle analysis of hybrid laparoscopic instruments, for example, found their carbon footprint was roughly one-quarter that of single-use equivalents while also cutting total procedure costs by more than half.[26] A review of twenty-seven comparative life-cycle studies reached a consistent conclusion, finding that reprocessing or reuse

---

[23] Thiel *et al.*, supra note 11, at 5332 (11 of 20).

[24] *Id.* at 5333 (12 of 20).

[25] *Id.* at 5332–33 (11–12 of 20).

[26] Chantelle Rizan & Mahmood F. Bhutta, *Environmental impact and life cycle financial cost of hybrid (reusable/single-use) instruments versus single-use equivalents in laparoscopic cholecystectomy*, 36 SURGICAL ENDOSCOPY 4067, 4073 (2022).

reduces average environmental impact across measured categories except water use.[27]

### III. Anticompetitive barriers to reprocessing harm hospitals, patients, and the public.

Anticompetitive conduct that suppresses reprocessing reduces and potentially forecloses the vast benefits that reprocessed medical devices provide. Researchers have documented original manufacturer practices including use of software and technology to render reprocessed devices inoperable, threats to void warranties when reprocessed single-use devices are used, unfair contracting that ties hospital discounts to minimum purchasing requirements for original devices, and direct interference with hospital reprocessing collection bins and inventory.[28] Reprocessing can eliminate regulated medical-waste disposal costs while simultaneously reducing procurement costs by approximately fifty percent, savings that only materialize if reprocessors can reach hospitals in the first place.[29] And barriers to reprocessing do not merely shift costs

---

[27] Mattis Keil *et al.*, *The impact of switching from single-use to reusable healthcare products: a transparency checklist and systematic review of life-cycle assessments*, 33 EURO. J. OF PUB. HEALTH 56, 60 (2022).

[28] Thiel *et al.*, supra note 11, at 5335 (14–15 of 20).

[29] Unger & Landis, supra note 12, at 1996, 2001.

13

from one party to another: they force hospitals back to a linear single-use device supply chain that generates substantially higher greenhouse gas emissions and is susceptible to supply chain disruptions.[30]

When an original medical-device manufacturer acts to eliminate a lower-cost reprocessable alternative, hospitals lose the ability to procure lower-cost medical devices, patients lose the savings that flow downstream, and the public bears the environmental cost of a less circular healthcare supply chain.

## CONCLUSION

The Court should affirm the judgment below.

DATED: May 27, 2026          Respectfully submitted,

 /s/ Conor R. Harvey
Conor R. Harvey
Raffi Melkonian
WRIGHT CLOSE BARGER
    & GUZMAN, LLP
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321
harvey@wcbglaw.com
melkonian@wcbglaw.com

*Counsel for Amicus Curiae*

---

[30] Meister *et al.*, supra note 22, at 2.

14

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-6042

I am the attorney or self-represented party.

**This brief contains** | 2,523 | words, including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Conor R. Harvey | **Date** | May 27, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Form 8          *Rev. 12/01/22*

15

## CERTIFICATE OF SERVICE

I, Conor R. Harvey, do hereby certify that I filed this Brief electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system on May 27, 2026. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Conor R. Harvey*
Conor R. Harvey

16