**No. 25-6042**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

INNOVATIVE HEALTH, LLC,

*Plaintiff-Appellee,*

v.

BIOSENSE WEBSTER, INC.,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Central District of California,
No. 8:19-cv-01984 (Hon. James V. Selna)

_____

**BRIEF FOR THE AMERICAN ANTITRUST INSTITUTE AS
AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE**

_____

MARK S. HEGEDUS
   *Counsel of Record*
RANDY M. STUTZ
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
Washington, D.C. 20036
(616) 313-2654 (mobile)
mhegedus@antitrustinstitute.org
rstutz@antitrustinstitute.org

*Counsel for Amicus Curiae*

May 27, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Appellate Rule 26.1(a), the American Antitrust Institute ("AAI") states that it is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it. AAI has separately filed Circuit Form 34.

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................... iii

TABLE OF AUTHORITIES ................................................................iv

INTEREST OF AMICUS CURIAE ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................2

ARGUMENT ..................................................................................9

I.  There is No Presumption Against the Legal Validity of Single-Brand Aftermarkets. .......................................................................9

    A.  There is No Legal Presumption Against Single-Brand Aftermarkets, Which Are Recurring ...................................13

    B.  Any Legal Presumption Against Single-Brand Markets Applies to Markets for Stand-Alone Products, Not Aftermarkets. ........................................................................15

    C.  The Jury Found the Requisite Lock-In to Define a Single-Brand Aftermarket.............................................................18

II.  Because Biosense's Unlawful Conduct Caused Innovative's Losses, the Jury's Damages Verdict Should Not Be Disturbed. ...20

CONCLUSION ..............................................................................29

CERTIFICATES

# TABLE OF AUTHORITIES

**Cases**

*Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010) ........................................13

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190
    (N.D. Cal. 2008) ...................................................................... 15, 17

*Avaya Inc. v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016)...............24

*City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361
    (9th Cir. 1992) ........................................................................21, 22

*Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097
    (N.D. Cal. 2013) ...................................................................... 16, 17

*Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974
    (N.D. Cal. 2010) ............................................................................15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ...............................................................*passim*

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (2023).....................*passim*

*Farley Transportation Co. v. Santa Fe Trail Transportation Co.*,
    786 F.2d 1342 (9th Cir. 1985) .......................................................23

*Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 2017).......................18

*FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986) .................10

*Green Country Food Mkt., Inc. v. Bottling Grp.*, 371 F.3d 1275
    (10th Cir. 2004) .............................................................................15

*Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380
    (9th Cir. 2018)...............................................................................27

*In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288
(N.D. Cal. 2008) ............................................................................. 15

*In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984 (9th Cir. 2009) ..... 17

*Innovative Health, LLC v. Biosense Webster, Inc.*, No. 22-55413,
2024 WL 62948 (9th Cir. Jan. 5, 2024) ......................................... 25

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) .............. 10

*Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024) ................ 14

*Los Angeles Mem. Coliseum Comm'n v. NFL*, 791 F.2d 1356
(9th Cir. 1984) ............................................................................... 6

*MCI Commc'ns Corp. v. AT&T*, 708 F.2d 1081 (7th Cir. 1983) ....... 21, 23

*Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679 (1978) ...... 28, 29

*Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038
(9th Cir. 2007) ........................................................................ *passim*

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ...................................... 27

*Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134 (1968) ................ 27

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430
(3d Cir. 1997) ................................................................................. 24

*Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) .... 28

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218
(N.D. Cal. 1999) ............................................................................. 15

*Reilly v. Apple, Inc.*, 578 F. Supp. 3d 1098 (N.D. Cal. 2022) .................. 16

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ....................................................................... 15

**Statutes**

15 U.S.C. § 1 ...............................................................................4

15 U.S.C. § 2 ...............................................................................4

15 U.S.C. § 15(a) ........................................................................21

Cal. Bus. & Prof. Code § 16720 ..................................................4

Cal. Bus. & Prof. Code § 16750(a) ............................................21

**Other Authorities**

American Antitrust Institute, "The Future of Aftermarkets in Systems Competition Symposium" (Jun. 20, 2006) ........................................4

Daniel Crane, *Private Enforcement of U.S. Antitrust Law—A Comment on the Data,* CPI ANTITRUST CHRON. (February 2019)....5

Edward D. Cavanagh, *The Jury Trial in Antitrust Cases: An Anachronism?*, 40 AM. J. TRIAL ADVOC., 1 (2016) ...........................6

*Federal Trade Commission, et al. v. Deere & Co.*, No. 3:25-cv-50017, "Memorandum Opinion and Order Denying Motion for Judgment on the Pleadings," Dkt. 152 (N.D. Ill. Jun. 9, 2025).......3

