**No. 25-6042**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

BIOSENSE WEBSTER, INC.,

*Defendant-Appellant,*

v.

INNOVATIVE HEALTH, LLC,

*Plaintiff-Appellee.*

———————————

On Appeal from the United States District Court
for the Central District of California,
No. 8:19-cv-01984 (Selna, J.)

———————————

## BRIEF FOR ANTITRUST LAW PROFESSORS AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE

———————————

JOSHUA P. DAVIS
MATTHEW SUMMERS
JESSICA SEIGEL
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, California 94111
(415) 906-0684 (*telephone*)
*jdavis@bergermontague.com*
*msummers@bergermontague.com*
*jseigel@bergermontague.com*

*Counsel for Amici Curiae*

May 27, 2026

---

# TABLE OF CONTENTS

**PAGE**

Table of Contents ..................................................................................i

Table of Authorities.............................................................................ii

Interest of Amici Curiae.......................................................................1

Introduction and Summary of Argument .............................................1

The Case Below ...................................................................................2

Argument..............................................................................................5

     I.    The Foremarket-Power theory...............................................7

     II.   The Lock-In Theory...............................................................11

     III.  Why The Foremarket-Power Theory Is Independently Sufficient .................................................................................14

Appendix.............................................................................................17

Certificate of Compliance..................................................................18

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Eastman Kodak Co. v. Image Tech. Servs.*,
   504 U.S. 451 (1992) ............................................................ 7, 13, 14, 15

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ..................................................... 11, 13

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) .......................................................................... 9

*Lambrix v. Tesla, Inc.*,
   737 F.Supp.3d 822 (N.D. Cal. 2024) ............................................ 10

**OTHER AUTHORITIES**

Patrick Rey & Jean Tirole, *A Primer on Foreclosure*,
   3 Handbook of Industrial Organization ch. 33 (Armstrong &
   Porter, eds. 2007) ......................................................................... 9

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An
   Analysis of Antitrust Principles and Their Application* (5th ed.
   Supp. 2026) ................................................................................ 6, 9

Steven C. Salop, *The First Principles Approach to Antitrust,
   Kodak, and Antitrust at the Millennium*,
   68 Antitrust L.J. 187 (2000) ........................................................ 12

## INTEREST OF AMICI CURIAE

Amici are antitrust law professors who have published significant research, including numerous books and the leading treatise, on the antitrust laws. The authors have written this brief independently.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The jury below reached a verdict under the *Kodak* lock-in factors. It had another basis to find the Defendant-Appellant, Biosense Webster, Inc. ("Biosense"), capable of causing anticompetitive harm—foremarket power. This alternative ground for affirmance provides another way—besides the *Kodak* factors—to show that Biosense was able to injure competition in the aftermarket here.

Three markets (or sets of markets) are at issue in this case. The first is the foremarket for cardiac mapping machines. These machines produce three-dimensional maps of patients' hearts. The Plaintiff-Appellant, Innovative Health LLC ("Innovative"), presented evidence below that Biosense's machine, the CARTO 3, has long been the dominant cardiac mapping machine.

The second market is for Clinical Account Specialists for the CARTO 3. These Specialists operate the CARTO 3 machines and enable them to produce heart maps for use by doctors. Innovative presented

---

[1] All parties have consented to the filing of this amicus. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than amici curiae or their counsel—has contributed money that was intended to fund preparing  or submitting this brief.

evidence below that Biosense controlled the market for Clinical Account Specialists for the CARTO 3 during the relevant period.

A third market—or set of markets—consists of various kinds of cardiac mapping catheters. Doctors insert the catheters in patients' bodies and use them to send electrical signals and generate a cardiac map.

On appeal, Biosense challenges the jury's finding that Innovative satisfied the *Kodak* lock-in factors to define the market for Clinical Account Specialists for the CARTO 3. However, Biosense overlooks that Innovative was able to properly define the market without reliance on the *Kodak* factors. That is because Biosense possessed market power in the cardiac mapping foremarket.

The *Kodak* factors are necessary for a claim of aftermarket monopolization only if a defendant lacks market power in the foremarket, not if, as here, the defendant has market power in the foremarket. Biosense's power in the foremarket for cardiac mapping systems provides an independently sufficient ground to affirm.

## THE CASE BELOW

Biosense's CARTO 3 is the leading cardiac mapping machine in the U.S. It is operated by trained Clinical Account Specialists. The Specialists combine the CARTO 3 with cardiac mapping catheters to provide real-time data from the patient to assist doctors in cardiac procedures.

