**Case No. 25-6042**

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**INNOVATIVE HEALTH LLC,**
*Plaintiff-Appellee,*

**v.**

**BIOSENSE WEBSTER, INC.,**
*Defendant-Appellant.*

---

Appeal from the United States District Court for
the Central District of California
Case No. 8:19-cv-01984
Hon. James V. Selna

---

**BRIEF OF *AMICUS CURIAE* UNITED STATES PUBLIC INTEREST
RESEARCH GROUP INC. IN SUPPORT OF PLAINTIFF-APPELLEE**

Nina K. Srejovic
Phillip R. Malone
JUELSGAARD INTELLECTUAL PROPERTY
  AND INNOVATION CLINIC
MILLS LEGAL CLINIC AT
  STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-2237
srejovic@stanford.edu

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..............................................................................III

INTEREST OF AMICUS CURIAE ...................................................................1

SUMMARY OF ARGUMENT ..........................................................................2

ARGUMENT ......................................................................................................4

I. Biosense's multi-pronged anticompetitive strategy violated the Sherman Act. .............................................................................................................4

    A. Biosense employed an integrated unlawful contractual and technological tie. .............................................................................5

    B. Biosense virtually eliminated superior products from the market through predatory exclusion rather than competitive merit. ................7

II. To protect patients, this Court must affirm that Biosense's anticompetitive practices violate antitrust law. .........................................9

    A. Anticompetitive practices such as Biosense's undermine the public interest by foreclosing cost saving, diminishing the quality of patient care, and blocking innovation. .........................................................10

    B. Anticompetitive practices exacerbate the already high cost of health care. .......................................................................................14

    C. Patients cannot leave the market to protect themselves from anticompetitive practices in health care. .............................................21

III. Consumers deserve free choice in product purchase, use, and maintenance. .......................................................................................23

A. Manufacturers like Biosense improperly impose restrictions on how hospitals can use the products they purchase.......................................24

B. Across industries, repair and reprocessing restrictions merit judicial attention.................................................................................................28

CONCLUSION .................................................................................................31

CERTIFICATE OF COMPLIANCE ...............................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ...................................................................7

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ...................................................................6

*Gamboa v. Apple Inc.*,
No. 24-CV-01270, 2025 WL 1684890 (N.D. Cal. June 16, 2025) .........6

*In re Deere & Co. Repair Service Antitrust Litigation*,
703 F.Supp.3d 862 (N.D. Ill. 2023) .......................................................30

*Innovative Health LLC v. Biosense Webster, Inc.*,
No. 19-cv-01984, slip op. (C.D. Cal. Aug. 27, 2025) ...............5, 6, 7, 8

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ..................................................................................5, 6

*Lambrix v. Tesla, Inc.*,
737 F. Supp. 3d 822 (N.D. Cal. 2024) ...................................................30

*Red Lion Medical Safety Inc. v. General Electric Company, Inc.*,
No. 15-CV-00308 (E.D. Tex. Apr. 26, 2017) .........................................30

*Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*,
571 F. Supp. 3d 1133 (N.D. Cal. 2021) ...................................................8

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) .................................................................................7

**Statutes**

15 U.S.C § 1 ...............................................................................................5

15 U.S.C. § 2 ..............................................................................................6

iii

**Other Authorities**

Allen, Alexandra, *Financialization in Health Care: History, Current Trends, and Impacts on Patients,* Health Care Value Hub (Nov. 2024), https://perma.cc/8UX2-JXBL................................................................19

Am. Hosp. Ass'n, *Costs of Caring: Challenges Facing America's Hospitals as They Care for Patients in 2026* (Mar. 2026), https://perma.cc/ZQY8-Q9VJ...............10

Am. Med. Ass'n, *Competition in Health Care Research*, (Dec. 16, 2025), https://perma.cc/BCQ7-PNBR ...............................................................19

Areeda, Phillip E. & Hovenkamp, Herbert, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1757 (5th ed. 2025) .......................................6

Ass'n of Med. Device Reprocessors, *Forced Obsolescence Designed into Devices*, https://perma.cc/AUS6-7KPS..........................................................9, 11

Ass'n of Med. Device Reprocessors, *Reducing Costs by Reprocessing* (Mar. 2026), https://perma.cc/Y4MP-GYJB ...............................................................10

Boise State Univ. Coll. of Bus. and Econ., *Issues in the U.S. Hospitals' Supply Chain System* (Apr. 29, 2025), https://perma.cc/75F6-XXYG............................12

Burns, Lawton R. et al., *Physician Preference Items: What Factors Matter to Surgeons? Does the Vendor Matter?* 11 Med. Devices: Evid. and Rsch. 39 (2018), ttps://perma.cc/KUG8-R2QE................................................................17

Cassling, *How Much Does an MRI Scanner Cost?* (June 3, 2024), https://perma.cc/VC6N-6S83 .................................................................27

Claxton, Gary et al., *Employer Health Benefits: 2025 Annual Survey,* KFF (2025), https://perma.cc/HTY5-GAZM ...............................................................16

Collins, Sara R. & Gupta, Avni, *The State of Health Insurance Coverage in the U.S.: Findings from the Commonwealth Fund 2024 Biennial Health Insurance Survey*, Commonwealth Fund (Nov. 21, 2024), https://perma.cc/2EJX-3H8E...16

Council of Econ. Advisors, *Economic Report of the President* (2019), https://perma.cc/T4M7-KYJE .................................................................21

Cunningham, Robert B. & Hobbs, Darby, *The Evolution of the Right to Repair*, Antitrust Mag. Summer 2023, https://perma.cc/9M4L-2AWZ ...........................29

iv

Definitive Healthcare, *Reigning in Hospital Supply Costs & Physician Preference Item Spending* (Aug. 18, 2020), https://perma.cc/2342-PSDX ...........................28

DrugPatentWatch, *Generic Drug Cost Optimization: Cut Production Costs, Win Patent Races, and Dominate the Market* (Mar. 24, 2025), https://perma.cc/XF3R-N8M2....................................................................................19

DrugPatentWatch, *The Art of the Evergreening: A Deep Dive into Drug Life Cycle Management Tactics and How to Challenge Them* (Jan. 14, 2026), https://perma.cc/5R8J-A77D .................................................................................18

Fed. Trade Comm'n, *FTC to Ramp Up Law Enforcement Against Illegal Repair Restrictions* (July 21, 2021), https://perma.cc/8G3D-S8VM].............................29

Federal Trade Comm'n, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions* (May 2021), https://perma.cc/RV9E-ZJ9K ...............................26, 29

Galewitz, Phil, *A New Car vs. Health Insurance? Average Family Job-Based Coverage Hits $27K*, KFF Health News (Oct. 22, 2025), https://perma.cc/3EJW-W8H2 .............................................................................................................15

Grand View Rsch., *Mapping Catheters Market Size, Share & Trends Analysis Report* (2025), https://perma.cc/53SG-VLXP ....................................................12

Grinvald, Leah Chan & Tur-Sinai, Ofer, *Intellectual Property Law and the Right to Repair*, 88 Fordham L. Rev. 63 (2019) .............................................................14

