**No. 25-6042**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INNOVATIVE HEALTH, LLC,

*Plaintiff-Appellee,*

v.

BIOSENSE WEBSTER, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Central
District of California, No. 8:19-cv-01984-JVS, Hon. James V. Selna

## APPELLANT'S REPLY BRIEF

M. Sean Royall
Connor R. Brewer
Jacob G. Mathew
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

William F. Cavanaugh, Jr.
Isaac J. Weingram
PATTERSON BELKNAP
 WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

Paul J. Watford
KING & SPALDING LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
(213) 443-4355
pwatford@kslaw.com

Ross E. Elfand
Casey M. Berger
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
(212) 556-2100

*Counsel for Appellant*

June 10, 2026

# TABLE OF CONTENTS

Page

INTRODUCTION.........................................................................................1

ARGUMENT ...............................................................................................5

I. INNOVATIVE FAILED TO PROVE ITS ASSERTED TYING MARKET. ....................................................................................5

    A. Satisfying *Jefferson Parish*'s "Separate Products" Test Does Not Suffice as Proof of a Well-Defined Tying Market.........................................................................5

    B. Proof of *Kodak* Aftermarket Factors Does Not Obviate the Need to Prove a Cognizable Market. ..................8

    C. Innovative Failed to Prove That Its Asserted Tying Market Satisfies "General Market-Definition Principles." ........................................................................9

II. INNOVATIVE FAILED TO PROVE THAT BIOSENSE HAS MARKET POWER IN THE ASSERTED TYING MARKET. ..................................................................................23

III. THE SAME DEFICIENCIES THAT REQUIRE REVERSAL OF THE SECTION 1 VERDICT MANDATE REVERSAL OF THE SECTION 2 VERDICTS............................27

IV. INNOVATIVE'S FAILURE TO PROPERLY DISAGGREGATE THE EFFECTS OF LAWFUL COMPETITION INVALIDATES THE DAMAGES AWARD. .......................................................................30

CONCLUSION ..........................................................................................39

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT, a Div. of Skylight, Inc. v. Associated Press,*
920 F. Supp. 1287 (S.D.N.Y. 1996) ...................................................... 16

*Airweld, Inc. v. Airco, Inc.,*
742 F.2d 1184 (9th Cir. 1984) .............................................................. 29

*Apple Inc. v. Psystar Corp.,*
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................................ 11, 23

*Avaya Inc. v. Telecom Labs, Inc.,*
838 F.3d 354 (3d Cir. 2016) ................................................................. 35

*Cal. Dental Ass'n v. FTC,*
224 F.3d 942 (9th Cir. 2000) ............................................................... 22

*Com. Data Servers, Inc. v. IBM Corp.,*
262 F. Supp. 2d 50 (S.D.N.Y. 2003) .................................................... 21

*Coronavirus Rep. v. Apple, Inc.,*
85 F.4th 948 (9th Cir. 2023) .................................................................. 2

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.,*
150 F.4th 1056 (9th Cir. 2025) .............................................................. 5

*Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.,*
773 F.2d 1506 (9th Cir. 1985) .............................................................. 32

*Dupree v. Younger,*
598 U.S. 729 (2023) .............................................................................. 30

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) ......................................................... *passim*

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.,*
786 F.2d 1342 (9th Cir. 1985) ........................................................ 32, 33

*Fortner Enterprises, Inc. v. U.S. Steel Corp.*,
  394 U.S. 495 (1969) ............................................................................ 26

*FTC v. Lab'y Corp. of Am.*,
  2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) ................................... 23

*FTC v. Microsoft Corp.*,
  681 F. Supp. 3d 1069 (N.D. Cal. 2023) ............................................ 11

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ...................................................... 11, 29

*FTC v. Tempur Sealy Int'l, Inc.*,
  768 F. Supp. 3d 787 (S.D. Tex. 2025) .............................................. 17

*FTC v. Wilh. Wilhelmsen Holding ASA*,
  341 F. Supp. 3d 27 (D.D.C. 2018) .................................................... 16

*Hyer v. City & Cnty. of Honolulu*,
  118 F.4th 1044 (9th Cir. 2024) ........................................................ 39

*In re IBM Peripheral EDP Devices Antitrust Litig.*,
  481 F. Supp. 965 (N.D. Cal. 1979), *aff'd*, 698 F.2d 1377
  (9th Cir. 1983) .................................................................................. 23

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
  547 U.S. 28 (2006) ................................................................... 1, 6, 26

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  903 F.2d 612 (9th Cir. 1990) ........................................................... 12

*Innovative Health, LLC v. Biosense Webster, Inc.*,
  2024 WL 62948 (9th Cir. Jan. 5, 2024) ..................................... *passim*

*It's My Party, Inc. v. Live Nat., Inc.*,
  88 F. Supp. 3d 475 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th
  Cir. 2016) ............................................................................................ 6

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ................................................................................ 6

*L.H. Equity Invs. LLC v. Wade,*
2010 WL 11505176 (S.D. Fla. Mar. 29, 2010) .................................... 23

*Laidlaw Acquisition Corp. v. Mayflower Grp., Inc.,*
636 F. Supp. 1513 (S.D. Ind. 1986) .................................................... 11

*M.A.P. Oil Co., Inc. v. Texaco Inc.,*
691 F.2d 1303 (9th Cir. 1982) ........................................................... 15

*Marbled Murrelet v. Babbitt,*
83 F.3d 1060 (9th Cir. 1996) ............................................................. 31

*Mortimer v. Baca,*
594 F.3d 714 (9th Cir. 2010) ............................................................. 19

*Newcal Indus., Inc. v. IKON Office Sol.,*
513 F.3d 1038 (9th Cir. 2008) ........................................................ 7, 36

*Omega Env't, Inc. v. Gilbarco, Inc.,*
127 F.3d 1157 (9th Cir. 1997) ........................................................... 25

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC,*
532 F.3d 963 (9th Cir. 2008) ....................................................... 16, 33

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.,*
188 F.3d 11 (1st Cir. 1999) ........................................................ 3-4, 21

*Snow-Erlin v. United States,*
470 F.3d 804 (9th Cir. 2006) .............................................................. 7