Federal Trade Commission, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions* (May 2021) .................................2

Geoffrey H. Kozen, "Aftermarkets, Exclusion, and Single-Serve Coffee," American Antitrust Institute Working Paper No. 15-02 (May 26, 2015) .................................................................................4

Harry First & Spencer Weber Waller, *Antitrust's Democracy Deficit*, 81 FORDHAM L. REV. 2543 (2013) .......................................6

*In re Deere & Co. Repair Servs. Antitrust Litig.*, No. 3:22-cv-50188, "Statement of Interest of the United States," Dkt. 120 (N.D. Ill. Feb. 14, 2023).............................................................3

Joseph P. Bauer, *Antitrust Implications of Aftermarkets*,
52 ANTITRUST BULL. 31 (2007) ......................................................2

*PhantomALERT, Inc. v. Apple, Inc.*, No. 25-7017, "Brief of Professor
Eric A. Posner and the American Antitrust Institute in
Support of Appellant PhantomALERT, Inc." (D.C. Cir. Jul. 18,
2025) .................................................................................................4

Severin Borenstein, Jeffrey K. MacKie-Mason & Janet S. Netz,
*Antitrust Policy in Aftermarkets*, 63 ANTITRUST L.J. 455 (1995).....3

Severin Borenstein, Jeffrey K. MacKie-Mason & Janet S. Netz,
*Exercising Market Power in Proprietary Aftermarkets*,
9 J. ECON. & MGMT. STRATEGY 157 (2000) ......................................3

*Surgical Instrument Serv. Co. v. Intuitive, Inc.*, No. 25-1372, "Brief of
the American Antitrust Institute as Amicus Curiae in
Support of Plaintiff-Appellant" (9th Cir. Jul. 30, 2025)............ 4, 14

## INTEREST OF AMICUS CURIAE[1]

The American Antitrust Institute ("AAI") is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. *See* http://www.antitrustinstitute.org/.[2]

---

[1] All parties consent to the filing of this amicus brief. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than amicus curiae or its counsel—has contributed money that was intended to fund preparing or submitting this brief.

[2] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions. Certain members of AAI's Board of Directors or Advisory Board, or their law firms, represent Plaintiff-Appellee, but they played no role in AAI's deliberations with respect to the filing of the brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Aftermarkets involve "functionally linked products," one of which a consumer purchases initially, *i.e.*, the foremarket product, and the other(s) of which the customer purchases following the initial acquisition, *i.e.*, the aftermarket product(s). *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992). This case involves aftermarkets for clinical support services and catheters needed to operate the CARTO 3 cardiac mapping machine (the foremarket product) sold by Appellant Biosense-Webster, Inc. ("Biosense").

"Products with aftermarkets are very common." Federal Trade Commission, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions* at 9 (May 2021), https://perma.cc/7R2D-4VEE (congressionally mandated report based on public comments, third-party empirical research, and FTC research). "[F]rom simple products like razors and razor blades, to operationally or technically complex products and services like software and software updates," *id.*, aftermarkets involve "a multitude of industries and hundreds of billions of dollars of sales." Joseph P. Bauer, *Antitrust Implications of Aftermarkets*, 52 ANTITRUST BULL. 31, 31 (2007). Economic research

shows that manufacturers of foremarket products have economic incentives to exercise market power in aftermarkets and that competition in foremarkets is not always sufficient to discipline that market power. *See* Severin Borenstein, Jeffrey K. MacKie-Mason & Janet S. Netz, *Antitrust Policy in Aftermarkets*, 63 ANTITRUST L.J. 455, 458 (1995); Severin Borenstein, Jeffrey K. MacKie-Mason & Janet S. Netz, *Exercising Market Power in Proprietary Aftermarkets*, 9 J. ECON. & MGMT. STRATEGY 157, 158-59 (2000).

Given the importance of these kinds of markets to consumers, it is not surprising that recent bipartisan antitrust enforcement and advocacy by the Federal Trade Commission and the U.S. Department of Justice have focused on anticompetitive conduct in aftermarkets. *See Federal Trade Commission, et al. v. Deere & Co.*, No. 3:25-cv-50017, "Memorandum Opinion and Order Denying Motion for Judgment on the Pleadings," Dkt. 152 (N.D. Ill. Jun. 9, 2025); *In re Deere & Co. Repair Servs. Antitrust Litig.*, No. 3:22-cv-50188, "Statement of Interest of the United States," Dkt. 120 (N.D. Ill. Feb. 14, 2023). AAI also has a long-

3

standing research and advocacy interest in aftermarkets and the role of antitrust law in protecting competition in such markets.[3]