Innovative sells reprocessed catheters that are approved by the FDA for use with the CARTO 3. Hospitals benefit when they can choose between Biosense catheters and reprocessed Innovative catheters.

Biosense dominates the market for cardiac mapping machines. Its CARTO 3 machines are used in two-thirds of all cardiac-mapping procedures and are in 72% of all hospitals with a mapping machine nationwide. 6-ER-981–82; 6-ER-1029–30; 4-ER-358. Biosense sold its machines at prices significantly above those of its competitors. As Dr. Forister testified at trial, Biosense's CARTO 3 pricing decisions and other market data support the conclusion that CARTO 3 is not subject to effective competition. Biosense can set CARTO 3 prices above competitive levels.

The market for Clinical Account Specialists for CARTO 3 was initially competitive. However, over time, Biosense used various anticompetitive strategies to obtain dominance in the market for Clinical Account Specialists for the CARTO 3.

This case centers around Biosense's campaign to dominate the markets for catheters. Innovative was a vigorous competitor in those markets. Innovative offered reprocessed catheters for the CARTO 3 that the FDA approved, that cost half as much as Biosense's new catheters, and that were as effective as or more effective than Biosense's catheters. Innovative's catheters were obtaining widespread adoption, cutting into Biosense's profits. To protect those profits, Biosense imposed a tie.

3

The jury found that Biosense engaged in tying. Biosense wanted to force hospitals to buy its catheters and to eliminate Innovative's reprocessed catheters as an alternative. Toward that end, Biosense prohibited hospitals from using its Clinical Account Specialists unless the hospitals used exclusively Biosense catheters in cardiac procedures. This tied Clinical Account Services to catheter purchases.

Biosense's tie coerced hospitals to use only Biosense catheters. Hospitals were reliant on Biosense's CARTO 3 and its Clinical Account Specialists.

Innovative presented evidence at trial of Biosense's market power in two ways. First, Innovative showed that Biosense disclosed its tie to hospitals only after they had purchased the CARTO 3 and tried to use third-party reprocessed catheters. 6-ER-1018–19; 9-ER-1695; 6-ER-975. By that time, Innovative argued, hospitals were dependent on Biosense's Clinical Account Specialists and, as a result, the tie coerced them to purchase Biosense's catheters rather than Innovative's reprocessed catheters.

Second, Innovative showed that Biosense dominated the foremarket for cardiac mapping machines. That dominance combined with Biosense's control over Clinical Account Specialists for the CARTO independently provided Biosense with sufficient market power to make its tie effective.

4

Innovative's claims against Biosense are based on a well-established concern that a firm can use its dominance in one market to suppress competition and obtain dominance in a second market. To prevail on a prima facie claim, the plaintiff must prove that the defendant has market power in the primary market and has used anticompetitive means—for example, tying—to obtain an advantage over competitors in the second market. That is just what the jury found below—that Biosense used its dominance over the Clinical Account Specialists to eliminate competition in cardiac mapping catheter markets.

The jury found that Innovative proved Biosense's aftermarket liability through the "lock-in theory." But if Biosense successfully challenges that finding on appeal, this Court should nonetheless affirm. The *Kodak* factors are required only where the defendant does *not* have market power in the primary market. Here, Innovative made a sufficient showing of power in the market for cardiac mapping machines that, when combined with its control of Clinical Account Specialists for CARTO 3, made for an effective anticompetitive tie, regardless of the *Kodak* factors.

## ARGUMENT

Sections 1 and 2 of the Sherman Act forbid monopolists from exploiting their market power in one market to stifle competition in another market. The reason is that consumers in the second market are harmed when competition is reduced or eliminated. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust*

*Principles and Their Application* ¶¶ 652c, 1706 (5th ed. Supp. 2026). For example, a prima facie tying case consists of showing that the defendant has market power over one product (the "tying" product) and conditions sales of that product on customers purchasing another product (the "tied" product) from it. Market or monopoly power in a primary market may similarly allow the defendant to impose exclusive dealing requirements, or otherwise obtain or maintain a monopoly, in a second market such as would support a Section 1 exclusive dealing claim or a Section 2 monopolization claim regarding the second market.