Hartman, Micah et al., *National Health Care Spending Increased 7.2 Percent in 2024 as Utilization Remained Elevated*, 45 Health Affs. 110 (2026), https://perma.cc/D2ER-NLEN .......................................................................15

Hawryluk, Markian, *As Ventilators Become Crucial, Repair Roadblocks Remain*, Fierce Biotech (Apr. 20, 2020, 7:30 AM), https://perma.cc/L4H3-89B5............13

He, Shuhan et al*., The Medical Right to Repair: The Right to Save Lives*, 397 Lancet 1260 (2021)....................................................................................13

Huang, Chunya et al., *Transitions from One Electronic Health Record to Another: Challenges, Pitfalls, and Recommendations*, 11 Applied Clinical Informatics 742 (2020), https://perma.cc/K2F6-PPYE .................................................................27

Kelmar, Patricia, *Testimony of U.S. PIRG at a House Ways and Means Committee, Subcommittee on Health hearing on Why Health Care Is Unaffordable*, U.S. PIRG (Mar. 23, 2023), https://perma.cc/3ESH-RVGY ........................................17

Kurani, Nisha et al., *Price Transparency and Variation in U.S. Health Services*, Peterson-KFF Health Sys. Tracker (Jan. 13, 2021), https://perma.cc/M5QG-BJ4C ..............................................................................................................23

Lindgren, Lars et al., *The Right to Repair Software-Dependent Medical Devices*, 50 J.L. Med. & Ethics 857 (2022) .......................................................................25

Lo, Justin et al., *Ongoing Challenges with Hospital Price Transparency*, Peterson-KFF Health Sys. Tracker (Feb. 10, 2023), https://perma.cc/R4K2-WCC9.........22

Louviere, Benjamin J., *Time for a Tune Up in America's Healthcare Market: Securing the Right to Repair for Medical Devices*, 48 J. Corp. L. 183 (2023) .....9

O'Brien, Linda, *Texas Jury Returns $131.4M Verdict Against GE Over Anesthesia Equipment Parts Monopoly*, VitalLaw (May 1, 2017), https://perma.cc/4D5R-3BJK ...........................................................................................................31

O'Grady, Eileen & Bernstein, Cory, *Private Equity in Durable Medical Equipment: How Private Equity Profits off of Disabled and Chronically Ill Americans*, Priv. Equity Stakeholder Project & Nat'l. Disability Rts. Network (Nov. 2023), https://perma.cc/4G9C-QA8E ......................................................20

O'Reilly, Kevin, *Philips' Right to Repair Restrictions Are Illegal, Jury Finds*, TechNation (July 1, 2023), https://perma.cc/DW3Q-C6NN ...............................26

Palabindala, V. et al., *Adoption of Electronic Health Records and Barriers*, 6 J. Cmty. Hosp. Internal Med. Persp., no. 5, 2016, https://perma.cc/89FN-ZUSK..27

PatientsRightsAdvocate.org, *Fourth Semi-Annual Hospital Price Transparency Report* (Feb. 2023), https://perma.cc/B5HD-Y79Z..........................................22

Pauly, Mark V. & Burns, Lawton R., *Price Transparency for Medical Devices*, 27 Health Aff. 1544 (2008), https://perma.cc/M33G-9535 ..........................25, 26, 28

Peter G. Peterson Found., *How Does the U.S. Healthcare System Compare to Other Countries?* (last updated Oct. 7, 2025), https://perma.cc/9T9K-2MWL ..15

vi

Proctor, Nathan & O'Reilly, Kevin, *Hospital Repair Restrictions: Manufacturer-Imposed Barriers to Fixing Medical Equipment Cause Inefficiencies and Delays*, U.S. PIRG Educ. Fund (Jul. 8, 2020), https://perma.cc/BTJ8-S2CC............12, 13

Proctor, Nathan, *Release: All 50 States Now Have Filed Right to Repair Legislation Over Last 8 Years*, U.S. PIRG (Feb. 24, 2025), https://perma.cc/Q5YA-CJ54.................................................................30

Proctor, Nathan, R*ight to Repair Is a Simple Way to Cut Health Care Costs*, U.S. PIRG (Sept. 11, 2018), https://perma.cc/N3YE-SAHP ......................................25

Purvis, Leigh, *Prices for Top Medicare Part D Drugs Have Nearly Doubled Since Entering the Market*, AARP Pub. Pol'y Inst. (Jan. 2025), https://perma.cc/Y2WC-YANA.................................................................18

Schondelmeyer, Stephen W. & Purvis, Leigh, *Trends in Retail Prices of Brand Name Prescription Drugs Widely Used by Older Americans, 2006 to 2024*, AARP Pub. Pol'y Inst. (Feb. 12, 2026), https://perma.cc/Y6UR-J9TQ..............18

Sparks, Grace et al., *Americans' Challenges with Health Care Costs*, KFF (Apr. 30, 2026), https://perma.cc/M43W-7HL7 ...............................................................21

Thiel, Cassandra et al., *The Case for Hospitals to Boost Single-Use Device Reprocessing Programs*, Nat'l Acad. of Med. (June 16, 2025), https://perma.cc/M8V8-J9HZ.................................................................9

Thording, Lars, *The Quiet Monopolies Driving Up Healthcare Costs,* MedCity News (Dec. 30, 2025, 9:11 AM), https://perma.cc/87R7-RNHF ..................14, 28

Tur-Sinai, Ofer & Grinvald, Leah Chan, *Repairing Medical Equipment in Times of Pandemic*, 52 Seton Hall L. Rev. 461 (2021) ......................................................11

U.S. Dep't of Health & Human Servs., *HHS Consolidation in Health Care Markets RFI Response* (2025), https://perma.cc/4JPN-E5TB...........................................20

Wager, Emma et al., *What Drives Health Spending in the U.S. Compared to Other Countries?* Peterson-KFF Health Sys. Tracker (Aug. 2, 2024), https://perma.cc/6TWW-W5VR.................................................................15

Welch, Henry & Proctor, Nathan, *Hospital Repair Restrictions II*, U.S. PIRG Educ. Fund (Mar. 12, 2026), https://perma.cc/LG56-YCV8.........................................11

vii

Wilson, Charles B., *Adoption of New Surgical Technology*, 332 BMJ 112 (2006),
https://perma.cc/JHU7-6DGL ...........................................................................28

## INTEREST OF AMICUS CURIAE[1]

*Amicus Curiae* United States Public Interest Research Group Inc. ("U.S. PIRG") is a national, nonprofit organization that advocates for the public interest by addressing the systemic problems affecting millions of Americans. U.S. PIRG stands as a voice for the public against entrenched interests, employing grassroots organizing and direct advocacy for the public across critical sectors including transportation, energy, consumer protection, and health care.

Dedicated to promoting competitive markets and lowering health care costs, U.S. PIRG works on behalf of consumers to dismantle the barriers that inflate health care expenditures. Through rigorous research, policy advocacy, and public education, the organization identifies and challenges practices that burden patients, insurers, and taxpayers, particularly the anticompetitive conduct found in increasingly concentrated health care markets. U.S. PIRG frequently appears as *amicus curiae* in litigation involving health care competition to provide a consumer-centric perspective on market dynamics.