*Tanaka v. Univ. of S. Cal.,*
252 F.3d 1059 (9th Cir. 2001) ........................................................... 11

*Teradata Corp. v. SAP SE,*
124 F.4th 555 (9th Cir. 2024) ........................................................... 18

*U.S. Steel Corp. v. Fortner Enters., Inc.,*
429 U.S. 610 (1977) .......................................................................... 26

*United States v. Blue Bell, Inc.,*
395 F. Supp. 538 (M.D. Tenn. 1975) ................................................. 11

iv

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ............................................................. 23

*Yammine v.* Toolbox for HR Spolka,
2025 WL 957825 (9th Cir. Mar. 31, 2025) ........................................ 30

*Zunum Aero, Inc. v. Boeing Co.*,
2022 WL 3346398 (W.D. Wash. Aug. 12, 2022) ............................... 12

## Other Authorities

Phillip E. Areeda & Herbert Hovenkamp,
*Antitrust Law* ................................................................ 16, 18, 26-27

## INTRODUCTION

The Supreme Court ruled twenty years ago that "in all cases involving a tying arrangement, the plaintiff must prove" (1) "the relevant market" for "the tying product," and (2) "that the defendant has market power ... within it." *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006). Innovative failed to prove either.

Innovative's tying claim required proof that clinical support for CARTO-3 mapping procedures is a market. A "relevant market for antitrust purposes" must comprise "'the area of effective competition.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) (citation omitted). Yet Biosense and other mapping-system manufacturers do not face "competition" for clinical support. They face competition to *sell* and *promote usage of* their mapping machines. As Innovative acknowledges by calling them "salespeople," AB-48, clinical-support personnel are integral to these promotional efforts; they provide a value-added service, not a standalone product.

Ignoring these commercial realities, Innovative tried its case on the theory that Biosense has market power in a market for CARTO-3 clinical support. Innovative maintains that Biosense "excluded,"

"exterminate[d]," and "thwarted" "independent clinical-support providers," AB-43, 50, 58, 60, 63, and by "stamping [them] out" "monopolized" the supposed CARTO-3 clinical-support market, AB-2. But this is pure fiction. There never were "independent clinical-support providers" because, as trial evidence confirmed, it is not efficient for anyone other than the manufacturer to supply this service. Self-supply of clinical support by hospitals quickly faded away for this very reason.

Market power involves the power to control price, restrict output, and exclude competition. Within Innovative's fictional tying market, there is no evidence of any of these things. Innovative maintains that Biosense's "95% clinical-support market share" proves market power, AB-31, but market shares are meaningless absent an "accurately define[d]" market. *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955, 957 (9th Cir. 2023). Abbott, Medtronic, and Boston Scientific have similar "95% market share[s]" of clinical support for their own procedures. AB-35.[1] This is not evidence of an industry-wide

---

[1] 4-ER-443 ("95 percent" of hospitals "exclusively rely upon the cardiac system manufacturer" (Biosense, Abbott, etc.) "to provide mapping support"); 4-ER-359 ("the manufacturer provides the mapper" in "[n]inety-five percent or more" of hospitals).

"monopoly" problem; it is evidence of an industry standard—one that developed in response to new entry and expanding product options.

Tying is about use of market power to *force* customers to purchase unwanted products in a way that undermines consumer choice. The facts do not fit that narrative. Biosense adopted a closed-platform offering, distinguishing itself from competitors that provided clinical support for their procedures regardless of whose catheters were used. However, introducing a "closed platform" in a marketplace with alternative "open ... platforms" is not inherently anticompetitive; it creates product differentiation and thereby "increases interbrand competition." *Epic*, 67 F.4th at 987.

*If* Biosense possessed market power in a properly defined tying market *and* customers truly were "locked in," consumer choice might have been undermined. But the evidence at trial supported neither conclusion. Having now conceded there is "no 'cost disparity'" here that makes switching cost-prohibitive, AB-53, Innovative is forced to rely on "non-monetary" switching costs and can only point to one thing: that most customers *prefer* CARTO-3. But "preference does not translate into the kind of economic power" that "antitrust law" cares about. *SMS*

*Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11, 23 (1st Cir. 1999).

Some customers responded to Biosense's policy by shifting to competing systems. Those that remained did so *by choice*. Even if they preferred the option of using reprocessed catheters, they preferred continued use of CARTO-3 mapping equipment even more.

Clear evidence of customer choice also invalidates the damages verdict because the only proof presented to the jury included amounts for lost sales linked to purchases made *after* the customers indisputably knew of Biosense's policy. As this Court previously held, such choices by "[s]ophisticated customers" "do[] not offend the antitrust laws." *Innovative Health, LLC v. Biosense Webster, Inc.*, 2024 WL 62948, at *2 (9th Cir. Jan. 5, 2024).

The jury's liability verdict must be reversed. And if the Court were to affirm liability (which it should not for reasons explained here and in the opening brief), the case still must be remanded on the issue of damages.

4

## ARGUMENT

Antitrust cases should be decided in accordance with "'actual market realities.'" *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1073 (9th Cir. 2025). The commercial reality here is that clinical support is an integral feature of interbrand competition among rival mapping-system manufacturers, not a distinct product offering. No reasonable jury could find that a standalone "market" for CARTO-3 clinical support exists, nor that Biosense possessed "market power" within that supposed market. Without proof of these elements of a tying claim, the liability verdict cannot stand. Because Innovative's damages proof incorporates lost profits tied to *lawful* competition, the damages verdict also cannot stand.

## I. INNOVATIVE FAILED TO PROVE ITS ASSERTED TYING MARKET.

### A. Satisfying *Jefferson Parish*'s "Separate Products" Test Does Not Suffice as Proof of a Well-Defined Tying Market.

Innovative spends 12 pages (AB-39-51) arguing that "clinical support and catheters are separate" products, which it wrongly maintains is "[t]he key question." AB-42, 46. Innovative's arguments mistakenly conflate: (1) the requirement to prove that the asserted

5

tying and tied products are "separate items," *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 25 (1984), and (2) the requirement to properly "defin[e] the relevant [tying] market," *Illinois Tool Works*, 547 U.S. at 46. The prior appeal addressed the first requirement but not the second.