In the proceeding below, a jury unanimously concluded that Appellee Innovative Health, LLC ("Innovative") proved that Biosense violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 16720 of the Cartwright Act, Cal. Bus. & Prof. Code § 16720, including by unlawfully tying availability of clinical support services for Biosense's CARTO 3 cardiac mapping machine to sales of catheters used with the machine. 1–ER–32. Innovative sells reprocessed catheters that compete with Biosense's own catheters. As a result of the tie,

---

[3] *See generally Surgical Instrument Serv. Co. v. Intuitive, Inc.*, No. 25-1372, "Brief of the American Antitrust Institute as Amicus Curiae in Support of Plaintiff-Appellant" (9th Cir. Jul. 30, 2025), https://www.antitrustinstitute.org/wp-content/uploads/2025/08/AAI-TSAC-SIS-v.-Intuitive.pdf; *PhantomALERT, Inc. v. Apple, Inc.*, No. 25-7017, "Brief of Professor Eric A. Posner and the American Antitrust Institute in Support of Appellant PhantomALERT, Inc." (D.C. Cir. Jul. 18, 2025), https://www.antitrustinstitute.org/wp-content/uploads/2025/07/AAI-TSAC-Brief-No-25-7017.pdf; Geoffrey H. Kozen, "Aftermarkets, Exclusion, and Single-Serve Coffee," American Antitrust Institute Working Paper No. 15-02 (May 26, 2015), https://www.antitrustinstitute.org/wp-content/uploads/2015/05/Working-Paper-No-15-02.pdf; American Antitrust Institute, "The Future of Aftermarkets in Systems Competition Symposium" (Jun. 20, 2006), https://www.antitrustinstitute.org/event/the-future-of-aftermarkets-in-systems-competition-symposium/ (agenda).

Biosense excluded reprocessors from the market, thus reducing output and raising prices for catheters purchased by hospitals that had previously purchased CARTO 3 mapping machines. The jury unanimously concluded that Biosense's unlawful conduct caused Innovative to suffer over $147 million in lost sales. 1–ER–33; 9–ER–1766.

On appeal, Biosense asks this Court to set aside the jury's unanimous verdicts. Those verdicts, however, are supported by substantial evidence, as Innovative's brief demonstrates. Accordingly, this Court should reject Biosense's request. Specifically, the Court should refuse Biosense's invitation to second guess the jury's deliberations and its verdicts.

Statistically, the odds are heavily against a private antitrust action making it to trial. Only 1% of private antitrust cases are ultimately heard by a jury. *See* Daniel Crane, *Private Enforcement of U.S. Antitrust Law—A Comment on the Data,* CPI ANTITRUST CHRON. at 5 (February 2019). Innovative here successfully ran a gauntlet of challenges before it presented the case to the jurors. The validity of Innovative's claims were repeatedly tested, including on a prior trip to

this Court, and the case passed all the tests. The jury was properly instructed, and even the district court agreed that there was "substantial evidence" to support the jury's verdicts. 1–ER–15-21.

This history demonstrates the strength of Innovative's claims. It also illustrates why it is especially important to protect the jury's damages award. Decades of defendant-friendly decisions have made it easier to end an antitrust damages case on a motion to dismiss or summary judgment. Even at trial, *Daubert* motions and other evidentiary challenges often drastically limit the evidence the jury sees and the questions it can answer. *See* Harry First & Spencer Weber Waller, *Antitrust's Democracy Deficit*, 81 FORDHAM L. REV. 2543, 2554 (2013); Edward D. Cavanagh, *The Jury Trial in Antitrust Cases: An Anachronism?*, 40 AM. J. TRIAL ADVOC. 1, 17-26 (2016) (cataloging the obstacles court decisions have created to jury trials). When plaintiffs have cleared all the hurdles to trial and presented a case that has convinced a jury to hold defendants liable, as Innovative did here, the rarity of such a verdict makes it especially important to respect the jury's findings and not second guess them. *See Los Angeles Mem. Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1366 (9th Cir. 1984)

6

("[W]here, as here, the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof, we will not play Monday morning quarterback and supplant the jury's evaluation of the complex and conflicting evidence with our own.") (cleaned up).

Second guessing, however, is exactly what Biosense invites this Court to do. Unable to show that the jury's verdicts were not supported by substantial evidence, Biosense advances multiple, unsound legal arguments, two of which AAI addresses in this brief.