In many markets, there is a "foremarket" consisting of durable goods (such as printers or large machines) and one or more "aftermarkets" consisting of goods (such as ink or catheters) or services (such as machine operation services) that are necessary to maintain, use, or derive maximum value from the foremarket good. "An aftermarket is a type of derivative market consisting of consumable goods or replacement components that must be used for the proper functioning of some primary good." *Id.* ¶ 564b. Under Sections 1 and 2, a plaintiff can make a prima facie case by showing that the defendant's market power over a foremarket enables it to restrict competition in one or more aftermarkets. This theory is a straightforward application of traditional antitrust principles and is not treated in the case law as a distinctive source of antitrust liability, but Amici call it the "foremarket-power

6

theory" here to distinguish it clearly from the lock-in theory. Innovative substantiated the foremarket-power theory below.

There is an alternative way for a plaintiff to prevail on a claim that a company has reduced competition in an aftermarket. This theory, unlike the first, is primarily used where the defendant does *not* have market power in the foremarket. According to the "lock-in theory," a defendant who faces competition in the foremarket may incur liability for excluding competitors in an aftermarket derived from demand for the defendant's foremarket product when consumers of the defendant's foremarket product had no reason to expect that such exclusion would take place, among other requirements. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992).

The two theories are separate and independent ways of establishing liability. Innovative substantiated its case under both theories. In addition to affirming Innovative's sufficient showing under the first (lock-in) theory, this Court should recognize Innovative's independently sufficient showing under the second (foremarket-power) theory. This will clarify the doctrine around single-brand aftermarkets and guide courts toward correctly applying the two theories.

## I.   THE FOREMARKET-POWER THEORY

The foremarket-power theory is simply an application of the standard doctrinal framework underpinning tying, exclusive dealing, and monopolization cases. As noted above, tying consists of exploiting

7

market power over a "tying" product to require purchasers to also purchase a "tied" product from the defendant, thereby reducing competition in the tied market. Similarly, a plaintiff makes out a prima facie section 2 case by showing that the defendant has obtained or maintained market power in one market through "anticompetitive," "exclusionary," or "predatory" conduct enabled by its market power in another market. The foremarket-power theory recognizes that market power over a foremarket product may give a defendant the ability to profitably suppress competition in a related aftermarket through tying, exclusive dealing, or other anticompetitive conduct affecting the aftermarket. Importantly, the defendant can exercise that power regardless of whether its customers are aware of the defendant's aftermarket behavior when they make their foremarket purchase—the defendant's power comes directly from its monopoly position in the foremarket, not from its customers' ignorance or confusion. That's why there's no "lock-in" requirement associated with the foremarket-power theory.

While antitrust law allows firms to obtain monopolies as a reward for innovation, it prohibits firms from using a monopoly in one market to suppress competition in a second market. To understand why, suppose that a firm has a monopoly over drug A, which it sells to hospitals. The firm also manufactures drug B in a competitive market where other firms also produce drug B. In monopolized market A, the firm can lawfully

charge monopoly prices at the expense of consumers and reap monopoly profits. The law permits monopoly pricing of drug A as a reward for inventing drug A. In competitive market B, the firm cannot charge monopoly prices because if it were to raise the price, the hospitals would simply buy drug B from other sellers. To prevent that from happening, the firm tells the hospitals that if they want to buy drug A from it, they must also buy all their needs for drug B from it, rather than from competing sellers of drug B. If drug A is important enough to the hospitals, the hospitals will stop buying drug B from the firm's competitors in the drug B market. Instead, they will buy drug B from the firm in question. Now the firm has two monopolies rather than just one, and it can raise prices for drug B as well as maintain its monopoly price for drug A. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) (describing the elements of a tying claim). An academic consensus supports liability in such cases for this reason. *See*, e.g., Patrick Rey & Jean Tirole, *A Primer on Foreclosure*, 3 Handbook of Industrial Organization ch. 33 (Armstrong & Porter, eds. 2007); Areeda & Hovenkamp, *supra*, ¶ 1704b2.

The effect of gaining control of a second or adjacent market is sometimes called "foreclosure" because firms that might otherwise sell drug B to the hospitals are foreclosed from doing so. The mechanism for foreclosing the market for drug B is tying in the example above, though other mechanisms—like exclusive dealing—can be used as well.

9

Foreclosure is harmful because the firm that engages in foreclosure converts a competitive market into a monopoly, enabling it to raise prices in that market. To prevail on a tying claim against the firm, a plaintiff must prove that the firm had market power over drug A and that it used the tie to exclude competition for drug B. If the plaintiff cannot prove that the firm had market power over drug A, it will lose the case.