---

[1]*Amicus* certifies that no counsel for a party authored this brief in whole or in part, and no person other than amicus or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. The parties have consented to its filing.

As a leading consumer advocate, U.S. PIRG has a longstanding history of advocating for policies to control health care costs without compromising quality. U.S. PIRG has a profound interest in preserving the integrity of health care markets and ensuring that consumers and providers retain the ability to challenge anticompetitive behavior.

U.S. PIRG submits this brief because the anticompetitive conduct at issue directly results in inflated medical device prices that place an unnecessary financial strain on American consumers and businesses. [2]

## SUMMARY OF ARGUMENT

Patients are captive consumers shopping for health care. American patients today often face an impossible choice between paying exorbitant prices for basic care and saving for other necessities. They navigate a thorny landscape where hospital services and prescription drugs are unaffordable and insurance premiums and co-pays are prohibitive. Anticompetitive conduct is often the culprit.

Biosense Webster Inc.'s ("Biosense") exclusionary behavior in the medical device sector contributes to the harms of an already anticompetitive health care landscape. Because medical device expenditures significantly impact hospital and

---

[2] *Amicus* wishes to thank Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic Certified Law Students Faith Fisher, John Snyder, and Chen "Mia" Xing for their substantial assistance in drafting this brief.

patient costs, the consequences of market manipulation are severe. Through a combination of contractual and technological tying, manufacturers like Biosense engineer and exploit single-brand aftermarkets—distinct secondary markets where high switching costs and informational asymmetries lock hospitals into a proprietary ecosystem. Hospitals must pass cost burdens onto patients because they are unable to respond to aftermarket exploitation. Quality of patient care suffers because devices cannot be serviced in time. And patient-focused, innovative technologies and services cannot enter the market.

The district court correctly determined there was substantial evidence to support the jury's verdict that Biosense engaged in unlawful tying under Section 1 of the Sherman Act and unlawful and attempted monopolization under Section 2 of the Sherman Act. Through mutually reinforcing contractual terms, technological barriers, and predatory hoarding practices, Biosense unlawfully obtained and maintained a single brand aftermarket, coercing hospitals using Biosense's CARTO 3 cardiac-mapping machine to buy catheters only from Biosense affiliates, suppressing competition from catheter reprocessors like Innovative Health, LLC ("Innovative Health"). This Court should affirm the district court's findings to protect the integrity of the health care system.

3

Biosense's restrictions are a manifestation of a growing harmful trend. From automobiles to agricultural equipment, repair and reprocessing aftermarket restrictions stifle competition and harm consumers. While legislatures have responded with "right to repair" reforms, courts must also condemn these practices as the antitrust violations they are, lest they become a blueprint for monopolizing aftermarkets in the health care sector and beyond.

The decision in this case is vital to protecting the public interest in a health care sector already burdened by suppressed competition and supracompetitive pricing. The anticompetitive practices at issue are not isolated to a single catheter or a single manufacturer. They pervade the American health care industry—in a health care market already characterized by insufficient competition, the consequences of allowing such tying arrangements and reprocessing barriers to stand would be severe. Permitting such practices would make medical care increasingly inefficient, expensive, and inaccessible for ordinary Americans.

## ARGUMENT

**I.** **Biosense's multi-pronged anticompetitive strategy violated the Sherman Act.**

Through its Case Coverage Policy, anti-reprocessing technology (the "Falcon Chip"), and used catheter collection practices, Biosense foreclosed competition in the CARTO 3 catheter aftermarket, coercing hospitals into abandoning Innovative

Health's FDA-regulated reprocessed devices in favor of its proprietary Biosense catheters.[3] *Innovative Health LLC v. Biosense Webster, Inc.*, No. 19-cv-01984, slip op. at 12 (C.D. Cal. Aug. 27, 2025). The district court correctly found that when viewed together, Biosense's tactics constitute "ample evidence of Biosense's anticompetitive conduct under [the Sherman Act]." *Id*.

### A. Biosense employed an integrated unlawful contractual and technological tie.

Biosense's anticompetitive behavior created and perpetuated the lock-in effect for its proprietary catheter aftermarket. Its Case Coverage Policy, issued in 2016, cornered customers into an intractable dilemma: either 1) use cost-effective reprocessed catheters and forfeit use of their CARTO 3 machines through the associated loss of "must-have" clinical support services, *id.* at 2, or 2) maintain functionality of their CARTO-3 machines by paying premium prices for Biosense catheters. By leveraging its power in the clinical support market to eliminate competition in the catheter market, Biosense deprived customers of their "freedom to select the best bargain in the second market" in violation of Section 1. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 14–15 (1984).

Biosense's Falcon Chip reinforced that contractual tie. Biosense's Falcon

---

[3] "Biosense catheters" refers to virgin Biosense catheters and SterilMed reprocessed catheters. SterilMed, Inc. and Biosense are both subsidiaries of Johnson & Johnson. 1-ER-5.

Chip unlawfully rendered the CARTO 3 incompatible with Innovative Health's and other reprocessors' catheters. By embedding the restraint in the product design itself, Biosense physically prevented the use of third-party reprocessed catheters, coercing hospitals into total dependence on Biosense catheters for continued use of the CARTO 3 machines they purchased. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913–14 (9th Cir. 2008) (quoting *Jefferson Par. Hosp. Dist. No.2*, 466 U.S. at 12) (emphasizing the *coerced* purchase of the tied product is the "key aspect of an illegal tie").

In addition, the Falcon Chip supports a monopolization claim under Section 2 of the Sherman Act, as it constituted an unlawful technological tie. An unlawful technological tie results from "the defendant's power in some primary product, as well as a product design that excludes rivals in a market for a secondary product." *Gamboa v. Apple Inc.*, No. 24-CV-01270, 2025 WL 1684890, at *4 (N.D. Cal. June 16, 2025) (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1757 (5th ed. 2025)) (finding a technological tie sufficient to state a claim under Section 2). Both elements are satisfied here. Biosense possessed market power in the CARTO 3 clinical support market, *see Innovative Health LLC*, slip op. at 8, and the Falcon Chip "prevented independent reprocessors from competing in the catheter market." *Id.* at 11.

6

**B. Biosense virtually eliminated superior products from the market through predatory exclusion rather than competitive merit.**

Biosense's monopoly did not result from "a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966). Its exclusionary acts—the Case Coverage Policy, the Falcon Chip, and used catheter collection practices—were mutually reinforcing and "none . . . made Biosense's products better." 6-ER-950. Rather, these tactics excluded products of higher quality from the market. 6-ER-994.