*Jefferson Parish* itself states that establishing separate tying and tied products "is only the beginning of the appropriate inquiry." 466 U.S. at 25. Once that threshold showing is made, the "question remains" whether the tying arrangement "involves the use of market power," which requires proving a "distinct product market." *Id.* at 22, 26. Even where the asserted tying and tied products are "separate," courts reject tying claims when the plaintiff fails to prove a cognizable tying market. *See It's My Party, Inc. v. Live Nat., Inc.*, 88 F. Supp. 3d 475, 490-92, 497 (D. Md. 2015) (granting summary judgment on tying claims because, despite "conce[ssion]" that "promotion and venue services are 'separate products,'" the claims suffered from "defective [tying] market definitions"), *aff'd*, 811 F.3d 676 (4th Cir. 2016).

The "key question" in this appeal is *not* whether "clinical support and catheters are separate products," AB-44, 46, but instead whether

6

Innovative proved a "legally cognizable 'relevant market.'" *Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). To meet that second requirement, Innovative had to prove that CARTO-3 clinical support is a distinct product offering separate from the mapping-system foremarket, not just separate from catheters. This Court's prior decision did not decide that issue, "explicitly or by necessary implication," and is not "law of the case." *Snow-Erlin v. United States*, 470 F.3d 804, 807 (9th Cir. 2006).

Innovative is wrong in asserting that Biosense "forfeited" this argument. AB-45. While Biosense's Rule 50(b) motion focused primarily on whether clinical support and catheters are "separate products" from one another, Biosense also argued that clinical support is not "a separate and distinct product from the cardiac mapping system," but rather "'a service that's provided as part of the overall product offering for the system itself.'" 1-SER-35-36; *see also* 1-SER-36-37 (arguing that "clinical support" is "'part of the overall system offering by the manufacturer,'" and not "a separate product").

## B. Proof of *Kodak* Aftermarket Factors Does Not Obviate the Need to Prove a Cognizable Market.

Innovative also contends (AB-52) that Biosense's sufficiency-of-the-evidence challenge is "foreclose[d]" by this Court's prior ruling that Innovative "produced sufficient evidence" to support its allegation "of a single brand aftermarket," *Innovative*, 2024 WL 62948, at *2-3, a ruling it argues is "[l]aw of the case." AB-52. This is wrong for several reasons.

In concluding that Innovative "produced sufficient evidence to defeat summary judgment," this Court reserved judgment as to whether the proof would be sufficient to "triumph at trial." *Innovative*, 2024 WL 62948, at *2-3. Biosense challenges the sufficiency of the evidence on two key elements: market definition and market power. The Court is not "foreclose[d]" from scrutinizing the adequacy of Innovative's trial proof on either issue, nor is Biosense precluded from challenging it. The adequacy of Innovative's trial presentation on the switching-cost issue is separately addressed below, *infra* § I.C.3. But as this Court made clear in *Epic*, the market-definition "inquiry does not end as soon as [the] plaintiff checks the *Kodak*-based boxes." 67 F.4th at 977. Even if its switching-cost proof were adequate to support "'an *Eastman Kodak*

8

[after]market,'" Innovative had the burden to prove a "'cognizable'" tying market consistent with "general market-definition principles." *Id.* (quoting *Newcal*, 513 F.3d at 1051).

**C.  Innovative Failed to Prove That Its Asserted Tying Market Satisfies "General Market-Definition Principles."**

**1.** Innovative contends that Biosense faced meaningful competition to supply clinical support for CARTO-3 procedures "before [it] pushed [that] competition" "out" through a "years-long campaign to exterminate," "block[]," and "stamp[] out" "independent providers" of CARTO-3 clinical support.  AB-2, 4, 42-43.

Through this rhetoric, Innovative seeks to convey the impression that at some point there *actually were* "independent providers" competing to supply CARTO-3 clinical support.  However, what Innovative is referring to through its repeated references to "independent providers" is *not* actual competition, but rather that some hospitals in the past (a vanishingly small percentage over time) supplied clinical support in-house.  Innovative asserts that "currently" "[r]oughly 5%" of hospitals "provide their own clinical support," AB-42, yet even that is an overstatement.  By the time of trial, "the last major

[Biosense] account that ... was self-supporting" had "stopped" doing so. 7-ER-1195-1196.

Voluminous evidence at trial confirmed that only the manufacturer can efficiently support clinical procedures using its own equipment. 6-ER-837 ("99 percent of the hospitals that I worked with did not ... or would not do that"); 4-ER-489 (it is "not economically feasible"); 5-ER-735 (self-support would have been "way too expensive"); 7-ER-1133 (it is "very efficient for the hospitals" to rely on manufacturer-supplied clinical support); 10-ER-1833.

Innovative does not deny the exodus away from hospital self-support but seeks to attribute this to Biosense's business practices. AB-22. The record tells a different story. As more manufacturers entered and cardiac-mapping systems became more complex, it became impracticable for hospitals to stay current and maintain proper training, giving way to an industry standard of manufacturer-supplied clinical support. 6-ER-777-778 ("more complicated and ... sophisticated" systems led to reliance on suppliers for their "expertise" and superior "training" ability).

10

It has been over a decade since anything more than a trivial percentage of hospitals engaged in self-support, but even in that earlier period hospitals were not "independent providers," much less "competitors." AB-2. As Biosense has explained, a customer's decision to "supply [its own] needs by self-help" cannot properly be "considered 'competition.'" *Laidlaw Acquisition Corp. v. Mayflower Grp., Inc.*, 636 F. Supp. 1513, 1519 (S.D. Ind. 1986); *see United States v. Blue Bell, Inc.*, 395 F. Supp. 538, 543 (M.D. Tenn. 1975) (self-supply was not reflective of "effective competition" and "not part of the market").

"[A]ccurately defin[ing] the relevant market" requires isolating "*the area of effective competition.*" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (emphasis added). Within the tying market Innovative sought to define, there never was "effective competition," so it does not comport with commercial realities to define an antitrust market. *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1064 (9th Cir. 2001) (the relevant market must capture the relevant "field of competition"); *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1085 (N.D. Cal. 2023) ("market definition" focuses on "where ... competition exists"); *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1201 (N.D.