First, Biosense challenges the jury's verdicts on the ground that Innovative did not define a "legally cognizable" product market comprising clinical support services for the CARTO 3 mapping machine because it "failed to overcome the presumption against single-brand aftermarkets." Biosense Br. at 48. There is no such presumption. Biosense effectively argues for the kind of legal presumption against single-brand aftermarkets that the Supreme Court rejected in *Kodak*, 504 U.S. at 467, 477. Rather than a legal presumption, *Kodak* and this Court's cases applying it require an examination of economic realities to determine whether the plaintiff rebuts an *economic* presumption that competition in the foremarket precludes defining the aftermarket as

7

just a single brand. Where the evidence demonstrates that competition in the foremarket does not suffice to discipline market power in the aftermarket, plaintiffs can and do successfully and repeatedly define single-brand product markets. Here, the jury concluded that Innovative had proven a single-brand product market because competition in the foremarket for cardiac mapping machines did not prevent Biosense from exercising market power in the aftermarket for clinical support services.

Second, Biosense has identified no factual or legal basis for vacating the jury's damages verdict on the ground that it fails to disaggregate Innovative's injuries due to Biosense's lawful conduct. Biosense's argument is based on a theory that hospitals that added CARTO 3 machines to their fleet with knowledge of the tying policy could not have been harmed when Biosense prevented them from purchasing lower-priced, better-quality reprocessed catheters. The jury, however, found that hospitals generally did not have that knowledge, and the record below showed that Biosense concealed the policy and did not include it in its contracts with hospitals. *See* Innovative Br. at 18. In addition, disaggregation is required only where the damages calculation

8

reflects sales attributable to lawful competition. The jury's verdicts here found that all of Biosense's conduct violated the antitrust laws and that none of it was lawful. Moreover, the market definition cases on which Biosense relies do not address whether disaggregation is required to account for lawful conduct. And even if such cases were relevant to assessing the need for disaggregation, Biosense failed to prove that hospitals' contractual commitments—rather than Biosense's market power—forced them to purchase clinical services and catheters from Biosense. It is economically logical to conclude hospitals would have wanted to purchase lower-priced and better-quality catheters from Innovative if they were not constrained by Biosense's tie.

## ARGUMENT

### I.    There is No Presumption Against the Legal Validity of Single-Brand Aftermarkets.

Based on a robust evidentiary record, the jury concluded that Biosense violated the antitrust laws by tying clinical support services for CARTO 3 mapping machines to Biosense catheters. 1–ER–32; 9–ER–1644. "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product that he

9

either did not want at all, or might have preferred to buy elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). "Control" over the tying product means that the seller has appreciable market power over that product. *See Kodak*, 504 U.S. at 462. Unless that market power can be proven through direct evidence, *id.* at 478; *see also FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460-61 (1986), the plaintiff must define a relevant product market to prove the seller has market power over the tying product. *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2007).

"[I]n some instances one brand of a product can constitute a separate market." *Kodak*, 504 U.S. at 482. "More specifically, the relevant market for antitrust purposes can be an *aftermarket*—where demand for a good is entirely dependent on the prior purchase of a durable good in a *foremarket*." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976 (2023) (emphasis in original). The jury here concluded that the tying market comprises a single brand—clinical support services for CARTO 3 mapping machines. 1–ER–32; 9–ER–1653-54.

A plaintiff proves a single-brand aftermarket where: "(1) the challenged aftermarket restrictions are not generally known when

consumers make their foremarket purchase; (2) significant information costs prevent accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic*, 67 F.4th at 977 (cleaned up). As the Supreme Court explained in *Kodak*, if current owners of durable equipment in a foremarket face switching costs, they may be "locked in" to the aftermarkets, meaning they would tolerate higher prices in the aftermarkets rather than switch to a different foremarket product. 504 U.S. at 476. "Under this scenario, a seller profitably could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in [aftermarket] prices, and the number of locked-in customers were high relative to the number of new purchasers." *Id.*

The district court below instructed the jury that a "[s]ingle-brand aftermarket[] may occur where a subset of customers were locked in by the purchase of a durable good." 9–ER–1653. The court also provided jury instructions that faithfully tracked the *Kodak* lock-in factors as articulated by this Court in *Epic*, 67 F.4th at 977. 9–ER–1653-54. In

11

reaching its verdict, the jury concluded that competition in the foremarket for cardiac mapping machines did not discipline Biosense's market power in the aftermarket for clinical support services and thus that Innovative had proven that clinical support services for CARTO 3 mapping machines constituted a single-brand aftermarket. 1–ER–32; 9–ER–1653-54.[4]

Biosense does not challenge the jury instructions on appeal. Instead, Biosense attacks the jury's verdict as legally infirm. Biosense Br. at 30 (arguing Innovative's market definition "failed as a matter of law"); *id.* at 26, 48 (single-brand market not "legally cognizable"). According to Biosense, the verdict is unsustainable because there is a "well established presumption" that single-brand markets are disfavored. *Id.* at 31; *see also id.* at 37, 49–50, 50, 57 (repeating four