The above example does not involve an aftermarket, but the principles are exactly the same. Now suppose that product A is a medical device, as in the case here, and that product B consists of parts, attachments, or services. If the defendant has a monopoly over the medical device, which it obtained through innovation, it is entitled to charge a monopoly price for that device. But the defendant is not permitted to use its monopoly over the foremarket medical device to suppress competition in related aftermarkets. That would permit the defendant to charge higher prices in the aftermarkets where it has not innovated, causing injury to consumers. The Sherman Act thus gives the customers (as well as competitors in aftermarkets) claims against the defendant for suppressing competition in aftermarkets.

A recent opinion in the Northern District of California illustrates these principles. In *Lambrix v. Tesla, Inc.*, 737 F.Supp.3d 822 (N.D. Cal. 2024), consumers sued Tesla for monopolizing the aftermarkets for replacement parts and repair services by requiring some of its suppliers to supply parts exclusively to Tesla and interfering with the ability of

10

independent service providers to service Tesla automobiles. The plaintiffs alleged both a foremarket-power theory and a lock-in theory. The court denied the motion to dismiss on the basis of both theories. The plaintiffs could proceed to trial on the foremarket-power theory because they sufficiently alleged that Tesla had market power in the electric vehicles market and used the power to monopolize the parts and repair aftermarkets. While the court also held that the plaintiffs adequately alleged the lock-in theory, the foremarket-power theory was sufficient on its own.

## II.    THE LOCK-IN THEORY

The lock-in theory is different from the foremarket-power theory because the lock-in theory does not require the defendant to have market power in the foremarket. The theory was recognized in the Supreme Court's *Kodak* case, and has been addressed in other cases such as *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023).

In *Kodak*, a group of companies that repair photocopiers sued Kodak for tying the sale of parts for Kodak-branded copiers to service of those copiers and monopolizing the aftermarket for service of those copiers. The plaintiffs argued that Kodak monopolized the service aftermarket by blocking sales of Kodak parts to the plaintiffs and in other ways interfering with the ability of the plaintiffs to service Kodak machines.

11

Kodak argued that, as a matter of law, it could not be held liable for monopolizing the aftermarket because it lacked power in the foremarket. Kodak asserted that even if it had a monopoly of the parts aftermarket, it did not have market power in that aftermarket and thus could not raise prices above the competitive level in either the parts or the service aftermarkets. The reason, Kodak argued, is that the buyers of copiers (in the foremarket) take into account downstream costs of maintenance and repair (in the aftermarkets). This is known as lifecycle pricing: the customers estimate the price of the Kodak copier over its entire lifecycle, thus summing the retail price at the time of purchase and the present value of the expected price of maintenance and repairs for the useful life of the copier. Kodak argued that, if it raised aftermarket prices, then the buyers would demand a discount in the foremarket so as to offset the additional expected downstream costs. Otherwise, they will buy copiers from Kodak's competitors rather than from Kodak. But because the foremarket is competitive, Kodak already sells copiers at the competitive price; if it reduces the price, it will lose money. Kodak thus argued it could not raise prices in the aftermarket without losing customers in the foremarket. In short, Kodak argued, it is impossible for a firm that faces foremarket competition to monopolize the aftermarket.[2]

---

[2] For a discussion of the lock-in theory in *Kodak*, see Steven C. Salop, *The First Principles Approach to Antitrust, Kodak, and Antitrust at the Millennium*, 68 Antitrust L.J. 187 (2000).

The Supreme Court rejected the argument. The Court explained:

> Kodak's claim that charging more for service and parts would be "a short-run game," . . . is based on the false dichotomy that there are only two prices that can be charged—a competitive price or a ruinous one. But there could easily be a middle, optimum price at which the increased revenues from the higher priced sales of service and parts would more than compensate for the lower revenues from lost equipment sales. The fact that the equipment market imposes a restraint on prices in the aftermarkets by no means disproves the existence of power in those markets.

*Kodak*, 504 U.S. at 470–71. In certain conditions, Kodak can raise the aftermarket price without lowering the foremarket price by locking in foremarket customers who are unable to accurately estimate the lifecycle price. In *Epic*, the Ninth Circuit enumerated the factors that a plaintiff must prove to proceed under *Kodak*'s lock-in theory where the defendant lacks power in the foremarket: (1) consumers in the foremarket must not generally be aware of the aftermarket restrictions; (2) consumers cannot price the aftermarket restrictions accurately because of significant information costs; (3) the cost of switching to a different brand in the foremarket is high; and (4) the aftermarket is itself a well-defined market. *Epic*, 67 F.4th at 977.