The Case Coverage Policy functioned as an artificial barrier to entry against independent reprocessors to the direct detriment of hospital budgets and missions. *See* 5-ER-731 ("[The Policy] stops us from being able to meet our goal of making healthcare affordable to everyone. We're paying full price for something that we can get at a fraction of the cost in order to be able to save money."). The Falcon Chip similarly restricted competition. It had no procompetitive justification but was instead created for the "sole purpose of hindering [the] reprocessing [of catheters]." *Innovative Health LLC*, slip op. at 12 . While product redesigns are not per se unlawful, they are not immune from Section 2 scrutiny where, as here, they serve only to eliminate competition and offer no consumer benefit. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010). Like the redesign at issue in *Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*,

7

the Falcon Chip lacked any "technical or safety justification" and served only to "prevent competition" from third-party providers. 571 F. Supp. 3d 1133, 1137–38 (N.D. Cal. 2021). Finally, Biosense "hoarded used catheters" not for any legitimate business purpose, but specifically "to block independent reprocessing companies from accessing and reprocessing them." *Innovative Health LLC*, slip op. at 2; *see also* 6-ER-958 (Biosense withheld 54,000 catheters from the market to restrict supply and hospital choice.).

Collectively, these practices achieved their intended effect. Independent reprocessors' share of the catheter aftermarket collapsed from 16% in 2013 and 2014 to only 1% in 2022 and 2023. *Innovative Health LLC*, slip op. at 2 (citing 6-ER-1033–35). But Biosense did not displace independent reprocessors by offering a superior product. Indeed, the record establishes that Biosense catheters were demonstrably inferior in safety to Innovative Health's: the FDA's Manufacturer and User Facility Device Experience ("MAUDE") data from 2013 to 2023 link ten patient deaths and 116 injuries to Biosense catheters, a higher rate of adverse events than Innovative Health catheters, which had a rate of zero adverse events per 10,000 catheters sold over the same period. 6-ER-994. Biosense virtually eliminated independently reprocessed catheters from the market by its exclusionary conduct.

8

**II. To protect patients, this Court must affirm that Biosense's anticompetitive practices violate antitrust law.**

Biosense's exclusionary behavior harms the public interest in affordable and quality health care. Unfortunately for hospitals and the patients they serve, original equipment manufacturers ("OEMs") like Biosense often employ strategies that discourage device reprocessing. *Forced Obsolescence Designed into Devices*, Ass'n of Med. Device Reprocessors.[4] To put it mildly, such restrictions "reflect[] a suboptimal arrangement for all stakeholders in the medical device market, save for OEMs." Benjamin J. Louviere, *Time for a Tune Up in America's Healthcare Market: Securing the Right to Repair for Medical Devices*, 48 J. Corp. L. 183, 197 (2023). "[T]o some OEMs, a dollar saved by a hospital reprocessing is one lost to the OEM's revenue." Cassandra Thiel, Amy Collins & Daniel Vukelich, *The Case for Hospitals to Boost Single-Use Device Reprocessing Programs*, Nat'l Acad. of Med. (June 16, 2025).[5]

---

[4] https://amdr.org/forced-obsolescence-designed-into-devices/#:~:text=THE%20ISSUE:,impossible%20to%20clean%20the%20device [https://perma.cc/AUS6-7KPS]

[5] https://nam.edu/perspectives/the-case-for-hospitals-to-boost-single-use-device-reprocessing-programs/ [https://perma.cc/M8V8-J9HZ]

**A. Anticompetitive practices such as Biosense's undermine the public interest by foreclosing cost saving, diminishing the quality of patient care, and blocking innovation.**

i. Foreclosing cost-saving

Devices engineered for single use through technical barriers like anti-reprocessing technology enhance a manufacturer's profit margin rather than improve the quality of care. Reprocessing is one of most straightforward cost reduction tools available to hospitals. With reprocessed devices costing hospitals 30% to 50% less than new ones, *Reducing Costs by Reprocessing*, Ass'n of Med. Device Reprocessors,[6] and equipment and supplies consuming roughly 18% of hospital expenses, *Costs of Caring: Challenges Facing America's Hospitals as They Care for Patients in 2026*, Am. Hosp. Ass'n, at 2 (Mar. 2026),[7] reprocessing restrictions suck hospital resources that could be used to improve the quality or lower the cost of patient care. *See* 6-ER-794–95(detailing how hospital savings from reprocessing go into newer technologies, equipment, and maintenance of existing equipment). Indeed, in 2025, hospitals and surgical centers that used reprocessed devices saved a combined $495 million. *Reducing Costs by Reprocessing*, *supra*. With respect to catheters in particular, hospitals that use just 240 of these devices per year can, as a

---

[6] https://amdr.org/portfolio-items/reducing-costs-by-reprocessing/[https://perma.cc/Y4MP-GYJB]

[7] https://www.aha.org/system/files/media/file/2026/03/Costs-of-Caring-2026.pdf [https://perma.cc/ZQY8-Q9VJ]

consequence of reprocessing restrictions, lose up to $25,000 per month. *Forced Obsolescence Designed into Devices*, *supra*.

### ii. Diminishing the quality of patient care

The consequences of anticompetitive redesign maneuvers transcend the balance sheet. They do not merely drain hospital resources; they directly endanger the health—and, in extreme cases, the lives—of the patients hospitals are meant to serve. Software barriers in medical devices can introduce delays in time-sensitive treatment, adversely affecting patient care. Henry Welch & Nathan Proctor, *Hospital Repair Restrictions II*, U.S. PIRG Educ. Fund (Mar. 12, 2026). [8] When a manufacturer-imposed barrier prevents a hospital's own staff from servicing a device, the hospital—and the vulnerable patient—must wait for an OEM technician to become available and travel to the site. "[A]ny delay in repairing a broken piece of medical equipment could translate to a decreased level of care for truly sick patients." Ofer Tur-Sinai & Leah Chan Grinvald, *Repairing Medical Equipment in Times of Pandemic*, 52 Seton Hall L. Rev. 461, 471 (2021).

In addition, a single-source supply chain like the one created by Biosense's anticompetitive practices poses a risk to hospitals and patients, as disruptions can lead to critical shortages. *Issues in the U.S. Hospitals' Supply Chain System*, Boise

---

[8] https://pirg.org/edfund/resources/hospital-repair-restrictions-ii/ [https://perma.cc/LG56-YCV8]

11

State Univ. Coll. of Bus. and Econ. (Apr. 29, 2025).[9] A supply restriction on the catheters for catheter ablation procedures is particularly concerning given projections that cases of atrial fibrillation, a common type of arrhythmia, will increase by over sixty percent by 2050. *Mapping Catheters Market Size, Share & Trends Analysis Report*, Grand View Rsch. (2025).[10] Here, Biosense amplified that risk in cardiac mapping procedures by effectively engineering a single-source supply chain for its catheters—unable to accept other catheters and clinical support services due to contractual and technical restrictions imposed by Biosense, CARTO 3 is rendered inoperable without a Biosense catheter.

Issues with patient care are not limited to cardiac mapping devices. Hospital biomedical engineers have described being told by manufacturers that in-house staff are "not allowed to work on the equipment," and have been forced to wait days for an authorized technician while a CT scanner sat inoperable and trauma patients waited for diagnosis. Nathan Proctor & Kevin O'Reilly, *Hospital Repair Restrictions: Manufacturer-Imposed Barriers to Fixing Medical Equipment Cause Inefficiencies and Delays*, U.S. PIRG Educ. Fund (Jul. 8, 2020).[11] This tension

---

[9] https://www.boisestate.edu/cobe/blog/2025/04/issues-in-the-u-s-hospitals-supply-chain-system/ [https://perma.cc/75F6-XXYG]

[10] https://www.grandviewresearch.com/industry-analysis/mapping-catheters-market-report[https://perma.cc/53SG-VLXP].