11

Cal. 2008) ("declin[ing]" plaintiff's request to define "a non-existent market").

In *Zunum Aero, Inc. v. Boeing Co.*, the court held there could be no "market" because there was no *rivalry* among vendors "competing" to win business from "the same customers." 2022 WL 3346398, at *10-11 (W.D. Wash. Aug. 12, 2022). Here too, there never has been a time when Biosense vied with alternative vendors to supply "the same [hospital] customers" with CARTO-3 clinical support, which means that no "'relevant market' exists." *Id.*

One "critical question" in determining if a distinct "market" exists for a product or service is "whether it is economically efficient" to supply it "separately." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 615 (9th Cir. 1990). The record here shows that only mapping-system manufacturers can *efficiently* supply clinical support. This is true not only for Biosense but also Abbott, Medtronic, and Boston Scientific. Each provides clinical support for mapping

12

procedures using its own equipment,[2] but none has ever faced competition from independent providers.

The fact that other mapping-system manufacturers *also* face no competition for clinical support confirms Innovative's failure of proof. Innovative responds by suggesting that "Biosense's own actions" "unique[ly]" explain why no "*separate market* for CARTO clinical support" ever came into "existence." AB-49-50 (cleaned up; emphasis added). This appears to be an admission that *no* "separate market" for CARTO-3 clinical support in fact "exist[s]," confirming grounds for reversal. AB-49. Moreover, no reasonable jury could conclude that Biosense did something "unique" to exclude would-be independent competitors when it is undisputed that other mapping-system manufacturers never faced competition to supply clinical support for their mapping procedures.

---

[2] 4-ER-359 ("[t]he large manufacturing companies" "typically provid[e] the mapper[s]"); 6-ER-838 ("all ... cardiac mapping machine companies" provide "mapping support"); 6-ER-777 (all "machine manufacturer[s] ... send representatives to operate their [own] cardiac mapping machines").

**2.** The evidence at trial showed that manufacturer-supplied clinical support is not a *product*, but rather an integral feature of competition in the mapping-system foremarket.

Biosense views clinical support as a "cornerstone" of its mapping-system product offering and an important "value-add proposition" that promotes sales and usage of CARTO-3 machines.  10-ER-2036.  These commercial realities were repeatedly confirmed through evidence at trial.  7-ER-1133 (clinical support "provided ... by the manufacturer" is "part of the overall [mapping] system offering"); 10-ER-1795 (same); 4-ER-312 (same); 12-ER-2365 ("[c]linical account specialists" help "grow" usage of mapping equipment and thereby "grow procedure share").  Innovative's expert testified that clinical-support specialists function "as salespeople," 9-ER-1584, 1592, and Innovative says the same.  AB-14, 48.

Biosense pioneered the approach of providing free clinical support as a sales and marketing differentiator.  10-ER-2036.  Offering hospitals free clinical support quickly became a *universal* industry practice and central element of competition.  Mapping-system manufacturers must provide free clinical support to remain competitive.

14

FER-9 (reducing clinical support would "quickly" cause a "loss" of "share" to Abbott and heavy drop-off in "per [c]ase" revenues).

These facts permit but one conclusion:  Clinical support is *not* a standalone product; it is an integral and important feature of the broader competition among mapping-system manufacturers to promote sales and usage of their machines, which in turn drives catheter sales.

In *M.A.P. Oil Co., Inc. v. Texaco Inc.*, this Court concluded the "economic reality" was that "component services" involving the "distribution" of gasoline—services customers were *not* charged for— were not a "separate" product but "essentially marketing techniques designed to either initially obtain or subsequently retain a customer." 691 F.2d 1303, 1307 (9th Cir. 1982).  That holding fully applies here. Innovative's only commentary on the case (observing that hospitals "demand ... catheters separate from clinical support," AB-47) is a non sequitur.

Innovative references the First Circuit's *SMS Systems* decision but misunderstands what the case held.  According to Innovative, the decision "shows" that, when a service (like clinical support) is "universal[ly]" sold together with the primary equipment, this does "not

15

compel treating" them as "a single product." AB-47 (emphasis omitted). The case actually says the exact opposite, as does Innovative's cited authority. P. Areeda & H. Hovenkamp, *Antitrust Law* ¶¶ 1744a, 1744b (in "a competitive market," where "all sellers" follow the "universal" practice of selling two items together, this supports "finding a single product"); *see also Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 975 (9th Cir. 2008) ("If competitive firms always" furnish products in combination, "they are a single product.").

Many other cases similarly treat value-added services as being part and parcel of competition among rival sellers to promote purchases and use of their products. *See, e.g., FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 42, 47-48, 57 (D.D.C. 2018); *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 920 F. Supp. 1287, 1299 (S.D.N.Y. 1996).

Consistent with these analogous precedents, clinical support is properly regarded as an element of competition for sales and post-installation usage of cardiac-mapping machines, not a standalone product. While Innovative contends that Biosense "repackage[s]" its market definition contentions on appeal, AB-44, the burden of

16

"prov[ing] a relevant market" "is on [Innovative] alone," and it failed to prove its own tying-market contentions. *FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 815 (S.D. Tex. 2025) ("[d]efendants need neither specify nor seek to offer proof of an alternative relevant market").

**3.** Innovative telegraphs the insufficiency of its switching-cost evidence by urging that the Court impose "light" scrutiny, not require "extensive" proof, and preferably "not require[]" "[s]witching-cost evidence" at all. AB-51-52, 57. The scant record evidence Innovative points to is clearly insufficient to support a finding of *Kodak*-style "lock in," and nothing Innovative says validates the defective tying market it chose to build its case around.

**a.** This Court's prior decision explained that in *Kodak* the "lock-in" issue arose "*because* the switching costs" associated with buying new equipment "were high *relative to* the increase in [tied product] prices." *Innovative*, 2024 WL 62948, at *2-3 (cleaned up; emphasis added). This was not simply "one phrase" "[c]herry-pick[ed]" from "the Supreme Court's opinion." AB-53. The existence of this type of cost-disparity proof was central to *Kodak*'s holding, as Innovative's own authority

17

confirms. *See* Areeda ¶ 1735d3 n.30 (showing that "higher prices" for tied products do not "exceed[] the costs of switching" is "essential to establishing a *Kodak*-style lock-in claim"); *cf. Teradata Corp. v. SAP SE*, 124 F.4th 555, 574 (9th Cir. 2024) ("high switching costs" made "it more expensive to switch to an alternative" platform "than to adopt" the tied software).