---

[4] Courts must assume that juries follow a court's instructions. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604 (1984). When the jury unanimously found that Innovative had proven an unlawful tie, 1–ER–32, it necessarily relied on factual findings that a significant number of customers were locked in such that competition in the foremarket for mapping machines did not discipline Biosense's exercise of market power in the aftermarket for clinical support services. *See Aspen Skiing*, 472 U.S. at 604-05 (implicit in a jury verdict are factual findings necessary to support the verdict).

times that Innovative failed to overcome the presumption). In effect, Biosense argues for the same kind of legal presumption applied to aftermarkets that the Supreme Court rejected in *Kodak*, 504 U.S. at 467, 477. While a legal presumption against single-brand markets may or may not apply to stand-alone products, *see infra* Part I.B,[5] the only presumption applied to aftermarkets is an "economic" one. *Epic*, 67 F.4th at 977 (quoting *Newcal*, 513 F.3d at 1050); *see infra* Part I.A.

### A. There is No Legal Presumption Against Single-Brand Aftermarkets, Which Are Recurring.

The Supreme Court in *Kodak* categorically rejected a legal presumption against single-brand aftermarkets because "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." 504 U.S. at 466-67, 482 (cleaned up); *cf. Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010) ("[W]e have eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged

---

[5] In this context, a "stand-alone" product is one for which there are no aftermarkets because a "derivative product" is not functionally linked to it. A derivative product is an aftermarket product, *i.e.*, one whose demand is dependent upon the prior purchase of a durable good (or "primary product") in a foremarket. *See Epic*, 67 F.4th at 976.

13

anticompetitive conduct actually operate."). Instead, the Court held that "[t]he proper market definition in this case can be determined only after a factual inquiry into the commercial realities faced by consumers." *Kodak*, 504 U.S. at 482 (cleaned up). Where, as here, the evidence demonstrates and the jury finds that competition in the foremarket does not "suffice to discipline anticompetitive practices in the aftermarket," a plaintiff rebuts the economic presumption that consumers knowingly choose to restrict their aftermarket purchases to just a single brand. *Newcal*, 513 F.3d at 1050; *see also Epic*, 67 F.4th at 977.[6]

Unsurprisingly, then, single-brand aftermarkets are not "extremely rare," Biosense Br. at 28, but rather are recurring. The Supreme Court, this Court, and district courts in this circuit have repeatedly held that plaintiffs can and do succeed in alleging or proving them. *See, e.g., Kodak*, 504 U.S. at 481-82; *Newcal*, 513 F.3d at 1049-50; *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 841 (N.D. Cal. 2024); *Datel*

---

[6] As Innovative points out, where the defendant has market power in the foremarket, proof of lock-in under the *Epic* factors is not required to prove the relevant market. Br. at 56-57; *see also Surgical Instrument Serv. Co.*, "Brief of the American Antitrust Institute as Amicus Curiae in Support of Plaintiff-Appellant," *supra* note 3, at 6-7, 10-11.

*Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 990 (N.D. Cal.

2010); *In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288,

1304 (N.D. Cal. 2008); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F.

Supp. 2d 1218, 1227 (N.D. Cal. 1999).

**B. Any Legal Presumption Against Single-Brand Markets Applies to Markets for Stand-Alone Products, Not Aftermarkets.**

None of the cases cited by Biosense adopt a legal presumption

against single-brand aftermarkets. *See* Biosense Br. at 48-49. At best,

those cases show that courts are reluctant to define single-brand

markets for stand-alone products. This reluctance reflects courts' desire

to avoid an erroneous finding of market power based solely on the

success of the "manufacturer's own products" rather than the success of

the manufacturer's products in relation to competing products. *Apple,*

*Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008)

(quoting *Green Country Food Mkt., Inc. v. Bottling Grp.*, 371 F.3d 1275,

1282 (10th Cir. 2004)); *see also Green Country Food Mkt.*, 371 F.3d at

1282 ("[A] company does not violate the Sherman Act by virtue of the

natural monopoly it holds over its own product.") (cleaned up); *United*

*States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956) (Coke

15

and Pepsi would not generally be single-brand product markets because the "power that … soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly.").

The cases relied on by Biosense, Br. at 48-49, do not hold otherwise. In *Reilly v. Apple, Inc.*, the plaintiff alleged a single-brand market for a stand-alone product, not a single-brand aftermarket. The court rejected the stand-alone product market, citing judicial reluctance to define *those* markets. 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022). In the course of doing so, it observed that "Plaintiff does not allege that the [relevant market] is an aftermarket" and that "the Supreme Court and Ninth Circuit have … found single-brand markets plausible in the context of aftermarkets." *Id.* at 1107 (citing *Newcal*, 513 F.3d at 1049).