The lock-in theory says that a firm without market power in the foremarket can achieve market power in an aftermarket. The *Kodak* court said this was possible because consumers who are unaware of aftermarket restrictions and are unable to engage in lifecycle pricing will make purchases in the foremarket without being able to take account of the consequences of their choice. Kodak can then surprise them with a

13

change of conduct—for example, as in Kodak itself, driving competitors from the aftermarket and then raising prices. The customer cannot simply switch to another brand of copier—perhaps because copiers are expensive or staff have been trained with Kodak machines or Kodak machines interoperate with other business equipment owned by the customer.

Innovative asserted both the lock-in theory and evidence of Biosense's market power in the surgical cardiac mapping machine foremarket. Accordingly, it was not required to satisfy the lock-in conditions to prevail.

## III. WHY THE FOREMARKET-POWER THEORY IS INDEPENDENTLY SUFFICIENT

Biosense's argument challenging the *Kodak* factors ignores Innovative's independently sufficient foremarket-power theory. That is a mistake. If Kodak had had market power in the market for copiers, then plaintiffs could have prevailed under the foremarket-power theory and would not have been required to satisfy the *Kodak/Epic* conditions for lock-in.[3] Imagine, for example, that customers could perfectly engage in lifecycle pricing, so that the lock-in theory does not apply. If Kodak had a foremarket monopoly over copiers, then the customers would know that Kodak could also obtain a monopoly over service by refusing to sell parts

---

[3] The Court explicitly recognized that Kodak did not have market power in the foremarket. *Kodak*, 504 U.S. at 465 & n.10.

to the repair companies. Knowing this, the customers could in principle calculate the lifecycle price of the copier. But having done so, they would not be able to purchase a different copier brand with a lower lifecycle price because there is no other copier brand. In this scenario, Kodak's use of foremarket power to monopolize the aftermarket causes an antitrust injury to consumers because of the reduction of competition in the aftermarket, enabling Kodak to raise aftermarket prices. The consumers' capacity to engage in lifecycle pricing does not protect them from the antitrust injury.

Biosense's fixation on the *Kodak* factors to the exclusion of foremarket-power theory turns the lock-in theory on its head. The lock-in theory *expanded* antitrust liability by applying it to defendants *without* foremarket power who lock in their customers. That is why Justice Scalia, in his *Kodak* dissent, complained that the majority's opinion "threatens to release a torrent of litigation." *Kodak*, 504 U.S. at 489. By contrast, Biosense's view would *contract* antitrust liability by immunizing defendants with foremarket power who exercise their market power with means other than lock-in. This is a mashup of lock-in and foremarket-monopoly that violates settled antitrust principles and common sense. Neither the Supreme Court nor any court of appeals has ever taken Biosense's position.

15

Respectfully submitted,

By: */s/ Joshua P. Davis*

JOSHUA P. DAVIS
MATTHEW SUMMERS
JESSICA SEIGEL
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, California 94111
(415) 906-0684 (*telephone*)
*jdavis@bergermontague.com*
*msummers@bergermontague.com*
*jseigel@bergermontague.com*

*Counsel for Amici Curiae*

16

# APPENDIX

## Identities of *Amici Curiae*

Rebecca Allensworth, David Daniels Allen Distinguished Chair of Law, Vanderbilt University Law School

Harry First, Charles L. Denison Professor of Law Emeritus, New York University School of Law

Eleanor Fox, Walter J. Derenberg Professor of Trade Regulation Emerita, New York University School of Law

Erik Hovenkamp, Professor of Law, Cornell Law School

Herbert Hovenkamp, James G. Dinan University Professor, University of Pennsylvania Carey Law School

Mark A. Lemley, William H. Neukom Professor of Law at Stanford Law School

John M. Newman, Herbert Herff Chair of Excellence, University of Memphis School of Law

Eric A. Posner, Kirkland & Ellis Distinguished Service Professor, University of Chicago Law School

Spencer Weber Waller, John Paul Stevens Chair in Competition Law, Loyola University Chicago School of Law

17

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s) 25-1372**

I am the attorney or self-represented party.

**This brief contains 3,481 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Date: May 27, 2026

*/s/ Joshua P. Davis*
JOSHUA P. DAVIS

*Counsel for Amici Curiae*

18