[11] https://publicinterestnetwork.org/wp-content/uploads/2020/07/Hospital_Repair_Restrictions_USPEF_7.8.20b.pdf[https://perma.cc/BTJ8-S2CC].

reached a breaking point during the COVID-19 pandemic where the human cost of these restrictive repair policies became tragically clear: "[W]hen any ventilator breaks down amid the surge of cases, waiting two weeks for repair can mean patients die." Markian Hawryluk, *As Ventilators Become Crucial, Repair Roadblocks Remain,* Fierce Biotech (Apr. 20, 2020, 7:30 AM).[12] A restriction on who may repair a device is, in the end, a restriction on who receives care and when.

In contrast, open repair and reprocessing ecosystems drive clinical efficiency. Not only does removing contractual and technological restrictions move the medical field in a more "affordable, efficient, and sustainable direction" but it also "enables life-saving services to continue to be available." Shuhan He et al*., The Medical Right to Repair: The Right to Save Lives*, 397 Lancet 1260, 1260 (2021). In critical care environments "on-site service is the only option quick enough to serve patients' needs." Proctor & O'Reilly*, supra*.

   iii. Blocking innovation in the health care sector

Anticompetitive strategies like those employed by Biosense exacerbate systemic barriers to entry that preclude patient-centered innovation. The medical device industry is already saddled with high barriers to entry including deeply entrenched relationships with clinical staff and the massive capital required to

---

[12] https://www.fiercebiotech.com/medtech/as-ventilators-become-crucial-repair-roadblocks-remain[https://perma.cc/L4H3-89B5].

compete with dominant medical technology manufacturers—even when a new entrant's technology offers "transformative potential." Lars Thording, *The Quiet Monopolies Driving Up Healthcare Costs,* MedCity News (Dec. 30, 2025, 9:11 AM).[13] When OEMs implement anticompetitive design changes specifically to limit reprocessing or third-party repairs, they further entrench their market power, impeding competitors attempting to enter the market.

Beyond creating barriers to market entry, OEM-imposed technical restrictions stifle innovation in repair markets. In an open, competitive environment, independent repair shops and tool developers have both the ability and motivation to create new methods of repair, develop sophisticated diagnostic and repair tools, and generate user-driven manuals; this type of open ecosystem can foster user innovation and spur product improvements. Leah Chan Grinvald & Ofer Tur-Sinai, *Intellectual Property Law and the Right to Repair*, 88 Fordham L. Rev. 63, 90-91 (2019).

### B. Anticompetitive practices exacerbate the already high cost of health care.

Health care spending in the United States has reached a scale that would have been unthinkable a generation ago. In 2024, national health care expenditures totaled

---

[13] https://medcitynews.com/2025/12/the-quiet-monopolies-driving-up-healthcare-costs/#:~:text=This%20relationship%20between%20technology%20brands,doctor%20knows%20inside%20and%20out[https://perma.cc/87R7-RNHF].

$5.3 trillion—$15,474 per person, representing nearly 18% of the nation's entire economy. Micah Hartman et al., *National Health Care Spending Increased 7.2 Percent in 2024 as Utilization Remained Elevated*, 45 Health Affs. 110, 110 (2026).[14] And, the United States spends roughly twice the per-capita average of other wealthy nations on health care. *How Does the U.S. Healthcare System Compare to Other Countries?* Peter G. Peterson Found. (last updated Oct. 7, 2025).[15] Despite this extra spending, "there is little evidence that this gap is driven by higher utilization or higher quality of care." Emma Wager, et al., *What Drives Health Spending in the U.S. Compared to Other Countries?* Peterson-KFF Health Sys. Tracker (Aug. 2, 2024).[16]

When health care prices rise, employers and insurers redistribute it—through higher premiums and conversion to high-deductible plans, for example—and a growing share of the burden falls on individual workers and their families. Phil Galewitz, *A New Car vs. Health Insurance? Average Family Job-Based Coverage Hits $27K*, KFF Health News (Oct. 22, 2025).[17] Annual premiums for employer-

---

[14]https://www.healthaffairs.org/doi/10.1377/hlthaff.2025.01683[https://perma.cc/D2ER-NLEN].

[15] https://www.pgpf.org/article/how-does-the-us-healthcare-system-compare-to-other-countries/ [https://perma.cc/9T9K-2MWL]

[16] https://www.healthsystemtracker.org/brief/what-drives-health-spending-in-the-us-compared-to-other-countries/ [https://perma.cc/6TWW-W5VR]

[17]https://kffhealthnews.org/news/article/workplace-health-insurance-premiums-family-plans-kff-survey/. [https://perma.cc/3EJW-W8H2]

sponsored family coverage reached $26,993 in 2025—a 6% increase from the year before—with workers contributing up to $6,850 out of pocket. Gary Claxton et al., *Employer Health Benefits: 2025 Annual Survey,* KFF, at 6 (2025).[18]

Premium growth is only the first layer. The average single-coverage deductible now stands at $1,886, and the share of workers facing a deductible of $2,000 or more has grown 77% over the past decade. *Id.* at 6, 12. Sixty-five percent of covered workers pay coinsurance on top of their deductibles, typically 20% per hospital admission and 19% for primary care and specialist visits. *Id.* at 12.

The health consequences are severe. Twenty-three percent of working-age insured adults (ages nineteen to sixty-four) were underinsured in 2024—covered on paper but effectively priced out of much needed care by cost-sharing requirements. Sara R. Collins & Avni Gupta, *The State of Health Insurance Coverage in the U.S.: Findings from the Commonwealth Fund 2024 Biennial Health Insurance Survey*, Commonwealth Fund (Nov. 21, 2024).[19] Two out of five adults who have delayed care because of cost report that their health subsequently worsened as a result. *Id.* These are the predictable downstream consequences of prices that have risen unchecked for decades.

---

[18] https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2025-Annual-Survey.pdf [https://perma.cc/HTY5-GAZM]
[19] https://www.commonwealthfund.org/publications/surveys/2024/nov/state-health-insurance-coverage-us-2024-biennial-survey [https://perma.cc/6CSF-9X9T]

The two primary drivers of national health care expenditures are prescription drugs and hospital services, which together account for nearly three-quarters of per-person spending in employer-sponsored insurance plans. Patricia Kelmar, *Testimony of U.S. PIRG at a House Ways and Means Committee, Subcommittee on Health hearing on Why Health Care Is Unaffordable*, U.S. PIRG, at 2–3 (Mar. 23, 2023).[20] Within hospital services, medical devices account for roughly 6% of annual national health expenditures—approximately $200 billion—and physician-preferred devices alone can constitute 40% to 60% of a hospital's total supply expenditures. Lawton R. Burns et al., *Physician Preference Items: What Factors Matter to Surgeons? Does the Vendor Matter?* 11 Med. Devices: Evid. and Rsch. 39, 41 (2018). [21] Anticompetitive behavior by manufacturers like Biosense—tying essential clinical support services to exclusive purchasing agreements and deploying proprietary blocking technologies—makes care even more expensive and out of reach for Americans by inflating hospital input costs and thus raising the price of hospital services.