Innovative concedes it does *not* have proof of the type of cost disparity central to *Kodak*'s "lock-in" analysis. Innovative's trial witnesses confirmed this. 6-ER-805 ("the total costs associated with the catheters ... exceed the costs of the capital equipment"); 6-ER-987 ("the amount that customers ... spend[] on [mapping] machines is" "low" compared to "the additional price" Biosense "charg[es] for catheters"). Even Innovative's counsel at trial argued that the total customer cost of catheters is inordinately *greater* than the cost of a mapping machine. 3-ER-250-251 ("more than 98 percent" of Biosense revenues come from catheter sales, versus "less than 2 percent for the machines"); 9-ER-1757.

**b.** Innovative's attempts to downplay this major proof deficiency fall flat. It argues "*Kodak* imposed no 'cost disparity' requirement."

18

AB-53. But this directly contradicts the authorities cited above, including this Court's prior decision. Innovative also argues that "Biosense did not preserve" the "cost disparity" argument. *Id.* To the contrary, Biosense's Rule 50 motions expressly called attention to the absence of any "significant" "cost[] ... barrier that would prevent hospitals from switching to a competitor," and highlighted that Innovative itself argued "catheter[] costs exceed machine costs by a factor of at least nine to one." 1-SER-39-40, 131.

Finally, Innovative again invokes "law of the case." AB-52. Yet the prior determination that "[a] rational trier of fact ... could conclude that [some] hospitals would face significant potential switching costs," *Innovative*, 2024 WL 62948, at *3, does not preclude an appellate challenge to Innovative's trial proof—particularly since this Court's prior decision assumed the evidence would show that "switching costs were high relative to the increase in [tied product] prices," *id.* at *2, which Innovative concedes it failed to prove at trial. *See Mortimer v. Baca*, 594 F.3d 714, 721 (9th Cir. 2010) ("law of the case" does not apply where evidence "adduced at a subsequent trial" was "substantially

19

different" from that contemplated in the prior decision) (citation omitted).[3]

    **c.** Innovative's other proof of monetary switching costs amounts to one witness saying the $250,000 "price tag" for a mapping machine is "huge," along with non-specific references to the "costs [of] retrain[ing] ... and transition[ing]" doctors "to a new brand of machine." AB-52, 54. Innovative's contention that purchasing a new mapping machine involves a "heavy initial outlay," AB-54 (citation omitted), contradicts the testimony of its own expert that the costs are "low" by comparison to "charg[es] for catheters," 6-ER-987, and is at odds with this Court's prior decision explaining it is the "*relative*" cost that matters. *Innovative*, 2024 WL 62948, at *2 (emphasis added). Innovative blithely dismisses "the ability to finance [system acquisition] costs," AB-54, yet in rejecting "lock-in" arguments courts have relied on the

---

[3] Innovative's argument that switching-cost evidence should "not [be] required" at all hinges on the unsupported claim that Biosense possesses "market power in the foremarket." AB-57. This contradicts even Innovative's own closing argument, which stressed the intense "competition between Biosense, Abbott ... and other [mapping-system] companies" and underscored the substantial degree of customer choice in this marketplace. 9-ER-1757 ("if you are buying a new system today, then, yes, you have a choice").

availability of "significant discounts" offered by "hardware manufacturers." *SMS Systems*, 188 F.3d at 22-23.

Innovative also ignores that "66 percent" of CARTO-3 hospitals have already procured another manufacturer's mapping system. 9-ER-1519-1520; FER-17. Hence, they have the ability, if they choose, to redirect mapping procedures to alternative systems even without needing to incur any "switching costs." And their proven ability to onboard other systems shows the costs of doing so are not prohibitive. *See SMS Systems*, 188 F.3d at 23 ("actual behavior" of customers "switching ... to other platforms" negated lock-in argument); *Com. Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 68 (S.D.N.Y. 2003) (same). Finally, Innovative's reference to unspecified and unquantified "costs to retrain doctors," AB-54, does nothing to remedy these proof deficiencies, and ignores this Court's admonition that plaintiffs are "required ... to produce evidence about the *magnitude* of switching costs." *Epic*, 67 F.4th at 979 (emphasis in original).

**d.** This leaves only Innovative's arguments about non-monetary switching costs. Innovative told the jury in opening statements that "physicians have strong opinions about which equipment they would

21

like to use" and "are *loyal* to that brand"; "rightly or wrongly," Innovative explained, "many physicians have a *preference* ... for Biosense's CARTO 3," and hospitals typically "buy what the doctors want to use." 3-ER-263 (emphasis added). Innovative's expert emphasized the same point. 9-ER-1587.

While Innovative's trial presentation liberally invoked "preference" for and "loyalty" to CARTO-3 as "switching costs," on appeal it distances itself from such terminology—apparently mindful of authorities that reject such arguments. *See* AOB-56-57 (citing cases). But an appellate court must focus its review on "the theory under which the case was tried." *Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 959 (9th Cir. 2000).

While Innovative eschews "preference" and "loyalty" phraseology on appeal, its reframed arguments invoke the same concepts. Thus, while Innovative argues that "hospitals switch[ing] systems" could cause "doctors [to] leav[e] for other hospitals" thereby "disrupting patient care," this argument remains rooted in the contention that doctors are "unwilling to switch," AB-55, from the systems they *prefer* and have grown *loyal* to. This theory is squarely at odds with

22

prevailing law.  *See Apple Inc.*, 586 F. Supp. 2d at 1198 ("[e]ven where brand loyalty is intense," this will not support defining "[s]ingle-brand markets"); *L.H. Equity Invs. LLC v. Wade*, 2010 WL 11505176, at *4 (S.D. Fla. Mar. 29, 2010) ("individual 'customer preference for a product'" does not create the kind of economic "'compulsion'" needed to support *Kodak* "lock-in" arguments) (citation omitted).