*Dang v. San Francisco Forty Niners* did not involve a single-brand market of either kind. 964 F. Supp. 2d 1097, 1105 (N.D. Cal. 2013). The court rejected the defendants' characterization of the market as single-brand and denied their motion to dismiss. *Id.* Although the court acknowledged judicial reluctance to define single-brand markets for

16

stand-alone products, it expressed no such reluctance with respect to aftermarkets. *Id.* at 1105.

In *Psystar*, the court similarly acknowledged judicial reluctance to define a single-brand market for a stand-alone product, but it rejected the plaintiff's proposed market in part *because* it was not an aftermarket. 586 F. Supp. 2d at 1197-98. Later in the opinion, when it rejected the plaintiff's separate allegation of an aftermarket derived from a foremarket, the court made no reference at all to a legal presumption against single-brand aftermarkets. *Id.* at 1200-03.

In *In re ATM Fee Antitrust Litigation*, the court rejected an alleged aftermarket, but not because of any presumption. 768 F. Supp. 2d 984, 995-97 (9th Cir. 2009). Rather, the plaintiff failed to adequately plead lock-in. *Id.* at 997. In acknowledging judicial reluctance to define a single-brand product market, the court cited only cases involving stand-alone products, not cases involving aftermarkets. *Id.* at 995, 997. The court also did not reason that the judicial reluctance to define single-brand markets for stand-alone products should extend to aftermarkets. *Id.*

17

### C. The Jury Found the Requisite Lock-In to Define a Single-Brand Aftermarket.

As noted above, in assessing whether a plaintiff has adequately defined a single-brand aftermarket, *Kodak* instructs lower courts to focus on market realities to determine whether there is sufficient lock-in. 504 U.S. at 476-77. This Court generally does so by looking to whether consumers have a voluntary contractual obligation to purchase the aftermarket product exclusively from the seller or whether the seller's market power coerces them to do so. *See Epic*, 67 F.4th at 977. Thus, in *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 2017), the Court rejected a single-brand aftermarket where the plaintiffs' initial purchases of insurance policies in a foremarket contractually— and unambiguously—committed them to use the defendant's hospital services in the aftermarket. As the Court further clarified in *Newcal*, "contractual obligations [are] not a cognizable source of market power." 513 F.3d at 1047.[7] But at the same time, the Court also emphasized

---

[7] The Court further observed that "the law prohibits an antitrust claimant from resting on market *power* that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." *Newcal*, 513 F.3d at 1048 (emphasis in original). The necessary implication is that, if the contract is not the sole source of the

that, simply by purchasing a product in the foremarket, the consumer does not contractually obligate itself to purchase products in the aftermarket from the foremarket seller. *Id.* at 1048; *see also Epic*, 67 F.4th at 977.

That is what happened here. The hospitals that purchased CARTO 3 mapping machines in the foremarket did not contractually obligate themselves to purchase clinical support services from Biosense in the aftermarket. As Innovative showed, "[c]linical support is not included contractually with a CARTO purchase." Innovative Br. at 46 (citing 6–ER–811; 10–ER–1794). Rather, Biosense's ability to exercise market power in the clinical support services aftermarket stemmed from the lock-in that the jury found Innovative adequately proved. 1–ER–32; 9–ER–1653-54.

Biosense thus provides no grounds for setting aside the jury's verdict. There is no legal presumption that can shield it from the consequences of its illegal tying violation, and the jury's finding of the

---

market power, the antitrust claimant may permissibly show lock-in using other economic evidence.

requisite lock-in confirms that Biosense exercised market power to inflict the injuries it caused hospitals in the aftermarkets.

## II. Because Biosense's Unlawful Conduct Caused Innovative's Losses, the Jury's Damages Verdict Should Not Be Disturbed.

Biosense also challenges the jury's damages verdict on the ground that Innovative should have disaggregated its damages to subtract lost sales attributable to what Biosense calls "lawful competition." Biosense Br. at 69. What Biosense characterizes as lawful are forced purchases of catheters by hospitals that acquired "additional" CARTO 3 machines while "knowing" about Biosense's tying policy. Biosense Br. at 73-74. Under Biosense's theory, catheter sales to these customers could not be deemed unlawful because such customers had allegedly made such subsequent machine purchases knowingly and freely. Apparently under Biosense's theory, hospitals making their first purchase of CARTO 3 machines (*i.e.*, not adding more CARTO 3 machines to their fleets) with supposed knowledge were still victims of unlawful behavior.