Anticompetitive practices like Biosense's are particularly troublesome when patients' costs are also affected by anticompetitive practices in the prescription drug

---

[20] https://waysandmeans.house.gov/wp-content/uploads/2023/03/U.S.-PIRG-Patricia-Kelmar-Testimony-High-costs-of-health-care-Ways-and-Means-subcommittee-on-Health-March-23-2023-1.pdf [https://perma.cc/3ESH-RVGY]
[21] https://pmc.ncbi.nlm.nih.gov/articles/PMC5768327/pdf/mder-11-039.pdf [https://perma.cc/KUG8-R2QE]

market. Manufacturers wield patents as instruments to block generic entry through tactics like evergreening, pay-for-delay agreements, and overlapping patent estates. *The Art of the Evergreening: A Deep Dive into Drug Life Cycle Management Tactics and How to Challenge Them*, DrugPatentWatch (Jan. 14, 2026).[22] For nearly two decades, a lack of robust competition has pushed brand-name drug prices far beyond the rate of general inflation; the average annual cost per drug used on a chronic basis is now roughly $13,000—more than four times what it would be had it tracked general inflation. Stephen W. Schondelmeyer & Leigh Purvis, *Trends in Retail Prices of Brand Name Prescription Drugs Widely Used by Older Americans, 2006 to 2024*, AARP Pub. Pol'y Inst. (Feb. 12, 2026).[23] This cost trend is exemplified by the top twenty-five most dispensed Medicare Part D drugs not selected for Medicare drug price negotiation, which have seen average lifetime price increases of 98%. Leigh Purvis, *Prices for Top Medicare Part D Drugs Have Nearly Doubled Since Entering the Market*, AARP Pub. Pol'y Inst. (Jan. 2025).[24] Competition remains the most effective remedy—the FDA has found that even a single generic competitor

---

[22] https://www.drugpatentwatch.com/blog/the-art-of-the-evergreening-a-deep-dive-into-drug-life-cycle-management-tactics-and-how-to-challenge-them/ [https://perma.cc/5R8J-A77D]

[23] https://www.aarp.org/pri/topics/health/prescription-drugs/trends-in-retail-prices-of-drugs/ [https://perma.cc/Y6UR-J9TQ]

[24] https://www.aarp.org/content/dam/aarp/ppi/topics/health/prescription-drugs/prices-top-medicare-part-d-drugs-nearly-doubled-since-entering-market.doi.10.26419-2fppi.00352.001.pdf [https://perma.cc/Y2WC-YANA]

can slash brand-equivalent prices by nearly 40%. *Generic Drug Cost Optimization: Cut Production Costs, Win Patent Races, and Dominate the Market*, DrugPatentWatch (Mar. 24, 2025).[25]

These dynamics unfold against a backdrop of sweeping consolidation across the health care sector. In commercial health insurance, 97% of metropolitan markets were highly concentrated in 2024 under the federal Herfindahl-Hirschman Index (HHI) standard, a common antitrust measure of market concentration and competitiveness; in 47% of those markets, a single insurer holds more than half of the market share. *Competition in Health Care Research*, Am. Med. Ass'n (Dec. 16, 2025).[26] Private equity firms have accelerated the consolidation trend in the sector. As of 2024, more than 8,000 health care transactions were completed with a combined value of nearly $1 trillion over the previous decade through a variety of acquisition strategies that aggregate entities across the health care supply chain. Alexandra Allen, *Financialization in Health Care: History, Current Trends, and Impacts on Patients,* Health Care Value Hub, at 2 (Nov. 2024).[27] The cumulative effect of these strategies is to enhance monopoly power, increase prices; and harm

---

[25] https://www.drugpatentwatch.com/blog/how-to-optimize-generic-drug-production-costs-a-guide-to-market-domination/ [https://perma.cc/XF3R-N8M2]

[26] https://www.ama-assn.org/health-care-advocacy/access-care/competition-health-care-research [https://perma.cc/BCQ7-PNBR]

[27] https://healthcarevaluehub.org/resource/2024/financialization-in-health-care-history-current-trends-and-impacts-on-patients/ [https://perma.cc/8UX2-JXBL]

patients, employees, and hospitals' long-term financial interests. U.S. Dep't of Health & Human Servs., *HHS Consolidation in Health Care Markets RFI Response*, at 7 (2025).[28] Private equity firms have also infiltrated the medical device sector; over the last decade, they have increasingly bought up durable medical equipment manufacturers and suppliers, driving the consolidation of the sector and harming consumers with disabilities and chronic health conditions. Eileen O'Grady & Cory Bernstein, *Private Equity in Durable Medical Equipment: How Private Equity Profits off of Disabled and Chronically Ill Americans*, Priv. Equity Stakeholder Project & Nat'l. Disability Rts. Network, at 6–8 (Nov. 2023).[29] In short, this structural shift away from competitive markets and toward consolidated, return-driven ownership is the environment in which the exclusionary conduct in this case must be understood.

Biosense's anticompetitive practices represent one instance of the many anticompetitive practices that pervade the health care sector. This Court must condemn Biosense's tying arrangements and reprocessing barriers to send a clear and urgent signal to the industry that such conduct will not be tolerated. It could mark an important first step toward dismantling practices that inflate costs, suppress

---

[28] https://www.hhs.gov/sites/default/files/hhs-consolidation-health-care-markets-rfi-response-report.pdf [https://perma.cc/4JPN-E5TB]

[29] https://pestakeholder.org/wp-content/uploads/2023/11/PESP_Report_DME_2023.pdf [https://perma.cc/4G9C-QA8E]

20

competition, and undermine patient care.

### C. Patients cannot leave the market to protect themselves from anticompetitive practices in health care.

Patients are uniquely vulnerable in the face of anticompetitive practices. Competitive markets discipline seller behavior because buyers can walk away from unfavorable deals or seek lower-priced alternatives. That mechanism scarcely exists in health care today. Patients cannot comparison-shop before a cardiac event; they cannot solicit competing bids before consenting to emergency surgery. Demand is driven by biological necessity, and necessity does not negotiate. Patients' ability to shop for care and predict price is severely constrained by contextual factors such as the urgency of need and the stage of diagnosis rather than the price or quality of the service itself. Council of Econ. Advisors, *Economic Report of the President*, at 204 (2019).[30] Nearly half of American adults find health care costs difficult to afford, and over one third of adults skipped or postponed care as a result; of the uninsured adult population, a striking 75% forewent care because of the cost. Grace Sparks et al., *Americans' Challenges with Health Care Costs*, KFF (Apr. 30, 2026).[31] These patients who skipped or delayed care exhausted their financial resources before they exhausted their medical need.