## II. INNOVATIVE FAILED TO PROVE THAT BIOSENSE HAS MARKET POWER IN THE ASSERTED TYING MARKET.

**A.**  Innovative contends that, "[b]y 2018, Biosense controlled about 95% of all CARTO clinical support," making out "a *prima facie* case of market power."  AB-59.  But "[i]f the market is incorrectly defined," "market shares ... have no meaning."  *FTC v. Lab'y Corp. of Am.*, 2011 WL 3100372, at *17 (C.D. Cal. Feb. 22, 2011).  Because Innovative's asserted tying market is unsustainable, "market share" evidence tethered to that defective market proves nothing.[4]

---

[4] Innovative's "barriers to entry" arguments, AB-59-60, fail for the same reason.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 82 (D.C. Cir. 2001) ("plaintiffs' failure" to prove a market was "dispositive" of related entry-barriers arguments); *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 981-82 (N.D. Cal. 1979) (same), *aff'd*, 698 F.2d 1377 (9th Cir. 1983).

**B.**  Innovative further contends that Biosense "thwart[ed]" and "excluded" "independent clinical-support providers," providing "direct evidence" of market power.  AB-58, 60.  Yet, as explained, there never were "independent providers"—not because they were "excluded," but because only the manufacturer can efficiently provide this service (explaining why there are no independent clinical-support providers for the competitors' mapping procedures either).

**C.**  Innovative argues that the "success" of Biosense's clinical-support policy is also "direct evidence" of market power.  AB-4.  Again, there is nothing inherently anticompetitive about adopting a "closed platform" in a marketplace with "open ... platform[]" options, which allows the seller to "differentiat[e] its products" and thereby "increases interbrand competition."  *Epic*, 67 F.4th at 987.

Biosense's adoption of this policy was a commercial gambit.  There was no assurance how customers would react, and "as a result of the policy" some "chose not to use CARTO 3," 10-ER-1775-1776, "switch[ing] to other cardiac mapping systems," 8-ER-1344.  These *choices* were made in a free market.  They were not economically compelled.

"Antitrust law assumes that competition best allocates resources by allowing firms to compete on 'all elements of a bargain—quality, service, safety, and durability.'" *Epic*, 67 F.4th at 987. The "success" of Biosense's policy was the outcome of customer choices made with such considerations in mind.[5] This is evidence of interbrand competition, not proof of market power. *See Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) ("success" of "a proven product" with a "strong reputation is ... the essence of competition").

To the extent the "uniqueness" of Biosense's CARTO-3 system contributed to the policy's success, AB-60, this also lends no support to a

---

[5] Innovative's claim that its reprocessed catheters "are safer than new Biosense catheters," AB-10, is based primarily on misleading data that the FDA itself states cannot be used "to compare adverse event occurrence rates across devices." 7-ER-1086-1087. In any event, as this Court has already observed, the hospitals that purchase these products are sophisticated consumers and clearly capable of making informed decisions across the same "elements of [the] bargain" *Epic* references, including safety.

finding of market power. In making the contrary argument, Innovative relies on outdated and discredited case law.[6]

**D.** Finally, Innovative contends that market power in the asserted "tying" market was proved by Biosense's claimed ability "to extract supracompetitive ... prices" in the "tied" markets for mapping catheters. AB-63. But as the Supreme Court held in *Illinois Tool Works*, "the plaintiff must prove ... market power *in the tying product*" and that "conclusion must be supported by proof of power *in the [tying] market*." 547 U.S. at 35, 42-43, 46 (emphasis added). By relying so heavily on out-of-market catheter pricing evidence, Innovative only underscores that it lacks the type of *in-market* proof the law requires. *See U.S. Steel Corp.*, 429 U.S. at 614, 618 (evidence of "noncompetitive price[s]" in a tied product market is "insufficient [to] support" a finding of "appreciable economic power" in the tying market); Areeda

---

[6] Innovative argues, based on *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495 (1969), that a product's "uniqueness" can contribute to market power, AB-60, but in a subsequent decision the Supreme Court held "[u]niqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves"—circumstances not present here. *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 621 (1977); *see* Areeda ¶ 1739a ("inferences" of market power tied to "uniqueness" became "obsolete" after "*Fortner II*").

26

¶¶ 1736c3, 1738f (modern courts "refuse[] to presume" "[market] power over the tying product" merely from "[an] above-market price for the tied product").

Legal errors aside, Innovative's market power arguments are refuted by the record. Innovative does not seriously contend with evidence showing that catheter prices "fell" after the policy was implemented. *See* AOB-67. Its assertion that Biosense "restrict[ed] SterilMed's output" (AB-66) is belied by evidence that SterilMed's sales (*e.g.*, for Pentaray catheters) increased by several multiples within just a few years, while Biosense's share declined commensurately. FER-18. And Innovative has no meaningful response to Biosense's "apples-to-oranges" argument. AB-64-65. Innovative attempts to paper over these deficiencies by arguing that "[t]he jury was entitled to credit the full picture," including assertions of "catheter-market harm," AB-66, but a verdict based on legally deficient proof cannot be sustained.

## III. THE SAME DEFICIENCIES THAT REQUIRE REVERSAL OF THE SECTION 1 VERDICT MANDATE REVERSAL OF THE SECTION 2 VERDICTS.

Innovative predicated its Section 2 monopolization claims largely on the same tying conduct underlying its Section 1 claim. Thus, the

27

failures of proof addressed above require reversal of the jury's verdicts on both Section 1 and Section 2 liability. This obvious proposition warranted no more than a footnote's discussion (AOB-58 n.1), but Innovative devotes four pages of briefing to making baseless arguments to the contrary.

The dominant focus of Innovative's trial evidence was the alleged tying conduct, as reflected by its expert's damages calculations. Dr. Forister calculated total damages of $147 million on the Section 2 claims, with $139 million attributable to alleged tying and only $8 million attributable to installation of EEPROM chips. Zero dollars were attributed to catheter collections because the collection evidence dealt with catheters not at issue in this case. 6-ER-999, 1035-1036; 7-ER-1044.