Biosense's theory fails at the threshold because the jury found that "Biosense's allegedly anticompetitive practices were not generally known when hospitals made their purchase of CARTO 3 machines." 1–

20

ER–1653; *see also supra* note 4. As Innovative showed, Biosense concealed the tying policy from hospitals, did not include it in CARTO 3 sales contracts, and revealed the policy to hospitals only when they sought to purchase reprocessed catheters. Innovative Br. at 18 (citing 6–ER–1018-19; 3–SER–456-57; 10–ER–1842-43; 6–ER–975). The jury's finding that Biosense's tying policy was not generally known wholly defeats the knowledge claim on which Biosense's "lawful competition" argument depends.

Biosense's theory also fails as a matter of law. The Sherman and Clayton Acts authorize successful antitrust plaintiffs to receive treble damages for injuries suffered because of a defendant's unlawful acts. *See* 15 U.S.C. § 15(a); *MCI Commc'ns Corp. v. AT&T*, 708 F.2d 1081, 1161 (7th Cir. 1983). The Cartwright Act provides similar relief. Cal. Bus. & Prof. Code § 16750(a). To avoid disaggregation of damages, a plaintiff therefore need only prove in a "reasonable manner" a "link between the injury suffered and the illegal practices of the defendant." *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992).

Here, the jury rejected none of Innovative's claims against Biosense and rejected all of Biosense's defenses that its conduct was lawful. It concluded that Innovative proved "by a preponderance of the evidence" that Biosense (1) "violated Section 1 of the Sherman Act through a tying arrangement," (2) "violated Section 2 of the Sherman Act by creating or maintaining a monopoly through anticompetitive practices," (3) "violated Section 2 of the Sherman Act by attempting to create or maintain a monopoly through anticompetitive practices," and (4) "violated Section 16720 of the Cartwright Act through a tying arrangement." 1–ER–32. Based on Biosense's violations, the jury awarded Innovative over $147 million in damages subject to trebling. 1–ER–33.

Courts order disaggregation of damages only where plaintiffs prove that some, but not all, of the defendant's conduct is illegal. When that is so, the sales attributable to lawful competition are disaggregated. *City of Vernon*, 955 F.2d at 1371. Thus, in *Farley Transportation Co. v. Santa Fe Trail Transportation Co.*, this Court vacated a jury's damages verdict and remanded for a new trial because plaintiff's evidence did not distinguish between damages caused by

22

defendant's unlawful scheme and injuries due to conduct that was not found unlawful. 786 F.2d 1342, 1352 (9th Cir. 1985). Similarly, in *MCI Communications*, the jury found for the plaintiff MCI on ten of the fifteen counts alleged against the defendant AT&T. 708 F.2d at 1160. Because MCI's damages study and evidence did not segregate damages caused by the ten counts from damages caused by the remaining five, the Seventh Circuit vacated the damages award and remanded for a new trial. *Id.*

Disaggregation, however, does not apply to sales attributable "the various unlawful acts of the defendant." *Id.* at 1161. Biosense provides no grounds for disaggregation or setting aside the damages verdict because the jury concluded that Innovative had proven that *all* of Biosense's conduct was unlawful. The trial judge specifically instructed the jury to compensate Innovative only "for all damages to its business that were a *direct result or likely consequence of the conduct that you found unlawful.*" 9–ER–1671 (emphasis added). Given the judge's instructions and the jury's verdicts, the jury's damages award reflects only unlawful conduct. *See supra* note 4. There is no lawful conduct on which to base disaggregation.

23

Nevertheless, Biosense cites several market-definition cases—*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997); *Newcal*, 513 F.3d 1038, and *Avaya Inc. v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016)—in support of requiring disaggregation of damages here. Biosense Br. at 70-73. Rather than disaggregation, those cases address the question relevant to the preceding liability determination, namely defining the relevant market in which competitive harm allegedly occurred. In *Queen City* and *Avaya*, the Third Circuit rejected a single-brand product market where it concluded that, because customers were allegedly locked into aftermarket purchases due to contractual commitments rather than the defendant's market power, the contracts, not the alleged anticompetitive conduct, compelled the aftermarket purchases. *Queen City*, 124 F.3d at 441; *Avaya*, 838 F.3d at 405. By contrast, this Court in *Newcal* concluded that the plaintiff had alleged the requisite lock-in, and thus defined a single-brand aftermarket, because the purchases were compelled by the defendant's market power in the foremarket and not by the customers' contractual commitments. 513 F.3d at 1050.