---

[30] https://www.govinfo.gov/content/pkg/ERP-2019/pdf/ERP-2019.pdf. [https://perma.cc/T4M7-KYJE]
[31] https://www.kff.org/health-costs/americans-challenges-with-health-care-costs/ [https://perma.cc/M43W-7HL7]

Price opacity compounds the problem. Patients are largely unable to obtain reliable price information before receiving care. Despite requirements by the Centers for Medicare & Medicaid Services Hospital Price Transparency that took effect in January 2021, compliance remains poor; less than a quarter of hospitals were complying with the transparency rules by February 2023. *Fourth Semi-Annual Hospital Price Transparency Report,* PatientsRightsAdvocate.org, at 1 (Feb. 2023).[32] Even when hospitals do publish data, the tools are often unreliable and incomplete. Data is frequently missing or difficult to locate, and fundamental ambiguities—how services are bundled into a given charge and how prices are defined and presented, for instance—make meaningful price comparison exceedingly difficult, whether across hospitals, within a single institution, or across regions. Justin Lo et al., *Ongoing Challenges with Hospital Price Transparency*, Peterson-KFF Health Sys. Tracker (Feb. 10, 2023).[33] Price transparency tools are generally limited to "shoppable" health services—those able to be scheduled in advance—which represent only 30% to 40% of total health spending. Nisha Kurani et al., *Price Transparency and Variation in U.S. Health Services*, Peterson-KFF

---

[32] https://www.patientrightsadvocate.org/blog/new-report-shows-more-than-75-of-hospitals-still-not-complying-with-hospital-price-transparency-rule [https://perma.cc/B5HD-Y79Z]

[33] https://www.healthsystemtracker.org/brief/ongoing-challenges-with-hospital-price-transparency/#Select%20data%20for%20University%20of%20Illinois%20Hospital%20Chicago [https://perma.cc/R4K2-WCC9]

Health Sys. Tracker (Jan. 13, 2021).[34] Even within the subset of shoppable services where price transparency tools can be useful, the utility of such tools is undermined by unforeseen clinical developments, hidden provider fees, and out-of-network variances that make accurate pre-service financial planning difficult. *Id.*

The consequence is a market in which the consumer behaviors that ordinarily discipline seller pricing—switching, comparison-shopping, opting out—are structurally unavailable. In such a market, when a dominant seller eliminates lower-cost competitors through exclusionary conduct, patients absorb the resulting price increase through higher premiums and larger deductibles. Or they forgo care. Neither response functions as a competitive check. In markets where consumers are this constrained, antitrust enforcement is one of the only realistic disciplines available to protect them.

## III. Consumers deserve free choice in product purchase, use, and maintenance.

Consumers should have the freedom to make informed choices during all stages of owning a product. When making capital investments in the foremarket, consumers should enjoy bargaining power and informational transparency. When maintaining a product they own, consumers should have access to repair and reprocessing services in the aftermarket and the ability to switch between products

---

[34] https://www.healthsystemtracker.org/brief/price-transparency-and-variation-in-u-s-health-services/ [https://perma.cc/M5QG-BJ4C]

23

without inhibitive costs.

Reality could not be farther from this commonsensical picture. Across medical device markets, manufacturers employ increasingly hidden technical and contractual barriers, using the leverage of a hospital's sunk investment to eliminate competition in the aftermarket and render the hospital a captive consumer. This dynamic spans industries and renders victim diverse groups of consumers including hospitals, raising alarm amongst agencies, legislatures, and courts.

### A. Manufacturers like Biosense improperly impose restrictions on how hospitals can use the products they purchase.

Biosense's harmful conduct is not aberrational. From the "information blocking" found in proprietary Electronic Health Record (EHR) systems to the digital lockdowns and repair restrictions on imaging equipment, a similar pattern recurs across products hospitals need: manufacturers can exploit high switching and information costs of initial equipment to create a captive aftermarket— an environment that lends itself to exclusionary designs that stifle competition rather than amplify merit.

The structural imbalances inherent in medical device markets leave hospitals uniquely vulnerable to the pricing and policies of dominant medical device sellers. Due to a relatively small number of sellers, patent protection, and limited competition, hospitals are "disadvantaged in their bargaining with medical device manufacturers," Mark V. Pauly & Lawton R. Burns, *Price Transparency for Medical*

24

*Devices*, 27 Health Aff. 1544, 1544, 1552 (2008),[35] and lack the leverage and information to negotiate away restrictive terms and inflated prices at the point of sale. OEMs use this bargaining power to "refuse to provide the parts and information needed to properly maintain equipment, allowing them to overcharge for these services." Nathan Proctor, R*ight to Repair Is a Simple Way to Cut Health Care Costs*, U.S. PIRG (Sept. 11, 2018).[36]

Informational asymmetries compound the anticompetitive effect. OEM restrictions are increasingly embedded within software locks that prevent anyone other than a manufacturer's authorized personnel from accessing the equipment for service and/or repairs. For example, manufacturers often restrict independent servicers from accessing the software they need for necessary calibration of imaging equipment, "locking them out of the device until it is reset by the manufacturer," Lars Lindgren et al., *The Right to Repair Software-Dependent Medical Devices*, 50 J.L. Med. & Ethics 857, 858 (2022), and capturing all the aftermarket profits.

A North Carolina jury recently condemned aftermarket service restrictions, finding that a Philips update designed to block third-party repairs on some of its medical devices violated the state's Unfair and Deceptive Trade Practices Act. Kevin O'Reilly, *Philips' Right to Repair Restrictions Are Illegal, Jury Finds*, TechNation

---

[35] healthaffairs.org/doi/10.1377/hlthaff.27.6.1544 [https://perma.cc/M33G-9535]
[36] https://pirg.org/resources/right-to-repair-is-a-simple-way-to-cut-health-care-costs/ [https://perma.cc/N3YE-SAHP]

(July 1, 2023).[37] The Federal Trade Commission ("FTC") has also noted that opaque software-embedded restrictions can exacerbate a systemic lack of transparency, Federal Trade Comm'n, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions*, at 50 (May 2021) (reporting "consumers lack information at the point of purchase about repairability"),[38] depriving consumers of essential repairability data when making their initial investment.

Widespread price opacity only exacerbates informational asymmetries. Medical device sellers utilize gag clauses that "[forbid] buyers from disclosing the final negotiated price to other buyers, or even to patients or insurers" and do not price their products uniformly. Pauly & Burns, *supra*, at 1544, 1545.[39] When the true cost of these devices is unknown or variable, the information hurdles required to calculate the total lifecycle costs become insurmountable, even for sophisticated customers like hospitals.

In addition to constraining consumer choice at the point of sale, the combination of massive capital investment and the operational complexity of medical equipment render switching costs untenable, preventing hospitals from

---

[37] https://1technation.com/philips-right-to-repair-restrictions-are-illegal-jury-finds/ [https://perma.cc/DW3Q-C6NN]

[38] https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf [https://perma.cc/RV9E-ZJ9K]

[39] healthaffairs.org/doi/10.1377/hlthaff.27.6.1544 [https://perma.cc/M33G-9535]

responding to aftermarket exploitation. For instance, a new MRI machine ranges from $500,000 to $7 million. *How Much Does an MRI Scanner Cost?*, Cassling (June 3, 2024). [40] For Electronic Health Record systems, too, switching is "remarkably expensive." Chunya Huang et al., *Transitions from One Electronic Health Record to Another: Challenges, Pitfalls, and Recommendations*, 11 Applied Clinical Informatics 742, 751 (2020).[41] For an individual hospital, implementation and maintenance costs "can easily reach far into the millions." V. Palabindala et al., *Adoption of Electronic Health Records and Barriers*, 6 J. Cmty. Hosp. Internal Med. Persp., no. 5, 2016, at 1, 3.[42] To transition systems, a hospital must not only lose their initial investment but also bear the daunting prospective costs of purchasing new hardware, retrofitting existing equipment, and reconfiguring laboratories and inventory connections. Even the most well-resourced hospitals are not immune from the "serious stress and financial strain" of such a transition. Chunya Huang et al., *supra*, at 751.