Because Innovative relied heavily on the alleged tying conduct to support both of its Sherman Act claims, the district court instructed the jury as follows: "If you find for Innovative on Innovative's tying claim under Section 1 of the Sherman Act, you may consider the facts relating to the clinical support policy under this claim as well. However, if you find for Biosense on Innovative's tying claim, you must not consider

28

facts relating to the clinical support policy under this claim." 1-SER-84 (monopolization); 1-SER-100 (attempted monopolization). That instruction makes plain why Innovative's failure to prove its tying claim invalidates the verdict on the Section 2 claims as well. The jury returned a general verdict, so it is impossible to know whether it would have found liability on the Section 2 claims had it been limited to considering only installation of EEPROM chips and catheter collections. The district court recognized as much when it denied Biosense's Rule 50(b) motion, noting that EEPROM chips and catheter collections on their own "may not 'independently' sustain a Section 2 violation." 1-ER-22.

Innovative's only response is to claim that the jury instruction quoted above was "incorrect." AB-82. But Innovative offers no support for that contention, which is contrary to settled law. This Court has long held that if "a court finds that the conduct in question is *not* anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *Qualcomm*, 969 F.3d at 991; *see also Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1191 n.3 (9th Cir. 1984).

## IV. INNOVATIVE'S FAILURE TO PROPERLY DISAGGREGATE THE EFFECTS OF LAWFUL COMPETITION INVALIDATES THE DAMAGES AWARD.

**A.** Starting from the erroneous premise that Biosense challenges "the sufficiency of Innovative's damages" proof, Innovative contends that Biosense forfeited its argument challenging the damages award by not raising the argument in its Rule 50 motions. AB-66-68. But as Biosense's opening brief makes clear, it does not raise a sufficiency challenge. It argues that Dr. Forister's damages model was "invalid as a matter of law," which in turn invalidates the jury's damages award. AOB-69. It is well settled that a Rule 50 motion "is not required to preserve ... purely legal issue[s]" for "appellate review." *Dupree v. Younger*, 598 U.S. 729, 736 (2023).

Biosense properly raised and preserved this purely legal issue by objecting to the admissibility of Dr. Forister's damages testimony in its pre-trial *Daubert* motion. Dkt. 318 at 12-17. Having received an adverse ruling on that objection before trial (1-ER-39), Biosense did not need to renew the argument in its Rule 50(b) motion, as it noted in the motion itself. 1-SER-27 n.1 (citing *Yammine v. Toolbox for HR Spolka*, 2025 WL 957825, at *1 (9th Cir. Mar. 31, 2025)). Indeed, under this

30

Court's precedent, Biosense *could not* have relitigated its objection to Dr. Forister's damages testimony through a post-trial challenge to the sufficiency of the evidence. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066-67 (9th Cir. 1996).

Biosense alerted Innovative to the legal defect in Dr. Forister's damages methodology through the *Daubert* motion. After obtaining a favorable ruling on this issue, Innovative made the strategic choice to proceed with its flawed methodology anyway. There is thus no sense in which Innovative was denied "the 'opportunity to cure' the claimed 'deficiency' in its proof." AB-67 (citation omitted). If Innovative thought it had a valid alternative damages model to present to the jury, it was free to do so at trial. It simply chose not to.

**B.** Innovative's next argument also starts from an erroneous premise. It asserts that "a 'yardstick' methodology" for calculating damages that incorporates "but-for world" comparisons is perfectly acceptable, AB-68-69, a proposition Biosense does not contest. Biosense's sole attack on Dr. Forister's damages methodology is that it failed to disaggregate the effects of lawful conduct and was therefore improperly overinclusive—a defect that can invalidate *any* form of

31

damages model. *See Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1349, 1352 (9th Cir. 1985) (expressing no concern with plaintiff's "but for" damages methodology but requiring a new damages trial because plaintiff's proof failed to "isolate" only damages "attributable to ... unlawful" conduct and to "segregat[e]" "damages attributable to lawful competition").

**C.** Innovative's efforts to defend Dr. Forister's damages methodology simply confirm the district court's error in allowing his overinclusive damages calculations to be presented to the jury.

Innovative cites *Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985), for the entirely correct proposition that damages may be calculated by "projecting the market share which the plaintiff would have attained *absent the anticompetitive activity*." AB-69 (emphasis added). The problem is that Dr. Forister's damages calculations assumed that *all* hospital purchases of the CARTO-3 system were the result of anticompetitive conduct. That assumption is incorrect as a matter of law. Hospitals that purchased a CARTO-3 after learning of the clinical-support policy made an informed *choice* to accept Biosense's closed-platform offering over rival mapping

32

systems, knowing that doing so would constrain their ability to purchase from third parties in the catheter aftermarket. As this Court previously held, such "knowing[] and voluntar[y]" purchase decisions by "[s]ophisticated [hospital] customers ... do[] not offend the antitrust laws," *Innovative*, 2024 WL 62948, at \*2 (quoting *Newcal*, 513 F.3d at 1048), because tying-related "antitrust concerns" depend on proof that a customer has been "force[d], exploit[ed], or coerce[d] ... to purchase a tied product," *Rick-Mik Enterprises*, 532 F.3d at 972. By including within its damages calculations these types of "knowing[] and voluntar[y]" purchases, Innovative failed to "isolate" "the amount of damages attributable *only* to the [claimed] unlawful conduct" and thereby invalidated its damages proof as a whole. *Farley*, 786 F.2d at 1352 (emphasis added).

The district court itself called attention to the defect in Dr. Forister's damages model by observing that it "includes customers who are not locked in—those who purchased the CARTO 3 after the tying policy took effect in April 2016—and have knowledge of the policy." 1-ER-39. As explained in Biosense's opening brief, the district court erred as a matter of law when it ruled that, notwithstanding the

33

inclusion of damages amounts linked to such knowing, well-informed purchases, Dr. Forister's overinclusive damages estimates could be presented to the jury. AOB-69-77.