24

None of these cases intimated that the assessment of lock-in for purposes of market definition at the liability phase should be carried forward to the calculation of damages. Indeed, the district court preemptively rejected that argument, correctly observing that *Kodak* lock-in analysis should not "be confused with the amount of damages." 1–ER–39. So did this Court's decision in the earlier appeal in this case. *See Innovative Health, LLC v. Biosense Webster, Inc.*, No. 22-55413, 2024 WL 62948 (9th Cir. Jan. 5, 2024).

Biosense quotes this Court's statement that "[m]arket power arising 'solely from contractual rights that consumers knowingly and voluntarily gave up to the defendant' does not offend the antitrust laws," Br. at 73 (quoting *Innovative Health*, 2024 WL 62948, at *2 (quoting *Newcal*, 513 F.3d at 1048)), asserting that the statement supports disaggregation of damages. But the statement does no such thing. Consistent with the cases discussed above, it merely means that, for purposes of defining a single-brand aftermarket, consumers committed to purchasing a defendant's aftermarket products solely due to a contract are not deemed to be locked in due to market power and thus do not have viable antitrust claims. *See supra* Part I.

25

Even if these market definition decisions had addressed damages calculations, which they did not, Biosense's argument that it acted lawfully to the extent that some hospitals knew they were being forced into the tying policy runs headlong into *Newcal*, which forecloses the incorrect assumption implicit in it. Assuming (contrary to the record) that the jury had found that some hospitals had knowledge of the policy, that does not come close to suggesting those hospitals were contractually committed to purchase Biosense catheters. To be sure, "the law permits an inquiry into whether a consumer's selection of a particular brand in the competitive [fore]market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in the aftermarket." *Newcal*, 513 F.3d at 1049. But that means only that "[t]he law permits an inquiry into whether consumers entered into such 'contracts' knowing that they were agreeing to such a commitment." *Id.*

Even if, as Biosense maintains, no formal contract is required, Biosense Br. at 72, Biosense must at least prove that any hospitals that were aware of the policy contractually gave up their rights to purchase

aftermarket products from companies such as Innovative. Biosense has not done so.[8]

Market definition is but a tool for assessing the competitive harm caused by a defendant's unlawful conduct. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018). The very inquiry into whether hospitals purchased from Biosense because they were obligated by contract or coerced by market power only confirms the potential for harm caused by Biosense's tying policy. Where, as here, there is no evidence that hospitals contractually committed to aftermarket purchases from Biosense, the necessary conclusion is that Biosense's market power coerced those purchases. All hospitals needing to make those purchases to operate CARTO 3 machines thus were harmed by being forced to pay prices that were higher than they would have been had foreclosed competitors been able to sell lower-priced and higher-quality alternatives. *See Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (output restrictions "restrict marketwide

---

[8] In any event, the fact that hospitals may have knowingly acquiesced to the tie does not immunize Biosense's conduct. *See Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 139-41 (1968) (holding that plaintiffs' agreement to anticompetitive contractual restrictions provides no basis to deny recovery, especially in light of evidence of coercion).

output and, hence, increase marketwide prices" (quoting *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)).

Moreover, even if some hospitals had knowledge of the exclusivity policy, that awareness does not in any way suggest they would have willingly forgone lower-cost and higher-quality alternatives had they been given a choice, that Innovative could not have competed successfully for those sales,[9] or that Biosense's own catheters would not have been priced differently had they been subjected to market forces. Biosense's tying policy denied both the price and non-price benefits of competition to all hospitals with CARTO 3 mapping machines.

The jury's damages calculation thus rests on the unexceptional "assumption that competition is the best method of allocating resources in a free market" and "that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers." *Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679, 697 (1978). That assumption is not open to question, because "the Sherman Act

---

[9] The evidence showed that third-party reprocessors' share of catheter sales was 16% before Biosense adopted the tying policy and fell to 1% afterwards. 3–SER–499.

28

reflects a legislative judgment" enshrining it as "[t]he heart of our national economic policy." *Id.*

## CONCLUSION

For the foregoing reasons, this Court should affirm the jury's verdicts and the district court's order.

Respectfully submitted,


/s/ *Mark S. Hegedus*
MARK S. HEGEDUS
*Counsel of Record*
RANDY M. STUTZ
AMERICAN ANTITRUST INSTITUTE
Suite 1000
1025 Connecticut Avenue NW
Washington, DC 20036
(616) 313-2654
mhegedus@antitrustinstitute.org

*Counsel for Amicus Curiae the American Antitrust Institute*

May 27, 2026

29

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-6042

I am the attorney or self-represented party.

**This brief contains** 5,452 **words, including** 0 **words**

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Mark S. Hegedus    **Date** May 27, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of May, 2026, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. Counsel for all parties to the case are registered CMS users and will be served by the appellate ACMS system.

/s/ *Mark S. Hegedus*
Mark S. Hegedus

Dated: May 27, 2026