Hospitals also face unique non-monetary switching costs, such as staff retraining and the disruption of surgical workflows. Surgeons generally adopt a new

---

[40] https://www.cassling.com/blog/how-much-does-an-mri-scanner-cost [https://perma.cc/VC6N-6S83]

[41] https://pmc.ncbi.nlm.nih.gov/articles/PMC7657707/ [https://perma.cc/K2F6-PPYE]

[42] https://pmc.ncbi.nlm.nih.gov/articles/PMC5089148/#CIT0004 [https://perma.cc/89FN-ZUSK]

technology when it can be "easily and quickly learnt" with "minimal disruption." Charles B. Wilson, *Adoption of New Surgical Technology*, 332 BMJ 112, 112 (2006).[43] Physicians prefer particular brands of devices in large part due to long-term use, familiarity, and "sticky" relationships with manufacturers, Pauly & Burns, *supra*, at 1546, even when lower cost instruments have the same clinical effectiveness, *Reigning in Hospital Supply Costs & Physician Preference Item Spending*, Definitive Healthcare (Aug. 18, 2020).[44] Medical device manufactures strategically exploit this choice persistence, "lock[ing] clinicians and health systems into repeating the same patterns of technology consumption," creating a "monopolistic" relationship where alternatives are often not considered. Thording, *supra*.

Layering technological and contractual ties on top of these natural human tendencies exacerbates switching costs. In other words, once the capital investment is made in Biosense CARTO 3, imaging devices, EHRs or other equipment, the hospital becomes anything *but* a free agent in a competitive landscape.

## B. Across industries, repair and reprocessing restrictions merit judicial attention.

By making it "difficult or impossible for [Independent System Operators] to

---

[43] https://pmc.ncbi.nlm.nih.gov/articles/PMC1326944/ [https://perma.cc/JHU7-6DGL]

[44] https://www.definitivehc.com/blog/reigning-in-hospital-supply-costs-and-physician-preference-item-spending [https://perma.cc/2342-PSDX]

compete in aftermarkets," Federal Trade Comm'n, *Nixing the Fix, supra*, at 9,[45] tying arrangements and technical restrictions foreclose the competition that would otherwise discipline prices and improve service quality. This problem extends beyond the health care sector: the restrictions that foreclose independent repair in health care are mirrored in industries such as agricultural equipment, consumer electronics, vehicles, and other markets where manufacturers have used software lockouts and contractual restrictions to monopolize repair aftermarkets. Robert B. Cunningham & Darby Hobbs, *The Evolution of the Right to Repair*, Antitrust Mag. Summer 2023, at 43, 44.[46]

Indeed, the FTC has noted that repair restrictions harm consumers, drive independent repair businesses from the market, and may constitute illegal tying arrangements, exclusive dealing, or refusals to deal. The commission subsequently "voted to ramp up law enforcement against repair restrictions that prevent small businesses, workers, consumers, and even government entities from fixing their own products." Fed. Trade Comm'n, *FTC to Ramp Up Law Enforcement Against Illegal Repair Restrictions* (July 21, 2021).[47]

---

[45] https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf [https://perma.cc/RV9E-ZJ9K]

[46] https://www.americanbar.org/content/dam/aba/publications/antitrust/magazine/2023/vol-37-issue-3/evolution-right-to-repair.pdf [https://perma.cc/9M4L-2AWZ]

[47] https://www.ftc.gov/news-events/news/press-releases/2021/07/ftc-ramp-law-enforcement-against-illegal-repair-restrictions [https://perma.cc/8G3D-S8VM]

Reflecting the broad consensus that repair restrictions impose unjustifiable costs, all fifty states have now introduced different variations of "right-to-repair" legislation to ensure owners can repair their devices independently or through a technician of their choosing. Nathan Proctor, *Release: All 50 States Now Have Filed Right to Repair Legislation Over Last 8 Years*, U.S. PIRG (Feb. 24, 2025).[48] Courts have likewise begun to scrutinize repair restrictions under antitrust principles. *See Lambrix v. Tesla, Inc.,* 737 F. Supp. 3d 822, 846, 848-50 (N.D. Cal. 2024) (recognizing that Tesla's monopolization of vehicle repair services could cause delays in service and supracompetitive prices and coerce consumers into undesired purchases); *In re Deere & Co. Repair Service Antitrust Litigation*, 703 F.Supp.3d 862, 913 (N.D. Ill. 2023) (noting that John Deere's alleged practice of withholding repair tools from farmers and independent repair shops "excludes competitors at the cost of Deere's customers' choices to perform their own repairs or have a local repair shop perform the repairs, even when they could perform the repairs faster, better, and cheaper"). In the medical device context, independent service providers secured a major antitrust verdict in April 2017 in *Red Lion Medical Safety Inc. v. General Electric Company, Inc.*[49] A federal jury found that GE unlawfully limited competition in the anesthesia gas machine parts aftermarket by entering an exclusive

---

[48] https://pirg.org/media-center/release-all-50-states-now-have-filed-right-to-repair-legislation-over-last-8-years/ [https://perma.cc/Q5YA-CJ54]
[49] Verdict Form, No. 15-CV-00308 (E.D. Tex. Apr. 26, 2017).

30

distributor arrangement which forced ISOs to purchase parts at "highly inflated prices," eliminating those third-party service competitors from the market. Linda O'Brien, *Texas Jury Returns $131.4M Verdict Against GE Over Anesthesia Equipment Parts Monopoly*, VitalLaw (May 1, 2017).[50]

## CONCLUSION

This Court should affirm the district court's denial of Biosense's Motion for Judgment as a Matter of Law, ensuring that hospitals have the ability to freely choose which brand of reprocessed catheters to use with the CARTO 3 machines they have purchased.

May 27, 2026

/s/ Nina K. Srejovic

Nina K. Srejovic
Phillip R. Malone
JUELSGAARD INTELLECTUAL PROPERTY
 AND INNOVATION CLINIC
MILLS LEGAL CLINIC AT STANFORD
 LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-2237
srejovic@stanford.edu

*Counsel for Amici Curiae*

---

[50] https://www.vitallaw.com/news/top-story-texas-jury-returns-131-4m-verdict-against-ge-over-anesthesia-equipment-parts-monopoly/ald01fdf3e94a7cb7100093c690b11c18cbab02?refURL%3Dhttps%253A%252F%252Fwww.google.com%252F [https://perma.cc/4D5R-3BJK]

31

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** 25-6042

I am the attorney or self-represented party.

**This brief contains 5920 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature _____*/s/ Nina K. Srejovic*_____      Date May 27, 2026

32