**D.** Innovative's primary response is that Biosense's argument purportedly "collapses the market power and damages analysis." AB-71 (quoting 1-ER-39). But it is Innovative's position that collapses the two. In Innovative's view, because the market-power analysis "turn[s] on the nature of competition *market-wide*," once it proved market power "the jury could find that the Policy was unlawful and harmed *every* hospital by reducing competition and increasing prices market-wide." AB-71, 72 (second emphasis added). Innovative never explains how a hospital that voluntarily purchased a CARTO-3 after learning of Biosense's clinical-support policy could have been "harmed" by the policy in any way relevant to antitrust liability. Innovative simply assumes, without supporting authority, that it is entitled to recover damages for lost sales on a "market-wide" basis, even if some portion of those lost sales is attributable to knowing and voluntary purchase decisions, *i.e.*, lawful competition. The law unequivocally prohibits that result.

34

Innovative next contends that the disaggregation principle applies only when "damages were sought on *dismissed claims*." AB-73. As *Avaya Inc. v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016), makes clear, this too is wrong. There, the court held that "no antitrust liability for a *Kodak*-style attempted monopolization claim could lie after May 2008," when customers learned of Avaya's new policy. *Id.* at 405. But the court held that PBX systems sold before that date *could* support liability on the very same claim, *id.* at 406-07, and accordingly reversed the judgment "on the PBX attempted monopolization claim as to the post-2008 time period" only. *Id.* at 414. Innovative is thus wrong in asserting that *Avaya* did not adopt a rule requiring the plaintiff to "perform a customer-specific lock-in analysis to estimate damages." AB-71. Performing that analysis in *Avaya* was easy because all customers became aware of the defendant's policy as of the same date, whereas here customers acquired such knowledge at different points in time. That factual difference, however, has no bearing on the applicability of the governing legal principle.

**E.** Finally, Innovative argues that the trial record does not support the factual predicate for Biosense's damages argument. To that

end, Innovative asserts that "[n]ot one hospital witness testified that their hospital system sought or embraced the Policy." AB-75. But that is not the question. The question is whether hospitals made a voluntary decision to purchase CARTO-3s over rival systems after learning of Biosense's clinical-support policy. *Newcal*, 513 F.3d at 1050. The undisputed trial evidence shows, at a minimum, that some hospitals did just that, even though different hospitals and hospital groups acquired knowledge of the policy at different points in time.

Biosense offered several illustrative examples in its opening brief in which hospital groups learned of Biosense's clinical-support policy and *thereafter* purchased additional CARTO-3s with full knowledge of the policy. AOB-74-75.[7] Innovative cannot (and makes no attempt to) contest the undisputed evidence establishing those factual predicates. Its mere assertion that such customers were somehow "captiv[e]" to Biosense, AB-77, lacks any factual support and, again, is directly at odds with this Court's prior conclusion that hospitals deciding to

---

[7] There are plenty of other examples. *See, e.g.*, 5-ER-744, 10-ER-1870, and FER-16 (JX-522) at rows 422, 429-32, 717 (Providence St. Joseph); 4-ER-490-492 and FER-16 (JX-522) at row 671 (MarinHealth); 7-ER-1116, 1147-1148 and FER-16 (JX-522) at row 338 (Grandview Alabama).

36

purchase CARTO-3 systems after becoming "aware of the policy" made a "knowing[] and voluntar[y]" choice. *Innovative*, 2024 WL 62948, at *2.

The evidence also contradicts Innovative's "captivity, not consent," narrative. AB-77. Take Ascension, a large hospital system comprising dozens of hospitals. As Innovative notes, Biosense began enforcing the policy with Ascension shortly after the parties entered into a new contract covering the years 2014-2017. But after that contract expired, Ascension hospitals purchased additional CARTO-3s in April 2019 (St. Mary's), August 2019 (St. Vincent's), December 2019 (Sacred Heart), and December 2020 (St. Thomas). 11-ER-2148; FER-16 (JX-522) at rows 498, 544, 574, 699. If Ascension wanted to use third-party reprocessed catheters in that later timeframe, it was free to choose one of the rival systems offering that option. The fact that Ascension instead chose to purchase additional CARTO-3s hardly shows "captivity."

The same is true with Allegheny. Innovative misleadingly quotes Portia Tranguch's testimony to suggest that "Allegheny couldn't switch because its physicians 'very rarely use' the other machines Allegheny owns—and buying brands doctors will not use would 'not [be]

financially responsible.'" AB-77 (alteration in original). What Ms. Tranguch actually said is that although Allegheny currently has multiple rival systems, "[o]ur physicians would *prefer* to use the CARTO system" because "it's a good system" and is "the *best thing* for our patients." 10-ER-1891-1892 (emphasis added). When asked whether Allegheny had tried switching to rival systems, she said no and explained why: "So when you have a system and the physicians are happy with the system, we're not going to change a system just to be able to use a reprocessed item. We're going to do what's best for the patient and what our physicians are comfortable with. In this case, it was CARTO. So looking at purchasing a brand new system to be able to use a reprocessed catheter is not financially responsible." 10-ER-1887-1888.

As this testimony shows, Allegheny in fact *could* have purchased a rival system if it had wanted to use reprocessed catheters. It *chose* not to do so because it valued "what's best for the patient" and physician preferences over whatever cost savings could be achieved by using reprocessed catheters.

38

*   *   *

Dr. Forister's flawed damages testimony indisputably formed the basis for the jury's damages award and rendered that award legally invalid. The district court's error in permitting this testimony "was both erroneous and prejudicial." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1055 (9th Cir. 2024). At a minimum, remand on the issue of damages is required.

## CONCLUSION

For the reasons stated, the judgment should be reversed.

Respectfully submitted,

/s/ Paul J. Watford

M. Sean Royall
Connor R. Brewer
Jacob G. Mathew
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600
sroyall@kslaw.com
cbrewer@kslaw.com
jmathew@kslaw.com

William F. Cavanaugh, Jr.
Isaac J. Weingram
PATTERSON BELKNAP
  WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
wfcavanaugh@pbwt.com
iweingram@pbwt.com

Paul J. Watford
KING & SPALDING LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
(213) 443-4355
pwatford@kslaw.com

Ross E. Elfand
Casey M. Berger
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
(212) 556-2100
relfand@kslaw.com
cberger@kslaw.com

*Counsel for Appellant*

June 10, 2026

40

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**   25-6042

I am the attorney or self-represented party.

**This brief contains**   6,994   **words,** including   0   words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  */s/ Paul J. Watford*          **Date**  June 10, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                    *Rev. 12/01/22*

41